## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| SCOTT DAVIS, NIALL ADAMS, MYA BATTON, THEODORE BISBICOS, AARON BOLTON, JASON BOOMSMA, THOMAS BRAUN, SABRINA CLARK, RYAN EISNER, STEVEN EWALD, JOHN GARRETT, BRENNON GROVES, DARIN HENDRY, ANNA JAMES, DO YEON IRENE KIM, JAMES LUTZ, JORDAN KULLMANN, JAMES MULLIS, DANIEL PARSONS, JOSHUA PUTT, JOHN SANNAR, ROBERT SAYLES, BEN SHADLE, BRENT STRINE, CHRISTINE VAN WOERKON, and SHERRIE WOHL, individually and on behalf of all others similarly situated, | Civil Action No: 2:24-cv-2374-WB<br><br>**ORAL ARGUMENT REQUESTED** |
|                Plaintiffs,<br>v.<br><br>HANNA HOLDINGS, INC.,<br><br>               Defendant. |  |

## BRIEF IN SUPPORT OF APPLYING THE RULE OF REASON IN RESOLVING HANNA HOLDINGS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT WITH PREJUDICE

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................1

BACKGROUND .....................................................................................................................2

    A.    Brokers Use Multiple Listing Services To Help Clients Sell
And Buy Homes.............................................................................................2

    B.    NAR Has Adopted Policies Governing Multiple Listing Services........................3

    C.    Plaintiffs Bring This Lawsuit......................................................................4

ARGUMENT ...........................................................................................................................5

I.     The Type Of Agreement Alleged Is Generally Subject To Rule-Of-Reason
Analysis..............................................................................................................6

II.    The NAR Guidelines Do Not Have Obviously Anticompetitive Effects ...........8

III.   The NAR Guidelines Have Facially Plausible Procompetitive Benefits...........11

CONCLUSION.......................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Broadcast Music, Inc. v. Columbia Broadcasting Systems, Inc.*,
441 U.S. 1 (1979)...........................................................................................................12, 14

*Buck v. Hampton Township School District*,
452 F.3d 256 (3d Cir. 2006)...............................................................................................2

*CSR Ltd. v. Federal Insurance Co.*,
40 F. Supp. 2d 559 (D.N.J. 1998) ......................................................................................6

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
610 F.3d 820 (3d Cir. 2010)...........................................................................................8, 15

*FTC v. Indiana Federation of Dentists*,
476 U.S. 447 (1986)..........................................................................................................11

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litigation*,
622 F. Supp. 3d 22 (E.D. Pa. 2022) ....................................................................................5

*In re Sulfuric Acid Antitrust Litigation*,
703 F.3d 1004 (7th Cir. 2012) ..........................................................................................12

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007).............................................................................................1, 2, 5, 7, 11

*Mayor & City Council of Baltimore v. Merck Sharp & Dohme Corp.*,
2023 WL 8018980 (E.D. Pa. Nov. 20, 2023) .....................................................................5

*Moratis v. West Penn Multi-List, Inc.*,
2024 WL 4436425 (W.D. Pa. Oct. 7, 2024) .......................................................................9

*Murphy v. Alpha Realty, Inc.*,
1978 WL 1451 (N.D. Ill. Dec. 7, 1978)............................................................................15

*NCAA v. Alston*,
594 U.S. 69 (2021)...............................................................................................................6

*O'Riordan v. Long Island Board of Realtors, Inc.*,
707 F. Supp. 111 (E.D.N.Y. 1988) ..............................................................................12, 13

*Realcomp II, Ltd. v. FTC*,
635 F.3d 815 (6th Cir. 2011) ............................................................................................13

*Reifert v. South Central Wisconsin MLS Corp.*,
450 F.3d 312 (7th Cir. 2006) ............................................................................................12

*Robertson v. Sea Pines Real Estate Cos.*,
    679 F.3d 278 (4th Cir. 2012) ........................................................13

*Rosebrough Monument Co. v. Memorial Park Cemetery Ass'n*,
    666 F.2d 1130 (8th Cir. 1981) ........................................................7

*Supermarket of Homes, Inc. v. San Fernando Valley Board of Realtors*,
    1983 WL 2199 (C.D. Cal. Sept. 1, 1983),
    *aff'd*, 786 F.2d 1400 (9th Cir. 1986) ........................................................15

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) ........................................................5, 7

*Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*,
    530 F.3d 204 (3d Cir. 2008) ........................................................7

*United States v. Brown University*,
    5 F.3d 658 (3d Cir. 1993) ........................................................6, 8, 12

*United States v. Gillen*,
    599 F.2d 541 (3d Cir. 1979) ........................................................9

*United States v. National Association of Realtors*,
    2006 WL 3434263 (N.D. Ill. Nov. 27, 2006) ........................................................12

*United States v. Realty Multi-List, Inc.*,
    629 F.2d 1351 (5th Cir. 1980) ........................................................12, 13

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) ........................................................9

*Venture Resources Group, Inc. v. Greater N.J. Regional Multiple Listing Service, Inc.*,
    1995 WL 866841 (D.N.J. Aug. 24, 1995) ........................................................12, 13

*Winn-Dixie Stores, Inc. v. Eastern Mushroom Marketing Cooperative, Inc.*,
    89 F.4th 430 (3d Cir. 2023) ........................................................5, 6, 7, 12

## STATUTES AND REGULATIONS

D.C. Code § 42-1703(f) ........................................................14

Del. Code tit. 24, § 2930 ........................................................14

Ill. Comp. Stat. 454/10-5 ........................................................14

Md. Code, Bus. Occ. & Prof. § 17-534 ........................................................14

Minn. Stat. § 82.70 ........................................................14

N.J. Admin. Code § 11:5-6.2 ...........................................................................................................14

## OTHER AUTHORITIES

Brobeck & Woodall, *How the Real Estate Cartel Harms Consumers and How
  Consumers Can Protect Themselves*, Consumer Fed. of Am. (June 2006) .........................2

## INTRODUCTION

Plaintiffs' Amended Complaint—like the original Complaint, which it follows nearly verbatim apart from the addition of new plaintiffs—alleges that Hanna Holdings somehow entered into a grand, nationwide conspiracy by unilaterally following the guidelines of a trade association, the National Association of Realtors (NAR).  These guidelines on their face help ensure a healthy and secure real estate market, as collaboration between home sellers and would-be buyers is necessary to facilitate an efficient marketplace.

Notwithstanding the price-fixing label plaintiffs wish to apply to their theory, these allegations do not justify eschewing the careful scrutiny courts apply in the vast majority of antitrust cases—known as the rule of reason—by condemning the challenged conduct as *per se* unlawful, especially at the pleading stage.  *Per se* illegality is a rare exception to the general practice of applying the rule of reason and is reserved for restraints that are "manifestly anticompetitive" and "lack … any redeeming virtue."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).  For three reasons, this Court should apply the rule of reason in assessing whether Plaintiffs have plausibly pleaded a violation of Section 1 of the Sherman Act or state antitrust laws.

*First*, the type of agreements Plaintiffs actually allege—vertical agreements between a trade association and its members to adopt and follow the association's rules—are evaluated under the rule of reason.  That is true even of vertical price-fixing agreements, which the Supreme Court has recognized can and often do have procompetitive benefits.  *See Leegin*, 551 U.S. at 889.  The rule of reason should still apply even if the Court were to find that Plaintiffs plausibly alleged a horizontal agreement between Hanna Holdings and its purported coconspirators.  Courts have held that *per se* treatment is not appropriate when assessing mutual

agreements to adopt trade association rules because of those agreements' procompetitive benefits.

*Second*, Plaintiffs have not plausibly alleged that the challenged NAR guidelines are so obviously anticompetitive that the Court can automatically condemn them as *per se* unlawful instead of "weigh[ing] all of the circumstances of [the] case." *Leegin*, 551 U.S. at 885 (citation omitted). Although the Amended Complaint makes passing references to price-fixing, Plaintiffs do not actually allege either explicitly or effectively that the challenged guidelines constitute an agreement to fix prices. Instead, they allege that the guidelines "enable" individual brokers to set a "standard" commission.

*Third*, rule-of-reason analysis is required because the challenged guidelines have facially plausible procompetitive benefits. Numerous courts have held that multiple listing services and the rules that govern them have procompetitive benefits. These guidelines are no different. The provisions that Plaintiffs challenge increase transparency and facilitate an efficient marketplace by lowering the transaction costs for buyers to make an offer on a home.

## BACKGROUND

### A.    Brokers Use Multiple Listing Services To Help Clients Sell And Buy Homes

Real estate brokers provide "a useful consumer service … that is very convenient for home buyers and sellers."[1] Although prospective buyers can find homes of interest themselves using "websites, such as Zillow," Am. Compl. ¶ 61, they still choose to use brokers: In 2020,

---

[1] Brobeck & Woodall, *How the Real Estate Cartel Harms Consumers and How Consumers Can Protect Themselves*, at 1, Consumer Fed. of Am. (June 2006), https://consumerfed.org/pdfs/ Real_Estate_Cartel_Study061906.pdf (cited at Am. Compl. ¶ 141). The Court can consider this transcript and other materials cited in the Amended Complaint and thus "incorporated by reference." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

"89% of sellers sold their home with assistance from a seller-broker, and 88% of buyers purchased their home with assistance from a buyer-agent," *id.* ¶ 57.

Brokers typically use Multiple Listing Services (MLSs)—"database[s] of properties listed for sale in … specified geographic areas"—to list homes for sellers and to find homes for buyers. Am. Compl. ¶ 60.  There are hundreds of MLSs, and none is national.  *Id.* ¶ 63.  MLSs typically are owned and operated by local or regional associations of brokers.  *Id.*  MLSs provide "the most up-to-date, accurate, and comprehensive compilation of [an] area's home listings."  Am. Compl. ¶ 122.

### B.    NAR Has Adopted Policies Governing Multiple Listing Services

Since 1996, NAR, a trade association for the real estate industry, has published a Handbook on Multiple Listing Policy.[2]  The Handbook includes a policy stating that brokers listing homes on MLSs "specify on each listing filed with the service[] the compensation being offered to other MLS participants" (i.e., the broker representing a prospective buyer).  Am. Compl. ¶ 81.  As the Handbook explains, "[s]pecifying the compensation on each listing is necessary, because the cooperating broker has the right to know what his compensation shall be prior to his endeavor to sell."  Gringer Decl. Ex. A at 69-70.  This policy—Policy Statement 7.23—provides that the compensation offered be shown as "a percentage of the gross selling price" or "a definite dollar amount" but does not require the compensation to be any particular percentage or dollar amount.  *Id.* at 70 n.*.  The policy states that the buyer-broker's compensation is not paid for by the buyer.  Instead, it "is established by the listing broker and is not fixed, controlled, recommended, or maintained by any person other than the listing broker."  *Id.* at 21.  It also provides that "[e]ntitlement to compensation is determined by the cooperating

---

[2] Gringer Decl. Ex. A (NAR, *2023 Handbook: Multiple Listing Policy*).  The Handbook is cited at Am. Compl. ¶¶ 64, 76, 78, 81-82, 102, 108, 116, 118-119, 121, 123, 125, 127-128, 130-131.

broker's performance as a procuring cause of the sale." *Id.* at 3.  And the Handbook expressly

prohibits "fix[ing], control[ling], recommend[ing], or suggest[ing]" the "commissions or fees

charged for real estate brokerage services" or the "cooperative compensation offered by listing

brokers to potential cooperating brokers." *Id.* at 7.

NAR also maintains a Code of Ethics, which requires members to "pledge themselves to

protect and promote the interests of their client." *See* Gringer Decl. Ex. B (NAR, *Code of Ethics

and Standards of Practice*) at Art. 1.[3]  Indeed, "[t]his obligation to the client is primary." *Id.*

Although MLSs are premised on cooperation between brokers to best serve clients, members are

not to do so "when cooperation is not in the client's best interest." *Id.* Art. 3.  Further, the Code

of Ethics states that "[t]he obligation to cooperate does not include the obligation to share

commissions, fees, or to otherwise compensate another broker." *Id.*

### C.    Plaintiffs Bring This Lawsuit

Plaintiffs are 26 home buyers who bought homes listed on MLSs across the country using

buyer-brokers.  In a copycat complaint of others filed in different jurisdictions by their same

counsel, Plaintiffs allege that Hanna Holdings participated in a conspiracy since at least 1996 to

have home buyers pay "inflated buyer agent commissions and inflated total commissions," even

though buyers pay no commissions whatsoever.  Am. Compl. ¶¶ 14, 132, 169.  Plaintiffs

challenge primarily the NAR guideline that MLS listings make blanket unilateral offers of

compensation to be paid to the buyer-agent by the seller-agent upon sale.  *See* Am. Compl.

¶¶ 81-84.

---

[3] The Code of Ethics is cited at Am. Compl. ¶¶ 69, 76, 77, 118-120, 125, 127-128, 130.

**ARGUMENT**

Courts use different standards for determining whether an alleged agreement violates the Sherman Act, depending on the nature of the arrangement: the rule of reason, the *per se* rule, and (rarely) quick-look analysis.  *See Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*, 89 F.4th 430, 435 (3d Cir. 2023).  These standards apply to courts' evaluation of both federal and state antitrust claims, since "state antitrust laws are generally interpreted 'in parallel, if not identically' to the federal antitrust law."  *Mayor & City Council of Baltimore v. Merck Sharp & Dohme Corp.*, 2023 WL 8018980, at *11 (E.D. Pa. Nov. 20, 2023) (citation omitted); *see also In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litigation*, 622 F. Supp. 3d 22, 65 (E.D. Pa. 2022) (applying rule of reason to all claims where plaintiffs alleged violations of both the Sherman Act and various state antitrust laws).

Courts "presumptively appl[y] rule of reason analysis."  *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).  "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition"—including inquiring into market power and market structure to assess the restraint's actual effect.  *Leegin*, 551 U.S. at 885 (citation omitted).

By contrast, *per se* treatment is reserved for only those rare agreements that are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality."  *Texaco*, 547 U.S. at 5.  Indeed, to evaluate an agreement under the *per se* standard is a rare exception for which "a restraint must have manifestly anticompetitive effects" and "lack … any redeeming virtue."  *Leegin*, 551 U.S. at 886 (citation omitted).  Similarly, quick-look analysis is appropriate only (if ever) where an arrangement is "at least so likely to be unlawful that just a 'quick look' is enough to recognize that anticompetitive effects may be presumed."

*Winn-Dixie*, 89 F.4th at 435.  Accordingly, courts "take special care not to deploy" *per se* liability—or even "quick look" analysis—unless they "have amassed 'considerable experience with the type of restraint at issue' and 'can predict with confidence that it would be invalidated in all or almost all instances.'"  *NCAA v. Alston*, 594 U.S. 69, 89 (2021).

Plaintiffs' allegations fall far short of meeting the high bars for a *per se* or quick-look analysis.  At the outset, agreements between a trade organization and its members—like the one alleged here—are typically evaluated under the rule of reason.  Regardless, Plaintiffs have not plausibly alleged that the challenged NAR guidelines are so obviously anticompetitive that the Court can evaluate them under the *per se* approach.  To the contrary, the guidelines have facially plausible procompetitive benefits.  Thus, in determining whether Plaintiffs have adequately pleaded a violation of federal or state antitrust laws on Hanna Holdings' separate motion to dismiss, this Court should conduct a rule of reason analysis.[4]

## I.    The Type Of Agreement Alleged Is Generally Subject To Rule-Of-Reason Analysis

As a general matter, the category of agreement that Plaintiffs allege here—vertical agreements of a trade association—is not subject to *per se* treatment.  As explained in a separate brief, at bottom, all Plaintiffs allege is that Hanna Holdings and its purported coconspirators each entered into a vertical agreement (that is, an agreement between entities at different levels, rather than between competitors) with NAR to follow NAR guidelines.  But as the Third Circuit has

---

[4] The Court can and should apply the rule of reason on Hanna Holdings' motion to dismiss.  At minimum, however, the Court must defer the decision of whether the rule of reason or *per se* rule applies until after Hanna Holdings has had an opportunity to demonstrate that the NAR guidelines have procompetitive benefits.  *See CSR Ltd. v. Fed. Ins. Co.*, 40 F. Supp. 2d 559, 564-565 (D.N.J. 1998) ("At this early stage of the proceeding, the court does not find it necessary to determine which mode of analysis it will ultimately employ in evaluating the defendants' activities."); *see also United States v. Brown University*, 5 F.3d 658, 669 (3d Cir. 1993) ("If the defendant offers sound procompetitive justifications, ... the court must proceed to weigh the overall reasonableness of the restraint using a full-scale rule of reason analysis.").

explained, "the legality of a vertical agreement … is governed by the rule of reason." *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 225 (3d Cir. 2008) (citing *Leegin*, 551 U.S. at 907). That is true even when the alleged vertical agreement is labeled "price-fixing." *See Leegin*, 551 U.S. at 884-885. And "[t]he rule of reason analysis applies even when, as in this case, the plaintiff alleges that the purpose of the vertical agreement … is to support illegal horizontal agreements between multiple" brokerages. *Toledo*, 530 F.3d at 225. There is no reason to depart from that general rule for the vertical restraints that Plaintiffs allege, namely, agreements by members of a trade association to adhere to the association's rules.

Even if Plaintiffs plausibly alleged a horizontal agreement between Hanna Holdings and its purported (but largely unspecified) coconspirators, many of whom do not even compete with Hanna Holdings, courts have held that *per se* treatment is not appropriate where, as here, a plaintiff challenges "restrictions imposed by a legitimate business collaboration, such as a business association or joint venture, on nonventure activities." *Texaco*, 547 U.S. at 7. Indeed, "[i]n analyzing whether a trade association agreement restrains competition in the profession, federal courts have most frequently applied the 'rule of reason.'" *Roseborough Monument Co. v. Memorial Park Cemetery Ass'n*, 666 F.2d 1130, 1137 (8th Cir. 1981). For example, the Third Circuit recently applied the rule of reason to allegations of price-fixing by a trade association and its members, reasoning that even "hybrid scheme[s]" are subject to the rule of reason because "the interplay between the[ir] vertical and horizontal components … muddies the theoretical economic conclusions that a court might draw, in turn negating [the court's] ability to label [the scheme] as 'obviously anticompetitive.'" *Winn-Dixie Stores*, 89 F.4th at 441.

Other Third Circuit cases have similarly held that alleged horizontal restraints were not *per se* illegal and had to be evaluated under the rule of reason. For instance, in *Deutscher Tennis*

*Bund v. ATP Tour, Inc.*, the plaintiffs "allege[d] an output-limiting horizontal restraint," but the court held that "[n]evertheless, the per se rule does not apply because for a tennis tour, like other sports leagues, 'horizontal restraints on competition are essential if the product is to be available at all.'"  610 F.3d 820, 830-831 (3d Cir. 2010).  Likewise, in *United States v. Brown University*, the plaintiffs argued that alleged agreements between horizontal competitors constituted "per se illegal price-fixing," but the Third Circuit held that the alleged arrangement "must be judged under the rule of reason."  5 F.3d at 672.  In so holding, the court explained that "the test for determining what constitutes per se unlawful price-fixing is one of substance, not semantics" and emphasized that the Supreme Court has been "avowedly reluctant to condemn rules adopted by professional associations as unreasonable *per se*."  *Id.* at 670-671 (citation omitted).  That is especially true where "professional associations adopt a restraint which they claim is motivated" by "ethical norms" because, in such circumstances, "economic harm to consumers may be viewed as less predictable and certain," *id.* at 672—even where "the absence of a revenue maximizing purpose is neither corroborated nor obvious," *id.* at 672 n.9.

## II.    The NAR Guidelines Do Not Have Obviously Anticompetitive Effects

The rule of reason also should apply because Plaintiffs have not plausibly alleged that the challenged NAR guidelines so obviously have anticompetitive effects that the Court need not examine their real-world effects.  The primary anticompetitive effects that Plaintiffs allege are supposedly inflated commissions.  Am. Compl. ¶ 132.  Setting aside that as buyers, Plaintiffs did not pay *any* commissions inflated or otherwise, *per se* treatment requires at least that the alleged conspiracy was "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing" prices.  *United States v. Gillen*, 599 F.2d 541, 545 (3d Cir. 1979) (citing

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940)).  The Amended Complaint fails to satisfy this standard.

Plaintiffs do not allege an explicit price-fixing agreement, nor could they.  The Handbook does not specify a required compensation rate; it is entirely within the discretion of individual brokers to decide how much compensation to offer buyer-brokers.  Gringer Decl. Ex. A at 21.  The guideline requires only that MLS listings "include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount."  Am. Compl. ¶ 82 (emphasis omitted).  There is no reason to believe, and more importantly no facts alleged, that this guideline fixes prices at any level.

Plaintiffs instead contend that the alleged conspiracy "facilitat[es] the steering of home buyers by their brokers towards higher-commission homes and away from lower-commission homes."  Am. Compl. ¶ 12.  That is not price-fixing, even accepting these implausible and conclusory allegations as true.  In fact, these are not even allegations of an unlawful agreement at all.  As another district court recently held in a similar case with materially identical allegations about steering, "Plaintiffs' allegations regarding steering fail to establish the agreement required to state a claim under the Sherman Antitrust Act" because "Plaintiffs allege, at most, that steering is a practice enabled by the buyer broker rule" and "do not allege any facts that steering is actually driven by an agreement between Defendant[]" and purported co-conspirators.  *Moratis v. W. Penn Multi-List, Inc.*, 2024 WL 4436425, at *3 (W.D. Pa. Oct. 7, 2024) (dismissing complaint with prejudice).  There, as here, plaintiffs alleged that the challenged rule "encourage[d] and facilitate[s] steering" and "result[ed] in steering" but did not actually allege "an illegal agreement to encourage 'steering.'"  *Id.* at *4.

Nor does any other NAR guideline that Plaintiffs raise plausibly have the effect of fixing buyer-broker commission rates. Plaintiffs advance the theory that Standard Practices 16-16 and 3-2 of NAR's Code of Ethics and related "Case Interpretations" restrain negotiation of buyer-broker commissions. Am. Compl. ¶¶ 110, 111. This too is not price-fixing and even if it were, Plaintiffs' theory is contradicted by the guidelines themselves. The Code of Ethics expressly provides that "the obligation to cooperate does not include the obligation to share commissions, fees, or to otherwise compensate another broker." Gringer Decl. Ex. B at Art. 3.

Standard Practices 16-16 and 3-2 also do not plausibly restrain negotiation because they merely prohibit the buyer-broker from "present[ing] an offer to a seller that is *conditional* on the seller reducing the buyer-broker commission," Am. Compl. ¶ 110 (emphasis added), and prohibit the seller-broker from responding to a purchase offer with a counteroffer that is conditional on modifying the buyer-broker commission, *id.* ¶ 112. In other words, brokers must present their clients' offers and counteroffers to purchase or sell a home without making that offer dependent on the commission the buyer-broker is to receive. That is very far from price-fixing or even placing any limit on the ability to negotiate. Indeed, the Handbook explicitly provides that listing brokers can "offer[] any MLS participant compensation other than the compensation indicated on any listing published by the MLS" and that the Handbook is "not intended to prohibit ethical, albeit aggressive or innovative business practices, and do[es] not prohibit disagreements with other MLS participants involving commission, fees, compensation, or other forms of payment or expenses." Gringer Decl. Ex. A at 39, 85. In other words, negotiations are absolutely allowed and unrestrained. This provision simply prevents the discussion about commissions from interfering with the underlying transaction for the home itself—further undermining plaintiffs' theory.

In any event, Plaintiffs' argument that certain guidelines restrain negotiations would only matter in those local and regional MLSs that had adopted the guidelines, and Plaintiffs do not actually allege that they bought homes listed on MLSs that have done so. At most, the Amended Complaint alleges that two MLSs on which none of Plaintiffs' homes were listed, and of which Hanna Holdings is not a member, have adopted their own purportedly similar guidelines. *Id.* ¶ 113.

Plaintiffs also fail to plausibly allege a related anticompetitive effect: that "total commissions are incorporated into the home purchase price … thereby causing buyers to pay higher prices for homes." Am. Compl. ¶ 132. Even if Plaintiffs had plausibly alleged such an effect, it is not so "manifestly" anticompetitive as to justify *per se* treatment. *See Leegin*, 551 U.S. at 886. But, in fact, Plaintiffs fail to plausibly allege why folding broker commissions into the sale price would have the net effect of increasing buyers' total expenses related to the purchase. It is far from obvious that having the buyer pay a commission to a broker directly would reduce the purchase price by more than the amount of the commission itself, which would need to be the case for the buyer's total expenses to decrease.

Because the challenged guidelines do not have "manifestly" anticompetitive effects, Plaintiffs fail to state a plausible *per se* claim (or to justify quick look analysis), and so the rule of reason applies.

## III.    The NAR Guidelines Have Facially Plausible Procompetitive Benefits

Rule-of-reason analysis is also required because the challenged guidelines, on their face, have procompetitive benefits. *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (rule-of-reason analysis required unless there is "[n]o credible argument" the conduct "has any … procompetitive effect"). Even price-fixing—which Plaintiffs do not squarely or plausibly

11

allege—is analyzed under the rule of reason, rather than being *per se* illegal, if it has compelling procompetitive justifications. *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.* ("*BMI*"), 441 U.S. 1, 9 (1979); *see also United States v. Brown Univ.*, 5 F.3d at 669 (holding that price-fixing allegations are subject to "a full-scale rule of reason analysis" if the "defendant offers sound procompetitive justifications"); *Winn-Dixie*, 89 F.4th at 435 (applying rule of reason to price-fixing claim); *In re Sulfuric Acid Antitrust Litigation*, 703 F.3d 1004, 1010-1011 (7th Cir. 2012) (similar). And again, this is not even price-fixing. Given the guidelines' commonsense procompetitive benefits, the rule of reason applies.

Courts have recognized that, as a general matter, MLSs and the guidelines that govern them can have procompetitive benefits, which preclude *per se* treatment. As courts have explained, "a multiple listing service may create significant competitive advantages both for its members and for the general public." *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1370 (5th Cir. 1980); *see also United States v. NAR*, 2006 WL 3434263, at *12 (N.D. Ill. Nov. 27, 2006) (same); *Venture Res. Grp., Inc. v. Greater N.J. Reg'l Multiple Listing Serv., Inc.*, 1995 WL 866841, at *3 (D.N.J. Aug. 24, 1995) (collecting cases). "The MLS functions like an exchange and provides wide dissemination of market information." *O'Riordan v. Long Island Bd. of Realtors, Inc.*, 707 F. Supp. 111, 115 (E.D.N.Y. 1988). In doing so, the MLS facilitates efficiency-enhancing benefits. These include "providing a more transparent marketplace[,]" "aiding competition[,] and fulfilling the purposes of the Sherman Act." *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 321 (7th Cir. 2006) (discussing NAR ethics code provisions prohibiting realtors from soliciting clients who have already entered into an agreement with other realtors). And "it has been recognized by courts that it is essential to the meaningful operation of any [MLS] to require participants to adhere to certain professional and ethical standards."

*Venture Res. Grp, Inc.*, 1995 WL 866841, at *3 (citing *Realty Multi-List, Inc.*, 629 F.2d at 1377, and *O'Riordan* 707 F. Supp. at 115).  NAR's professional and ethical standards, among other things, help "ensur[e] that its members will not be endangered legally or ethically by the brokers with whom they enter into a multiple listing agreement."  *O'Riordan*, 707 F. Supp. at 115.  Because MLSs and the guidelines that govern them have procompetitive benefits, courts overwhelmingly apply the rule of reason when evaluating MLS guidelines.  *See, e.g.*, *O'Riordan* 707 F. Supp. at 115 ("[T]here appears no federal case in which a court has applied a per se analysis to an MLS."); *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 827 (6th Cir. 2011) (applying rule of reason to MLS policy); *Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278, 290 (4th Cir. 2012) (same).

    NAR's guidelines governing MLSs—including the particular guidelines that Plaintiffs challenge here—likewise have procompetitive benefits that fit comfortably within this precedent. Plaintiffs primarily challenge the guideline that MLS listings make blanket unilateral offers of compensation to be paid to the buyer-agent upon sale.  *See* Am. Compl. ¶¶ 81-84.  As explained in the Handbook, one function of an MLS is to provide a "means by which authorized participants make blanket unilateral offers of compensation to other participants."  Gringer Decl. Ex. A at 53.  An MLS, in part by facilitating such offers of compensation, "enhance[s] cooperation," allows for "accumulat[ion] and disseminat[ion] of information," and allows participants to "better serve their clients and the public."  *Id.* at 3.  It facilitates smoother real estate transactions by reducing the need for constant individual communications between huge numbers of brokers.  That ensures that discussions between brokers will not be disruptive to the home buying process, reducing friction in the process of buying and selling a home. Additionally, the challenged guidelines benefit buyers by giving them the service of a broker for

free.  That eliminates the need for buyers to negotiate commissions with their brokers, allows buyers to make offers on whatever homes they wish with the assistance of a broker, allows first-time buyers to receive the guidance of a broker without incurring costs, and allows buyers to save those funds for their home purchase.  In recognition of these benefits, some state legislatures have adopted laws that enshrine a seller's right to pay commissions to buyer-brokers, mimicking the guidelines at issue here.  For example, Minnesota provides that "[t]he seller may, in the listing agreement, authorize the seller's broker to disburse part of the broker's compensation to other brokers, including the buyer's brokers solely representing the buyer." Minn. Stat. § 82.70; *see also* 225 Ill. Comp. Stat. 454/10-5 (Illinois); Del. Code tit. 24, § 2930 (Delaware); Md. Code, Bus. Occ. & Prof. § 17-534 (Maryland); N.J. Admin. Code § 11:5-6.2 (New Jersey); D.C. Code § 42-1703(f) (Washington, D.C.).  In sum, MLSs, NAR guidelines, and the challenged guidelines align the interests of buyers and sellers and ensure that both get what they want:  buyers are able to enter the market without needing to pay for a broker, and sellers are able to sell their homes more efficiently to unencumbered buyers.

Furthermore, the Supreme Court has found that rules and guidelines resembling the NAR guidelines challenge here have procompetitive benefits.  For example, it held that blanket licenses for copyrighted musical compositions had procompetitive benefits—and so had to be analyzed under the rule of reason—because a "middleman with a blanket license was an obvious necessity if the thousands of individual negotiations, a virtual impossibility, were to be avoided." *BMI*, 441 U.S. at 20; *see also id.* ("[I]ndividual fees for the use of individual compositions would presuppose an intricate schedule of fees and uses, as well as a difficult and expensive reporting problem for the user and policing task for the copyright owner.").  Likewise, here, encouraging sellers to include an initial opening offer for a buyer-broker commission in their listings

(potentially an offer of zero) reduces transaction costs. Courts have held that disclosing set commission rates in advance provides a more transparent marketplace and does not violate antitrust law, explaining that "potential cooperating brokers" are "entitled to information concerning the rate of commission the listing broker is to receive from the seller and how that commission will be apportioned in order to decide whether a subagency relationship should be established." *Murphy v. Alpha Realty, Inc.*, 1978 WL 1451, at *4 (N.D. Ill. Dec. 7, 1978); *see also Supermkt. of Homes, Inc. v. San Fernando Valley Bd. of Realtors*, 1983 WL 2199, at *7 (C.D. Cal. Sept. 1, 1983), *aff'd*, 786 F.2d 1400 (9th Cir. 1986) (similar).

To be clear, at this stage, Hanna Holdings does not ask the Court to find these benefits decisively exist or weigh them against any anticompetitive harm. Instead, Hanna Holdings points to these potential benefits, which are clear from the face of the Amended Complaint, to support the Court selecting a mode of analysis that would allow full and fair consideration of these obvious procompetitive benefits in the event of any adjudication on the merits.

Because Plaintiffs fail to allege a *per se* antitrust violation, they must state a claim under the rule of reason. *See, e.g.*, *Deutscher Tennis Bund*, 610 F.3d at 829-830. As discussed in a separate brief, they cannot do so because they fail to allege either a plausible product market or a plausible geographic market.

## CONCLUSION

For the foregoing reasons, Defendant respectfully asks that the Court apply the rule of reason in resolving Defendant's motion to dismiss Plaintiffs' federal and state antitrust claims.

Respectfully submitted,

*/s/ David Z. Gringer*
David Z. Gringer*
Emily Barnet*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
david.gringer@wilmerhale.com
emily.barnet@wilmerhale.com

Seth P. Waxman*
Karin Dryhurst*
Claire M. Bergeron*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
seth.waxman@wilmerhale.com
karin.dryhurst@wilmerhale.com
claire.bergeron@wilmerhale.com

Eric G. Soller
Pa. I.D. No. 65560
William Pietragallo II
Pa. I.D. No. 16413
Quintin DiLucente
Pa. I.D. No. 330648
PIETRAGALLO GORDON ALFANO
  BOSICK & RASPANTI, LLP
One Oxford Centre, 38th Fl.
Pittsburgh, PA 15219
(412) 263-1836
EGS@Pietragallo.com
WP@Pietragallo.com
QD@Pietragallo.com

*Attorneys for Hanna Holdings, Inc.*

*Admitted pro hac vice

16

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on November 6, 2024, this document was electronically filed with the Clerk of the Court using the CM/ECF system, which will automatically send email notification of such filing to the attorneys of record registered with the CM/ECF system.

*/s/ David Z. Gringer*
David Z. Gringer