**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

<table>
<tr>
<td>

SCOTT DAVIS, NIALL ADAMS, MYA BATTON, THEODORE BISBICOS, AARON BOLTON, JASON BOOMSMA, THOMAS BRAUN, SABRINA CLARK, RYAN EISNER, STEVEN EWALD, JOHN GARRETT, BRENNON GROVES, DARIN HENDRY, ANNA JAMES, DO YEON IRENE KIM, JAMES LUTZ, JORDAN KULLMANN, JAMES MULLIS, DANIEL PARSONS, JOSHUA PUTT, JOHN SANNAR, ROBERT SAYLES, BEN SHADLE, BRENT STRINE, CHRISTINE VAN WOERKON, and SHERRIE WOHL, individually and on behalf of all others similarly situated,

Plaintiff,

v.

HANNA HOLDINGS, INC.,

Defendant.

</td>
<td>

Civil Action No: 2:24-cv-2374-WB

**ORAL ARGUMENT REQUESTED**

</td>
</tr>
</table>

**BRIEF IN SUPPORT OF HANNA HOLDINGS' MOTION TO DISMISS THE
AMENDED COMPLAINT WITH PREJUDICE FOR FAILURE TO STATE A CLAIM**

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................................1

BACKGROUND ...........................................................................................................................2

    A.   Brokers Use Multiple Listing Services To Help Clients Sell And Buy Homes ...............2

    B.   NAR Has Adopted Policies Governing Multiple Listing Services ...................................2

    C.   Plaintiffs Bring This Lawsuit .........................................................................................4

ARGUMENT .................................................................................................................................4

I.   Plaintiffs' State Law Claims Fail ............................................................................................4

    A.   Plaintiffs' State Law Claims Fail To Satisfy Rule 8's Pleading Requirement ................4

    B.   Plaintiffs Fail To State A Claim Under Certain State Laws For Additional Reasons .......6

        1.   Plaintiffs Failed To Comply With Pre-Filing Notice Requirements Under Several State Statutes, Warranting Dismissal Of Those Claims (Arizona, Hawaii, Nevada, And Utah Antitrust Statutes And Massachusetts Consumer Protection Statute) ............................................................................................6

        2.   Several States' Consumer Protection Statutes Do Not Apply To Claims Of Purely Anticompetitive Conduct (Pennsylvania, Virginia, Colorado, Michigan, Oregon, New York, Wisconsin) ....................................................................................7

        3.   Several States' Consumer Protection And Antitrust Laws Do Not Apply To Real Estate Brokerage Services (Florida, Iowa, Virginia, Michigan, Rhode Island) .........9

II.   Plaintiffs' Federal And State Antitrust Claims (And Follow-On Consumer Protection Claims) Should Be Dismissed Because Plaintiffs Fail To Plausibly Allege An Agreement Or A Relevant Market ..........................................................................................10

    A.   The Amended Complaint Does Not Plausibly Allege An Agreement And Thus Fails To State Any Antitrust Claim .............................................................................10

        1.   Plaintiffs' Conclusory "Group Pleading" Allegations Are Inadequate ...................13

        2.   Plaintiffs' Allegations That Hanna Holdings Participated In NAR And Adhered To Its Guidelines Do Not Sufficiently Plead An Agreement ...................14

        3.   Localized Markets Make The Alleged Agreement Implausible ...............................17

        4.   At Minimum, Plaintiffs Fail To Allege An Agreement Among The Brokerages ....18

    B.   The Amended Complaint Fails To State A Claim Under The Rule Of Reason Because Plaintiffs Have Not Pleaded A Plausible Relevant Market ..............................19

        1.   Plaintiffs Fail To Plead A Plausible Product Market ..............................................20

        2.   Plaintiffs Fail To Plead A Plausible Geographic Market .........................................21

    C.   Plaintiffs' Failure To Plausibly Allege An Agreement Or Market Also Requires Dismissal Of Their Follow-On State Consumer Protection Claims ...............................23

III.  Plaintiffs' Unjust Enrichment Claim Fails ...........................................................................23

CONCLUSION ............................................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*In re Actos End Payor Antitrust Litigation*,
  2015 WL 5610752 (S.D.N.Y. Sept. 22, 2015),
  *aff'd in part, vacated in part on other grounds*, 848 F.3d 89 (2d Cir. 2017) ...........................5

*In re Aggrenox Antitrust Litigation*,
  94 F. Supp. 3d 224 (D. Conn. 2015) ......................................................................................25

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
  37 F.3d 996 (3d Cir. 1994) ....................................................................................................15

*Antoine v. State Farm Mutual Automobile Insurance Co.*,
  662 F. Supp. 2d 1318 (M.D. Fla. 2009) .................................................................................10

*In re Asacol Antitrust Litigation*,
  2016 WL 4083333 (D. Mass. July 20, 2016) ...........................................................................6

*Bank of America, N.A. v. Knight*,
  725 F.3d 815 (7th Cir. 2013) .................................................................................................13

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .......................................................................................11, 12, 13, 14, 18

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ...............................................................................................................22

*Buck v. Hampton Township School District*,
  452 F.3d 256 (3d Cir. 2006) ....................................................................................................2

*Building Materials Corp. of America v. Rotter*,
  535 F. Supp. 2d 518 (E.D. Pa. 2008) ....................................................................................20

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011) .......................................................................................11, 12, 18

*Cho v. Hyundai Motor Co., Ltd.*,
  636 F. Supp. 3d 1149 (C.D. Cal. 2022) ...................................................................................8

*In re Chocolate Confectionary Antitrust Litigation*,
  801 F.3d 383 (3d Cir. 2015) ..................................................................................................17

*City of Boston v. Aetna Life Insurance Co.*,
  506 N.E.2d 106 (Mass. 1987) ..................................................................................................6

*Consolidated Metal Products, Inc. v. American Petroleum Institute*,
  846 F.2d 284 (5th Cir. 1988) .................................................................15

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
  610 F.3d 820 (3d Cir. 2010)..................................................................19

*In re Digital Music Antitrust Litigation*,
  592 F. Supp. 2d 435 (S.D.N.Y. 2008),
  *vacated and remanded on other grounds, sub nom.*
  *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314 (2d Cir. 2010) ...............................23

*Doherty v. Allstate Indemnity Co.*,
  2016 WL 5390638 (E.D. Pa. Sept. 27, 2016) ...........................................9

*Doyle v. Chihoski*,
  443 A.2d 1243 (R.I. 1982)....................................................................10

*In re Effexor Antitrust Litigation*,
  357 F. Supp. 3d 363 (D.N.J. 2018) .........................................................6

*In re EpiPen Direct Purchaser Litigation*,
  2022 WL 1017770 (D. Minn. Apr. 5, 2022)............................................19

*In re Flonase Antitrust Litigation*,
  692 F. Supp. 2d 524 (E.D. Pa. 2010) ....................................................24

*In re Flonase Antitrust Litigation*,
  610 F. Supp. 2d 409 (E.D. Pa. 2009) ....................................................25

*FOMCO, LLC v. Hearthside Grove Association*,
  2021 WL 2659632 (W.D. Mich. June 29, 2021) ....................................10

*Gordon v. Lewistown Hospital*,
  423 F.3d 184 (3d Cir. 2005)..............................................................22, 23

*In re HIV Antitrust Litigation*,
  2023 WL 3006572 (N.D. Cal. Apr. 18, 2023) ..........................................7

*Howard Hess Dental Laboratories Inc. v. Dentsply International, Inc.*,
  602 F.3d 237 (3d Cir. 2010)..............................................................11, 19

*In re Insurance Brokerage Antitrust Litigation*,
  618 F.3d 300 (3d Cir. 2010)..........................................................11, 15, 16

*Kotteakos v. United States*,
  328 U.S. 750 (1946)..............................................................................19

*In re Lidoderm Antitrust Litigation*,
  103 F. Supp. 3d 1155 (N.D. Cal. 2015) .................................................................7

*Miami Products & Chemical Co. v. Olin Corp.*,
  546 F. Supp. 3d 223 (W.D.N.Y. 2021) ............................................................24, 25

*Moratis v. West Penn Multi-List, Inc.*,
  2024 WL 4436425 (W.D. Pa. Oct. 7, 2024) ...............................8, 9, 12, 16, 17

*In re Namenda Indirect Purchaser Antitrust Litigation*,
  2021 WL 2403727 (S.D.N.Y. June 11, 2021) .......................................................7

*In re New Motor Vehicles Canadian Export Antitrust Litigation*,
  350 F. Supp. 2d 160 (D. Me. 2004) ......................................................................8

*In re Niaspan Antitrust Litigation*,
  42 F. Supp. 3d 735 (E.D. Pa. 2014) ...............................................................7, 24

*Nsheiwat v. American Family Mutual Insurance Co.*,
  2021 WL 8895035 (S.D. Iowa Nov. 22, 2021) ..................................................10

*Ohio v. American Express Co.*,
  585 U.S. 529 (2018)..............................................................................................20

*In re Opana ER Antitritust Litigation*,
  162 F. Supp. 3d 704 (N.D. Ill. 2016) ..................................................................25

*In re Packaged Ice Antitrust Litigation*,
  779 F. Supp. 2d 642 (E.D. Mich. 2011)..............................................................24

*Poindexter v. Mercedes-Benz Credit Corp.*,
  792 F.3d 406 (4th Cir. 2015) ...............................................................................10

*In re Processed Egg Products Antitrust Litigation*,
  821 F. Supp. 2d 709 (E.D. Pa. 2011) .............................................................13, 14

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997)..................................................................................20

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*,
  199 F. Supp. 2d 362 (M.D.N.C. 2002) ................................................................23

*In re Revlimid & Thalomid Purchaser Antitrust Litigation*,
  2024 WL 2861865 (D.N.J. June 6, 2024).........................................................4, 5

*In re Suboxone Antitrust Litigation*,
  2017 WL 4642285 (E.D. Pa. Oct. 17, 2017).....................................................5, 11

*United States v. Brown University*,
  5 F.3d 658 (3d Cir. 1993) ........................................................................................19

*United States v. E. I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956)................................................................................................20

*United States ex rel. Krahling v. Merck & Co., Inc.*,
  44 F. Supp. 3d 581 (E.D. Pa. 2014) ........................................................................24

*In re Wellbutrin XL Antitrust Litigation*,
  260 F.R.D. 143 (E.D. Pa. 2009)..............................................................................25

## DOCKETED CASES

*1925 Hooper LLC v. National Association of Realtors*,
  1:23-cv-05392 (N.D. Ga.).........................................................................................21

*Burton v. National Association of Realtors*,
  7:23-cv-05666 (D.S.C.).............................................................................................21

*Gibson v. National Association of Realtors*,
  4:23-cv-00788 (W.D. Mo.)........................................................................................21

*Martin v. Texas Association of Realtors, Inc.*,
  4:23-cv-01104 (E.D. Tex.).........................................................................................21

*Moehrl v. National Association of Realtors*,
  1:19-cv-01610 (N.D. Ill.)...........................................................................................21

*QJ Team, LLC v. Texas Association of Realtors*,
  4:34-cv-01013 (E.D. Tex.).........................................................................................21

## STATUTES AND REGULATIONS

15 U.S.C. § 1 ......................................................................................................................11

Ariz. Rev. Stat. § 44-1415 ..................................................................................................6

Fla. Stat. § 501.212(6)........................................................................................................9

Haw. Rev. Stat. § 480-13.3 .................................................................................................6

Iowa Code §714H.4(1)(a)(4) ..............................................................................................9

Mass. Gen. Laws. Ch. 93A, § 9(3).....................................................................................6

Mich. Comp. Laws § 339.2502..........................................................................................10

Mich. Comp. Laws § 445.904.............................................................................................9

Nev. Rev. Stat. § 598A.210(3) ..............................................................................6

R.I. Gen. Laws § 5-20.5-4 ...................................................................................10

R.I. Gen. Laws § 6-13.1-4 .....................................................................................9

Utah Code § 76-10-3109(9) ...................................................................................6

Va. Code § 59.1-199(6) ..........................................................................................9

## OTHER AUTHORITIES

Brobeck & Woodall, Consumer Fed. of Am., *How the Real Estate Cartel Harms Consumers and How Consumers Can Protect Themselves* (June 2006) ...................2

Evans, *The Antitrust Economics of Multi-Sided Platform Markets*, 20 Yale J. on Reg. 32 (2003) ....................................................................................................21

MLS Map of the National Association of REALTORS®, https://www.nar.realtor/mls-map-of-the-national-association-of-realtors (last visited Nov. 5, 2024)...............................................................................................22

Rochet & Tirole, *Two-Sided Markets: A Progress Report*, 37 RAND J. Econ. 645 (2006)....................................................................................................................21

## INTRODUCTION

Plaintiffs' Amended Complaint conclusorily alleges that Hanna Holdings somehow entered into a grand, nationwide conspiracy. But despite this Court's admonition, the Amended Complaint does not include *any* additional allegations on the nature of the alleged conspiratorial agreement or Hanna Holdings' role in that agreement. Rather, the Amended Complaint is identical to the original complaint except that it adds some named Plaintiffs and strikes a handful of state-law claims. Thus, like the virtually-identical original complaint, the Amended Complaint does not plausibly allege that there was any nationwide agreement to elevate commissions—let alone that Hanna Holdings entered such an agreement—or define a plausible market in which the purported nationwide conspiracy harmed competition.

As explained in a separate brief in support of Defendant's Motion to Dismiss the Amended Complaint, Plaintiffs lack standing to pursue their Sherman Act claim and numerous state-law claims. That alone is reason to dismiss those claims under Rules 12(b)(1) and 12(b)(6). Those claims—and the remainder—also must be dismissed for failure to state a claim.

*First*, all of Plaintiffs' state law claims fail because they do not specify how the facts alleged are actionable under any of the state laws Plaintiffs invoke. Particular state law claims also fail for myriad state-specific reasons. *Second*, Plaintiffs' state and federal antitrust claims fail because Plaintiffs have not plausibly alleged either an agreement among Defendant and the purported coconspirators or a relevant antitrust market. *Third*, Plaintiffs have not alleged any valid unjust enrichment claim because they do not reference any legal basis for such a claim, and instead merely repackage their antitrust claim. Having failed in their second complaint filed against Hanna Holdings, further amendment is clearly futile. This case should be dismissed.

## BACKGROUND

### A.    Brokers Use Multiple Listing Services To Help Clients Sell And Buy Homes

Brokers provide "a useful consumer service … that is very convenient for home buyers and sellers."[1]  Although prospective buyers can find homes of interest themselves using "websites, such as Zillow," Am. Compl. ¶ 61, they still choose to use brokers:  In 2020, "89% of sellers sold their home with assistance from a seller-broker, and 88% of buyers purchased their home with assistance from a buyer-agent," *id.* ¶ 57.

Brokers use Multiple Listing Services (MLSs)—"database[s] of properties listed for sale in … specified geographic areas"—to list homes for sellers and find homes for buyers.  Am. Compl. ¶ 60.  There are hundreds of MLSs, and none is national.  *Id.* ¶ 38.  MLSs typically are owned and operated by local or regional associations of brokers, some of which are members of NAR.  *Id.*  MLSs have different governance structures:  An MLS can operate as a committee of an association or a wholly owned subsidiary corporation of an association, or be wholly owned by, but separately incorporated from, an association.  Gringer Decl. Ex. A (National Association of Realtors, *2023 Handbook: Multiple Listing Policy*) at ix.[2]  MLSs provide "the most up-to-date, accurate, and comprehensive compilation of [an] area's home listings."  Am. Compl. ¶ 122.

### B.    NAR Has Adopted Policies Governing Multiple Listing Services

Since 1996, the National Association of Realtors (NAR) has published a Handbook on Multiple Listing Policy.  The Handbook includes a policy stating that brokers listing homes on

---

[1] Brobeck & Woodall, Consumer Fed. of Am., *How the Real Estate Cartel Harms Consumers and How Consumers Can Protect Themselves*, at 1 (June 2006).  https://consumerfed.org/pdfs/Real_Estate_Cartel_Study061906.pdf (cited at Am. Compl. ¶ 141).  The Court can consider this transcript and other materials cited in the Amended Complaint and thus "incorporated by reference."  *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

[2] The Handbook is cited at Am. Compl. ¶¶ 64, 76, 78, 81-82, 102, 108, 116, 118-119, 121, 123, 125, 127-128, 130-131.

MLSs "specify on each listing filed with the service[] the compensation being offered to other MLS participants" (i.e. the broker representing a prospective buyer). Am. Compl. ¶ 81. As the Handbook explains, "[s]pecifying the compensation on each listing is necessary, because the cooperating broker has the right to know what his compensation shall be prior to his endeavor to sell." Gringer Decl. Ex. A at 69-70. This policy—Policy Statement 7.23—provides that the compensation offered be shown as "a percentage of the gross selling price" or "a definite dollar amount" but does not require the compensation to be any particular percentage or amount. *Id.* at 70 n.*. The policy states that the buyer-broker's compensation is not paid for by the buyer, and "is established by the listing broker and is not fixed, controlled, recommended, or maintained by any person other than the listing broker." *Id.* at 21. It also provides that "[e]ntitlement to compensation is determined by the cooperating broker's performance as a procuring cause of the sale." *Id.* at 3. And the Handbook expressly prohibits "fix[ing], control[ing], recommend[ing], or suggest[ing]" the "commissions or fees charged for real estate brokerage services" or the "cooperative compensation offered by listing brokers to potential cooperating brokers." *Id.* at 7.

NAR also maintains a Code of Ethics, which asks members to "pledge themselves to protect and promote the interests of their client." *See* Gringer Decl. Ex. B (NAR, *Code of Ethics and Standards of Practice*) at Art. 1.[3] Indeed, "[t]his obligation to the client is primary." *Id.* Although MLSs are premised on cooperation between brokers to best serve clients, members are not to do so "when cooperation is not in the client's best interest." *Id.* Art. 3. Further, the Code of Ethics states that "[t]he obligation to cooperate does not include the obligation to share commissions, fees, or to otherwise compensate another broker." *Id.*

---

[3] The Code of Ethics is cited at Am. Compl. ¶¶ 69, 76, 77, 118-120, 125, 127-128, 130.

### C.    Plaintiffs Bring This Lawsuit

Plaintiffs are 26 home buyers who bought homes listed on MLSs across the country using buyer-brokers.  In a copycat complaint of others filed in different jurisdictions by their same counsel, Plaintiffs allege that Hanna Holdings participated in a conspiracy since at least 1996 to have home buyers pay "inflated buyer agent commissions and inflated total commissions," in violation of the Sherman Act and various state antitrust and consumer protection laws.  Am. Compl. ¶¶ 14, 132.  Many of Plaintiffs' allegations are copied from other cases and concern markets where Hanna Holdings does not operate.  For example, Plaintiffs cite a DOJ investigation into NAR, *id*. ¶¶ 6-7, that did not concern Hanna Holdings.  Plaintiffs also emphasize the Greater Las Vegas Association of Realtors' use of "a software program called Matrix," which "allows brokers to provide tailored electronic listings" to buyers.  *Id.* ¶¶ 94-96.  But Hanna Holdings does not operate in Nevada.

## ARGUMENT

### I.    Plaintiffs' State Law Claims Fail

In addition to Plaintiffs' lack of Article III and antitrust standing to assert many of their state law claims, explained in a separate brief, Plaintiffs' state-law antitrust and consumer protection claims fail for several independent reasons.

### A.    Plaintiffs' State Law Claims Fail To Satisfy Rule 8's Pleading Requirement

"[M]ultiple courts, including within this Circuit, have held that merely listing statutes that could provide possible causes of action without explaining even the broadest contours of how those statutes were violated is insufficient to state a claim."  *In re Revlimid & Thalomid Purchaser Antitrust Litig.*, 2024 WL 2861865, at *110 (D.N.J. June 6, 2024) (citation omitted).  That is, under Rule 8 of the Federal Rules of Civil Procedure, plaintiffs "cannot simply enumerate a long list of state-law claims for states where they might otherwise have no available

antitrust recovery and rely on the defendants and the court to sort out whether or how those laws can act as surrogates for antitrust law." *Id.* at *112 (citation omitted).

The Amended Complaint's state law counts do just that. They merely incorporate by reference Plaintiffs' Sherman Act allegations, recite the legal conclusions necessary for their claims, state that the "aforementioned conduct" violated the following laws, and then list antitrust and consumer protection statutes from 34 states without explaining how any of those statutes were violated. Am. Compl. ¶¶ 178, 184. That is not enough. For example, a court in this district dismissed a slew of state consumer protection and unfair competition claims, where, as here, plaintiffs "fail[ed] to identify any activities by [defendant], aside from those set forth in support of the federal antitrust claims, that would invoke liability under any of the identified state statutes" and instead simply "'repeat[ed] and realleg[ed] every preceding allegation' and then add[ed] the conclusory statement that the 'the aforementioned practices by Defendants,'" violate state law. *In re Suboxone Antitrust Litig.*, 2017 WL 4642285, at *13 (E.D. Pa. Oct. 17, 2017). This approach fails to "plausibly give rise to an entitlement to relief" under the state statutes, because "the complaint d[oes] not contain specific reference to the various state standards under which the claims were made or tailor facts to suit the significant differences among States' consumer protection laws." *Id.* at *13-14 (citation omitted); *see also In re Actos End Payor Antitrust Litig.*, 2015 WL 5610752 at *28 (S.D.N.Y. Sept. 22, 2015) ("Plaintiffs merely restate their antitrust allegations as separate consumer protection claims, providing no distinct factual basis for a violation of consumer protection law. This is insufficient to meet the Rule 8 pleading standard under *Twombly* and *Iqbal*."), *aff'd in part, vacated in part on other grounds*, 848 F.3d 89 (2d Cir. 2017). Plaintiffs' state-law claims should be dismissed for this reason alone.

**B.      Plaintiffs Fail To State A Claim Under Certain State Laws For Additional Reasons**

Even if Plaintiffs had standing to bring their state law claims, and had pled them with sufficient specificity, many of them must be dismissed for state-specific reasons.

**1.      Plaintiffs Failed To Comply With Pre-Filing Notice Requirements Under Several State Statutes, Warranting Dismissal Of Those Claims (Arizona, Hawaii, Nevada, And Utah Antitrust Statutes And Massachusetts Consumer Protection Statute)**

The Arizona, Hawaii, Nevada, and Utah antitrust statutes, along with the Massachusetts consumer protection statute, all require plaintiffs to provide specified forms of notice before filing suit.  *See* Ariz. Rev. Stat. § 44-1415; Haw. Rev. Stat. § 480-13.3; Nev. Rev. Stat. § 598A.210(3); Utah Code § 76-10-3109(9); Mass. Gen. Laws. Ch. 93A, § 9(3).  The Amended Complaint does not allege that Plaintiffs provided timely notice to Hanna Holdings, let alone that they provided any notice.  And, in fact, notice was not provided (except defectively post-complaint in Massachusetts).  Gringer Decl. ¶¶ 5-6.  Plaintiffs' claims under these state laws should therefore be dismissed.  *See In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 389 (D.N.J. 2018) (holding that because plaintiffs "failed to comply with the notice provisions under Arizona's Uniform Antitrust Act, Nevada's Unfair Trade Practices Act, and Utah's Antitrust Act, as well as Massachusetts's Consumer Protection Act," their "class claims under these statutes are dismissed without prejudice"); *City of Boston v. Aetna Life Ins. Co.*, 506 N.E.2d 106, 109 (Mass. 1987) (plaintiff's failure "to allege the sending of a demand letter is fatal" to Massachusetts consumer protection claim); *In re Asacol Antitrust Litig.*, 2016 WL 4083333, at *15 (D. Mass. July 20, 2016) ("[T]he Court concludes that these state [notice] laws apply and the claims brought under Arizona, Hawaii, Nevada and Utah law are dismissed without prejudice.").

> **2.**     **Several States' Consumer Protection Statutes Do Not Apply To Claims Of Purely Anticompetitive Conduct (Pennsylvania, Virginia, Colorado, Michigan, Oregon, New York, Wisconsin)**

Several of the state consumer protection statutes Plaintiffs invoke are inapplicable to the conduct alleged here.  Plaintiffs allege that Hanna Holdings engaged in anticompetitive conduct, but do not plausibly allege that any such conduct was "infused with fraud or deception," *In re HIV Antitrust Litig.*, 2023 WL 3006572, at *5 (N.D. Cal. Apr. 18, 2023) (assessing claims under Colorado, Pennsylvania, and Virginia consumer protection statutes).  Although the Amended Complaint contains the conclusory assertion that "Defendant engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in the states pleaded below," Am. Compl. ¶ 182; *see also* Am. Compl. ¶¶ 183-185, it does not contain—as it must—factual allegations plausibly suggesting deception or fraud.  Indeed, Plaintiffs do not plausibly allege that Hanna Holdings, in particular, made any misrepresentation at all, let alone to them.

That is fatal to several of Plaintiffs' state-law claims because the consumer protection statutes in Pennsylvania, Virginia, Colorado, Michigan, Oregon, New York, and Wisconsin only "apply to conduct that is *deceptive* or *fraudulent*, as opposed to merely anticompetitive."  *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 760 (E.D. Pa. 2014) (dismissing claims under Pennsylvania and Virginia consumer protection statutes based on anticompetitive conduct, where plaintiffs did not sufficiently allege "deception and fraud as part of the alleged anticompetitive conspiracies"); *see also In re HIV Antitrust Litig.*, 2023 WL 3006572, at *1-4 (dismissing claims under Colorado, Pennsylvania, and Virginia consumer protection statutes on same grounds); *In re Namenda Indirect Purchaser Antitrust Litig.*, 2021 WL 2403727, at *30 (S.D.N.Y. June 11, 2021) (dismissing consumer protection claims under Michigan law because "[n]one of [that law's] expressly prohibited acts pertains to any kind of antitrust violation"); *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155 (N.D. Cal. 2015) (refusing to extend Oregon's consumer

protection statute to cover price-fixing allegations); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 206 (D. Me. 2004) (dismissing claims under New York, Pennsylvania, Virginia, and Michigan consumer protection statutes for failure to plausibly allege that the anticompetitive conduct was deceptive); *Cho v. Hyundai Motor Co., Ltd.*, 636 F. Supp. 3d 1149, 1179 (C.D. Cal. 2022) (dismissing claim under Wisconsin's consumer protection statute "with prejudice for failure to allege affirmative misrepresentations").

Indeed, the Western District of Pennsylvania recently dismissed (with prejudice) a complaint against Hanna Holdings challenging an MLS rule alleged to be similar to the NAR guidelines here under both the Sherman Act and Pennsylvania's Unfair Trade Practices and Consumer Protection Law (CPL). *Moratis v. W. Penn Multi-List, Inc.*, 2024 WL 4436425, at *5-6 (W.D. Pa. Oct. 7, 2024). In dismissing the consumer protection claim, the court explained that "Plaintiffs have failed to plausibly allege that Defendants engaged in deceptive or fraudulent conduct as proscribed by the CPL." *Id.* at *5. First, the court explained that "even assuming anticompetitive collusion is occurring, the complaint fails to allege how an internal MLS rule requiring disclosure of offered commissions could deceive, confuse, or mislead customers of a broker … The rule is merely a listing requirement, it does not have the capacity to deceive." *Id.* Second, the court explained that "to the extent that the alleged deceptive statement is that certain buyer broker commissions are 'standard' or 'typical,' this theory also fail[ed]" because "[t]he complaint d[id] not indicate which, if any, Defendant made this representation to which, if any, Plaintiffs." *Id.* at *6. The complaint in *Moratis* was thus insufficiently specific, because "[g]eneral allegations that defendant[s] engaged in deceptive conduct without specifying what that deceptive conduct actually was are insufficient; a plaintiff must identify the specific act, omission or misrepresentation in order to demonstrate that such confusion or misunderstanding

was caused by certain acts or omissions on the part of the Defendants." *Id.* (quoting *Doherty v. Allstate Indem. Co.*, 2016 WL 5390638, at *6 (E.D. Pa. Sept. 27, 2016)). The Amended Complaint here is similarly devoid of specific allegations of deceptive conduct. As in *Moratis*, that dooms plaintiffs' consumer protection claims in those states that require plaintiffs to plead such conduct as the predicate for a violation (Pennsylvania, Virginia, Colorado, Michigan, Oregon, New York, and Wisconsin).

### 3. Several States' Consumer Protection And Antitrust Laws Do Not Apply To Real Estate Brokerage Services (Florida, Iowa, Virginia, Michigan, Rhode Island)

The consumer protection laws of Florida, Iowa, Virginia, Michigan, and Rhode Island all exempt from their reach transactions involving real estate brokers. *See* Fla. Stat. § 501.212(6) (exempting "[a]n act or practice involving the sale, lease, rental, or appraisal of real estate by a person licensed, certified, or registered pursuant to [the Real Estate Brokers, Sales Associates, Schools, and Appraisers chapter]"); Iowa Code § 714H.4(1)(a)(4) (exempting transactions involving "[p]ersons … licensed … under chapter[] … 543B[,]" governing "Real Estate Brokers and Salespersons"); Va. Code § 59.1-199(6) ("Nothing in this [Virginia Consumer Protection Act] chapter shall apply to … [r]eal estate licensees who are licensed under Chapter 21 (§ 54.1-2100 et seq.) of Title 54.1"—governing "Regulation of Real Estate Brokers, Salespersons and Rental Location Agents"); Mich. Comp. Laws § 445.904 (exempting any "transaction or conduct specifically authorized under laws administered by a regulatory board"); R.I. Gen. Laws § 6-13.1-4 (similar). Therefore, these laws cannot apply here.

Because the conduct Plaintiffs challenge here involves the sale of real estate by licensed real estate agents, *see* Am. Compl. ¶¶ 58-59, the Florida, Iowa, and Virginia consumer protection statutes exempt such conduct from their reach. Courts regularly dismiss claims brought under these state laws because they do not apply to exempt categories of businesses. *See, e.g.*, *Antoine*

9

*v. State Farm Mut. Auto. Ins. Co.*, 662 F. Supp. 2d 1318, 1326 (M.D. Fla. 2009) (dismissing Florida Deceptive and Unfair Trade Practices claim because "no cause of action may be maintained against [an insurance company] under" that statute; *Nsheiwat v. Am. Fam. Mut. Ins. Co.*, 2021 WL 8895035, at *7 (S.D. Iowa Nov. 22, 2021) (dismissing Iowa Consumer Frauds Act claim "because § 714H.4 expressly excludes … '[m]erchandise offered or provided by … Insurance companies subject to Title XIII'"); *Poindexter v. Mercedes-Benz Credit Corp.*, 792 F.3d 406, 414-415 (4th Cir. 2015) (affirming dismissal of Virginia Consumer Protection Act claim because the statute "does not apply to 'mortgage lenders'").  Likewise, because real estate brokerage transactions are regulated by the Michigan Board of Real Estate Brokers and Salespersons, Mich. Comp. Laws § 339.2502, and the Rhode Island Director of Business Tegulation, R.I. Gen. Laws § 5-20.5-4, the Michigan and Rhode Island consumer protection statutes exempt the conduct challenged here.  *See, e.g.*, *FOMCO, LLC v. Hearthside Grove Ass'n*, 2021 WL 2659632, at *2-3 (W.D. Mich. June 29, 2021) (holding that real estate transactions are exempt from the MCPA because "[r]eal estate brokers and salespersons are regulated by Michigan's Occupational Code"); *Doyle v. Chihoski*, 443 A.2d 1243, 1244 (R.I. 1982) ("Since the real estate brokerage industry is regulated by the Department of Business Regulation, the trial justice quite properly rejected defendant's reliance on the Deceptive Trade Practices Act.").

## II.    Plaintiffs' Federal And State Antitrust Claims (And Follow-On Consumer Protection Claims) Should Be Dismissed Because Plaintiffs Fail To Plausibly Allege An Agreement Or A Relevant Market

### A.    The Amended Complaint Does Not Plausibly Allege An Agreement And Thus Fails To State Any Antitrust Claim

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or

with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1.  An antitrust plaintiff must plead two elements: (1) "that the defendant was a party to a contract, combination ... or conspiracy" and (2) "that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (citation omitted).  As to the first prong, Section 1 claims always require "the existence of an agreement." *Id.* (citation omitted); *see also Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 254 (3d Cir. 2010) ("Section 1 claims are limited to combinations, contracts, and conspiracies and thus always require the existence of an agreement.").  Unilateral action, regardless of the motivation, does not violate Section 1.  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 321 (3d Cir. 2010).  This requirement also applies to state law antitrust claims, since "state antitrust laws" are "consistently interpreted in parallel, if not identically, with the Sherman Act." *In re Suboxone Antitrust Litig.*, 2017 WL 4642285, at *11 (dismissing "state antitrust claims premised on the identical actions that form the basis of the Sherman Act claims … for the same reasons" that warrant dismissal of the Sherman Act claims).

Plaintiffs have not plausibly alleged that the conduct that forms the basis of their antitrust claims was the product of an agreement among Hanna Holdings and its purported coconspirators. Rather, the Amended Complaint contains exactly what the Supreme Court said "will not suffice" for an antitrust claim at the pleading stage:  "[A]n allegation of parallel conduct and a bare assertion of conspiracy." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  Namely, Plaintiffs allege that Hanna Holdings and its supposed coconspirators each "adopted a series of rules, policies, and practices that significantly restrain competition," Am. Compl. ¶ 5, primarily the NAR guideline that MLS listings make blanket unilateral offers of compensation to be paid to the buyer-agent by the seller-agent upon sale, *see* Am. Compl. ¶¶ 81-84.  And Plaintiffs assert

11

that by merely following NAR rules, Hanna Holdings and its purported coconspirators participated in a grand, nationwide conspiracy.  But there is no allegation that Hanna Holdings agreed with any of its competitors to do any of these things.  Thus, the Amended Complaint fails to state a claim.

To plausibly allege an agreement, a complaint must include "enough factual matter (taken as true) to suggest that an agreement was made"—that is, facts that exclude the possibility that the purported conspirators acted independently.  *Twombly*, 550 U.S. at 556.  And "a conclusory allegation of agreement at some unidentified point" does not suffice.  *Id.* at 557; *see id.* at 565 n.10 (explaining that the plaintiff's failure to allege a "specific time, place, or person involved in the alleged conspiracies" left "no clue as to which of the [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place").  Courts regularly dismiss complaints that lack sufficient factual allegations of an agreement.  *See, e.g.*, *Burtch*, 662 F.3d at 225.  The Court should do the same here.  Indeed, the reason the court in *Moratis* dismissed the (similar) antitrust claims there was that the plaintiffs failed to plausibly allege an agreement.  *See* 2024 WL 4436425, at *4.

Here, as in the original complaint, Plaintiffs allege—with no factual support—nationwide "continuing agreements among Defendant and its coconspirators," over the span of almost 30 years, "to set, raise, and maintain the level of broker commissions."  Am. Compl. ¶ 166.  Indeed, Plaintiffs have done *nothing* to salvage the weak allegations in their original complaint, despite the Court's express request that they do so.  These allegations remain insufficient for four reasons.  *First*, Plaintiffs engage in impermissible group pleading without tying Hanna Holdings to the so-called agreement.  *Second*, the few specific allegations that Plaintiffs do make—that Hanna Holdings participated in NAR and adhered to its guidelines—are merely parallel conduct

and membership in an organization, which is well short of what the law requires.  *Third*, the localized structure of the markets for real estate services makes the alleged nationwide agreement implausible.  *Fourth*, the allegations fail to show an agreement among each of the purported brokerage coconspirators.

### 1.    Plaintiffs' Conclusory "Group Pleading" Allegations Are Inadequate

Even if a nationwide agreement were theoretically plausible (and it is not), Plaintiffs cannot plead a grand, nationwide antitrust conspiracy by lumping coconspirators together, including many that are not even named.  *See* Am. Compl. ¶¶ 50-53.  Instead, it is "essential to show that [each] particular defendant joined the conspiracy and knew of its scope."  *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013).  Courts thus "look[] for more than mere repetitive generic reference to 'Defendants'"—or here, "Defendant and its coconspirators,"— "tacked on to a conclusory verb form to connect an individual defendant to an actual agreement in an antitrust conspiracy."  *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 720 (E.D. Pa. 2011).  *Twombly* itself rejected such vague group pleading as insufficient to allege a Sherman Act violation, explaining that "the complaint … furnishe[d] no clue as to which of the four [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place."  550 U.S. at 565 n.10.

The Amended Complaint does not—as it must—allege facts to support the contention that *Hanna Holdings in particular* entered into an agreement, and there are no facts alleged to suggest with whom Hanna Holdings supposedly agreed.  Instead, Plaintiffs make conclusory allegations as to all alleged conspirators, such as that "NAR, Defendant, and their coconspirators have adopted a series of rules, policies, and practices that significantly restrain competition," Am. Compl. ¶ 5, "NAR's anticompetitive rules apply to and have been implemented and

enforced by Defendant and its coconspirators nationwide," *id.* ¶ 19, and "Defendant and its coconspirators act to sustain high commission rates for broker services," *id.* ¶ 85.

These are insufficient because they contain no specific allegations about Hanna Holdings' involvement in the alleged conspiracy. As in *Twombly*, these generic allegations give "no clue" as to how, specifically, Howard Hanna participated in the allegedly illicit agreement. *See Twombly*, 550 U.S. at 565 n.10. Rather, these allegations are exactly the kind that the *Egg Products* court found insufficient: generic references to "Defendant and its coconspirators" that are "tacked on to a conclusory verb form"—such as "adopted," "implemented and enforced," and "act"—to connect Hanna Holdings to a supposedly anticompetitive agreement. 821 F. Supp. 2d at 720. As that court explained, "[s]imply using the global term 'defendants' to apply to numerous parties without any specific allegations that would tie each particular defendant to the conspiracy is not sufficient." *Id.* That is what Plaintiffs effectively do here by using the term "Defendant and its coconspirators." *See, e.g.*, Am. Compl. ¶¶ 5, 19, 85. Such "[c]onclusory, collective language is too convenient, too undisciplined, and too unfocused in light of exposures to litigation expense and disruption (even without ultimate liability) that are so great in antitrust (and other) cases." *Egg Products*, 821 F. Supp. 2d at 720.

### 2. Plaintiffs' Allegations That Hanna Holdings Participated In NAR And Adhered To Its Guidelines Do Not Sufficiently Plead An Agreement

When Plaintiffs' conclusory "group pleading" allegations are properly disregarded, vanishingly little remains. As to Hanna Holdings in particular, the Amended Complaint merely (1) describes the company in a pro forma "Defendant" section, Am. Compl. ¶¶ 46-49; (2) cites a Hanna Holdings franchise disclosure document allegedly requiring agents to comply with NAR standards, *id.* ¶ 125 & n.11; and (3) alleges that representatives of Hanna Holdings have served on various NAR boards and committees, *id.* ¶¶ 128-131. None of these facts suggest, let alone

make it plausible, that Hanna Holdings agreed with anyone to do anything. Indeed, the only conduct that Plaintiffs allege Hanna Holdings individually engaged in—requiring franchise agents to comply with NAR standards and having representatives serve on NAR committees—could easily be the product of unilateral activity and thus do nothing to establish an agreement.

At bottom, Plaintiff' claim boils down to a theory that Hanna Holdings' participation in a membership-based organization and independent adherence to its guidelines—in parallel with alleged coconspirators following the same guidelines—is participation in a conspiracy. But a membership-based group like "a trade association is not by its nature a 'walking conspiracy.'" *Consol. Metal Prods., Inc. v. Am. Petrol. Inst.*, 846 F.2d 284, 293-294 (5th Cir. 1988). "[C]oncerted action does not exist every time a trade association member speaks or acts. Instead, in assessing whether a trade association (or any other group of competitors) has taken concerted action, a court must examine all the facts and circumstances to determine whether the action taken was the result of some agreement, tacit or otherwise, among members." *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1007-1008 (3d Cir. 1994).

To that end, the Third Circuit has expressly held that allegations that members of a trade association chose to follow the association's rules—even along with allegations that members controlled the organization—are not sufficient to state a viable claim under Section 1 of the Sherman Act. In *In re Insurance Brokerage Antitrust Litigation*, the plaintiffs alleged that defendant insurance brokers conspired to conceal fellow brokers' receipt of commission payments in return for steering customers to certain insurers. 618 F.3d at 311-313. According to plaintiffs in that case, the defendants carried out a conspiracy by participating in a trade association, exercising "control" over the association's affairs, "adopt[ing]" an allegedly anticompetitive policy governing disclosure of commission payments, and adhering to that

15

policy. *Id.* at 313, 349. The Third Circuit rejected that theory and upheld the dismissal of the complaint for failure to plead concerted action, explaining that "neither defendants' membership in the [trade group], nor their common adoption of the trade group's suggestions, plausibly suggest conspiracy." *Id.* at 349. Nor did allegations "that the defendant brokers collaborated in crafting" the challenged policy "insofar as [they] allegedly 'control[led] the affairs of [the trade association]," *id.*, and "sat on [the association's] Board of Directors," *id.* at 381.

Applying *In re Insurance Brokerage* to these allegations defeats Plaintiffs' claims here. All Plaintiffs allege is participation and leadership in NAR and independent adherence to its guidelines. More is required: namely, plausible factual allegations that Hanna Holdings "acted other than independently when it decided to incorporate" NAR guidelines and that this decision "was itself the product of an agreement." *See Ins. Brokerage*, 618 F.3d at 349-350. Hanna Holdings raised this deficiency in its motion to dismiss the original complaint, and—despite the Court's admonition—Plaintiffs did not amend to address it or other shortcomings. Moreover, since Hanna Holdings filed its last motion to dismiss, a court rejected materially identical allegations against Hanna Holdings, explaining that allegations that defendants controlled the rule-setting organization (there, an MLS) "does not establish an agreement." *Moratis*, 2024 WL 4436425, at *4; *see also id.* ("Defendants' mere membership and participation in a trade association such as the West Penn MLS is insufficient to plausibly suggest an agreement.").

Plaintiffs' generic allegation that Hanna Holdings and its purported coconspirators, by separately adopting NAR rules, have "facilitat[ed] the steering of home buyers by their brokers towards higher-commission homes and away from lower-commission homes," Am. Compl. ¶ 12, also does not establish an agreement (even accepting these implausible and conclusory allegations as true). As the court held in *Moratis*, which featured materially identical allegations

16

about steering, "Plaintiffs' allegations regarding steering fail to establish the agreement required to state a claim under the Sherman Antitrust Act" because "Plaintiffs allege, at most, that steering is a practice enabled by the buyer broker rule" and "do not allege any facts that steering is actually driven by an agreement between Defendant[]" and purported coconspirators. 2024 WL 4436425, at *3. There, as here, plaintiffs alleged that the challenged rule "encourage[d] and facilitate[s] steering" and "result[ed] in steering" but did not actually allege "an illegal agreement to encourage 'steering.'" *Id.* at *4.

### 3.   Localized Markets Make The Alleged Agreement Implausible

Plaintiffs appear to allege that the purported conspiracy extends to home sales on any NAR-affiliated "database of properties listed for sale in … specified geographic areas," i.e., NAR-affiliated MLSs across the country. Am. Compl. ¶ 60. But the structure of the real estate market is not conducive to a nationwide agreement. *See In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 398 (3d Cir. 2015) (treating the market's conduciveness to agreement as relevant to whether there is evidence of an agreement).

As Plaintiffs acknowledge, the alleged "market" is really thousands of local markets, each with different competitive dynamics, practices, and market participants. *See* Am. Compl. ¶¶ 55-56, 70, 72. And, as Plaintiffs likewise acknowledge, the MLSs operating across these markets are not uniform. *See id.* ¶ 63. An MLS may be governed by committee, or may be owned and operated by but incorporated separately from a local realtor association, or may operate as a subsidiary of an association; in all scenarios, each MLS decides separately whether to adopt NAR guidelines. *See id.* ¶ 52 (alleging that individual MLSs are coconspirators because they have "adopt[ed] the Buyer Buyer-Agent Commission Rule in their individual rules and regulations").

And because real estate firms, even large ones, often operate regionally, some of the alleged brokerage coconspirators do not operate in the same markets or on the same MLSs. Hanna Holdings would, for example, have no reason to enter into an agreement with a brokerage that operates in Missouri because Hanna Holdings does not operate in Missouri and the real estate markets in Missouri are distinct from the markets where Hanna Holdings does operate. As alleged, Hanna Holdings and the purported brokerage coconspirators do not determine whether any one of the hundreds of regional MLSs complies with the challenged guidelines.

Because real estate service markets involve many unaffiliated regional actors, a nationwide conspiracy like the one alleged in this Amended Complaint is implausible.

### 4.    At Minimum, Plaintiffs Fail To Allege An Agreement Among The Brokerages

Even if the Court concludes that Plaintiffs have plausibly alleged a vertical agreement between Hanna Holdings and NAR based on Hanna Holdings' participation in NAR and adherence to its rules, and between each purported brokerage coconspirator and NAR on the same grounds, the Amended Complaint still fails to state a claim because it does not plausibly allege—as it must to state a Section 1 claim—an agreement among the brokerages. The Amended Complaint does not allege that Hanna Holdings, or any other particular brokerages operating in disparate markets across the country, ever agreed or even communicated *with each other* about the challenged NAR guidelines, let alone their potential impact on commission rates. Instead, the allegations of a conspiracy among the brokerages are merely generic allegations of parallel conduct—brokerages allegedly adopting and enforcing trade association guidelines— followed by "a bare assertion of conspiracy." *Twombly*, 550 U.S. at 556. The Amended Complaint thus cannot survive a motion to dismiss. *See, e.g.*, *Burtch*, 662 F.3d at 231 (affirming dismissal of antitrust claim where allegations lacked specificity).

Without an alleged agreement among brokerages, the alleged conspiracy fails because it is, at most, a "rimless" wheel conspiracy, which courts repeatedly have held cannot establish a Section 1 violation. That form of agreement resembles "separate spokes" (here, the brokerages) "meeting at a common center" (NAR) "without the rim of the wheel to enclose the spokes" (an agreement among the brokerages). *Kotteakos v. United States*, 328 U.S. 750, 755 (1946). Such an arrangement is not "a single conspiracy" at all; it is merely parallel conduct. *Id.* Accordingly, the Third Circuit has affirmed the dismissal of Sherman Act claims on the grounds that plaintiffs failed to plead a horizontal agreement, that is, a "rim" connecting the spokes. *See Howard Hess*, 602 at 255 (explaining that plaintiff failed to adequately allege "an agreement among the Dealers themselves"). And every other circuit to address the question—the Second, Fourth, Fifth, and Sixth—has also "held rimless hub-and-spokes conspiracies do not violate § 1 of the Sherman Act." *See In re EpiPen Direct Purchaser Litig.*, 2022 WL 1017770, at *7 (D. Minn. Apr. 5, 2022) (citation omitted) (collecting cases). Thus, even if the Court accepts Plaintiffs' conclusory allegations that each brokerage has an individual agreement with NAR, Plaintiffs have not plausibly alleged a conspiracy among the brokerages themselves.

**B.     The Amended Complaint Fails To State A Claim Under The Rule Of Reason Because Plaintiffs Have Not Pleaded A Plausible Relevant Market**

Even if Plaintiffs plausibly alleged an agreement, their antitrust claims still must be dismissed under the rule of reason for failure to allege a plausible relevant market. As explained in a separate brief, Plaintiffs fail to allege that the conduct should be evaluated under the *per se* approach, and thus must state a claim under the rule of reason. *See, e.g.*, *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 829-830 (3d Cir. 2010). That requires, among other things, defining a plausible relevant market, which has two components: a product market and a geographic market. *United States v. Brown Univ.*, 5 F.3d 658, 668-669 (3d Cir. 1993). Without

19

a plausible market, there is no way to measure whether Hanna Holdings and its alleged coconspirators have sufficient power to harm competition or that such harm occurred. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). Accordingly, failure to plead a plausible market warrants dismissal. *See id.* ("Where the plaintiff fails to define its proposed relevant market … the relevant market is legally insufficient and a motion to dismiss may be granted."); *Bldg. Materials Corp. of Am. v. Rotter*, 535 F. Supp. 2d 518, 525 (E.D. Pa. 2008) (dismissing antitrust claim because plaintiff did not state a plausible product market).

Plaintiffs have not met their burden to plausibly allege a relevant market, for two reasons. *First*, Plaintiffs have not alleged a plausible product market because their market definition is too narrow: It includes only the buyer-side of what is, in reality, a two-sided market—the market for real estate brokerage services. *Second*, Plaintiffs have not identified a plausible geographic market because their candidate geographic market of "the geographic areas in which NAR MLSs operate," Am. Compl. ¶ 70, does not reflect the commercial reality of the real estate industry.

### 1.     Plaintiffs Fail To Plead A Plausible Product Market

Plaintiffs allege that the relevant product market is the "market for buyer-agent services," Am. Compl. ¶ 70, but this is not a plausible product market—that is, a market consisting of products that compete because they are "reasonably interchangeable." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). Plaintiffs' market definition includes only the buyer-side, and not the seller-side, of what is a two-sided market. That is fatal: plaintiffs challenging conduct in two-sided markets must allege anticompetitive effects on both sides of the market because "competition cannot be accurately assessed by looking at only one side of the platform in isolation." *See Ohio v. Am. Express Co.*, 585 U.S. 529, 546 (2018).

Two-sided markets are markets "in which one or several platforms enable interactions between end-users and try to get the two (or multiple) sides 'on board' by appropriately charging

each side."  Rochet & Tirole, *Two-Sided Markets: A Progress Report*, 37 RAND J. Econ. 645, 645 (2006).  In the market for real estate brokerage services, an MLS (the platform) intermediates between home buyers and sellers (and their brokers) and facilitates real estate transactions.  *See* Evans, *The Antitrust Economics of Multi-Sided Platform Markets*, 20 Yale J. on Reg. 325, 338, 374 (2003) (classifying real estate market as a two-sided market).  Without one group of consumers (e.g., sellers), the platform would be worthless to the other set of consumers (e.g., buyers).  *See Am. Express Co.*, 585 U.S. at 535 ("[T]he value of the two-sided platform to one group of participants depends on how many members of a different group participate.").  Thus, for two-sided platforms, "the relative price structure matters, and platforms must design it so as to bring both sides on board."  *Id*. at 536 (quotation marks omitted).  As a result, allegations addressed to only one side of a two-sided market—like those in the Amended Complaint—may suggest anticompetitive effects where, in fact, there are none.

Plaintiffs assert that buyers have been harmed because of the effects on the buyer-side of the market for real estate brokerage services.  But there are pending class action lawsuits on the seller-side of the market too, which claim that buyers are *benefitting* from the challenged guidelines because they are relieved from paying broker commissions themselves.  *See, e.g.*, *Gibson v. NAR*, 4:23-cv-00788 (W.D. Mo.); *1925 Hooper LLC v. NAR*, 1:23-cv-05392 (N.D. Ga.); *QJ Team, LLC v. Tex. Ass'n of Realtors*, 4:34-cv-01013 (E.D. Tex.); *Martin v. Tex. Ass'n of Realtors, Inc.*, 4:23-cv-01104 (E.D. Tex.); *Burton v. NAR*, 7:23-cv-05666 (D.S.C.); and *Moehrl v. NAR*, 1:19-cv-01610 (N.D. Ill.).  Both cannot be right.  What is right is that the market is two-sided and Plaintiffs has completely ignored one of the two sides.  Thus, Plaintiffs fail to plead a plausible product market, warranting dismissal.

### 2.    Plaintiffs Fail To Plead A Plausible Geographic Market

Plaintiffs' market definition of "the geographic areas in which NAR MLSs operate," Am. Compl. ¶ 70, is implausible.  The relevant geographic market "is that area in which a potential buyer may rationally look for the goods or services he seeks."  *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 212 (3d Cir. 2005).  The geographic market "must … both 'correspond to the commercial realities' of the industry and be economically significant."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 336-337 (1962).

The geographic areas in which NAR MLSs operate do not plausibly reflect the commercial realities of the market for buyer-broker services as required under *Brown Shoe*.  For example, a single MLS, Bright MLS, covers 93,254 realtors who work across six states— Delaware, Maryland, New Jersey, Pennsylvania, Virginia, and West Virginia—and the District of Columbia.  *See* MLS Map of the National Association of REALTORS®, https://www.nar.realtor/mls-map-of-the-national-association-of-realtors (last visited Nov. 5, 2024) (cited at Am. Compl. Fig.1 n.9).  While there may be business reasons for these realtors to form a single MLS, the covered area does not plausibly reflect the relevant market for buyer-broker services.  A prospective home buyer in Philadelphia is unlikely to view a broker who works in University City as interchangeable with a broker who works in Alexandria, Virginia.

Further, because MLSs are broker-facing, consumers do not know their scope—and thus MLS boundaries do not reflect actual competition between brokers for consumers' business.  That is fatal to Plaintiffs' geographic market definition because a geographic market is the area in which providers of goods or services compete for a potential buyer's business.  *See Gordon*, 423 F.3d at 212.  Thus, the "geographic scope of a relevant product market" must be "determined in the context of each case in acknowledgement of the commercial realities of the industry being considered."  *Id.*  Here, the commercial realities of the real estate industry—

including that MLSs are broker-facing not consumer-facing and do not correspond to consumer purchasing decisions—render Plaintiffs' proposed geographic market implausible.

### C. Plaintiffs' Failure To Plausibly Allege An Agreement Or Market Also Requires Dismissal Of Their Follow-On State Consumer Protection Claims

Because Plaintiffs have failed to plausibly allege an agreement or a relevant market, their follow-on state law consumer protection claims must also be dismissed.  Plaintiffs' consumer protection count (Claim II) merely incorporates the allegations underlying their antitrust claims, adds the words "deceptive or fraudulent," and conclusorily asserts that those allegations violate 25 different state consumer protection statutes.  Am. Compl. ¶¶ 181-185.  Since Plaintiffs' argument is just that the alleged antitrust violations are also violations of consumer protection laws, the failure of their antitrust claims necessarily dooms their consumer protection claims. *E.g.*, *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 396 (M.D.N.C. 2002) ("Because Plaintiffs do not allege any facts that suggest that Defendant's conduct is unlawful beyond the conduct that is the basis for their failed federal [antitrust] claims, Plaintiffs' state common law and statutory claims fail as well."); *In re Digital Music Antitrust Litig.,* 592 F. Supp. 2d 435, 450-51 (S.D.N.Y. 2008) (dismissing consumer protection claims under California, D.C., Florida, Massachusetts, Nebraska, and North Carolina law because the "conclusion that Plaintiffs have not adequately alleged [a federal antitrust] violation necessarily precludes their attempt to recast that violation as an unfair business practice"), *vacated and remanded on other grounds, sub nom. Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010).  If that alone did not doom the claims, the conclusory allegations of deception and fraud do.

### III. Plaintiffs' Unjust Enrichment Claim Fails

Plaintiffs have not alleged a valid unjust enrichment claim.  The Amended Complaint alleges that Hanna Holdings "received benefits from Plaintiffs and Class members and unjustly

retained those benefits at their expense," Am. Compl. ¶ 187, but fails to reference any basis in law on which a claim for unjust enrichment might proceed.  That defeats this claim.  As courts have noted, "[s]tate law requirements under unjust enrichment law vary widely."  *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 667 (E.D. Mich. 2011).  For example, some states' laws require "a plaintiff to establish that it directly conferred a benefit on the defendant," an impossibility here as Plaintiffs are indirect purchasers.  *See In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 544, 546 (E.D. Pa. 2010) (dismissing unjust enrichment claims under Florida and North Carolina law on this basis).[4]  Because Plaintiffs have not even identified under what state laws they are pursuing unjust enrichment claims, Hanna Holdings—and the Court—cannot evaluate whether Plaintiffs have plausibly alleged the elements of those claims.

At most, Plaintiffs refer only to "unjust enrichment principles" and leave Hanna Holdings and the Court guessing as to what law they seek to invoke.  Am. Compl. ¶ 190.  Where, as here, the complaint "fails to invoke the law of any particular jurisdiction," it "fail[s] to meet the applicable pleading standards," including under Rule 8 of the Federal Rules of Civil Procedure, and warrants dismissal.  *U.S. ex rel. Krahling v. Merck & Co., Inc.*, 44 F. Supp. 3d 581, 609 (E.D. Pa. 2014).  In fact, "[t]his is the type of formulaic, conclusory pleading that *Twombly* and *Iqbal* are meant to eliminate."  *Miami Prods. & Chem. Co. v. Olin Corp.*, 546 F. Supp. 3d 223, 248 (W.D.N.Y. 2021) (dismissing unjust enrichment claim because "Plaintiffs' failure to specifically address the factual requirements of [the] claim under the various asserted [state] laws"); *see also In re Flonase Antitrust Litig.*, 610 F. Supp. 2d 409, 419 (E.D. Pa. 2009)

---

[4] Another point of differentiation (discussed in a separate brief addressing standing) is that Plaintiffs, as indirect purchasers, cannot bring a claim for unjust enrichment under a particular state's unjust enrichment law "if they otherwise would be barred from bringing a claim under that state's antitrust and consumer-protection statutes, absent a showing that the common law of the state in question expressly allows for such recovery."  *Niaspan*, 42 F. Supp. 3d at 763.

(dismissing unjust enrichment claim where plaintiff failed to invoke specific state laws "[b]ecause states analyze unjust enrichment claims differently"); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 167 (E.D. Pa. 2009) (dismissing unjust enrichment claim for plaintiffs' "fail[ure] to link their claim to the law of any particular state"); *In re Opana ER Antritrust Litig.*, 162 F. Supp. 3d 704, 726 (N.D. Ill. 2016) ("[Plaintiffs] have *listed* claims under various state [unjust enrichment] laws, but they have not truly *pleaded* claims under those laws sufficient to show their entitlement to recovery under them.").

Moreover, as with their consumer protection claims, Plaintiffs' failure to plausibly allege an agreement or relevant market is fatal to their unjust enrichment claim—which merely repackages their failed antitrust claims. Am. Compl. ¶¶ 186-191. Indeed, courts often dismiss unjust enrichment claims that, as here, merely repackage the factual allegations underlying a an antitrust claim without further explanation, especially when the antitrust claim fails. *See, e.g.*, *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 255 (D. Conn. 2015) (dismissing state-law claims where the plaintiffs "pleaded federal antitrust claims and the factual foundation for them … and [then] merely allege[d] that those claims are also actionable under general consumer-protection laws and as unjust enrichment").

## CONCLUSION

For the foregoing reasons, Defendant respectfully asks that the Court dismiss Plaintiffs' Amended Complaint, which does not even attempt to correct the deficiencies of their original complaint, with prejudice.

Respectfully submitted,

*/s/ David Z. Gringer*
David Z. Gringer*
Emily Barnet*
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
david.gringer@wilmerhale.com
emily.barnet@wilmerhale.com

Seth P. Waxman*
Karin Dryhurst*
Claire M. Bergeron*
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
seth.waxman@wilmerhale.com
karin.dryhurst@wilmerhale.com
claire.bergeron@wilmerhale.com

Eric G. Soller
Pa. I.D. No. 65560
William Pietragallo II
Pa. I.D. No. 16413
Quintin DiLucente
Pa. I.D. No. 330648
PIETRAGALLO GORDON ALFANO
   BOSICK & RASPANTI, LLP
One Oxford Centre, 38th Fl.
Pittsburgh, PA 15219
(412) 263-1836
EGS@Pietragallo.com
WP@Pietragallo.com
QD@Pietragallo.com

*Attorneys for Hanna Holdings, Inc.*

*Admitted pro hac vice

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 6, 2024, this document was electronically filed with the Clerk of the Court using the CM/ECF system, which will automatically send email notification of such filing to the attorneys of record registered with the CM/ECF system.

*/s/ David Z. Gringer*
David Z. Gringer