IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SCOTT DAVIS,** *et al.*,<br>        **Plaintiffs,**<br><br>        **v.**<br><br>**HANNA HOLDINGS, INC.,**<br>        **Defendant.** | **CIVIL ACTION**<br><br><br><br>**NO. 24CV2374** |

## OPINION

Plaintiffs, a group of individuals who purchased residential real estate throughout the United States, sued Defendant Hanna Holdings, Inc., a real estate brokerage firm and member of the National Association of Realtors, bringing claims under federal and state antitrust laws, state consumer protection statutes, and the doctrine of unjust enrichment on behalf of themselves and two putative classes of home buyers. Plaintiffs allege that Hanna participated in a conspiracy to maintain and enforce anticompetitive rules governing brokerage commissions in real estate transactions, leading to artificially inflated home prices and reduced competition in the market for real estate brokerage services.

Hanna filed a Motion to Dismiss Plaintiffs' Amended Complaint, arguing lack of standing, failure to state a claim, and failure to mediate. Given the complexity of the matter, the Court permitted Hanna to file four separate memoranda in support of its Motion to Dismiss, respectively concerning standing and mootness, the applicability of the rule of reason, failure to state a claim, and failure to mediate. Plaintiffs were given an opportunity to respond in kind. Hanna's arguments concerning standing and mootness were considered in a previous Opinion, wherein the Court dismissed Count I of Plaintiffs' Amended Complaint without prejudice. *See Davis v. Hanna Holdings, Inc.*, __ F. Supp.3d __, 2025 WL 845918, at *8 (E.D. Pa. Mar. 18,

2025).

The Court now considers Hanna's arguments seeking dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth below, Hanna's Motion will be granted in part and denied in part.

## I.    FACTUAL BACKGROUND

Except where otherwise noted, the following facts are taken from Plaintiffs' Amended Complaint, well-pleaded allegations from which are taken as true at this stage.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

### A.  The Parties and Their Roles in the Market

Defendant Hanna Holdings, Inc. ("Hanna") is the largest privately-held real estate brokerage company in the United States, operating across thirteen states on the East Coast and in the Midwest.  Hanna and its employee-brokers are members of the National Association of Realtors ("the NAR"), a 1.4-million-member trade association that represents residential and commercial real estate brokers, salespeople, property managers, appraisers, and others engaged in the real estate industry across the nation.  The NAR establishes and enforces rules, policies, and practices that govern the activities of realtors belonging to the association's 54 state or territorial associations and its approximately 1,200 local boards.

Each local board operates a database of local property listings called a Multiple Listing Service ("MLS") and does so in accordance with rules promulgated on the national level by the NAR.  In any particular geographical region of the country, the local MLS serves as the *de facto* marketplace for home listings—brokers working for home sellers ("seller-brokers") list houses on the MLS, and brokers working for home buyers ("buyer-brokers") use the MLS to find potential homes for their clients.  MLSs also serve as the main source for the listings displayed

by popular online real estate companies like Zillow, which, in exchange for access to NAR-controlled MLS data, agree not to compete with NAR members by acting as real estate brokers themselves.

Most homes bought each year—nearly 90%, according to NAR figures from 2020—were bought with the assistance of NAR-member brokers, who typically use their local NAR-controlled MLS to find properties for sale. Without access to the NAR-controlled MLSs, buyer-brokers would be deprived of the most comprehensive and up-to-date information about local home listings and would be unable to effectively compete with brokers who have such access. The NAR controls a substantial number of MLSs in the United States.

Plaintiffs are individuals who bought homes with the help of a NAR-member broker which utilized a NAR-controlled MLS. They allege that Hanna and non-party coconspirators—other real estate brokerages that are members of the NAR—worked together to promulgate several NAR rules designed to inflate buyer-agent commissions above competitive market rates and stymie competition among real estate brokers. As a result of these rules, Plaintiffs allege that they paid higher prices for their homes and received poorer quality brokerage services than they would have in a competitive market.

### B.  The Mechanics of Broker Compensation

As described above, most home purchases that occur in the United States are facilitated by brokers representing buyers or sellers. Both buyer-brokers and seller-brokers are compensated with fees calculated as a percentage of the home's final sale price; these fees are paid to the brokers by the home seller out of the proceeds received from the buyer. The sizes of the brokers' commissions are usually determined at the outset of the business relationship between the seller and their broker, which parties enter into a listing agreement specifying the

total commission fee that will be paid to the seller-broker after the home sells.  Using the MLS,

the seller-broker then lists the house and makes an offer of compensation to any buyer-broker

who can successfully broker the sale.

Suppose, for example, that Sam wants to sell their house.  Sam contacts a seller-broker,

who agrees to market the house in exchange for a 6% total commission fee.  Sam's broker then

creates a listing for Sam's house on the MLS and, as part of that listing, unilaterally offers a fee

of 3% to any buyer-broker who can find a buyer.   Several buyer-brokers show Sam's house to

their clients, and a few buyers make offers on the home.  Sam decides to accept Blake's offer of

$500,000.  Blake pays $500,000 into an escrow account; from this account, $15,000 is

transmitted to Blake's broker (3% of the sale price, pursuant to the unilateral offer made by

Sam's broker); another $15,000 goes to Sam's broker (the 6% total commission minus the 3%

offered to the buyer-broker); and the rest is sent to Sam.

### C.  The Anticompetitive Conduct and its Effects

Plaintiffs allege that Hanna conspired with other NAR-member brokerages to artificially

inflate commission rates for buyer-brokers, and suppress competition among them, by

promulgating certain rules, policies, and practices that govern the behavior of NAR members and

NAR MLS users.

The first and most central of these rules, which Plaintiffs call the "Buyer-Agent

Commission Rule," is set forth in the NAR's Handbook on MLS Policy as follows:

> In filing a property with [a MLS controlled by the NAR], the
> participant of the service is making blanket unilateral offers of
> compensation to the other MLS participants, and shall therefore
> specify on each listing filed with the service, the compensation
> being offered to the other MLS participants. . . . [MLSs] shall not
> publish listings that do not include an offer of compensation
> expressed as a percentage of the gross selling price or as a definite
> dollar amount, nor shall they include general invitations by listing

> brokers to other participants to discuss terms and conditions of possible cooperative relationships.

In lay terms, the Buyer-Agent Commission Rule requires seller-brokers, when listing a house on an MLS, to offer the same fee to any buyer-broker who successfully finds a buyer for the home, and forbids them from inviting buyer-brokers to negotiate the commission amount.

Elsewhere, as a complement to the Buyer-Agent Commission Rule, the Handbook prescribes what Plaintiffs call the "Commission Filter Rule," which allows buyer-brokers using an MLS to sort and select "listings they choose to display based only on objective criteria including . . . compensation offered by listing brokers." Certain NAR-controlled MLSs even allow buyer-brokers to set up automated email blasts to their buyer clients which filter out any homes that fall below a certain compensation amount or percentage.

Plaintiffs allege that these rules collectively facilitate a process dubbed "steering," whereby buyer-brokers deliberately avoid showing their clients any homes for which the buyer-broker fee is below the artificially high market compensation rate. Buyer-brokers do this to discourage sellers from offering low fees: if no buyer-broker will show a house listed too far below the supracompetitive market rate, then such a home will never find a buyer, forcing the seller-brokers to respond by offering the artificially inflated fee about which Plaintiffs complain.

Plaintiffs also allege that these rules reduce the quality of services offered by buyer-brokers. When brokers decide which houses to show their clients based on potential payouts, those brokers discount the buyer's desiderata—location, style, land features, *et cetera*. And since the same compensation fee is offered to all buyer-brokers regardless of skill, experience, or amount of time expended, buyer-brokers need not market themselves to compete along these axes. Making money as a buyer-broker becomes a pure numbers game, and buyers are deprived of the bespoke services they might otherwise receive if their brokers were compensated

5

differently.

Plaintiffs also contend that Hanna and its co-conspirator NAR members have developed a set of rules that conceal from potential buyers the information they would need to resist or detect steering. First and foremost is the "Free Service Rule," under which buyer-brokers are permitted to represent to their buyer clients that their services are "free"—even though, as Plaintiffs allege, the buyer ends up paying for these services through artificially-inflated home prices. Plaintiffs also contend that NAR forbids buyer-brokers from revealing to their clients the total commission rate associated with a property (as determined between the seller and their broker) as well as the commission rate specifically offered to the buyer-broker. Because buyers believe their brokers are working for free, and because they do not know the commission rates involved in the transaction, they are highly unlikely to attempt to negotiate a lower buyer-broker commission.

But even if a buyer did know the rate their broker was offered, Plaintiffs contend, the buyer would be all but powerless to reduce it. This is because the buyer-broker's rate is determined by the seller and the seller-broker—not the buyer and the buyer-broker—and the NAR's ethical rules[1] expressly prohibit buyer-brokers from "us[ing] the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation . . . ." To the extent buyer-brokers are permitted to negotiate their commission rates at all, the NAR requires that such negotiations take place *before* the buyer-broker shows the home in question to a potential buyer, and the seller loses the ability to unilaterally modify the offer of compensation once *any* buyer has placed an offer on the house, leaving a short window of time during which fees have the potential to be modified downward. The NAR ethical rules also forbid buyer-

---

[1] The NAR's ethical rules are codified in its Code of Ethics; local member associations that fail to enforce the Code's rules are subject to expulsion from the national organization.

agents from urging their clients to attempt fee negotiations directly with the seller, meaning that buyer-agents cannot skirt the NAR's guardrails by encouraging the buyer to act in their own best interest.

With all these rules governing the conduct of NAR-member brokers, why would a buyer not simply find a broker who is not a NAR member?  Because, according to Plaintiffs, the NAR limits access to lockboxes, which contain the keys to enter the homes listed on NAR MLSs, to NAR members.  Since NAR controls so many local MLSs (and, by extension, the keys to the homes listed thereon), the number of homes a non-member buyer-broker could access would be minimal, rendering them an ineffective broker.  The NAR's lockbox policy, then, encourages all buyer-brokers operating in a NAR-dominated market to become NAR members, thereby subjecting all the brokers in the region to the same anticompetitive rules and effectively driving out all non-NAR competition for buyer-broker services.

### D.  The Effect of the Anticompetitive Conduct

Plaintiffs contend that home buyers have borne the brunt of the anticompetitive rules and policies laid out above.  Higher commission fees for buyer-brokers mean higher home prices, and higher home prices mean buyers have paid more for their homes than they would have in a competitive market.  Buyers have also received lower quality brokerage services, since brokers have steered them away from homes that match their purchase criteria in favor of homes offering high commission fees.  And buyers are none the wiser, having had the wool pulled over their eyes by brokers who are permitted to represent their services as "free."  Meanwhile, brokers operating outside the NAR-controlled conspiracy are literally locked out of the market.  Buyers, then, have neither the information they would need to negotiate better rates or services, nor any real ability to search for a home beyond the conspiracy's reach.

Plaintiffs allege that this is a conspiracy which has inflated buyer-broker rates to artificially high levels for decades, even as technological changes in the industry have lowered costs for brokerage services and rendered the buyer-broker's role less instrumental in the home-buying process.  The digitalization of real estate databases and the ubiquity of instantaneous communication methods for transmitting offers has reduced the amount of time it takes for a broker to find houses for their client and make offers on their behalf.  What's more, the rise of online public real estate marketplaces like Zillow has changed the *modus operandi* of home-buying; buyers increasingly locate the homes they are interested in on their own, and retain a broker only to coordinate a showing or to help put in an offer.  Plaintiffs allege that the conspiracy engineered by Hanna and other NAR members is the only reason that cost-savings and diminishing demand have not resulted in lower fees for buyer-brokers.

## II.    LEGAL STANDARDS

Hanna moves to dismiss Plaintiffs' Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  The plaintiff is obliged to provide something "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

In deciding a Rule 12(b)(6) motion, "[t]he court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to

the plaintiff," *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000), with the question being "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief," *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citation omitted). Furthermore, "factual and legal elements of a claim should be separated," with the former "accept[ed] . . . as true" and the latter "disregard[ed]" where not supported by well-pleaded facts. *Fowler*, 578 F.3d at 210 (citations omitted).

## III.   DISCUSSION

Plaintiffs' Amended Complaint brings claims under: (1) the Sherman Act, 15 U.S.C. § 1 *et seq.*, seeking injunctive relief; (2) antitrust statutes of twenty-four states and the District of Columbia,[2] seeking damages; (3) consumer protection statutes of twenty-two states and the District of Columbia,[3] seeking damages; and, (4) the equitable doctrine of unjust enrichment, seeking disgorgement and restitution. Hanna argues that the entire Amended Complaint should be dismissed because each of these Counts is insufficiently pleaded. Its arguments, and Plaintiffs' responses, will be analyzed *seriatim*.

---

[2] These statutes are: Ariz. Rev. Stat. §§ 44-1401, *et seq.*; Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*; Conn. Gen. Stat. §§ 35-24, *et seq.*; D.C. Code Ann. §§ 28-4501, *et seq.*; Haw. Rev. Stat. § 480-3, *et seq.*; 740 Ill. Comp. Stat. Ann. 10/7, *et seq.*; Iowa Code §§ 553.1, *et seq.*; Kan. Stat. Ann. §§ 50-101, *et seq.*; Me. Rev. Stat. Ann. tit. 10, § 1104(1), *et seq.*; Md. Com'l Law Code Ann. § 11-204, *et seq.*; Mich. Comp. Laws Ann. §§ 445.771, *et seq.*; Minn. Stat. Ann. § 325D.57, *et seq.*; Neb. Code Ann. §§ 59-801, *et seq.*; Nev. Rev. Stat. Ann. §§ 598A, *et seq.*; N.H. Rev. Stat. § 356:1, *et seq.*; N.M. Stat. Ann. § 57-1-1, *et seq.*; N.Y. Gen. Bus. L. §§ 340, *et seq.*; N.C. Gen. Stat. §§ 75-1, *et seq.*; N.D. Cent. Code § 51-08.1-01, *et seq.*; Or. Rev. Stat. §§ 646.705, *et seq.*; R.I. Gen. Laws §§ 6-36-4, *et seq.*; Utah Code 76-10-3101, *et seq.*; Vt. Stat. Ann. tit. 9, § 2453 *et seq.*; W. Va. Code § 47-18-1, *et seq.*; and Wis. Stat. §§ 133.03, *et seq.*

[3] These statutes are: Ariz. Rev. Stat. §§ 44-1521, *et seq.*; Cal. Bus. and Prof. Code §§ 17200, *et seq.*; Colo. Rev. Stat §§ 6-1-105, *et seq.*; Conn. Gen. Stat. §§ 42-110A, *et seq.*; D.C. Code §§ 28-3901, *et seq.*; Fla. Stat. §§ 501.201, *et seq.*; Iowa Code §§ 714H.1, *et seq.*; Mass. Gen. Laws ch. 93A, § 9 *et seq.*; Mich. Comp. Laws Ann. § 445.901, *et seq.*; Mo. Stat. §§ 407.010, *et seq.*; Mont. Code Ann. § 30-14-101, *et seq.*; Neb. Rev. Stat. § 59-1601, *et seq.*; Nev. Rev. Stat. §§ 598.0903, *et seq.*; N.H. Rev. Stat. § 358:1, *et seq.*; N.J. Stat. Ann. § 56:8-1, *et seq.*; N.Y. Gen. Bus. Law § 349, *et seq.*; N.C. Gen. Stat. §§ 75-1.1, *et seq.*; Or. Rev. Stat. §§ 646.605, *et seq.*; 73 Pa. Stat. Ann. §§ 201-1 *et seq.*; R.I. Gen Laws § 6-13.1-1, *et seq.*; S.C. Code Ann. § 39-5-140(a), *et seq.*; Va. Code §§ 59.1-196, *et seq.*; and Wisc. Stat. § 100.18, *et seq.*

### A. Antitrust Challenges

Turning first to Plaintiffs' antitrust claim brought pursuant to § 1 of the Sherman Act, which reads, in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. A plaintiff suing under § 1 must plead allegations that satisfy two elements. "First, the plaintiff must show that the defendant was a party to a 'contract, combination . . . or conspiracy'"—referred to as an 'agreement.' *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 218 (3d Cir. 2008). Second, "the plaintiff must show that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade." *Id.* Hanna argues that Plaintiffs' federal and state antitrust claims clear neither of these hurdles.[4]

### i. Agreement

Agreement is one of the two pillars of a § 1 violation. *See id.* To make out a § 1 claim, a plaintiff must plausibly show that the defendant agreed with another party to restrain trade; "[u]nilateral action, no matter what its motivation, cannot violate § 1." *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 110-11 (3d Cir. 1980). Although the text of § 1 refers to the trio of "contract, combination . . . or conspiracy," 15 U.S.C. § 1, courts have routinely interpreted that text as invoking "a single concept about common action"—in other words, an

---

[4] Plaintiffs bring both federal and state antitrust claims, but Hanna cites only to federal caselaw in attacking the sufficiency of their pleadings, maintaining that both kinds of claims fail for the same reasons. Plaintiffs, for their part, do not dispute here that their state claims rise and fall with their federal one. This is because the twenty-five state antitrust statutes that Plaintiffs rely on share a common ancestor—the federal Sherman Act—and are regularly interpreted in accordance with federal caselaw. *See Davis*, 2025 WL 845918, at *13 (describing the harmonization provisions of many state antitrust laws, which "require or allow [those] laws to be interpreted in accordance with federal antitrust precedent"); *In re Suboxone Antitrust Litig.*, 2017 WL 4642285, at *11 (E.D. Pa. Oct. 17, 2017) (explaining that state antitrust laws are "consistently interpreted in parallel" with the Sherman Act). Accordingly, all of Plaintiffs' antitrust claims will be interpreted together under the rubric of the Sherman Act.

agreement—without which no § 1 claim may proceed.  *Id.* at 111; s*ee also Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946) (interpreting § 1 to prohibit two or more actors engaging in "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement").  Of importance in the discussion that follows is that agreements are either horizontal or vertical in nature, with the former resulting from "agreement between competitors" and the latter from "agreement between firms at different levels of distribution . . . ."  *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988).

To satisfy its burden at the pleading stage, a § 1 plaintiff may set forth either direct or circumstantial evidence suggesting that an agreement has taken place.  *LifeWatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 333 (3d Cir. 2018).  Direct evidence "is explicit and requires no inferences to establish the proposition or conclusion being asserted," *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999); an example relevant to the antitrust context could be "a document or conversation explicitly manifesting the existence of the agreement in question."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.23 (3d Cir. 2010) (hereinafter "*Insurance Brokerage*").  "Allegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate" to plausibly plead an agreement.  *Id*. at 323.

By contrast, where a plaintiff relies only on circumstantial evidence—paradigmatically, evidence of parallel conduct between competitors—its burden cannot be satisfied merely by setting forth facts that are equally consistent with shrewd, independent business judgment as they are with an illegal agreement to restrain trade.  *See Twombly*, 550 U.S. at 556-57 ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.").  Instead, absent direct evidence, the pleadings must include "enough factual matter (taken as true) to suggest that an agreement *was* made," and "that discovery *will* reveal evidence" of that

11

agreement.  *Id.* at 556 (emphasis added).  To make that showing, courts typically require

evidence of parallel conduct and "something 'more,'" which is sometimes called a "'plus

factor.'"  *LifeWatch Servs.*, 902 F.3d at 333 (quoting *Insurance Brokerage*, 618 F.3d at 321).

### a.  Horizontal Agreement

With these standards in mind, Hanna argues that Plaintiffs have failed to plead direct or

circumstantial evidence that Hanna entered into a horizontal agreement with its competitor

brokerages.[5]  As for the evidence that Plaintiffs *do* offer—that Hanna and its brokers are NAR

members, that its executives helped promulgate the complained-of NAR rules, and that its

brokers adhere to and enforce those rules—Hanna maintains that these actions "could easily be

the product of unilateral activity and thus do nothing to establish an agreement" with its fellow

NAR-member brokerages.  For support, it points to caselaw suggesting that "concerted action

does not exist every time a trade association member speaks or acts," but rather only when "all

the facts and circumstances" suggest "the action taken was the result of some agreement, tacit or

otherwise, among members."  *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1007-08

---

[5] Hanna argues, as a threshold matter, that the Amended Complaint fails to put it on notice of what actions it has taken that are evidence of a purported antitrust conspiracy.  Instead, the argument goes, Plaintiffs engage in illicit "group pleading" by omitting any "specific allegations about Hanna['s] involvement in the alleged conspiracy" and relying solely on "generic references to '[Hanna] and its coconspirators' that are tacked on to a conclusory verb form—such as 'adopted,' 'implemented and enforced,' and 'act[ed]'—to connect [Hanna] to a supposedly anticompetitive agreement."  *See In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp.2d 709, 720 (E.D. Pa. 2011) (explaining that an antitrust complaint must be specific enough to make a defendant "at least reasonably aware of what they have done or failed to do, lest the litigants be left to wander aimlessly through the wilds and wilderness of discovery to no ultimate destination"); *see also Twombly*, 550 U.S. at 565 n.10 ("[A] defendant seeking to respond to . . . conclusory allegations in the § 1 context would have little idea where to begin.").

Hanna's notice argument is belied by the Amended Complaint itself, a review of which reveals concrete allegations about Hanna's involvement in the alleged conspiracy.  Specifically, the Amended Complaint names certain of Hanna's executives who have served on NAR Boards of Directors that "drafted, developed, and promulgated" the NAR rules complained of in this case, as well as other executives who have sat on the NAR's "Multiple Listing Issues and Policies Committee, which is responsible for reviewing and reissuing the NAR handbook" containing some of those rules.  In a case where Hanna is alleged to have acted in furtherance of a conspiracy to restrain trade by implementing and enforcing rules governing NAR member-brokers, facts tying Hanna's executives to the NAR bodies that enacted and reviewed those rules are sufficient to make Hanna "at least reasonably aware" of what they are alleged to have done in connection with the alleged conspiracy.  *Processed Egg Prods.*, 821 F. Supp.2d at 720.

(3d Cir. 1994); *see also Consol. Metal Prods., Inc. v. Am. Petrol. Inst.*, 846 F.2d 284, 293-94

(5th Cir. 1988) ("[A] trade association is not by its nature a 'walking conspiracy,' its every denial

of some benefit amounting to an unreasonable restraint of trade.").

Hanna also relies heavily on *Insurance Brokerage*, wherein the Third Circuit affirmed the

District Court's dismissal of an antitrust complaint partly on the grounds that the plaintiffs did

not plead, under the standard set forth by the Supreme Court in *Twombly*, any plausible

horizontal agreement between the defendant insurance brokers. 618 F.3d at 349. In that case,

the plaintiffs alleged that defendant insurance brokers each individually established vertically-

anticompetitive business relationships with certain preferred insurance agencies, and then

proceeded to agree horizontally with one another to conceal the existence and details of those

relationships from the public and from other brokers. *Id.* at 327. As evidence of the latter

horizontal agreement between brokers, plaintiffs pointed to the fact that the defendants issued

boilerplate "'statements modeled after [their trade organization's] position statement' advising

brokers on how to respond to questions regarding" the vertically-anticompetitive dealings in

which each defendant was individually engaged. *Id.* at 349. But the Third Circuit reasoned that,

even if "the defendant brokers collaborated in crafting" the trade group position statement that

the brokers adopted, that fact would only plausibly establish "that defendants agreed to work

together to determine the best way of disguising activity in which each engaged"—*not* "that the

decision to disguise that activity . . . was *itself* the product of an agreement" among the brokers.

*Id*. at 349-50 (emphasis added).

Applying *Insurance Brokerage* to the case at bar, Hanna argues that "[a]ll Plaintiffs

allege is [Hanna's] participation and leadership in NAR and independent adherence to [NAR's]

guidelines." Like the inadequate allegations in *Insurance Brokerage*, these pleadings fail to

prove an agreement, Hanna argues, because Plaintiffs have not proffered any evidence plausibly suggesting that Hanna's decision to promulgate and adopt the NAR rules in question "was itself the product of an agreement" with its fellow NAR-member brokerages. *Id.* In other words, just as the plaintiffs in *Insurance Brokerage* failed to demonstrate that the defendant brokers *first* agreed to conceal their business dealings *before* working together to develop a rule allowing such concealment, Plaintiffs here offer no evidence that Hanna first agreed with other NAR brokerages to restrain competition before enacting and enforcing the NAR rules in question.

Plaintiffs counter that the challenged NAR rules are themselves direct evidence of a horizontal agreement between Hanna and its rival brokerages. They liken this matter to a line of cases involving mandatory trade organization rules that have been found to be anticompetitive, and where no additional evidence of agreement was required other than the existence of the mandatory rules themselves. *See, e.g.*, *Associated Press v. United States*, 326 U.S. 1, 19 (1945) (finding that publishers had agreed to "surrender[] [themselves] completely to the control of the association" simply by adhering to "restrictive By-Laws") (cleaned up); *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 682-83 (1978) (finding that the existence of a restrictive bidding regulation in professional organization's Code of Ethics was itself "[e]vidence of th[e] agreement" to restrain competition); *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 99 (1984) ("By participating in an association which prevents member institutions from competing against each other on the basis of price," association members "created a horizontal restraint—an agreement among competitors on the way in which they will compete with one another.").

Plaintiffs also liken this case to the Second Circuit's decision in *Relevent Sports, LLC v. United States Soccer Federation, Inc.*, 61 F.4th 299 (2d Cir. 2023). In that case, the defendant—

an international association of soccer leagues—issued a policy that prohibited its member

leagues from hosting official season games outside of a league's home territory; for example, La

Liga—a member-league based in Spain—would be forbidden, under the policy, to host a regular-

season match between two La Liga teams in the United States.  *Id*. at 304.  The plaintiff, a

United States-based soccer promoter, alleged that this rule constituted a "horizontal division of

geographic markets agreement" in violation of § 1 of the Sherman Act.  *Id.* at 308.  However,

upon motion by the defendant, the Southern District of New York dismissed the claim for failure

to plead an agreement, holding that "[i]n order for an organizational decision or policy to

constitute concerted action and, therefore, to serve as direct evidence of an unlawful agreement,"

a plaintiff "must plausibly allege an antecedent agreement among horizontal competitors to agree

to vote a particular way to adopt such a policy."  *Relevent Sports, LLC v. Fed'n Internationale de

Football Ass'n*, 551 F. Supp. 3d 120, 131-32 (S.D.N.Y. 2021) (cleaned up).

On appeal, the Second Circuit reversed the District Court's decision and found that the

plaintiff had adequately pleaded an agreement.  61 F.4th at 308-09.  In doing so, the Court of

Appeals distilled Supreme Court precedent to draw a distinction between two types of § 1 cases

involving trade organization rules.  The first type of case involves "alleg[ations] that a policy or

rule is in service of a plan to restrain competition[;]" when a plaintiff pursues this theory of

agreement, "it must allege enough additional facts to show that agreement to such a plan exists."

*Id.* at 308.  However, in the second type of case, where "the plaintiff adequately alleges that the

policy or rule *is the agreement itself*," the plaintiff "need not allege any further agreement."  *Id.*

(emphasis added); *see also id.* at 307 ("[T]he adoption of a binding association rule designed to

prevent competition is direct evidence of concerted action.  No further proof is necessary.").

Applying this dichotomy to the case before it, the Second Circuit reasoned that, because the

plaintiff adequately alleged that the anticompetitive policy in question was "the agreement itself," the case fell into the second of these categories and "no further proof" of a separate agreement "[was] necessary" to state a claim under § 1.  *Id*. at 307-08.

Here, at oral argument, both parties expressed that the framework set forth in *Relevent Sports* was useful in elucidating their disagreements.[6]   Plaintiffs maintained that their allegations fall into the second category established in *Relevent Sports*, arguing there (as they do in their brief) that it is immaterial whether Hanna and its competitor brokerages agreed to restrain competition for buyer-broker services separate from and antecedent to their enactment of the rules enabling that restraint, since the fact of the rules' enactment is itself direct evidence of an agreement to restrain competition.  Hanna's position at oral argument, on the other hand, was that Plaintiffs' claims belong in the first *Relevent Sports* category; because Plaintiffs have endeavored to plead that the NAR rules work "in service of a plan to restrain competition," the argument goes, they "must allege enough additional facts to show that agreement to such a plan exists" separate from the NAR rules that supposedly enable it.  *Id.* at 308.  And since they fail to do so, Hanna argued, their § 1 claim must be dismissed.

Ultimately, though, at the motion to dismiss stage, it is the allegations in the operative complaint that set the terms of the analysis—not the parties' arguments in their briefs or at oral argument.  *See Gould Elecs., Inc.*, 220 F.3d at 176.  Here, a review of the Amended Complaint vindicates Hanna's characterization, and belies Plaintiffs'.  In Paragraph 166, Plaintiffs plead that "the contract, combination, or conspiracy alleged herein has consisted of continuing

---

[6] Hanna did maintain, at oral argument, that the Second Circuit's description of the pleading standard that applies in the second type of case—where the trade organization rule is itself alleged as the anticompetitive agreement in question—is inconsistent with the Third Circuit's holding in *Insurance Brokerage*.  However, as explained in more detail below, Plaintiffs' Amended Complaint falls into the first category of cases set forth in *Relevent Sports*; accordingly, it need not be determined here whether there exists a direct conflict between that case and *Insurance Brokerage*.

agreements among [Hanna] and its coconspirators to set, raise, and maintain the level of broker

commissions."  Then, in Paragraph 167, Plaintiffs explain that "[i]n furtherance of the contract,

combination, or conspiracy, [Hanna] and its coconspirators have committed" the "overt acts" of

"participat[ing] in the establishment, maintenance, and implementation of the [challenged NAR

rules]" and "us[ing] their control over the NAR MLSs to force affiliated brokers, members, and

franchisees of [Hanna's] to implement and adhere to [the challenged NAR rules] in the areas in

which the NAR MLSs operate."[7]  These pleadings explicitly contemplate the existence of

agreements antecedent to the challenged NAR rules—namely, the "continuing agreements

among [Hanna] and its coconspirators to set, raise, and maintain the level of broker

commissions" referenced in Paragraph 166—and characterize the  NAR rules as "overt acts"

taken "[i]n furtherance" of those prior agreements.

 Plaintiffs draw attention to several other Paragraphs of their Amended Complaint, but

none of these pleadings actually allege that the NAR rules themselves constitute the horizontal

agreement in question.  In fact, a few of Plaintiffs' cited Paragraphs say almost nothing about

agreement at all.  Paragraph 8, for example, simply lays out the NAR rules at issue.  Paragraph

46, too, is merely a description of Hanna's business structure that alleges nothing relevant to the

question of agreement except for the undisputed fact that Hanna is a NAR member.

 Other Paragraphs allege facts that might arguably be pertinent to the question of

agreement, but still do not allege that the NAR rules are the horizontal agreement about which

Plaintiffs complain.  Paragraph 11 alleges that "[Hanna] and its coconspirators further implement

the conspiracy by reviewing and reissuing NAR's rules," which, like Paragraphs 166 and 167,

---

[7] Plaintiffs make similar allegations in Paragraphs 174 to 178, which charge Hanna with violating various state antitrust laws.

suggests that the NAR rules are designed to "implement" a prior horizontal agreement, as opposed to constituting the agreement itself. Paragraphs 77 and 125 allege that NAR members are required to obey and enforce NAR rules, but, as explained further below, this fact only plausibly suggests a vertical agreement between Hanna and NAR, not a horizontal agreement between Hanna and its competitors. Paragraph 131 alleges that Hanna's executives served on NAR boards that "review[] and reissu[e]" NAR rules, but does not allege that, by doing so, Hanna's executives entered into a horizontal agreement with anyone else. Finally, Paragraph 145 alleges that, in the years preceding the filing of the Amended Complaint, Hanna and its coconspirators "repeatedly engaged in anticompetitive conduct, including implementing and enforcing" the NAR rules at issue. But alleging that Hanna "engaged in anticompetitive *conduct*" by enacting and enforcing the NAR rules is not the same as alleging that the implementation of NAR rules is itself the anticompetitive *agreement* at which the antitrust claims are directed—especially in the context of an Amended Complaint that elsewhere explicitly characterizes "the [agreement] alleged [t]herein" as "consist[ing] of continuing agreements among [Hanna] and its coconspirators to set, raise, and maintain the level of broker commissions."

Stating the matter in terms of *Relevent Sports*, the Amended Complaint falls into the first of the two categories, since Plaintiffs allege that the NAR rules work "in service of a plan to restrain competition" separate from and antecedent to those rules. 61 F.4th at 308. Plaintiffs do not actually allege, as they maintain in their brief that they do, that the NAR rules in question constitute "the agreement itself," such that no additional evidence of agreement is needed. *Id*. Instead, Plaintiffs' Amended Complaint states that "the . . . conspiracy alleged [t]herein" consists of several "continuing agreements among [Hanna] and its coconspirators;" accordingly, they

"must allege enough additional facts to show that" those agreements plausibly took place. *Id.*

Here, Plaintiffs' factual allegations do not meet that standard. Plaintiffs allege that Hanna and its brokers are NAR members who follow the organization's rules; that its executives helped promulgate the complained-of NAR rules; and that Hanna and its coconspirators work together to enforce the rules in the MLSs that they jointly own. None of these constitutes direct evidence of a prior agreement to restrain trade; indeed, binding precedent holds that joining a trade organization, helping develop its rules, and enforcing those rules (even in collaboration with other members of the organization) do not plausibly establish the existence of a prior and separate horizontal agreement among competitors. *See Alvord-Polk*, 37 F.3d at 1007-08; *Insurance Brokerage*, 618 F.3d at 348-50; *Twombly*, 550 U.S. at 567 n.12 (rejecting the suggestion that parallel conduct, plus shared membership in a trade association, demonstrates the existence of a conspiracy).

At best, Plaintiffs' allegations paint a picture in which Hanna, "knowing that concerted action was contemplated and invited, . . . participated in" the passage and enforcement of the NAR rules "without previous agreement" to restrain competition among brokers. *Interstate Cir., Inc. v. United States*, 306 U.S. 208, 226-27 (1939). But this type of "conscious parallelism" is not outlawed by the Sherman Act, because it is just as likely to result from independent business judgment as from prior agreement among competitors. *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 541 (1954); *Insurance Brokerage*, 618 F.3d at 350 (finding that, where "each member of the industry believes its profits would suffer" if a shared business practice were disclosed to the general public, "it is not plausible to infer that each member's decision not to expose" the widespread use of that practice—*i.e.*, "not to engage in mutually assured destruction—is the product of an agreement").

19

In sum, the Amended Complaint charges Hanna with entering "continuing agreements" separate from and antecedent to the NAR rules in question. Neither the existence of these NAR rules, nor Hanna's alleged role in promulgating them, is direct evidence that any prior agreements actually took place. *See Insurance Brokerage*, 618 F.3d at 349-50. The same goes for the allegations that Hanna is a NAR member who follows the organization's rules; that its executives helped promulgate those rules; and, that Hanna and its coconspirators work together to enforce those rules; since these facts are equally likely to be explained by independent, self-interested business judgment, they are not direct evidence of any horizontal agreement. *See id.*; *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d at 1007-08. And because Plaintiffs do not separately argue that they have otherwise pleaded sufficient circumstantial evidence to plausibly allege a horizontal agreement between Hanna and its alleged coconspirators,[8] they have failed to state a claim that there was one. *See Twombly*, 550 U.S. at 556-57 ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.").

### b. Vertical Agreement

Although Plaintiffs have not plausibly alleged a horizontal agreement between Hanna and its competitor brokerages, they have plausibly alleged a vertical agreement between Hanna and NAR. Plaintiffs allege that Hanna is a NAR member; that its executives sit on NAR boards; that it requires its brokers and franchisees to follow NAR rules; and that it imposes the same rules on all brokers utilizing the MLSs that it controls. This evidence directly and circumstantially describes an agreement between Hanna and NAR—entities "at different levels" of the real estate market—and thus plausibly suggests a vertical agreement. *See Bus. Elecs. Corp.*, 485 U.S. at

---

[8] At oral argument, Plaintiffs' counsel confirmed that Plaintiffs intended to rest on their argument that they had proven a horizontal agreement by direct evidence, and did not present an alternative argument that they had proven the same by circumstantial evidence.

730.  Indeed, Hanna itself characterizes Plaintiffs' allegations as describing Hanna entering a "vertical agreement [with] a trade organization."  For the purposes of this Motion, then, Plaintiffs have met their burden of plausibly pleading a vertical agreement between Hanna and NAR.[9]

### ii.    *Unreasonable Restraint of Trade*

The Sherman Act outlaws "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations . . . ."  15 U.S.C. § 1.  Since almost all business conduct—even undoubtedly procompetitive dealing—amounts to some kind of "restraint of trade," the Supreme Court "has not taken a literal approach to [§ 1's] language."  *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).  Instead, "the Court has repeated time and again that § 1 'outlaw[s] only *unreasonable* restraints.'"  *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)) (emphasis added).

Courts utilize one of three tests to determine whether a restraint of trade is unreasonable in violation of § 1: the rule of reason, the *per se* approach, or the 'quick look' analysis.  *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*, 89 F.4th 430, 438-39 (3d Cir. 2023).  The rule of reason is "the accepted standard for testing whether a practice restrains trade" unreasonably, *Leegin*, 551 U.S. at 885, and it is presumed to apply in all §1 cases, *Winn-Dixie*, 89 F.4th at 438 (citing *Texaco*, 547 U.S. at 5).  That presumption does not hold, however, in the small set of cases where the challenged conduct "is manifestly anticompetitive" such that it may

---

[9] Plaintiffs argue that, if they "have not pleaded a horizontal agreement," then they at least "have pleaded a hybrid vertical and horizontal agreement with NAR as the hub and Hanna and its co-conspirator brokerages as the spokes." But to plead a hub-and-spoke conspiracy, a plaintiff must also establish a "rim"—here, an agreement among the brokerages separate from each brokerage's individual relationship with the NAR. *Kotteakos v. United States*, 328 U.S. 750, 755 (1946); *Insurance Brokerage*, 618 F.3d at 327.  As explained above, that is precisely what Plaintiffs have failed to plead.  Accordingly, they likewise fail to plausibly allege that Hanna was involved in a hub-and-spoke conspiracy.

be deemed illegal *per se*, *Continental T.V. v. GTE Sylvania*, 433 U.S. 36, 49-50 (1977), or in

cases "where *per se* condemnation is inappropriate" but where only a 'quick look' is needed to

reveal "the anticompetitive character of an inherently suspect restraint." *United States v. Brown

Univ.*, 5 F.3d 658, 669 (3d Cir. 1993) (internal quotations omitted).

      The character of the agreement underlying the alleged restraint of trade determines the

test to which it is subject. *See Winn-Dixie*, 89 F.4th at 438-42. Here, because Plaintiffs have

only plausibly pleaded a vertical agreement between Hanna and NAR, and not a horizontal

agreement between Hanna and its competitor brokerages, the rule of reason will govern their

antitrust allegations for the sake of the instant Motion to Dismiss. *See Toledo*, 530 F.3d at 225

(explaining that "the legality of a vertical agreement . . . is governed by the rule of reason," even

where the alleged "purpose of the vertical agreement . . . is to support illegal horizontal

agreements"); *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) (explaining that "nearly

every" vertical restraint of trade "should be analyzed under the rule of reason"); *Leegin*, 551 U.S.

at 899 (explaining that "the rule of reason, not a *per se* rule of unlawfulness, would be the

appropriate standard to judge vertical price restraints"). But this decision is not trapped in

amber; should subsequent factual development reveal that the underlying agreement has a

different shape, a different mode of analysis may be proper at a later stage. *See Swarthmore

Radiation Oncology, Inc. v. Lapes*, 812 F. Supp. 517, 520 (E.D. Pa. 1992) (explaining that a

court need not definitely determine "whether to apply a *per se* standard or a 'rule of reason'"

before discovery (citing *Fuentes v. South Hills Cardiology*, 946 F.2d 196, 202 (3d Cir. 1991)));

*Fuentes v. Royal Dutch Shell PLC*, 2019 WL 7584654, at *1 (E.D. Pa. Nov. 25, 2019) (collecting

cases).

      The rule of reason requires a factfinder to "weigh[] all of the circumstances of a case in

deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Cont'l T.V.*, 433 U.S. at 49.  Among the circumstances to be considered are "information about the business, the restraint's history and effect, and the business's market power."  *In re Processed Egg Prods. Antitrust Litig.*, 962 F.3d 719, 726 (3d Cir. 2020).  To that end, "[t]he plaintiff bears an initial burden under the rule of reason of showing that the alleged combination or agreement produced adverse, anti-competitive effects within the relevant product and geographic markets."  *United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993).  Implicit therein is a plaintiff's antecedent "burden of defining the relevant market."  *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 436 (3d Cir. 1997); *Am. Express*, 585 U.S. at 543 ("[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market.").

Here, Hanna argues that Plaintiffs have failed to allege either a plausible product market or a plausible geographic market.  Each argument will be considered in turn.

### a.  Product Market

For purposes of determining whether a restraint of trade in a given product market violates the Sherman Act, the definition of that market should include those "commodities reasonably interchangeable by consumers for the same purposes."  *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).  The "commodities" at issue may include either products or services.  *See, e.g., Am. Med. Ass'n v. United States*, 317 U.S. 519 (1943) (considering Sherman Act claim involving medical services).  "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  However, "courts should combine different products or services into

23

a single market"—even if those products or services are not interchangeable, but instead complementary—"when that combination reflects commercial realities." *Am. Express*, 585 U.S. at 544.

Here, Plaintiffs allege that the relevant product market is the "market for buyer-agent services." Hanna does not argue that this market definition flouts "the rule of reasonable interchangeability and cross-elasticity of demand," or that the definition "clearly does not encompass all interchangeable substitute products . . . ." *Id.* Instead, it takes issue with the fact that "Plaintiffs' market definition includes only the buyer-side, and not the seller-side, of what is a two-sided market." It argues that this myopia "is fatal," since "plaintiffs challenging conduct in two-sided markets must allege anticompetitive effects on both sides of the market because 'competition cannot be accurately assessed by looking at only one side of the platform in isolation.'" *Am. Express*, 585 U.S. at 546.

A two-sided market is a market consisting of two-sided transaction platforms, which, in turn, are defined as products or services that "facilitate a single, simultaneous transaction between participants." *Am. Express*, 585 U.S. at 545. The example considered by the Supreme Court in *American Express* is the market for credit-card transaction services. In that case, the United States and several States challenged American Express's ("Amex") policy that forbade merchants "from discouraging customers from using their Amex card after they have already entered the store and are about to buy something, thereby avoiding Amex's fee." *Id*. at 534. Amex maintained this policy—called the 'antisteering' provision—because its competitor credit-card companies generally charged merchants lower fees. *Id.* at 538. The challengers alleged that this policy resulted in supracompetitive merchant fees and thus violated the Sherman Act as an unreasonable restraint of trade. *Id.* at 539.

24

At the trial level, the District Court determined that "the credit-card market should be treated as two separate markets—one for merchants and one for cardholders." *Id.* at 540. The Supreme Court rejected the resultant verdict against Amex on the grounds that this was not "an accurate definition of the relevant market," rendering application of the rule of reason impossible. *Id.* at 542-43; *see also Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177 (1965) ("Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition."). In the market for credit-card services, the Court explained, a card company "can sell its services only if a merchant and cardholder both simultaneously choose to use the network;" it does the company no good to sign up cardholders if no merchants accept the customers' cards, and vice versa. *Am. Express*, 585 U.S. at 545. In this sense, a credit-card company "cannot sell transaction services to either cardholders or merchants individually," making it impossible to evaluate competition *between* credit-card companies without considering "both sides" of the platform—merchants *and* cardholders. *Id.* Because the plaintiffs in *American Express* "stake[d] their entire case on proving that Amex's agreements increase[d] merchant fees" without considering the agreements' effects on cardholders, it was impossible for any factfinder to evaluate whether those high fees had "anticompetitive effects on the two-sided credit-card market *as a whole*"—whether by "increas[ing] the cost of credit-card transactions above a competitive level, reduc[ing] the number of credit-card transactions, or otherwise stifl[ing] competition" among credit-card companies. *Id.* at 547 (emphasis added).

The allegations of anticompetitive conduct set forth in Plaintiffs' Amended Complaint are analogous to the challenges brought in *American Express*. Plaintiffs plausibly allege a vertical agreement between Hanna and the NAR, where the former agrees to enforce the latter's

rules in exchange for the benefits of NAR membership.  Those benefits include the ability to

participate in NAR-controlled MLSs, where, due to the anticompetitive effects of a handful of

NAR rules restraining normal competition among brokers, brokerage fees have allegedly

ballooned to supracompetitive rates and non-NAR brokers have been iced out of the market.

Plaintiffs allege that homebuyers bear the brunt of these inflated commissions, since sellers pass

the inflated rates on to buyers as part of the purchase price of the home.  Similarly, in *American

Express*, Amex was accused of engineering an anticompetitive structure where its vertically-

situated merchant clients agreed not to encourage competition from other credit-card providers in

exchange for the right to continue accepting payments from Amex cardholders.  *Id.* at 539-40.

The resultant dearth of competition at the cash register allegedly resulted in higher fees for

merchants, who had no option but to continue accepting Amex cards even as Amex hiked its

transaction rates with the impunity of a monopolist.  *Id.* at 556-57 (Breyer, J., dissenting).

Despite the similarities between the cases, *American Express* is distinguishable.  There,

the Court explained that "[e]valuating both sides of a two-sided transaction platform is []

necessary to accurately assess competition" between credit-card companies because "the product

that credit-card companies sell is transactions, not services to merchants, and the competitive

effects of a restraint on transactions cannot be judged by looking at merchants alone."  *Id.* at 546,

547.  In the real estate market, however, the opposite is true: brokers sell *services* to homebuyers

and homesellers, not *transactions* themselves.  Hanna can earn a commission by only

representing one party in a home sale, even if that sale is necessarily a two-party transaction;

Amex, on the other hand, cannot make a cent unless it singlehandedly pairs a cardholder with a

subscribing merchant.  This is a crucial difference, because it impacts what kind of information a

court needs to determine whether competition is being suppressed in the respective markets.  A

court evaluating a restraint of trade in the credit-card services market needs to know the effects

the restraint has on both sides of a credit-card companies' business—cardholder and merchant—

in order to determine whether competition between credit-card companies is truly being

suppressed.  In the buyer-broker services market, however, a court only needs to know whatever

facts about the seller-side are "necessary to accurately assess competition."  *Id.* at 546.

Here, Plaintiffs allege that the NAR rules inflate buyer-broker fees by suppressing

negotiation and competition among brokers, that sellers pass those inflated fees onto buyers (who

pay them as part of the total home price), and that Hanna is legally responsible.  At this early

stage of the proceeding—where the Plaintiffs' well-pleaded allegations set the terms of the

analysis, as opposed to "actual market realities," *Eastman Kodak Co. v. Image Tech. Servs., Inc.*,

504 U.S. 451, 466-467 (1992)—these facts are all a court needs to make a preliminary

determination about whether the "alleged combination or agreement produced adverse, anti-

competitive effects within the" market for buyer-broker services.  *Brown Univ.*, 5 F.3d at 668;

*Brown Shoe*, 370 U.S. at 325.

However, it must also be borne in mind that, "in most cases," the determination about

whether a market has been properly defined can be made "only after a factual inquiry into the

commercial realities faced by consumers."  *Queen City Pizza*, 124 F.3d at 436; *see also Batton v.

Nat'l Ass'n of Realtors*, 2024 WL 689989, at *5 (N.D. Ill. Feb. 20, 2024) (finding, in case

involving substantially similar allegations, that "more factual development than is possible at the

motion to dismiss stage" was required before the District Court could properly determine

whether "a two-sided analysis" was appropriate).[10]  Indeed, *American Express* was decided with

---

[10] Plaintiffs argue that dismissal would be improper for this reason alone.  But the Third Circuit has expressly rejected any "*per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market under [Rule] 12(b)(6)," *Queen City Pizza*, 124 F.3d at 436, so that argument fails.

the benefit of a voluminous record developed over the course of a seven-week bench trial. *Am. Express*, 585 U.S. at 557 (Breyer, J., dissenting). So, while Plaintiffs have carried their burden of establishing a plausible product market for the purposes of this Motion to Dismiss, future fact-finding may—or may not, for that matter—alter this determination.

b.   Geographic Market

In addition to pleading a relevant product market, the plaintiff bears the burden to plead a plausible geographic market. *Brown Univ.*, 5 F.3d at 668. A geographic market is "the area of effective competition" relevant to a given antitrust claim. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). Because this kind of "market is not ordinarily susceptible to a 'metes and bounds' definition," *id.* at 331, it is sufficient for a plaintiff to plead a plausible "area in which a potential buyer may rationally look for the goods or services he seeks." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 212 (3d Cir. 2005); *see also Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir. 1999) (defining geographic market as the "locale in which consumers of a product or service can turn for alternative sources of supply").

The Amended Complaint sets forth the relevant geographic market as "the geographic areas in which NAR MLSs operate." Hanna argues that this market is implausible for two reasons. First, it maintains that many NAR MLSs are so large that "a potential buyer" would not "rationally look for" brokerage services across the full breadth of that MLS's reach. *Gordon,* 423 F.3d at 212. For example, a single NAR MLS—Bright MLS—"covers 93,254 realtors who work across six states" in the Mid-Atlantic "and the District of Columbia." This is too large of a market to be plausible, says Hanna, because "a prospective home buyer in Philadelphia is unlikely to view a broker who works in University City as interchangeable with a broker who works in Alexandria, Virginia." But this argument proves too much; there is no requirement that

a market be defined such that "a potential buyer may rationally look for the goods or services he seeks" in every far-flung corner of that market—only that the market be "determined in the context of each case in acknowledgment of the commercial realities of the industry being considered." *Id.* Here, Plaintiffs plead that NAR members operate MLSs all throughout the United States. It follows, then, that the geographic market they plead "acknowledg[es] . . . the commercial reality of the industry" by being defined to match the expansive, nationwide reach of NAR MLSs. *Id.*

Second, Hanna argues that, "because MLSs are broker-facing, consumers do not know their scope—and thus MLS boundaries do not reflect actual competition between brokers for consumers' business." But this argument mischaracterizes Plaintiffs' pleadings. Plaintiffs' alleged geographic market includes the entirety of "the geographic areas in which NAR MLSs operate." In other words, where multiple MLSs operate in the same geographic area, Plaintiffs' market definition includes the whole area, not merely the actual coordinates covered by those MLSs that NAR members control. *See Tampa Elec.*, 365 U.S. at 331 ("[T]he relevant competitive market is not ordinarily susceptible to a 'metes and bounds' definition . . . .").

Consider the New York metropolitan area. A buyer seeking to move within commuting distance of Manhattan might conceivably purchase a home in another borough of the City, in New York's Hudson Valley, in Northern or Central New Jersey, or, in Western Connecticut, each of which is served by a different NAR MLS. *See MLS Map of the National Association of REALTORS®*, https://www.nar.realtor/mls-map-of-the-national-association-of-realtors (last accessed June 17, 2025). Plaintiffs' proposed geographical market—"the geographic areas in which NAR MLSs operate"—would include the entirety of the area in which this buyer is shopping—*i.e.*, the New York metropolitan area—and would not be rendered implausible simply

because the buyer may not realize he is shopping across the territories of several different MLS. What matters is simply that the pleaded market covers the "area in which a potential buyer may rationally look for the goods or services he seeks." *Gordon*, 423 F.3d at 212. At this early stage in the proceedings, Plaintiffs plausibly establish their pleaded market does this. *See id.* at 212-13 (explaining that "[t]he geographic scope of a relevant product market is a question of fact to be determined in the context of each case"); *see also Queen City Pizza*, 124 F.3d at 436 ("[I]n most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers.").

Since Plaintiffs have plausibly pleaded a vertical agreement between Hanna and the NAR and have put forth allegations sufficient to rebut Hanna's arguments based in the rule of reason, Counts I and II of the Amended Complaint survive Hanna's Motion to Dismiss.

## B. State Law Challenges

In addition to the arguments rooted in federal antitrust precedent analyzed above, Hanna brings several challenges that concern only Plaintiffs' state antitrust, consumer protection, and unjust enrichment claims. Each of these challenges is considered in turn.

### i. *Federal Rule of Civil Procedure 8*

Federal Rule of Civil Procedure 8 requires a complaint to contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8. Hanna argues that Count II of Plaintiffs' Amended Complaint—which sets forth their claim for relief under the antitrust laws of twenty-five states—fails to meet this standard. Specifically, Hanna accuses Plaintiffs of "'merely listing statutes that could provide possible causes of action without explaining even the broadest contours of how those statutes were violated'" and "'rely[ing] on the defendant[] and the [C]ourt to sort out whether or how those

laws'" may provide relief.  *In re Revlimid & Thalomid Purchaser Antitrust Litig.*, 2024 WL 2861865, at *110, 112 (D.N.J. June 6, 2024).

Hanna's argument mischaracterizes the Amended Complaint.  In Count II, Plaintiffs: "reallege and incorporate the" allegations set forth in the preceding one-hundred and seventy-three paragraphs of the Amended Complaint, including the paragraphs comprising their Sherman Act claim in Count I; allege that Hanna's "conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in each of the" states on whose antitrust laws Plaintiffs rely; and, explain that this unreasonable restraint of trade has harmed Plaintiffs and putative class members by causing them to "pay[] inflated prices for their homes and inflated buyer-agent commissions," as well as to accept "lower quality or fewer services" from buyer-brokers. Plaintiffs then list each state antitrust statute upon which they rely.

These allegations are more than enough to satisfy Rule 8 because they provide Hanna with "fair notice" of the nature of Plaintiffs' state law antitrust claims "and the grounds upon which [they] rest[]."  *Twombly*, 550 U.S. at 555; s*ee also Jones v. CVS Health Corp.*, 2024 WL 4643514, at *13 (E.D. Pa. Oct. 31, 2024) (rejecting similar argument where "the Complaint ma[de] detailed allegations about Defendants' actions to execute the NG Scheme over the course of approximately ninety pages," "incorporate[d] these allegations," and the "list[ed] the state . . . statutes that Plaintiff [was] invoking" along with a brief outline of "how these allegations [were] relevant to the statutes").

### ii.    *State Notice Requirements*

The Arizona, Hawaii, Nevada, and Utah antitrust statutes, as well as the Massachusetts consumer protection statute, require potential plaintiffs to give certain kinds of notice, usually to the state's Attorney General, before filing suit.  *See* Ariz. Rev. Stat. § 44-1415; Haw. Rev. Stat. §

480-13.3; Nev. Rev. Stat. § 598A.210(3); Utah Code § 76-10-3109(9); Mass. Gen. Laws ch. 93A § 9(3).  Hanna notes that Plaintiffs failed to provide the notice required by each statute before filing their Amended Complaint, and argues that their claims must therefore be dismissed. Plaintiffs do not contest that they failed to give the requisite notice before filing their Amended Complaint, but point out that they did give post-filing notice and argue that dismissal would be inequitable since no state Attorney General has since objected to the case or indicated an intention to intervene.  Plaintiffs also argue that these notice requirements are procedural in nature and need not be followed in federal court when, as here, they conflict with the Federal Rules of Civil Procedure.  *See Liggon-Redding v. Est. of Sugarman*, 659 F.3d 258, 262 (3d Cir. 2011) ("A federal court sitting in diversity must apply state substantive law and federal procedural law."); *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).

Courts inside and outside the Third Circuit are divided on the question of whether these kinds of state notice requirements apply in federal court.  *Compare In re Effexor Antitrust Litig.*, 357 F. Supp.3d 363, 389 (D.N.J. 2018) (applying notice requirements to dismiss claims where no notice was given, and collecting cases to that effect); *with In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp.3d 814, 835 (E.D. Pa. 2019) (finding that the notice requirements do not apply in federal court and collecting cases).  This difficult question need not be answered in this case, however, because Hanna argues neither that Plaintiffs' failure to give pre-filing notice requires dismissal with prejudice, nor that Plaintiffs' tardy, post-filing notice would be insufficient to meet the statutory requirements if Plaintiffs were to file a future Second Amended Complaint.  So, assuming without deciding that the state notice requirements do apply in this federal case, Plaintiffs' claims under the Arizona, Hawaii, Nevada, and Utah antitrust statutes, as well as the Massachusetts consumer protection statute, will be dismissed without prejudice.

### iii.    *Deception and Consumer Protection Claims*

Plaintiffs seek damages under twenty-three state consumer protection statutes, based largely on the same alleged conduct that grounds their antitrust claims.  Hanna argues that Plaintiffs' claims under Colorado, Michigan, New York, Oregon, Pennsylvania, Virginia, and Wisconsin law must be dismissed because those states' consumer protection statutes "only apply to conduct that is deceptive or fraudulent, as opposed to merely anticompetitive."  *In re Niaspan Antitrust Litig.*, 42 F. Supp.3d 735, 760 (E.D. Pa. 2014) (dismissing claims under Pennsylvania and Virginia consumer protection statutes based on anticompetitive conduct, where plaintiffs did not sufficiently allege "deception and fraud as part of the alleged anticompetitive conspiracies"); *see also In re HIV Antitrust Litig.*, 2023 WL 3006572, at *1-4 (dismissing claims under Colorado, Pennsylvania, and Virginia consumer protection statutes on same grounds); *In re Lidoderm Antitrust Litig.*, 103 F. Supp.3d 1155 (N.D. Cal. 2015) (declining to extend Oregon's consumer protection statute to cover price-fixing allegations); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp.2d 160, 206 (D. Me. 2004) (dismissing claims under New York, Pennsylvania, Virginia, and Michigan consumer protection statutes for failure to plausibly allege that the anticompetitive conduct was deceptive); *Cho v. Hyundai Motor Co., Ltd.*, 636 F. Supp.3d 1149, 1179 (C.D. Cal. 2022) (dismissing claim under Wisconsin's consumer protection statute "with prejudice for failure to allege affirmative misrepresentations"). The crux of Hanna's argument is that Plaintiffs fail to plead deception because they do not allege specific, factual evidence of deceptive conduct or statements by Hanna to Plaintiffs.  *See Moratis v. W. Penn Multi-List, Inc.*, 2024 WL 4436425, at *6 (W.D. Pa. Oct. 7, 2024) (in challenge to MLS rules, dismissing Pennsylvania consumer protection claim because "[g]eneral allegations that [a] defendant engaged in deceptive conduct without specifying what that deceptive conduct

actually was are insufficient; a plaintiff must identify the specific act, omission or representation in order to demonstrate that such confusion or misunderstanding was caused by certain acts or omission on the part of the Defendants." (quotations omitted)).

Plaintiffs offer several reasons to the contrary. First, they dispute Hanna's characterization of the consumer protection laws in question, arguing that they "do not require a heightened showing of fraud, but merely conduct that would mislead a reasonable consumer." This argument is unsupported by any citation to relevant caselaw in violation of Local Rule of Civil Procedure 7.1(c). E.D. Pa. R. Civ. P. 7.1(c) ("Every motion not certified as uncontested, or not governed by Local Civil Rule 26.1(g), shall be accompanied by a brief containing a concise statement of the legal contentions *and authorities* relied upon in support of the motion.") (emphasis added). Accordingly, this argument is waived. *Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("[A]n argument consisting of no more than a conclusory assertion . . . will be deemed waived." (citation omitted)).

Next, Plaintiffs argue that "[t]his District has held that similar allegations suffice to state consumer protection act claims in Colorado, Michigan, New York, Virginia, and Wisconsin, among others." For support, they cite to *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, where the District Court found that allegations of a conspiracy to fix generic drug prices also stated claims under state consumer protection laws because the plaintiffs' "detailed factual allegations" of an "unfair, deceptive and unconscionable scheme to fix prices and allocate markets" and of "deceptive conduct regarding pricing" sufficed to "make plausible" their claims of consumer protection violations. 368 F. Supp.3d at 839-40. However, as Hanna points out, that case involved allegations of "an illegal price-fixing conspiracy" that was "hatched in secret and maintained through deception, during which [d]efendants misleadingly conveyed to

34

[p]laintiffs and the market that" their pricing was competitive. *Id.* at 846. Nothing about the vertical relationship alleged by Plaintiffs plausibly suggests active concealment or deception. Thus, this argument fails as well.

Plaintiffs next argue that the NAR's "Free Service Rule," which permits buyer-brokers to represent their services as free to buyers, worked to "encourag[e]" Hanna to make material misrepresentations about their commissions to their buyer clients. But this argument fails because the rule does not *require* brokers (or even "encourage" them, as claimed) to represent their services as free—it only *permits* them to do so, and only on the condition that "the potential for [the broker] to obtain a benefit from a third party is clearly disclosed at the same time." Plaintiffs do not affirmatively allege that a broker working for Hanna or any of its coconspirators actually represented its services as free to any Plaintiff or class member in accordance with this rule. Plaintiffs argue that it is reasonable to infer that brokers did do so, but even if they had, that representation is not misleading, in that the rule requires the broker to disclose "the potential for [the broker] to obtain a benefit from a third party," which disclaimer removes whatever misleading quality the representation might otherwise have.

Finally, as evidence of deceptive conduct, Plaintiffs point to their allegation that "Hanna actively concealed the conspiracy by prohibiting disclosure of total commissions to home buyers." Plaintiffs cite the NAR rule that prohibits MLSs from publishing the "commission negotiated between the seller and the listing broker" as factual evidence in support of this allegation, but this rule says nothing about disclosure of total commissions *to home buyers*, as Plaintiffs claim it does. It merely prohibits the MLS—a platform that Plaintiffs do not even allege that buyers can access—from publishing that information as part of a home listing. Thus, the allegation that Hanna "prohibited disclosure of total commissions to home buyers" is

unsupported by facts that would render it plausible, as is required to survive a Motion to Dismiss. *Iqbal*, 556 U.S. at 678 ("[A] complaint must contain sufficient *factual matter*, accepted as true, to state a claim to relief that is plausible on its face." (quotation omitted)).

Because Plaintiffs have failed to rebut Hanna's argument that certain states' consumer protection laws require deceptive conduct, and because they have not adequately pleaded such conduct, their consumer protection claims under Colorado, Michigan, New York, Oregon, Pennsylvania, Virginia, and Wisconsin law will be dismissed without prejudice.

### iv.    Statutory Exemptions for Real Estate Brokerage Services

Hanna argues that Plaintiffs' consumer protection claims under Florida, Iowa, Michigan, Rhode Island, and Virginia law must be dismissed because those statutes contain exemptions for "transactions involving real estate brokers." *See* Fla. Stat. § 501.212(6); Iowa Code § 714H.4(1)(a)(4); Va. Code § 59.1-199(6); Mich. Comp. Laws § 445.904; R.I. Gen. Laws § 6-13.1-4.

At the outset, three of these exemptions—Florida's, Iowa's, and Michigan's—apply only to real estate brokerages licensed or registered under the laws of those states. *See* Fla. Stat. § 501.212(6) (exempting from the reach of the state's consumer protection law "[a]n act or practice involving the sale, lease, rental, or appraisal of real estate by a person licensed, certified, or registered pursuant to chapter 475," which in turn contains regulations for real estate professionals); Iowa Code § 714H.4(1)(a)(4) (exempting transactions involving "[m]erchandise offered or provided by . . . [p]ersons licensed under" Iowa Code § 543B, which is a regulatory scheme for "Real Estate Brokers and Salespersons"); Va. Code § 59.1-199(6) ("Nothing in this [Virginia Consumer Protection Act] chapter shall apply to … [r]eal estate licensees who are licensed under Chapter 21 (§ 54.1-2100 et seq.) of Title 54.1," which governs "Regulation of

36

Real Estate Brokers, Salespersons and Rental Location Agents"). Crucially, Plaintiffs never allege in their Amended Complaint that Hanna is licensed as a real estate brokerage in any of these states. Hanna argues that the Amended Complaint necessarily implies as much, even if it does not say so explicitly, because it alleges that Hanna is a real estate broker and that brokers are subject to licensure under state law. But it does not necessarily follow that Hanna specifically was licensed in Florida, Iowa, or Virginia, since Plaintiffs' theory of recovery is, in part, one of joint and several liability based on Hanna's participation in an alleged conspiracy with other brokerages operating throughout the country. If discovery reveals that Hanna is indeed registered as a broker in these states, the exemptions might then apply—but for now, Plaintiffs' pleadings control. *See Fowler*, 578 F.3d at 210-11; *see also Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (explaining that well-pleaded claims can survive a motion to dismiss even if "it may appear on the face of the pleadings that a recovery is very remote and unlikely") (cited in *Twombly*, 550 U.S. at 555).

As for Michigan and Rhode Island, these states' exemptions apply to transactions that are specifically enabled by the state's other regulatory laws governing real estate. *See* Mich. Comp. Laws § 445.904(1)(a) (exempting any "transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state"); R.I. Gen. Laws § 6-13.1-4(a) (exempting "actions or transactions permitted under laws administered by the department of business regulation or other regulatory body or officer acting under statutory authority of this state"). Plaintiffs argue that, because participating in "a nationwide real-estate antitrust conspiracy is [not] specifically authorized" by any state regulatory body, Hanna cannot claim these exemptions to protect it from liability under the consumer protection laws. Hanna replies that the conduct at issue is not "creating and enforcing anticompetitive

rules," but rather "engaging in real estate transactions"—the latter of which is "specifically authorized" by state regulations, such that the exemptions would apply.

In Michigan, the exemption is construed to apply where "the transaction at issue, not the alleged misconduct, is 'specifically authorized.'" *Smith v. Globe Life Ins. Co.*, 597 N.W.2d 28, 37 (1999); *Attorney General v. Diamond Mortg. Co.*, 327 N.W.2d 805, 811 (Mich. 1982) (finding that real estate broker could not claim exemption where he wrote and issued usurious mortgages because mortgage writing was not "specifically authorized" by his real estate license). Count III of Plaintiffs' Amended Complaint, which contains its consumer protection claims, does not spell out in explicit terms what is the "transaction" underpinning those claims. It does allege, however, that Hanna "harmed" Plaintiffs by causing them to "pay[] inflated prices for their homes and inflated buyer-agent commissions" and to "receiv[e] lower quality or fewer services" in connection with those purchases. It follows from this pleading, then, that the "transaction" at issue is the furnishing of buyer-broker services in connection with the purchase of a home—not, as Plaintiffs now claim, the passage of trade association rules with alleged anticompetitive effects. Because that transaction is "specifically authorized" by Michigan state law, *see Diamond Mortg.*, 327 N.W.2d at 811 (explaining that Michigan law "authorizes [brokers] to engage in the activities of a real estate broker"), the exemption applies, and Plaintiffs' claim under Michigan's consumer protection law must be dismissed without prejudice.

The analysis under Rhode Island law is different, but the outcome is the same. In that state, the party claiming the exemption must first "demonstrate that the general activities complained of are subject to monitoring" by state regulation, after which "the burden shifts to the party seeking to enforce [the consumer protection law] to establish that 'the specific acts at issue are not covered by the exemption.'" *Lynch v. Conley*, 853 A.2d 1212, 1214 (R.I. 2004) (quoting

*State v. Piedmont Funding Corp.*, 382 A.2d 819, 822 (R.I. 1978)).  Hanna correctly notes that the "general activities" at issue—real estate transactions—are "subject to monitoring" by the Rhode Island Director of Business Regulation.  *See* R.I. Gen. Laws § 5-20.5-1 *et seq*. (regulating "Real Estate Brokers and Salespersons").  The burden then shifts to Plaintiffs to show that "the specific acts at issue are not covered by the exemption."  *Piedmont Funding Corp.*, 382 A.2d at 822.

Plaintiff has not carried that burden here.  Count III of the Amended Complaint alleges that Hanna committed "unfair, unconscionable, deceptive or fraudulent acts" in Rhode Island, which led to Plaintiffs' economic harm.  Although Count III does not describe these "acts" in detail, it is plain from the Amended Complaint that the "acts" in question are the passage and enforcement of the allegedly anticompetitive NAR rules.  However, Plaintiffs fail to cite any caselaw to establish the final piece of connective tissue—namely, that conspiratorial behavior among real estate brokers is not already regulated in some manner under Rhode Island law.  The cases Plaintiffs do rely upon deal primarily with consumer protection claims involving automobile sales, an industry with an entirely different regulatory scheme, which renders those cases inapplicable to the question at issue, which is particular to the real estate industry.  *See, e.g., In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 2021 WL 5915060, at *12 (N.D. Cal. Dec. 10, 2021) (declining to apply Rhode Island's exemption to consumer protection claim involving misleading car advertising since Rhode Island law only regulates car sales from manufacturers to dealers, not retail sales).  Because Plaintiffs have not carried their burden to demonstrate that Rhode Island law does not already regulate the conduct at issue, the real estate exemption applies and their claim under the Rhode Island consumer protection statute is dismissed without prejudice.

### v.    *Unjust Enrichment Claim*

Count IV of the Amended Complaint seeks disgorgement and restitution of

supracompetitive buyer-broker commissions under the equitable doctrine of unjust enrichment. However, unlike in Counts II and III of the Amended Complaint—where Plaintiffs identify the state antitrust and consumer protection statutes under which they seek relief—Count IV merely invokes "unjust enrichment principles" without specifying which states' common law may provide the basis for the relief they seek.  This slim pleading is simply too vague to clear the bar of Rule 8 because the law of unjust enrichment varies from state to state.  *See In re Flonase Antitrust Litig.*, 610 F. Supp.2d 409, 419 (dismissing common law unjust enrichment claim where plaintiffs did not "specify under which states' laws they [brought] this claim . . . [b]ecause states analyze unjust enrichment claims differently").  Because Count IV "fails to invoke the law of any particular jurisdiction," it will be dismissed without prejudice.  *United States ex rel. Krahling v. Merck & Co., Inc.,* 44 F. Supp.3d 581, 609 (E.D. Pa. 2014) (dismissing unjust enrichment claim for the same reason).

## IV.    CONCLUSION

For the foregoing reasons, Hanna's Motion to Dismiss for Failure to State a Claim will be granted in part and denied in part.  Concerning Counts I and II of the Amended Complaint, Hanna's Motion to Dismiss will be denied with respect to Plaintiffs' allegations of a vertical antitrust conspiracy between Hanna and the NAR, and will be granted, without prejudice, with respect to allegations of a horizontal agreement between Hanna and its competitor brokerages. Additionally, Plaintiffs' claims in Count II under the Arizona, Hawaii, Nevada, and Utah antitrust statutes will be dismissed without prejudice.

Concerning Count III, Plaintiffs' consumer protection claims under Colorado, Massachusetts, Michigan, New York, Oregon, Pennsylvania, Rhode Island, Virginia, and Wisconsin law will be dismissed without prejudice.

Finally, Count IV will be dismissed without prejudice in its entirety.

An appropriate order follows.

**BY THE COURT:**

**S/ WENDY BEETLESTONE**

_____

**WENDY BEETLESTONE, J.**