## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| SCOTT DAVIS, NIALL ADAMS, MYA BATTON, THEODORE BISBICOS, AARON BOLTON, JASON BOOMSMA, THOMAS BRAUN, SABRINA CLARK, RYAN EISNER, STEVEN EWALD, JOHN GARRETT, BRENNON GROVES, DARIN HENDRY, ANNA JAMES, DO YEON IRENE KIM, JAMES LUTZ, JORDAN KULLMANN, JAMES MULLIS, DANIEL PARSONS, JOSHUA PUTT, JOHN SANNAR, ROBERT SAYLES, BEN SHADLE, BRENT STRINE, CHRISTINE VAN WOERKON, and SHERRIE WOHL, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) ) ) ) ) ) | Case No. 2:24-cv-2374-WB<br><br>Honorable Wendy Beetlestone<br><br>**JURY TRIAL DEMANDED** |
| v. | ) ) | |
| HANNA HOLDINGS, INC., | ) ) | |
| Defendant. | ) ) ) ) | |

## <u>PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THEIR SECOND AMENDED COMPLAINT</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................... 1

BACKGROUND .................................................................................................... 4

LEGAL STANDARD ............................................................................................. 7

ARGUMENT ......................................................................................................... 7

   I.   Plaintiffs Plead an Anticompetitive Agreement .................................................. 7

     A.   Plaintiffs Plead Direct Evidence of an Unlawful Horizontal Agreement ..................... 8

     B.   Plaintiffs Plead Circumstantial Evidence of a Horizontal Agreement......................... 13

     C.   Plaintiffs Plausibly Plead a Vertical Agreement.......................................... 21

     D.   Plaintiffs Plead a Hub and Spoke Conspiracy ............................................ 23

   II.   Plaintiffs Plausibly Plead an Unreasonable Restraint of Trade Under Any Mode of Analysis ........................................................................................................ 24

     A.   Plaintiffs Plausibly Plead a Geographic Market .......................................... 25

     B.   Plaintiffs Plead Anticompetitive Effects................................................. 28

     C.   The Challenged Restraints Do Not Have Any Procompetitive Benefits ..................... 29

   III.   Plaintiffs Plausibly Plead Standing .......................................................... 31

     A.   Plaintiffs Have Antitrust Standing ....................................................... 31

     1.   Plaintiffs Satisfy Causation............................................................ 32

     2.   Plaintiffs Satisfy Directness........................................................... 34

     3.   Plaintiffs Are Efficient Enforcers...................................................... 35

     B.   Plaintiffs Have Article III Standing ..................................................... 38

   IV.   Plaintiffs Plausibly Plead Their State Law Claims ...................................... 38

     A.   Real Estate Exemptions Do Not Require Dismissal (FL, IA) ...................... 38

     B.   Plaintiffs Plausibly Plead Their Arizona, Washington, D.C., and Massachusetts Claims.................................................................................................39

CONCLUSION...................................................................................................... 40

# TABLE OF AUTHORITIES

## Cases

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*,
 228 F.3d 429 (3d Cir. 2000) ............................................................................... 33

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
 486 U.S. 492 (1988) ............................................................................................ 9

*Am. Tobacco Co. v. United States*,
 328 U.S. 781 (1946) ............................................................................................ 8

*Arizona v. Maricopa Cnty. Med. Soc.*,
 457 U.S. 332 (1982) ..................................................................................... 11, 24

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ............................................................................................ 7

*Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*,
 459 U.S. 519 (1983) ............................................................................. 31, 34, 35

*Associated Press v. United States*,
 326 U.S. 1 (1945) ............................................................................................... 9

*Batton v. Nat'l Ass'n of Realtors*,
 No. 21-CV-00430, 2024 WL 689989 (N.D. Ill. Feb. 20, 2024) ................... 1, 33, 36

*Brown Shoe Co. v. United States*,
 370 U.S. 294 (1962) .......................................................................................... 27

*Buck v. Hampton Twp. Sch. Dist.*,
 452 F.3d 256 (3d Cir. 2006) ............................................................................... 7

*Building Materials Corp. of Am. v. Rotter*,
 535 F. Supp.2d 518 (E.D. Pa. 2008) ................................................................. 27

*Burnett v. Nat'l Ass'n of Realtors*,
 No. 4:19-CV-00332-SRB, 2022 WL 17741708 (W.D. Mo. Dec. 16, 2022) ......... 1, 24, 33

*Burtch v. Milberg Factors, Inc.*,
 662 F.3d 212 (3d Cir. 2011) ............................................................................. 19

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
   485 U.S. 717 (1988) ............................................................................ 21

*Catalano, Inc. v. Target Sales, Inc.*,
   446 U.S. 643 (1980) ............................................................................ 24

*Cheatham v. ADT Corp.*,
   161 F. Supp.3d 815 (D. Ariz. 2016) .................................................... 39

*Ciardi v. F. Hoffmann-La Roche, Ltd.*,
   436 Mass. 53 (Mass. 2002) ................................................................ 39

*D.R. Ward Const. Co. v. Rohm & Haas Co.*,
   470 F. Supp.2d 485 (E.D. Pa. 2006) ...................................... 31, 34, 35

*Davis v. Hanna Holdings, Inc.*,
   771 F. Supp.3d 552 (E.D. Pa. 2025) ..................................................... 1

*Davis v. Hanna Holdings, Inc.*,
   787 F. Supp.3d 42 (E.D. Pa. 2025) .................................................. 1, 6

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
   610 F.3d 820 (3d Cir. 2010) ............................................................... 24

*Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*,
   637 F.2d 105 (3d Cir. 1980) ................................................................. 8

*Fuentes v. Royal Dutch Shell PLC*,
   No. CV 18-5174, 2019 WL 7584654 (E.D. Pa. Nov. 25, 2019) ............ 25

*Gelboim v. Bank of Am. Corp.*,
   823 F.3d 759 (2d Cir. 2016) ............................................................... 11

*Gibson v. Cendyn Group, LLC*,
   148 F.4th 1069 (9th Cir. 2025) .................................................. 3, 22, 23

*Gordon v. Lewistown Hosp.*,
   423 F.3d 184 (3d Cir. 2005) ............................................................... 26

*In re Baby Food Antitrust Litig.*,
   166 F.3d 112 (3d Cir. 1999) ........................................................... 8, 13

*In re Domestic Drywall Antitrust Litig.*, No.,
   15-CV-1712, 2019 WL 4918675 (E.D. Pa. Oct. 3, 2019) ...................... 35

*In re Flat Glass Antitrust Litig.*,
    385 F.3d 350 (3d Cir. 2004) ................................................................ 11, 15, 16, 18

*In re Generic Pharms. Pricing Antitrust Litig.*,
    338 F. Supp.3d 404 (E.D. Pa. 2018) .............................................................. passim

*In re Generic Pharms. Pricing Antitrust Litig.*,
    16-CM-27241, 2025 WL 2483981 (E.D. Pa. Aug. 27, 2025) ................................. 19

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ................................................................................ 11

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ........................................................................... passim

*In re Linerboard Antitrust Litig.*,
    504 F. Supp.2d 38 (E.D. Pa. 2007) .................................................................. 14, 19

*In re Lower Lake Erie Iron Ore Antitrust Litig.,*
    998 F.2d 1144 (3d Cir. 1993) .............................................................................. 31

*In re Mushroom Direct Purchaser Antitrust Litig.*,
    No. 06-0620, 2015 WL 6322383 (E.D. Pa. May 26, 2015) ................................... 24

*In re Philips Recalled CPAP, Bi-Level PAP, & Ventilator Prods. Litig.*,
    No. 2:21-MC-1230, 2023 WL 7019287 (W.D. Pa. Sept. 28, 2023) ........................ 39

*In re Processed Egg Prods. Antitrust Litig.,*
    No. 08-MD-2002, 2016 WL 5539592 (E.D. Pa. Sept. 28, 2016) ............................ 22

*In re Processed Egg*,
    821 F. Supp. 2d 709 (E.D. Pa.) ........................................................................... 20

*In re Propranolol Antitrust Litig.*,
    249 F. Supp.3d 712 (S.D.N.Y. 2017) ................................................................... 18

*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, No. 13-MD-2445,
    2015 WL 12910728 (E.D. Pa. Apr. 14, 2015) ..................................................... 31

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
    64 F. Supp.3d 665 (E.D. Pa. 2014) .................................................................. 31, 35

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
    622 F. Supp.3d 22 (E.D. Pa. 2022) ................................................................. 29, 30

iv

*InterVest, Inc. v. Bloomberg, L.P.*,
    340 F.3d 144 (3d Cir. 2003) ............................................................................ 19

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ...................................................................................... 22

*LifeWatch Servs. Inc. v. Highmark Inc.*,
    902 F.3d 323 (3d Cir. 2018) ............................................................................ 8

*Lutz v. HomeServices of Am., Inc.*,
    No. 4:24-CV-10040-KMM, 2025 WL 2046905 (S.D. Fla. July 15, 2025) ............................ 36

*Mayor & City Council of Baltimore v. Merck Sharp & Dohme Corp.*,
    No. CV 23-828, 2023 WL 8018980 (E.D. Pa. Nov. 20, 2023) ................................. 27

*Medical Diagnostic Lab'ys, LLC v. Independence Blue Cross*,
    No. 16-5855, 2017 WL 3776619 (E.D. Pa. Aug. 30, 2017) ...................................... 27

*Moehrl v. Nat'l Ass'n of Realtors*,
    492 F. Supp.3d 768 (N.D. Ill. 2020) ........................................................ 1, 25, 33

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*,
    468 U.S. 85 (1984) ...................................................................................... 11

*O'Riordan v. Long Island Bd. of Realtors, Inc.*,
    707 F. Supp. 111 (E.D.N.Y. 1988) ................................................................... 30

*Phillips v. Cnty. of Allegheny*,
    515 F.3d 224 (3d Cir. 2008) ............................................................................ 7

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) ........................................................................... 29

*Realcomp II, Ltd. v. F.T.C.*,
    635 F.3d 815 (6th Cir. 2011) .......................................................................... 30

*Reifert v. S. Cent. Wis. MLS Corp.*,
    450 F.3d 312 (7th Cir. 2006) .......................................................................... 30

*Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*,
    551 F. Supp.3d 120 (S.D.N.Y.) ....................................................................... 16

*Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*,
    61 F.4th 299 (2d Cir. 2023) .............................................................. 2, 8, 11, 12

*Sitzer v. Nat'l Ass'n of Realtors*,
   420 F. Supp.3d 903 (W.D. Mo. 2019)..................................................................... 1, 25

*Smart v. Nat'l Collegiate Athletic Ass'n*,
   No. 2:22-cv-02125, 2023 WL 4827366 (E.D. Cal. July 27, 2023) ........................... 9

*Steamfitters Loc. Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
   171 F.3d 912 (3d Cir. 1999)............................................................................... 34, 35

*Suber v. Liberty Mut. Ins. Grp.*,
   650 F. Supp.3d 282 (E.D. Pa. 2022) ..................................................................... 38

*Sullivan v. Pulte Home Corp.*,
   290 P.3d 446 (Ariz. Ct. App. 2012) ...................................................................... 39

*Swarthmore Radiation Oncology, Inc. v. Lapes*,
   812 F. Supp. 517 (E.D. Pa. 1992) ......................................................................... 25

*Taylor v. Pathmark Stores, Inc.*,
   177 F.3d 180 (3d Cir. 1997)................................................................................. 21

*Tunis Bros. Co. v. Ford Motor Co.*,
   952 F.2d 715 (3d Cir. 1991)................................................................................. 26

*United States v. Brown Univ. in Providence in State of R.I.*,
   5 F.3d 658 (3d Cir. 1993)............................................................................... 24, 30

*United States v. Nat'l Football League*,
   116 F. Supp. 319 (E.D. Pa. 1953) .......................................................................... 9

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940)............................................................................................ 10

*Watts v. Medicis Pharm. Corp.*,
   239 Ariz. 19, (2016)............................................................................................ 39

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*,
   89 F.4th 430 (3d Cir. 2023)............................................................................. 22, 24

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*,
   513 F. Supp. 1100 (E.D. Pa. 1981) ....................................................................... 10

## **Rules**

Fed. R. Civ. P. 8(d)(3)...................................................................................................... 21

## INTRODUCTION

This case alleges a price-fixing conspiracy between Hanna Holdings, Inc., the National Association of Realtors, and Hanna's horizontal competitors (other real estate brokerages) to artificially inflate the commission rates paid to brokers for homebuyers, which are baked into the total price of the home. At the time Plaintiffs[1] opposed Defendant's prior motions to dismiss, five separate decisions had already upheld substantially similar allegations to those in this case.[2] This Court's decisions made it seven. *Davis v. Hanna Holdings, Inc.*, 787 F. Supp. 3d 42, 49 (E.D. Pa. 2025), ECF No. 93 ("12b6 Order"); *Davis v. Hanna Holdings, Inc.*, 771 F. Supp. 3d 552, 560 (E.D. Pa. 2025), ECF No. 84 ("Standing Order").

To reach its two decisions on Defendants' motions to dismiss the prior complaint, this Court reviewed nearly a hundred pages of briefing, heard two oral arguments, and painstakingly analyzed the parties' arguments regarding the existence of an agreement, the nature of the agreement, whether to apply a per se or rule of reason analysis, standing, and Plaintiffs' state law claims. *See generally* 12b6 Order; Standing Order. But Hanna's oversize motion reads like none of that ever happened. Its bid to relitigate the many issues it has already lost should be rejected.

There are three principal issues, however, that actually pertain to Plaintiffs' newly added allegations or to purported changes in the law and thus warrant further discussion. *First*, Hanna contends that Plaintiffs' Second Amended Complaint, ECF No. 104 ("SAC"), fails to allege a

---

[1] "Plaintiffs" refers to all named plaintiffs and the proposed class.

[2] *See Batton v. Nat'l Ass'n of Realtors*, No. 21-CV-00430, 2024 WL 689989, at *14 (N.D. Ill. Feb. 20, 2024) ("*Batton I*"); [2] *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768 (N.D. Ill. 2020); *Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903 (W.D. Mo. 2019); *Burnett v. Nat'l Ass'n of Realtors*, No. 4:19-CV-00332-SRB, 2022 WL 17741708 (W.D. Mo. Dec. 16, 2022) (denying defendants' summary judgment motion); *Gibson v. Nat'l Ass'n of Realtors*, 4:23-cv-00788-SRB (W.D. Mo. Dec. 16, 2024), ECF No. 590.

horizontal agreement among Hanna, NAR, and their co-conspirator brokerages. But Plaintiffs explicitly allege that NAR's anticompetitive rules are the agreements themselves, SAC ¶¶[3] 116, 124, 136, which is sufficient to allege direct evidence of a horizontal conspiracy under *Relevent Sports, LLC v. United States Soccer Fed'n, Inc*., 61 F.4th 299, 308 (2d Cir. 2023), and Supreme Court precedent. Hanna urges this Court to ignore *Relevent Sports* and the precedent on which it is based by claiming it contradicts the Third Circuit's decision in *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300 (3d Cir. 2010). There is no such conflict. *Insurance Brokerage* evaluated the circumstantial evidence needed to plausibly allege a conspiracy in the *absence* of direct evidence of an agreement based on binding trade association rules developed by competitors. Here, by contrast, Plaintiffs allege mandatory association rules that on their faces restrict commission offers and negotiation and which were agreed to, enacted, enforced, and maintained by horizontal competitors.

Even setting aside the direct evidence of an agreement, Plaintiffs also plausibly allege substantial circumstantial evidence of an agreement. Defendants were motivated to conspire to keep their commissions high and buyer-brokers relevant as the internet threatened to usurp the role of buyer-brokers. They had numerous opportunities to collude through industry associations and meetings—in an industry that had been repeatedly investigated for anticompetitive conduct. Hanna in particular held leadership positions on the committees that enacted the Challenged Restraints. Hanna and its co-conspirators thereafter engaged in parallel pricing. And they all followed and enforced rules that required their agents to offer uniform commissions and restricted commission negotiations when it would have been in their economic self-interest to compete on price absent a horizontal agreement.

---

[3] "¶" refers to paragraphs in the SAC.

*Second*, this Court previously held that Plaintiffs plausibly pleaded a vertical agreement between Hanna and NAR. Hanna urges the Court to reconsider based on a single out-of-circuit opinion. But even if it were a Third Circuit opinion, *Gibson v. Cendyn Group, LLC*, 148 F.4th 1069 (9th Cir. 2025), holds that a vertical conspiracy to fix hotel room prices did not exist between a software provider and hotels because the software provider supplied a different product (pricing recommendation software) to different customers (hotels) and did not contribute any services necessary for the distribution of hotel room rentals, the alleged price-fixed product. Here, by contrast, NAR's decision-making bodies are themselves composed of real estate agents who operate in the market for buyer-broker services, and NAR dictates the behavior of all participants on almost all Multiple Listing Services ("MLSs") in the country, which are necessary for buyer-agents to provide their services. *Gibson* would mirror this case only if the software provider was composed of hotel industry employees, and only if consumers had to use hotels licensed by the software provider in order to find a room. There is nothing in *Gibson* to justify revisiting this Court's prior decision. In any event, because Plaintiffs have alleged horizontal and vertical agreements, Plaintiffs have also alleged a hub and spoke conspiracy with "NAR" as the hub and Hanna and other brokerages as the spokes.

*Third*, Hanna argues that Plaintiffs have failed to plead that the alleged restraint is unreasonable. As an initial matter, this Court has already held that Plaintiffs' allegations satisfy the most restrictive analysis, the rule of reason. Hanna offers nothing new to impact this Court's previous decision. There is therefore no need for the Court to decide whether a *per se* or rule of reason analysis applies at this time. Nevertheless, should the Court select a mode of analysis, Plaintiffs now plead a horizontal conspiracy to fix prices that warrants *per se* treatment.

Hanna's remaining arguments—that Plaintiffs fail to plead antitrust and Article III standing, fail to demonstrate that Hanna is ineligible for certain state law exemptions, or fail to plead a business relationship under certain states' laws—have all already been raised by Hanna and rejected by this Court. Hanna offers nothing to compel a new ruling here.

## BACKGROUND

The Court is familiar with the alleged conspiracy in this case. Defendant is a real estate brokerage company and active member of NAR. ¶¶ 52, 55, 98, 100, 180, 183–86. Plaintiffs allege that NAR enacted several rules, policies, and practices that restrict how residential real estate brokers could offer and negotiate commissions (the "Challenged Restraints"). ¶¶ 10–13, 15, 18, 20, 112–72. Hanna has agreed to follow NAR's rules. ¶¶173–86. Hanna was also deeply involved in NAR governance. ¶¶ 183–86. For example, Hanna executives Gary Scott, Pat Riley, Marsha Rand, and Dennis Cestra, Sr., have all served on NAR's Board of Directors, whose Professional Standards Committee drafted, developed, and promulgated NAR's Handbook and its Code of Ethics (and thus the Buyer-Agent Commission Rule). ¶¶ 185–86. Hanna requires its franchises and agents to follow NAR rules. ¶ 180.

Indeed, NAR members must agree to follow and implement NAR's rules, policies, and practices in order to access the benefits of NAR-affiliated MLSs, where brokers share information about homes for sale. ¶¶ 3–5, 112–16. NAR MLSs are essential for any broker to compete in the United States market. ¶¶ 106–11. NAR threatens its members with expulsion if they do not follow NAR's Code of Ethics, ¶ 175, and threatens to withhold insurance benefits for agents who do not follow NAR's Handbook, ¶ 178.

The rules, policies, and practices at issue (the "Challenged Restraints") included: a requirement that every seller-broker make a blanket unilateral offer of compensation to the

buyer-broker (the "Buyer-Agent Commission Rule"); prohibitions on disclosing the commission to buyers (the "Filter Rules"); restrictions on when and how buyer-agent commissions could be negotiated ("Negotiation Rules"); and a rule encouraging agents to misrepresent their buyer-broker services as free (the "Free-Service Rule"). ¶¶ 11, 115, 117–72. These Challenged Restraints ensured that buyer-brokers were paid regardless of whether they attempted to negotiate a lower rate, or whether they even wanted a broker. ¶ 125. As one Hanna brokerage put it, "the Buyer-Broker Commission Rule meant that 'sellers didn't have a choice. They had to offer something. Conversely, buyers had limited choices as well, because they never had a direct opportunity to negotiate the commission for their buyer's agent.'" ¶ 81. NAR and its co-conspirators, including Defendant, ensured that these rules, policies, and procedures were adopted and enforced throughout the country. ¶¶ 4–5, 15, 25, 57, 62, 71–72, 107.

These rules required sellers to offer uniform commissions regardless of the buyer-broker's skill, experience or services offered, suppressed negotiation, and restrained competition among buyer-brokers, and thereby inflated buyer-broker commissions. ¶¶ 117–72, 135, 187–99. Plaintiffs have suffered injury because the artificially inflated buyer-broker commissions were paid out of—and baked into—the price buyers paid for their homes. ¶¶ 18, 20, 77, 133, 139, 187. Rational home-sellers were motivated to pass on the harm from inflated commissions to homebuyers by increasing the prices of the homes they sold, among other economic harms to homebuyers. ¶¶ 18, 20, 77, 133, 139, 117–72, 187, 192, 201. Plaintiffs suffered this economic harm when they paid too much for their homes.

On March 18, 2025, the Court dismissed Plaintiffs' claim for injunctive relief and otherwise denied Defendant's standing motion. Standing Order at 584. On June 23, 2025, the Court ruled on Defendant's motion to dismiss Plaintiffs' Amended Complaint, dismissing some

of Plaintiffs' state-law claims without prejudice but upholding the remainder. 12b6 Order, 787 F. Supp.3d 42 at 70, 71–72.

On October 1, 2025, Plaintiffs filed the SAC. The SAC adds new allegations responsive to the Court's holdings, including:

- the Challenged Restraints themselves are an anticompetitive agreement between competitors; *see*, *e.g.*, ¶ 116 ("These NAR Rules constitute an agreement among competitors."); ¶ 124 ("The NAR Buyer-Agent Commission Rule is an anticompetitive agreement in itself" and constitutes both a horizontal and vertical conspiracy); ¶ 136 (the Buyer-Agent Commission Rule "was an unlawful agreement among Defendant, NAR, and Defendant's coconspirators to encourage the overuse and overcompensation of buyer-brokers"); *see also* ¶¶ 4, 10–11, 20, 25, 106, 131, 136, 185;

- NAR and its member brokerages have a long history of fixing prices (¶¶ 84–90);

- NAR created a culture of cooperation among competing real estate agents, including the payment of cooperative commissions (¶¶ 91–100);

- NAR and its member brokerages employed a subagency model, under which listing brokers would offer to share commissions with buyers' brokers to serve as the listing broker's subagent (¶¶ 101–05, 148–49);

- Additionally, over the years access to the internet became increasingly ubiquitous, enabling potential homebuyers to conduct their own searches for homes (¶¶ 9, 16, 100, 151, 188). These developments threatened to encroach on NAR's and the brokerages' control over commissions and render buyer-brokers obsolete (¶¶ 9, 104, 151);

- Faced with legal threats over the subagency model and concerned that the internet could render buyer-brokers obsolete, NAR enacted the Challenged Restraints (¶¶ 9–10, 104–05, 152–53, 189);

- Beyond passing and maintaining the NAR rules, Hanna and its co-conspirators entered into agreements through leadership of state and local realtor associations and specific MLSs with their competitors in order to implement the rules (¶¶ 53, 183–86); and

- Hanna is not a licensed broker in Florida, Iowa, or Virginia (¶ 233).

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The question is "whether, *under any reasonable reading* of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (emphasis added). In answering this question, courts "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

## ARGUMENT

### I.    Plaintiffs Plead an Anticompetitive Agreement

This Court previously held that Plaintiffs plausibly pleaded an anticompetitive vertical agreement between NAR and Hanna. 12b6 Order at 30. Nothing in Plaintiffs' SAC changes this conclusion. Instead, Plaintiffs' SAC now adds allegations the Court previously noted would be needed to plead a horizontal agreement between Hanna, NAR, and Hanna's co-conspirator

brokerages by alleging that the Challenged Restraints themselves are the anticompetitive agreement.

To plead an antitrust violation among multiple firms, Plaintiffs must plead an unlawful agreement. *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 110–11 (3d Cir. 1980). An unlawful agreement is formed when conspirators engage in "a single concept about common action." *Id.*; *see also Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946) (interpreting § 1 to prohibit two or more actors engaging in "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement"). Plaintiffs may plead an agreement with either direct or circumstantial evidence. *LifeWatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 333 (3d Cir. 2018). Here, Plaintiffs plead both.

### A.  Plaintiffs Plead Direct Evidence of an Unlawful Horizontal Agreement

First, the Challenged Restraints are direct evidence of an unlawful agreement between Defendant, NAR, and their co-conspirator brokerages. Where a plaintiff pleads direct evidence of an agreement, no further inferences or so-called "plus factors" are required. *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999); *Ins. Brokerage*, 618 F.3d 300 (3d Cir. 2010). Allegations that an association's rules *themselves* are the anticompetitive agreement constitute direct evidence of an unlawful agreement. *Relevent Sports*, 61 F.4th at 308 (where "the plaintiff adequately alleges that the policy or rule *is the agreement itself*, then it need not allege any further agreement") (emphasis added), *cert. denied*, 144 S. Ct. 1391 (2024). This makes perfect sense: if horizontal competitors join a trade association, agree to put the association in charge of pricing and competition standards for the entire industry, and agree to follow the association's decisions, they have all necessarily agreed on fixing, maintaining, or stabilizing the price or otherwise restricting competition. *Id.* ("the adoption of a binding association rule designed to prevent competition is direct evidence of concerted action"). Nothing further is needed.

8

That association rules may constitute anticompetitive agreements among the association's members is consistent with seminal Supreme Court precedent. *See, e.g.*, *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988) ("Agreement on a product standard is, after all, implicitly an agreement not to manufacture, distribute, or purchase certain types of products."); *Associated Press v. United States*, 326 U.S. 1, 8, 19 (1945) (where a member "surrender[s] himself completely to the control of the association" in a "contractual restraint of interstate trade, 'designed in the interest of preventing competition,'" a rule that imposes "duties and restrictions in the conduct of [the members'] separate businesses" demonstrates an agreement for purposes of Section 1 of the Sherman Act); *see also United States v. Nat'l Football League*, 116 F. Supp. 319, 321 (E.D. Pa. 1953) ("The by-laws have been agreed to by all the League members and are binding upon all of them. They clearly constitute a contract within the meaning of the word as it is used in the Sherman Act[.]"); *Smart v. Nat'l Collegiate Athletic Ass'n*, No. 2:22-cv-02125, 2023 WL 4827366, at *6 (E.D. Cal. July 27, 2023) (denying motion to dismiss § 1 Sherman Act count alleging that NCAA bylaw prohibiting member schools from paying a fourth assistant baseball coach was an illegal wage fixing conspiracy).

The SAC cures the Court's finding that the prior complaint did not plead that the Challenged Restraints are themselves the relevant anticompetitive agreements (12b6 Order at 60–61). Plaintiffs now explicitly plead: "The NAR Buyer-Agent Commission Rule is an anticompetitive agreement in itself and constitutes both a vertical conspiracy between Defendant and NAR and a horizontal conspiracy among Defendant, NAR, and Defendant's coconspirator brokerages." ¶ 124; *see also* ¶ 116 ("These NAR Rules constitute an agreement among competitors."); ¶¶ 4, 10–11, 106, 131, 136, 185. Contrary to Hanna's arguments (Def.'s Motion to Dismiss, ECF No. 110 ("MTD") at 12), these allegations reflect Plaintiffs' unchanged theory

9

of the case: that NAR, Hanna, and its co-conspirators entered into an agreement, embodied in the Challenged Restraints set forth in NAR's Handbook of Multiple Listing Policy and Code of Ethics and adopted by Hanna and other brokerages, to fix commission prices and restrict competition, which in turn reduced competition among brokers, increased the cost of buyer-brokers, and artificially increased home prices for homebuyers.

Hanna incorrectly contends that *Relevent Sports* requires that the claimed antitrust violation must be "synonymous" with the rule itself, which in this case according to Hanna would require that the "the buyer-broker's compensation [be] fixed at a specific amount." MTD at 13. But this is wrong for two reasons. First, the rules explicitly restrain the horizontal competitors' ability to compete on commission prices. On their own terms, the rules expressly require each listing agent to make a blanket unilateral offer of commission, restrict agents from negotiating that amount, permit agents to filter properties based on commissions, and prevent consumers from seeing the commission offers prior to closing or from seeing listings not bound by NAR's rules. ¶¶ 11, 115, 119–23, 155, 156, 160, 162–64, 166–68, 170. The rules unambiguously *do* impose the pricing restrictions that Plaintiffs allege violate the antitrust laws, whether labeled a "price-fixing" conspiracy or not.

Second, it is bedrock antitrust law that an agreement to fix prices does not require competitors to agree on specific numbers when they agree on industry structures that have the effect of creating supracompetitive prices. *United States v. Socony-Vacuum Oil Co*., 310 U.S. 150, 221 (1940) ("Any combination which tampers with price structures is engaged in an unlawful activity."); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd*., 513 F. Supp. 1100, 1148 (E.D. Pa. 1981) (agreements to charge low or depressed prices, even without fixing a particular price, are per se illegal because they stabilize prices and distort market competition);

*see also Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 776 (2d Cir. 2016) (plaintiffs plausibly alleged price-fixing agreement even though defendant banks were not agreeing on the actual prices because their agreement was designed to (and did) impact the *starting point* for those prices). An agreement that sets price levels without regard to the skill or the services provided and that restricts negotiation *is* an agreement to fix prices. *See, e.g., Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 99–100 (1984) ("*NCAA*") ("the [d]istrict [c]ourt found that the minimum aggregate price in fact operates to preclude any price negotiation between broadcasters and institutions, thereby constituting horizontal price fixing"); *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 348 (1982) ("the [*per se*] rule is violated by a price restraint that tends to provide the same economic rewards to all practitioners regardless of their skill, [] experience, [] training, or [] willingness to employ innovative and difficult procedures in individual cases"); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002) (agreement to fix list prices is per se antitrust violation even where most transactions occurred at lower prices because "the list price is usually the starting point for the bargaining and the higher it is (within reason) the higher the ultimately bargained price is likely to be"); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 362 (3d Cir. 2004) (quoting *High Fructose* for proposition that "[a]n agreement to fix prices is ... a per se violation of the Sherman Act even if most or for that matter all transactions occurred at lower prices."). Plaintiffs allege that the Challenged Restraints on their faces contain price restraints that award a uniform commission divorced from a broker's skill or experience and that restrict the ability to negotiate or compete. ¶¶ 135, 153, 161, 169.

   *Relevent Sports* did not defy this precedent by requiring a specific amount because it was not a price-fixing case at all—it alleged unlawful "horizontal division of geographic markets." 61

F.4th at 309. The Second Circuit determined that the association rule forbidding professional soccer teams from playing games outside their home countries constituted direct evidence because (1) the association adopted a policy that on its face restrained competition (through geographic market allocation); (2) the members "surrendered [their] freedom of action … and agreed to abide by the will of the association"; and (3) the members would otherwise "compete" on the plane governed by the restraint (geography). *Id.* at 309–10. Likewise, Plaintiffs here allege (1) NAR, through its member brokerages, adopted the Challenged Restraints that on their faces restrain prices for buyer-brokers on the MLS and restrain competition on price negotiation (¶¶ 154–57, 165–72); (2) NAR members, including Hanna, surrendered their freedom to compete on buyer-broker price and agreed instead to abide by and enforce NAR's Challenged Restraints (¶¶ 6, 13, 15, 20, 125, 154–55, 159, 167, 181, 219, 228); and (3) Hanna and other co-conspirator brokers would have competed on the plane of buyer-broker price absent the NAR rules (¶¶ 13, 136, 147, 157, 166–67). Plaintiffs have therefore alleged direct evidence of a conspiracy under *Socony-Vacuum*, *Maricopa County*, *NCAA*, *Zenith Radio*, *Smart*, and *Relevent Sports*.

Attempting again to dispense with *Relevent Sports* and the precedent on which it is based, Hanna also argues that the Second Circuit's ruling conflicts with the Third Circuit's decision in *Insurance Brokerage*. MTD at 10–11. This is incorrect because *Insurance Brokerage* concerned circumstantial evidence of a conspiracy and did not involve direct evidence based on a binding trade association rule that restrained a fundamental plane of competition, like price or geography. *Ins. Brokerage*, 618 F.3d at 324–25 & n.23, 349. Instead, *Insurance Brokerage* involved allegations that the trade association itself was a "plus factor" providing "circumstantial evidence" of a conspiracy. *Id*.

12

In the absence of any direct evidence, the *Insurance Brokerage* plaintiffs pointed to a *nonbinding* "position statement advising brokers on how to respond to questions" about commissions they received for independent vertical steering agreements between insurers and brokers. *Id.* at 349. Unlike here, that "position statement" was not binding on its members and was not on its face an explicit agreement to set blanket, unilateral commissions among horizontally competing brokers. Nor was it an explicit agreement among the brokers to enter into vertical agreements with the insurers. Instead, it was nothing more than a "proposed approach" for responding to inquiries into preexisting, independent parallel conduct common in the industry. *Id.* Also unlike here and unlike *Relevent Sports*, the position statement was not a mandatory rule through which the competitors surrendered their freedom of action. *Id.*

Here, as in *Relevent Sports*, the alleged conspiracy is a single horizontal conspiracy among the association and its members embodied in written mandatory rules that, on their face, impose anticompetitive restrictions—geographic limits in *Relevent Sports* and limits on brokers' ability to set and negotiate their commissions in this case. No further inferences are required. *Baby Food*, 166 F.3d at 118 (no "plus factors" necessary where there is direct evidence of an agreement); *Ins. Brokerage*, 618 F.3d at 325 n.23.

### B. Plaintiffs Plead Circumstantial Evidence of a Horizontal Agreement

In any event, Plaintiffs also plead circumstantial evidence of a horizontal agreement among Hanna, NAR, and NAR's other broker members to fix commission prices. The categories of relevant circumstantial evidence include "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Ins. Brokerage*, 618 F.3d at 321–22. In evaluating plaintiffs' evidence, the court is not to "tightly compartmentalize the evidence put forward by [plaintiffs], but instead analyze it as a whole to see if together it supports an inference

13

of concerted action." *In re Linerboard Antitrust Litig.*, 504 F. Supp.2d 38, 54 (E.D. Pa. 2007). The SAC contains numerous allegations of this circumstantial evidence.

**<u>Motive to conspire.</u>** Evidence of motive to conspire means evidence that the structure of the industry renders it conducive to price-fixing. *Id*. Plaintiffs allege NAR-affiliated MLSs dominate the distribution channel for residential listings (¶¶ 3, 13, 107–11), that access to MLSs is essential to effectively compete for buyers (¶¶ 106, 109, 176), and that non-NAR MLSs have substantial barriers to entry (¶¶ 109–11). *See, e.g.*, *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp.3d 404, 448 (E.D. Pa. 2018) ("High barriers to entry...make an industry more conducive to collusion."). Plaintiffs also allege that Hanna, NAR, and the other brokerages had a motive to conspire to prevent technology from usurping the role of the buyer-broker, and consequently declining prices and profits. ¶¶ 9, 16, 104, 151, 188–89. "Declining prices or profits in a market make price competition more than usually risky and collusion more than usually attractive." *Id*.

The Challenged Restraints directly respond to Hanna's and its co-conspirators' fear of losing their commission-generating role, in that they require sellers to make unilateral offers to buyer agents the second a home is placed on the market, completely independent of a particular buyer's desire to have an agent and or that buyer's negotiation with their agent. The rules then double down to protect commissions from competition by making it very difficult, if not impossible, for buyers to negotiate commissions as part of the pricing of the home. Indeed, Plaintiffs are hard-pressed to describe how the Challenged Restraints restricted competition among buyer-brokers, and Hanna's and its co-conspirators' motivation for enacting them, better than Hanna itself: "the Buyer-Broker Commission Rule meant that 'sellers didn't have a choice. They had to offer something. Conversely, buyers had limited choices as well, because they never

14

had a direct opportunity to negotiate the commission for their buyer's agent.'" ¶ 81 (real estate brokerage affiliated with Hanna explained that the Buyer-Broker Commission Rule); *see also* ¶ 125.

**Acts against economic self-interest.** "Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational" in a competitive market. *Flat Glass*, 385 F.3d at 360. Plaintiffs allege that absent an agreement not to compete through Hanna's and its co-conspirators' adoption of the Challenged Restraints, it would have been in Hanna's and each MLS's economic self-interest to gain market share by competing on buyer-broker commission rates. ¶¶ 147, 157, 167.

Plaintiffs also allege nearly uniform pricing by Hanna and their co-conspirators. ¶ 90. Plaintiffs further plead buyer-broker commissions have been substantially elevated or stabilized despite being "divorced from the quantity, quality, and value of the services" and despite the objective value of buyer-broker services decreasing over time with the advent of the internet. ¶¶ 151, 190. These allegations show that commission prices were inconsistent with competition in the industry. *Flat Glass*, 385 F.3d at 362.

**Customary indications of traditional conspiracy.** Indications of traditional conspiracy consist of "non-economic … 'proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown.'" *Flat Glass*, 385 F.3d at 361. First, Plaintiffs allege opportunities to collude by setting forth detailed facts regarding Hanna's and other brokerages' membership and participation in NAR, including leadership positions on committees responsible for reviewing and issuing the Challenged Restraints. ¶¶ 52, 55, 113, 173–74, 183–86. These allegations "demonstrate[] how and when Defendant[] had opportunities to exchange information

15

or make agreements." *Generic Pharms*., 338 F. Supp.3d at 449 (crediting allegations regarding defendants' trade association memberships, meeting attendance, and participation in industry gatherings).

Plaintiffs' allegations regarding the history of government investigations into and legal actions against NAR and others for fixing commission prices (¶¶ 16–17, 87, 89, 94–97) further bolster the plausibility of an agreement. *Id*. at 452 (allegations regarding ongoing federal and state investigations and executives' guilty pleas supported inference of agreement).

Finally, Plaintiffs allege that NAR and its member brokerages cultivated a long-standing culture of cooperation in which they entered into agreements first to set and abide by commission schedules and, when that was found to violate antitrust laws, to make unilateral offers of compensation to subagents who owed their duty of loyalty to the seller even though they represented the buyer. ¶¶ 101–05, 125. When subagency ended following more legal pressures, the co-conspirators came up with a new way to ensure maximum broker commissions—an agreement in the form of an association rule requiring home sellers to set and offer uniform commissions to buyer-brokers. ¶¶ 9, 101–05, 125. Together, the co-conspirators designed a uniform transactional structure where home purchasing "funds would be earmarked for buyer brokers from every transaction regardless of whether a buyer wanted a broker or could negotiate a lower rate." ¶ 125. This evidence is even stronger than circumstantial evidence that demonstrates co-conspirators "adopted a common plan even though no meetings, conversations, or exchanged documents are shown." *Flat Glass*, 385 F.3d at 361. It also serves as evidence of an "antecedent agreement among horizontal competitors to agree" to adopt a certain policy. *Relevent Sports*, 551 F. Supp.3d at 131–32.

Hanna's arguments against Plaintiffs' allegations of circumstantial evidence are unavailing. First, Hanna concedes that barriers to entry can "be indicative of markets that are conducive to price-fixing", but claims Plaintiffs' allegations cannot be credited because they do not plead barriers to entry in the market for buyer-broker services. MTD at 8. Plaintiffs, however, plead a market for buyer-broker services in areas where NAR MLSs operate. ¶ 106. In these areas, brokers require access to the NAR MLSs in order to effectively compete. *Id.;* ¶¶ 109–110. Indeed, Plaintiffs plead that "NAR and Defendant, through their coconspirator franchisees and other conspiring brokers where the NAR MLSs operate, collectively provide the majority of the residential real estate broker services in these areas." ¶ 107. Moreover, the MLSs, which NAR, Hanna, and their co-conspirators control, work as a tool to prevent would-be discount brokers from competing. ¶¶ 143–44. NAR also advises its members that "non-competes" that prevent third-party websites from using "data in a manner that is similar to a Multiple Listing Service" are critical. ¶ 111. Thus, impediments to the creation of competing MLSs do function as barriers to entry to the buyer-broker services market.

Second, Hanna argues that the buyer-broker services market is too localized to be conducive to collusion. MTD at 8. This argument boils down to the proposition that plaintiffs must allege a concentrated market in order to plead circumstantial evidence of an agreement. But none of Hanna's cited authorities goes so far. Moreover, Hanna entirely ignores Plaintiffs' allegations that NAR and Hanna, "through their coconspirator franchisees and other conspiring brokers where the NAR MLSs operate, collectively provide the majority of the residential real estate broker services" throughout the country and that "Defendant and its coconspirators collectively have market power in each relevant market through their control of the local MLS

and their dominant share of the local market." ¶¶ 107–08. In this context, the absence of a high market concentration does not render collusion improbable.

Third, Hanna argues that it had "independent incentives to follow the NAR guidelines without any agreement," specifically "reducing transaction costs, facilitating real estate transactions, and providing a more transparent marketplace." MTD at 9. Hanna does not explain how the Challenged Restraints achieve these specific "benefits." *Id*. Nor does it present any argument or evidence that, for example, commission prices were caused by changes in costs or demand. *In re Flat Glass*, 385 F.3d at 360–61 (actions contrary to self-interest existed where there was no proof that price increases were caused by changes in costs or demand). To the contrary, Plaintiffs allege there was increasingly *less* need for buyer-brokers. ¶¶ 9, 104, 151.

In any event, Plaintiffs are not required at this stage to rebut Defendant's potential independent incentives for agreeing to NAR's guidelines. *Generic Pharms*., 338 F. Supp.3d at 449 ("Ultimately ... [d]efendants may show they had legitimate economic reasons for their pricing decisions, as they argue in their briefs, but [] [p]laintiffs are not required to rebut those reasons in order to withstand dismissal.") (citing *In re Propranolol Antitrust Litig.*, 249 F. Supp.3d 712, 721 (S.D.N.Y. 2017) ("At the motion to dismiss stage, ... plaintiffs need not 'offer evidence that tends to rule out the possibility that the defendants were acting independently[.]'")). Instead, Plaintiffs' allegations as a whole must raise a reasonable inference that Hanna and its coconspirators agreed among themselves. *Ins. Brokerage*, 618 F.3d at 341 n.42 (*Twombly* "does not require as a general matter that the plaintiff plead facts supporting an inference of defendant's liability more compelling than the opposing inference," only enough to draw a "*reasonable* inference that the defendant is liable for the misconduct alleged."). Here, even if Hanna and its co-conspirators had some independent reasons to agree to the Challenged

18

Restraints, the circumstantial evidence outlined above (motive, parallel pricing, a history of anticompetitive behavior, acts against self-interest), raises an inference of conspiracy. *In re Linerboard Antitrust Litig.*, 504 F. Supp.2d 38, 53, 54–55 (E.D. Pa. 2007) (finding evidence of a traditional conspiracy, motive, and actions against interest sufficient to demonstrate a conspiracy at summary judgment phase, noting motive and actions contrary to interest "may not suffice-by themselves-to defeat summary judgment on a claim of horizontal price-fixing" but are still "important to a court's analysis, because their existence tends to eliminate the possibility of mistaking the workings of a competitive market … with interdependent, supracompetitive pricing"). Indeed, what goal would NAR, Hanna, and their coconspirator brokerages have in specifically restricting commission offers and suppressing negotiation other than impacting actual commission levels? *See In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-CM-27241, 2025 WL 2483981, at *10 (E.D. Pa. Aug. 27, 2025) ("the evidence in the record creates a reasonable inference: what other goal would manufacturers hope to accomplish in raising list prices other than to cause an increase in their actual prices?").

Moreover, the authority Hanna relies on (MTD at 9) is distinguishable. Both *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 229 (3d Cir. 2011), and *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 166 (3d Cir. 2003), dealt with a decision by defendant companies to not partner with other firms so as to not risk their profits. *InterVest*, 340 F.3d at 166 (refusing to partner with company with unproven technology); *Burtch*, 662 F.3d at 229 (refusing to extend credit to a company experiencing financial hardship). As *Burtch* explained, motivation to increase profits is not evidence of a conspiracy. *Burtch*, 662 F.3d at 229. But Plaintiffs allege that Hanna and its co-conspirators were motivated by market developments that threatened not just to impact Hanna's bottom line, but to bypass buyer-brokers altogether. ¶¶ 9, 104. In the face of these market

changes, Plaintiffs allege that unless the Challenged Restraints were mandatory for all NAR members (they were), it would have been in Hanna's self-interest to compete on price directly with homebuyers in order to stave off the threat posed by the internet. *Id*. The only other alternative to this threat of disintermediation and declining profits, which Hanna chose, was to enter into agreements with its competitors that would ensure offers would be made to buyer-brokers whether a buyer wanted one or not and to sidestep the buyer's ability to negotiate altogether.  ¶¶ 81, 125.

Fourth, Hanna contends that Plaintiffs' allegations regarding the history of antitrust investigations and violations should be disregarded because they do not specifically allege how Hanna participated during that history. But a "defendant need not be accused of having engaged in all activities alleged to have advanced the conspiracy." *Generic Pharms.*, 338 F. Supp. 3d at 450 (quoting *In re Processed Egg*, 821 F. Supp. 2d 709, 742 (S.D.N.Y.) (plaintiffs are not required to allege the same "conduct or quantity of alleged bad acts" as to each defendant). Plaintiffs allege that Hanna is a member of NAR, has executives who serve on key NAR committees and are deeply involved in the management and operation of NAR, requires its franchises and agents to follow NAR rules, makes public statements that buyer-broker services are free, and that Hanna participated in industry-wide studies and discussions regarding the state of the industry and the best way to ensure, in Hanna's own words, that everyone moved "in the same direction." ¶ 99. This is enough.[4] *Compare to Generic Pharms.*, 338 F. Supp.3d at 450 (finding allegations regarding all but one defendant who was not alleged to be part of the

---

[4] These same allegations demonstrate Hanna's participation in the conspiracy. It does not matter that Hanna's "home MLS" does not impose the Buyer-Agent Commission Rule. MTD at 15. Hanna's agents serve as brokers for buyers across multiple states using multiple different MLSs, and Hanna requires them to follow NAR rules. ¶¶ 52, 180–82.

relevant association at all sufficient, even though they were not all alleged to have participated in the conspiracy to the same degree).

Finally, Hanna argues that Plaintiffs cannot simultaneously plead that the Challenged Restraints themselves are anticompetitive agreements and plead circumstantial evidence of a separate agreement to enact, abide by, and enforce the Challenged Restraints. MTD at 12. Hanna does not explain why not. Nor does it contest that Plaintiffs may plead in the alternative. Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."); *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 189 (3d Cir. 1997) (even where two "theories undercut one another ... a plaintiff may plead in the alternative").

Plaintiffs therefore plead ample circumstantial evidence of a horizontal agreement among Hanna and its co-conspirators to fix commission prices.

## C.  Plaintiffs Plausibly Plead a Vertical Agreement

The Court previously observed that Plaintiffs' prior Amended Complaint alleges "that Hanna is a NAR member; that its executives sit on NAR boards; that it requires its brokers and franchisees to follow NAR rules; and that it imposes the same rules on all brokers utilizing the MLSs that it controls." 12b6 Order at 61. The SAC does too. ¶¶ 52, 55, 63–64, 113, 130, 174, 181–86. As with the Amended Complaint, "[t]his evidence directly and circumstantially describes an agreement between Hanna and NAR—entities 'at different levels' of the real estate market—and thus plausibly suggests a vertical agreement." 12b6 Order at 61 (citing *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988)).

Hanna now argues that this Court's ruling contravenes a new rule of Hanna's own invention: that vertical agreements can exist only along a single supply chain. MTD at 17. That is not the law. Restraints "imposed by agreement between firms at different levels of distribution" are nonetheless vertical restraints. *Bus. Elecs. Corp.*, 485 U.S. at 730, holding modified by

21

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007). There is no requirement that the upstream and downstream entities sell the same product in the same market. *See*, *e.g.*, *In re Processed Egg Prods. Antitrust Litig.,* No. 08-MD-2002, 2016 WL 5539592, at *12 (E.D. Pa. Sept. 28, 2016), *aff'd sub nom. In re Processed Egg Prods. Antitrust Litig.*, 850 F. App'x 142 (3d Cir. 2021) (plaintiffs offered enough direct and circumstantial evidence of an agreement to restrain trade among egg producers and the United Egg Producers association).

Hanna reads "vertical restraint" far more narrowly than even its own cited authority supports. MTD at 16–17 (citing *Cendyn*, 148 F.4th at 1069). *Cendyn* involved, among others, alleged agreements between hotels and Cendyn, a software provider, to license Cendyn's price-recommendation software. *Id*. The court held that Cendyn and the hotels were not in a vertical relationship because they operated in different markets (advisory services versus hotel room rentals) for purposes of plaintiffs' antitrust claim. *Id*. At bottom, Cendyn offered hotels nonbinding pricing recommendations that were not in any way necessary to the hotels' provision of hotel-room rentals to plaintiffs. *Id*.

In reaching this conclusion, *Cendyn* explicitly noted that a vertical conspiracy can exist outside of a manufacturer-retailer scenario, particularly where a "service-provider" furnishes resources and infrastructure "necessary … for production" and distribution in a market. *See Cendyn*, 148 F.4th at 1082 ("[t]his is not to say that service-providers cannot be in vertical relationships with their clients."). If it had, *Cendyn* would be in conflict with this Circuit, which recognizes that it is the nature of the specific antitrust conspiracy alleged that governs the analysis—not rigid categories. *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*, 89 F.4th 430, 439–40 (3d Cir. 2023) (finding the "complex business arrangements" at issue

precluded "clean line drawing"); 12b6 Order at 62 ("The character of the agreement underlying the alleged restraint of trade determines the test to which it is subject.").

Here, NAR operates and controls essential MLSs and governs how homes are listed, how brokers transact, and, until recently, how brokers were paid. ¶¶ 5, 64, 70–75, 117–130, 176–77. That is, NAR is not a peripheral vendor that provides pricing recommendations incidental to the provision of buyer-broker services. Instead, NAR provides the necessary infrastructure for real estate brokers to operate and then sets the rules of the industry. This fits comfortably within the distributional necessity recognized in *Cendyn*. *See* 148 F.4th at 1082. Without agreeing to NAR's rules, a broker cannot effectively participate in the market for buyer-broker services at all because they will lack access to the necessary MLSs. ¶¶ 109, 176. Even under *Cendyn,* these allegations adequately plead a vertical conspiracy. 148 F.4th at 1082 (unlike here, "Cendyn's revenue-management software products serve a 'back-office' function; they are not used to make hotel rooms available in the first instance"). Moreover, unlike *Cendyn*, NAR's membership is composed of agents who do provide buyer-agent services.

In short, the Court has already found that Plaintiffs plausibly pled a vertical agreement. Plaintiffs still do.

### D.  Plaintiffs Plead a Hub and Spoke Conspiracy

Plaintiffs have also plausibly pleaded a so-called "hub-and-spoke" conspiracy with NAR as the hub and Hanna and the other brokerages as the spokes. *Ins. Brokerage*, 618 F.3d at 327 (hub and spoke conspiracies have "a long history in antitrust jurisprudence"). As set forth above, Plaintiffs plead a vertical relationship with the "hub," NAR, and a horizontal conspiracy among the "rims", competitor brokerages (including Hanna) who are connected by agreeing to the anticompetitive Challenged Restraints and serving on NAR committees, near uniform pricing, and working together to agree to, enact, implement, and enforce the Challenged Restraints across

local Realtor associations and MLSs. *See* pp. 8–16, *supra*; *see also Ins. Brokerage*, 618 F.3d at 327, 347 ("[T]he critical issue for establishing a *per se* violation with the hub and spoke system is how the spokes are connected to each other", finding allegations of bid-rigging— "quintessentially collusive behavior"—sufficient to plead conspiracy).

## II.    Plaintiffs Plausibly Plead an Unreasonable Restraint of Trade Under Any Mode of Analysis

Courts have developed three modes of analysis for evaluating whether restraints of trade are unreasonable under the Sherman Act. In ascending order of rigor, they are (1) a *per se* analysis; (2) an abbreviated or "quick-look" analysis; and (3) the "rule of reason." *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 6322383, at *7 (E.D. Pa. May 26, 2015). As Plaintiffs' SAC now pleads a horizontal price-fixing conspiracy, the Court may apply the *per se* standard. *See*, *e.g.*, *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980) (collecting cases and stating horizontal agreements to fix prices are the "archetypal example" of a *per se* illegal restraint of trade); *Maricopa*, 457 U.S. at 348 ("*per se* rule is violated … by a price restraint that tends to provide the same economic rewards to all practitioners regardless of their skill, experience, training, or willingness to employ innovative and difficult procedures in individual cases"); *Burnett*, 2022 WL 17741708, at *10 (holding at summary judgment that the same NAR rules, particularly the Buyer-Agent Commission Rule, are subject to the *per se* analysis because they operate to set prices).[5]

---

[5] Hanna's three Third Circuit cases are distinguishable. MTD at 13. In *Winn-Dixie*, 89 F.4th at 441, the court applied the rule of reason to plaintiffs' allegations that defendants entered into a "unique, integrated hybrid scheme" involving "multifaceted relationships" with both vertical and horizontal components that could not easily be delineated from one another. *Id.* It did not apply the rule of reason because the conspiracy involved a trade association. Unlike in *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 831 (3d Cir. 2010), Hanna does not argue—and there is no basis to believe—that its horizontal restraints are necessary if the product (broker services) is to remain available. The Challenged Restraints were largely rescinded last year yet real estate continues to be sold. And unlike in *United States v. Brown Univ. in Providence in State of R.I.*, 5 F.3d 658, 662 (3d Cir. 1993)), Hanna does not argue that its

24

However, even if the Court applies the rule of reason, the Court previously held that Plaintiffs' allegations satisfy that rubric. 12b6 Order at 66. As discussed further below, Hanna offers nothing new to compel the Court to deviate from its prior ruling. Because Plaintiffs satisfy the rule of reason, the Court need not determine which mode of analysis will ultimately apply at this stage. *Swarthmore Radiation Oncology, Inc. v. Lapes*, 812 F. Supp. 517, 520 (E.D. Pa. 1992) (the court "need not reach the question of whether to apply a *per se* standard or a 'rule of reason'"); *Fuentes v. Royal Dutch Shell PLC*, No. CV 18-5174, 2019 WL 7584654, at *1 (E.D. Pa. Nov. 25, 2019) (declining to determine which mode of analysis applied to no-poach provision at the pleading stage).

Hanna challenges only Plaintiffs' alleged geographic market and anticompetitive effects. MTD at 21–29. As they did before, Plaintiffs have pleaded both.

## A. Plaintiffs Plausibly Plead a Geographic Market

Plaintiffs allege markets consisting of "the geographic areas in which NAR MLSs operate." ¶ 106. This Court previously analyzed in detail Plaintiffs' allegations as to geographic market—which remains unchanged in the SAC—and found them plausible. 12b6 Order at 65-66. The Court correctly explained that "Plaintiffs plead that NAR members operate MLSs all throughout the United States" and "where multiple MLSs operate in the same geographic area, Plaintiffs' market definition includes the whole area." 12b6 Order at 66. The Court rejected Hanna's arguments for two reasons: the market (1) "acknowledg[es] … the commercial reality of the industry" by being defined to match the expansive, nationwide reach of NAR MLSs and (2)

---

adoption of the restraints at issue was motivated by "ethical norms." Finally, both *Burnett* and *Moehrl* declined to select a mode of analysis at the pleading stage. *Sitzer v. NAR*, 420 F. Supp.3d 903, 913 n.3 (W.D. Mo. 2019); (deferring decision of which standard would ultimately govern); *Moehrl*, 492 F. Supp.3d at 782 (determining mode of analysis was unnecessary because plaintiffs contended that the [c]ourt need not decide whether the *per se* rule applied at the pleading stage and instead employed the rule of reason).

"covers the 'area in which a potential buyer may rationally look for the goods or services he seeks.'" 12b6 Order at 66 (quoting *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 212 (3d Cir. 2005)). Accordingly, contrary to Hanna's argument that the Court's prior ruling rested entirely on its reasoning that Plaintiffs allege a single market (MTD at 23–24), the Court's conclusion resulted from its (correct) understanding that buyers search for brokers in given geographic *areas*, not by MLS.

Hanna devotes nearly four pages of its brief to relitigating the Court's conclusion, but its arguments, when distilled, are essentially the same as before. Hanna's primary argument is that Plaintiffs' geographic market is implausible because buyers do not know about or base their search for broker services on the areas in which NAR MLSs operate. [6] The Court already held, however, that Plaintiffs' geographic market "would not be rendered implausible simply because the buyer may not realize he is shopping across the territories of several different MLS." 12b6 Order at 66. There is no requirement that buyers "look for buyer-broker services based on the 'areas' in which NAR MLSs operate" or that "MLS boundaries" be a "factor animating a buyer's decision." MTD at 20. Nor does it matter whether Plaintiffs allege a single market or multiple markets covering each of these areas. MTD at 24. What matters is that the pleaded geographic market covers the area where a buyer would rationally look for a broker. 12b6 Order at 66; *Gordon*, 423 F.3d at 212

---

[6] Hanna repeatedly makes this same argument in slightly different forms. MTD at 21–25 (plaintiffs fail to allege that home buyers perceive these areas as markets for buyer-broker services, let alone as *separate* markets); *id.* at 21 (allegations implausible "because it is obvious that buyers do not look for buyer-broker services based on the 'areas' in which NAR MLSs operate."); *id.* at 22 ("MLS boundaries are not a factor animating a buyer's decision when purchasing a home"); *id.* at 24 ("A consumer in an area with overlapping MLSs… has no reason to limit his or her search for a broker based on the geographic area in which a particular MLS operates."); *id.* at 25 ("Plaintiffs' proposed market does not reflect how buyers actually view the market and therefore renders it implausible.").

Hanna's authority agrees. *Tunis Bros. Co. v. Ford Motor Co.,* 952 F.2d 715, 726 (3d Cir. 1991) ("The geographic market … is comprised of the area where his customers would look to buy such a product."); *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962) ("Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one."); *Medical Diagnostic Lab'ys, LLC v. Independence Blue Cross*, No. 16-5855, 2017 WL 3776619, at *6 (E.D. Pa. Aug. 30, 2017) ("A geographic market must be alleged in terms of consumer choices—that is, in terms of 'the area in which customers would look to purchase the product.").[7]

And Hanna's hypothetical illustrates the point. Hanna posits that the New York buyer will search for a home in the New York area, which is covered by multiple MLSs, some NAR-operated and some not. And some of the NAR MLSs that operate in the New York region may also operate in other regions. But none of this matters. Plaintiffs' alleged geographic market covers the region because it is an area in which an NAR MLS operates.

In fact, Hanna's arguments ignore reality, commercial and otherwise. Hanna claims that it is impossible for the Court to tell where the relevant geographic regions are or how they differ from excluded markets. *Id*. Hanna ignores SAC ¶ 72, which shows generally where NAR MLSs operate. And it is obvious from ¶ 106 how these regions are different than others: NAR MLSs operate in included regions and do not operate in excluded regions. It is also not necessary for Plaintiffs to define "operate" with such specificity when Plaintiffs allege that MLSs are databases of properties listed for sale. ¶ 106. As before, Plaintiffs have alleged "enough to plead the contours of the relevant market at the pleadings stage." *Mayor & City Council of Baltimore v.*

---

[7] *Building Materials Corp. of Am. v. Rotter*, 535 F. Supp.2d 518, 525 (E.D. Pa. 2008), rejected product markets where plaintiffs failed to state whether there were interchangeable products or why the markets were distinct from others. It is irrelevant.

*Merck Sharp & Dohme Corp.*, No. CV 23-828, 2023 WL 8018980, at *8 (E.D. Pa. Nov. 20, 2023) (market allegations sufficient where plaintiffs pleaded a lack of interchangeability, a United States market, and allegations suggesting multiple additional markets within the United States).[8] So much so that this District Court *did* assess identical pleadings and found them sufficient. 12b6 Order at 62–66.

### B.  Plaintiffs Plead Anticompetitive Effects

Like the relevant market, this Court has already determined that Plaintiffs plausibly allege anticompetitive effects in the market by pleading "the NAR rules inflate buyer-broker fees by suppressing negotiation and competition among brokers, that sellers pass those inflated fees onto buyers (who pay them as part of the total home price), and that Hanna is legally responsible." 12b6 Order at 65. The SAC pleads these same facts. ¶¶ 18, 20, 22, 187. Accordingly, "[a]t this early stage of the proceeding," these facts are all that is required for "Plaintiffs [to] have carried their burden of establishing a plausible product market." *Id*.

Despite pages of argument, Hanna (again) fails to offer anything to compel a different conclusion. For example, Hanna contends that Plaintiffs cannot plausibly show anticompetitive effects in the context of a vertical agreement between Hanna and NAR. MTD at 28–29. But this Court's original ruling already analyzed the alleged conspiracy as a vertical agreement. MTD at 21. Hanna's other arguments contradict the allegations in the SAC (MTD at 26 ("Plaintiffs pay no commissions")); rely on facts outside of the SAC (MTD at 27 ("Brokers present their clients' offers and counteroffers without making them *dependent* on the commission the buyer-broker is to receive.")); repeat incorrect statements of law (MTD at 26 (suggesting NAR rules cannot

---

[8] Tellingly, Hanna does not offer a single in-District decision in support of its arguments that Plaintiffs' allegations are too "fuzzy" for the pleading stage.

cause inflated commissions because "the NAR guidelines do not specify a required commission rate")); and misconstrue Plaintiffs' allegations (*id*. ("Plaintiffs[] claim that the guidelines restrain competition among home buyers").

Hanna does nothing but demonstrate why this Court was correct to previously conclude that questions about the relevant market and effects within it are "in most cases" better left until after discovery.12b6 Order at 65 (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)). Take for example Hanna's submission of Mr. Davis's contract, which specifies that the broker would receive 2.5% or Mr. Davis would pay the difference. MTD at 26. Hanna fails to mention that the same contract also says that Mr. Davis's agent would get more if the commission offered on the MLS for his home was higher. ECF No. 110-5 at 2 (stating "if additional compensation … is offered … through the MLS or otherwise, Buyer will permit the Firm to receive it in addition to the Fee."). Accordingly, no matter what Mr. Davis negotiated, his buyer broker was entitled to get the MLS-offered commission rate. This is exactly how the SAC alleges the Challenged Restraints operated for all class members: the Buyer-Agent Commission Rule ensured that funds would be earmarked for buyer brokers from every transaction regardless of whether a buyer wanted a broker or could negotiate a lower rate. ¶ 125; *see also* ¶ 81 (Hanna states buyers never had an opportunity to negotiate the commission for their buyer's agent).

### C.  The Challenged Restraints Do Not Have Any Procompetitive Benefits

As Plaintiffs have plausibly alleged a relevant market and anticompetitive effects, "a full-blown market analysis is not necessary." *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 622 F. Supp.3d 22, 47 (E.D. Pa. 2022). Nevertheless, Hanna attempts to identify procompetitive benefits of its conduct. MTD at 20–21. It fails. First, Plaintiffs do not

29

claim that MLSs themselves are anticompetitive, and so they need not and do not contest that MLSs may have procompetitive benefits outside of the alleged conduct. Instead, Plaintiffs challenge specific NAR rules.[9]

 Hanna's arguments about the guidelines themselves directly contradict Plaintiffs' well-pleaded allegations (which must be credited). Plaintiffs plead that buyers do incur costs because buyers pay both the seller-broker and the buyer-broker when they pay the purchase price for their home. Plaintiffs also do not plead that buyers are "relieved of the need to negotiate"—they plead that buyers are *prevented* from doing so or that the Challenged Restraints render any negotiation irrelevant. ¶ 169. And Hanna does not explain how reducing friction in the process of buying a home or enabling buyers to make offers, even if true, promotes *competition* or why the restraints are necessary to achieve these goals. *Suboxone*, 622 F. Supp.3d at 53 ("The final step in the rule of reason requires balancing the harm to competition against the procompetitive justifications. This step 'involves determining whether the challenged [conduct] is necessary to achieve its purported goals'") (quoting *Brown Univ.*, 5 F.3d at 678). This Court need not speculate to reject Hanna's arguments. Because of related litigation the Challenged Restraints have been removed for over a year (¶¶ 115, 160). Yet MLSs still exist and people still buy and sell home with no

---

[9] Hanna's authority does not support its position. *Realcomp II, Ltd. v. F.T.C.*, 635 F.3d 815, 836 (6th Cir. 2011), recognized benefits of a website and certain policies, but rejected defendant's procompetitive justifications for failing to demonstrate how its restrictions benefited consumers. *O'Riordan v. Long Island Bd. of Realtors, Inc.*, 707 F. Supp. 111, 115 (E.D.N.Y. 1988), examined "anti-trust aspects of an MLS" as opposed to NAR's rules, and concluded, "where an MLS has merely required membership in a board of realtors numerous courts have refused to find an anti-trust violation." Here, the Challenged Restraints require far more than membership in a board of realtors. *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 321 (7th Cir. 2006), challenged an NAR rule that prevented solicitation of other members' exclusive clients. *Id.* The court found that this rule promoted transparency and efficiency in the market because, without it, brokers may be afraid to post their listings lest others steal their clients. *Id.* Hanna makes no similar argument that the Challenged Restraints themselves promote transparency, efficiency, or competition or that the supposed goals could not have been accomplished with less restrictive means.

discernible negative effects. Hanna does not even attempt to identify any. Thus, Hanna fails to meet its burden under the Rule of Reason.

### III.    Plaintiffs Plausibly Plead Standing

#### A.  Plaintiffs Have Antitrust Standing

This Court previously found that Plaintiffs had antitrust standing. Hanna's second motion to dismiss offers no sound reason for changing course. Antitrust standing asks "whether [a] plaintiff is a proper party to bring a private antitrust action." *See Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) ("*AGC*"). *AGC* sets forth five factors to consider to answer this question: (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to prevent; (3) the directness of the injury; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages. *Id.*; *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165–66 (3d Cir. 1993). The parties previously conceded, and Hanna does not now contest, that *AGC* is the strictest test available. Standing Order at 575. Accordingly, if Plaintiffs satisfy *AGC*, Plaintiffs have standing to bring their antitrust claims in each of the states for which they bring claims. Standing Order at 577; *D.R. Ward Const. Co. v. Rohm & Haas Co.*, 470 F. Supp.2d 485, 502–3 (E.D. Pa. 2006) (applying *AGC* for the sake of argument and finding that indirect purchasers satisfied it); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp.3d 665, 697 (E.D. Pa. 2014), *on reconsideration in part sub nom. In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, No. 13-MD-2445, 2015 WL 12910728 (E.D. Pa. Apr. 14, 2015) (same).

### 1. Plaintiffs Satisfy Causation

The Court previously found the following allegations sufficient to plead causation and intent under *AGC*: homebuyers "paid supracompetitive home prices and received lower quality buyer-broker services as a direct result of the NAR rules and guidelines in question" (Standing Order at 578); that "[i]nflated total commissions are incorporated into the home purchase price, thereby causing buyers to pay higher prices for homes" (*id.*); and that Hanna and its coconspirators "intentionally and wrongfully" conspired to adopt the relevant rules in order to stifle competition (*id.*). Based on these allegations, the Court found it "easy to understand how inflated commissions would result in inflated home prices." *Id*. The SAC contains these same allegations. ¶¶ 80, 116, 153, 187, 193, 204, 221.

Hanna argues that references to "cooperative commissions" in the SAC destroy the causal link between Hanna's conspiracy and Plaintiffs' injury. This argument stretches Plaintiffs' allegations beyond any reasonable reading. The SAC contains precisely one reference to "cooperative commissions." ¶ 91. Hanna also references ¶ 95, which simply points out that the DOJ and FTC had noted that the culture of cooperation among NAR and brokerages disincentivized brokers from offering lower commissions. Both of these references appear in the section of the SAC that explains the culture of cooperation and certain prior agreements that existed among NAR and its members. ¶¶ 91–100. This culture and these agreements set the stage for the current Challenged Restraints that resulted in Plaintiffs' injury. *Id.*; *see also* pp. 6, 6–16, *supra*. These allegations leave untouched Plaintiffs' theory of causation—that the Challenged Restraints directly resulted in higher commissions, which were baked into the prices Plaintiffs paid for their homes. ¶¶ 133, 139, 187.

Hanna next repeats its previously rejected argument that many factors impact home prices. MTD at 37. In an effort to avoid the Court's prior finding that this argument relies on information outside the pleadings (Standing Order at 577), Hanna points to Plaintiffs' allegation that there have been "widespread fluctuations in housing prices" (¶ 189) and argues that these fluctuations would not occur if commission levels were the only force impacting home prices. Plaintiffs, however, have never alleged that commission levels are the *only* thing impacting home prices, nor do they need to. The price of every product on the market is impacted by multiple inputs. What matters at the pleading stage for purposes of *AGC* is that plaintiffs allege facts sufficient to show that their injury was proximately caused by defendants' conduct. Standing Order at 578. Plaintiffs have done so. *Id.*; *Moehrl*, 492 F. Supp.3d at 784 ("it is easy to understand how [the NAR rules implemented by Defendant] could plausibly result in inflated commission rates."); *Batton I*, 2024 WL 689989, at *8 ("[I]t is not difficult to trace the path of the overcharge.").[10]

Indeed, while accounting for market forces may be difficult in some economic systems, this is *not* true of the real estate industry. *See Burnett*, 2022 WL 17741708, at *10 (distinguishing the real estate industry from complicated business structures because it involves only two parties, one product, and a written agreement). This feature of the real estate industry sets this case apart from *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 441 (3d Cir. 2000), where plaintiffs had to do myriad speculative calculations to prove damages from increased medical costs. *Id.* (likening to another case where plaintiffs had to show how many smokers would have

---

[10] In fact, Plaintiffs have already submitted an expert report in one of their cases against Hanna's co-conspirators setting forth a comprehensive, precise methodology for calculating damages for each individual buyer by isolating the effect of supracompetitive buyer-broker commissions from other factors impacting home prices. *See Batton I*, ECF No. 243-4.

stopped smoking, how many would have begun smoking less dangerous products, how much healthier these smokers would have been, and the savings hospitals would have realized by paying out fewer claims for smoking-related illnesses).

In any event, the pleading stage is not the proper juncture to assess questions about the precise relationship between commission rates and home prices. *See D.R. Ward*, 470 F. Supp.2d at 503 ("the discovery process is necessary to develop an array of factual issues that bear upon the directness of the plaintiffs' injury", including "the degree to which the artificially increased portion of the price of plastics additives was passed along the distribution chain" and "the impact of intra- and extra-market factors").

### 2. Plaintiffs Satisfy Directness

This Court previously held that Plaintiffs satisfied the directness factor by alleging they are the direct recipients of buyer-broker services and that the price of their homes was inflated to cover the cost of those services. Standing Order at 578–79. The Court stated that Plaintiffs' allegations suggest that they "have suffered the greatest, if not the most direct, injury of alleged antitrust conspiracy … since they received worse services and paid higher prices than they otherwise would, while sellers came out even after passing on the supracompetitive fees." *Id.* at 578 (quoting *D.R. Ward*, 470 F. Supp.2d at 503). These allegations too remain unchanged in the SAC. ¶¶ 116, 153, 164, 187, 221, 229. There is thus no reason to depart from the finding that Plaintiffs have sufficiently alleged directness for purposes of antitrust standing.

Hanna submits that the SAC alleges purportedly new and additional links in the causal chain such that the SAC now oversteps some unknown maximum number of steps that *AGC* allows. MTD at 35. But the supposed additional steps of agreement and approval for NAR rules that Hanna claims are new causal events are in fact one single step previously alleged—

enactment of the rules. Even if they were not, the addition of two rule-making steps still would not destroy causation. Hanna cites, for example, *Steamfitters Loc. Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 932 (3d Cir. 1999) (MTD at 35). In that case, plaintiffs would have had to establish no less than five links to demonstrate that defendants' suppression of information on the dangers of smoking and withholding of safer tobacco products from the market caused plaintiffs greater expenditures. *Id.* Even assuming the SAC adds two additional steps, Plaintiffs would still only need to establish that NAR committees agreed to new anticompetitive rules, obtained approval of those rules, that those rules were enforced across franchises and agents, and that such rules increased prices. As described earlier, Plaintiffs have alleged all of these things. And in reality, all Plaintiffs must demonstrate is that the rules inflated commissions, which in turn inflated home prices, which Plaintiffs also allege. ¶¶ 187–99. Plaintiffs' allegations are sufficient to plead directness.

### 3. Plaintiffs Are Efficient Enforcers

While this Court previously considered that the existence of home sellers (direct purchasers) seeking the same relief in separate litigation weighed against standing, it ultimately held that this litigation did not bar Plaintiffs' claims. Standing Order at 580–81. In reaching this conclusion, the Court rejected any "wide-sweeping proposition" that "wherever a direct purchaser is actively suing to enforce the antitrust laws, any similar suit by an indirect purchaser is automatically doomed." *Id.* at 580. The rejection of such a sweeping rule is consistent with other courts in this District that have routinely found that indirect purchasers asserting antitrust claims under the laws of *Illinois Brick* repealer states satisfied *AGC*. *See*, *e.g.*, *Suboxone*, 64 F. Supp.3d at 698 (directness satisfied where indirect purchasers purchased the price-fixed product or provided reimbursement to members for the product); *D.R. Ward*, 470 F. Supp.2d at 503

(indirect purchasers who alleged inflated prices of plastic additives were passed on to them satisfied directness and in fact plausibly pleaded they "suffered the greatest" injury); *see also In re Domestic Drywall Antitrust Litig.*, No. 15-CV-1712, 2019 WL 4918675, at *11–12 (E.D. Pa. Oct. 3, 2019) (refusing to grant summary judgment of indirect purchasers' claims on directness).

Hanna asks this Court to overturn its prior ruling based on a recent Southern District of Florida decision examining similar allegations to those alleged here and finding that Plaintiffs were not efficient enforcers of federal antitrust law to seek injunctive relief. *See* MTD at 36 (citing *Lutz v. HomeServices of Am., Inc.*, No. 4:24-CV-10040-KMM, 2025 WL 2046905, at *3 (S.D. Fla. July 15, 2025)). The *Lutz* decision is irrelevant because Plaintiffs here no longer seek injunctive relief, only damages.[11] The court in *Lutz* dismissed Plaintiffs' claims for *injunctive relief* because "there are more directly injured plaintiffs (i.e., home sellers) pursuing *the same injunctive relief that Plaintiffs seek here.*" *Id.* (emphasis added). The *Lutz* court did not, however, extend that holding to Plaintiffs' state-law claims for damages—the only claims at issue in this case—even though it was presented with an opportunity to do so. The *Batton I* court similarly dismissed homebuyer plaintiffs' claim for injunctive relief, but upheld plaintiffs' state law claims finding that plaintiffs adequately pleaded that NAR's and the broker defendants' conduct proximately caused inflated home prices. *Batton I*, 2024 WL 689989, at *8 ("the Court does not agree that Plaintiffs' claimed injury is too remote to support their state-law claims"). Hanna therefore cannot credibly claim that, just because home sellers were also injured and brought suit to recover their damages, *homebuyers* have no way of recouping their own damages even though their states have made the considered decision to permit indirect purchasers to recover damages.

---

[11] While Plaintiffs previously sought injunctive relief in this case, they removed those claims from the SAC in order to streamline this case.

Moreover, lawsuits brought by home sellers cannot be more efficient enforcers of state laws permitting homebuyers to recover damages passed through to them as indirect purchasers, because home sellers in those cases have a fundamental conflict with homebuyers seeking pass-through damages. Home sellers are motivated to argue there was no pass-through, whereas homebuyers are motivated to prove significant pass-through.

Hanna's settlement in *Gibson*, No. 4:23-cv-00788 (W.D. Mo. Oct. 3, 2025), ECF No. 813, likewise does not warrant dismissal. That settlement only compensates class members for damages they incurred when selling a home, and does not guarantee any compensation for class members' home purchasing claims. *See*, *e.g.*, "Real Estate Broker Commission Claim Form", https://www.realestatecommissionlitigation.com/admin/api/connectedapps.cms.extensions/asset? id=c28deceb-c56d-4ffa-8c44-9154feb5a5fb&languageId=1033&inline=true (last visited Dec. 1, 2025) (requesting class members to provide information about their home sales only). As the *Gibson* plaintiffs are not seeking compensation for homebuying claims, it can hardly be said that they are more efficient enforcers of homebuyers' right to redress. Moreover, a significant percentage of the putative class in this case are first-time homebuyers who have never sold a home and thus are not class members in *Gibson*.[12] Hanna does not, because it cannot, identify who would be more efficient enforcers to recover damages for first-time homebuyers who have never sold a home. Against this backdrop, the *Gibson* settlement provides no basis for the Court to deviate from its prior holding.

---

[12] Hanna contends that the *Gibson* court will ultimately interpret the release in Hanna's settlement agreement to cover class members' homebuying claims, as it did with Hanna's co-conspirators. While Hanna may ultimately be correct in predicting that court's ruling, Hanna's conclusion is premature and presumptuous at this point. But even if Hanna is correct, Plaintiffs will appeal that interpretation as they have done with respect to Hanna's co-conspirators. And even if Plaintiffs lose that appeal, a significant portion of the market remains first-time homebuyers who have never sold a home and for whom no one else has standing to recover their damages.

### B. Plaintiffs Have Article III Standing

Hanna argues that Plaintiffs lack Article III standing to bring claims under the laws of thirteen states (California, Hawaii, Kansas, Michigan, Montana, Nebraska, New Hampshire, New Jersey, North Dakota, Pennsylvania, Rhode Island, Utah, and Vermont) in which no Plaintiff resides. MTD at 38. The issue, as aptly stated by this Court, is "what a named plaintiff must do to properly invoke a federal court's jurisdiction over claims it brings solely on behalf of putative class members." Standing Order at 570 n.8. The Court previously found that Plaintiffs satisfied their burden based on two showings: (1) each of the named Plaintiffs had standing to pursue state law claims under the states where they live or were injured; and (2) the state laws under which they bring claims are sufficiently similar that "the Plaintiffs still have a sufficiently 'personal stake in the outcome of the controversy to assure concrete adverseness.'" Standing Order at 570–71 (quoting *Suber v. Liberty Mut. Ins. Grp.*, 650 F. Supp.3d 282, 293 (E.D. Pa. 2022)). Hanna does not contest that Plaintiffs have made both of these showings here as well, but instead marches through all of its prior arguments "for the Court's consideration and to preserve the argument in the event this litigation progresses to an appeal." MTD at 38 n.7. There is nothing further to "consider" and no reason to belabor this point.

### IV.  Plaintiffs Plausibly Plead Their State Law Claims[13]

### A. Real Estate Exemptions Do Not Require Dismissal (FL, IA)

The SAC affirmatively alleges that Defendant is not a licensed brokerage in these states. ¶ 233. Hanna does not contend otherwise. As Hanna cannot claim the exemptions, its argument

---

[13] Plaintiffs withdraw their Colorado, New York, Oregon, Pennsylvania, Virginia, and Wisconsin consumer protection claims. Accordingly, Defendant's argument that certain state consumer protection laws require allegations of deception that it claims Plaintiffs have not sufficiently pleaded (despite numerous examples being provided in the complaint) is moot.

that it has no presence in Florida and Iowa,[14] and therefore "cannot have violated the Florida and

Iowa statutes," is irrelevant. MTD at 33.

    **B.  Plaintiffs Plausibly Plead Their Arizona, Washington, D.C., and Massachusetts Claims**

Hanna asserts for the second time that the consumer protection statutes in Arizona,

Washington, D.C., and Massachusetts require a business relationship between the parties. MTD

at 34. As an initial matter, it is not clear that these states do require such a business relationship.

*See, e.g.*, *Cheatham v. ADT Corp.*, 161 F. Supp.3d 815, 825 (D. Ariz. 2016) (the Arizona

Consumer Fraud Act provides a right of action to "any person" whose damages were

"proximately caused" by a violation of the Act); *Watts v. Medicis Pharm. Corp.*, 239 Ariz. 19,

(2016) (discussing Hanna's cited case, *Sullivan v. Pulte Home Corp.*, 290 P.3d 446, 453–54

(Ariz. Ct. App. 2012), and rejecting *per se* rule that the CFA cannot apply without a direct

merchant-consumer transaction); *In re Philips Recalled CPAP, Bi-Level PAP, & Ventilator*

*Prods. Litig.*, No. 2:21-MC-1230, 2023 WL 7019287, at *33 (W.D. Pa. Sept. 28, 2023) (rejecting

the argument that D.C. consumer protection law requires privity), report accepted in part and

rejected in part on other grounds 2024 WL 278641 (W.D. Pa. Jan. 24, 2024); *Ciardi v. F.*

*Hoffmann-La Roche, Ltd*., 436 Mass. 53 (Mass. 2002) (Massachusetts consumer protection

statute allows "any person who has been injured by trade or commerce indirectly affecting the

people of this Commonwealth to bring a cause of action … there is no requirement of contractual

privity").

---

[14] Hanna also contends that this allegation is wrong as to Virginia because its subsidiary Howard Hanna is licensed in Virginia and that another subsidiary Howard Hanna Real Estate Services, Virginia Homes for Sale & Rent has a "considerable presence" in Virginia. MTD at 33. Setting aside that Hanna Holdings, Inc. is not registered or licensed in Virginia, this argument is moot because Plaintiffs' have withdrawn their Virginia consumer protection claim.

But even if they do, the Court previously held Plaintiff Davis satisfies the requisite relationship with Hanna. Standing Order at 582. Hanna argues that the SAC does not allege that putative class members in these states have any relationship with Hanna Holdings. MTD at 34. But Hanna offers no authority for such a requirement where "the class as pleaded contains individuals who have the 'business relationship' Hanna suggests." Standing Order at 582; E.D. Pa. R. Civ. P. 7.1(c) ("Every motion not certified as uncontested, or not governed by Local Civil Rule 26.1(g), shall be accompanied by a brief containing a concise statement of the legal contentions *and authorities* relied upon in support of the motion.").

Hanna's only additional argument is that Hanna does not operate in Arizona, Washington, D.C., and Massachusetts. Hanna's argument appears to be that there can be no class members in these states with the supposedly necessary business relationship with Hanna. MTD at 34. But Hanna offers neither law nor fact in support of this statement—because it clearly cannot. Class members who reside in Arizona, Washington, D.C., and Massachusetts could easily have a business relationship with Hanna. For example, an individual in Washington, D.C. may wish to purchase a home in South Carolina, where Hanna operates.[15] That individual would be part of the class (¶ 209 (defining class as individuals who purchased homes in the Indirect Purchaser States)), a resident of Washington, D.C., and have a business relationship with Hanna. Hanna's arguments should be rejected.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Hanna's Motion to Dismiss in its entirety.

---

[15] *See* Howard Hanna Real Estate Services, https://www.howardhanna.com/about (last visited Dec. 1, 2025) (listing states).

Respectfully submitted,

December 1, 2025

*/s/ Vincent Briganti*
Vincent Briganti (pro hac vice)
Margaret MacLean (pro hac vice)
Noelle Forde (pro hac vice)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
vbriganti@lowey.com
mmaclean@lowey.com
nforde@lowey.com

George A. Zelcs
Randall P. Ewing, Jr.
Ryan Z. Cortazar
**KOREIN TILLERY, LLC**
205 North Michigan Avenue,
Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
gzelcs@koreintillery.com
rewing@koreintillery.com
rcortazar@koreintillery.com

Steven M. Berezney
Michael E. Klenov
Carol O'Keefe
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: 314.241.4844
sberezney@koreintillery.com
mklenov@koreintillery.com
cokeefe@koreintillery.com

*Attorneys for Plaintiff and the Proposed
Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 1, 2025, I caused the foregoing to be served via electronic mail on all counsel of record.

<u>*/s/ Anthony Christina*</u>
Anthony Christina