# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SCOTT DAVIS, NIALL ADAMS, MYA BATTON, THEODORE BISBICOS, AARON BOLTON, JASON BOOMSMA, THOMAS BRAUN, SABRINA CLARK, RYAN EISNER, STEVEN EWALD, JOHN GARRETT, BRENNON GROVES, DARIN HENDRY, ANNA JAMES, DO YEON IRENE KIM, JAMES LUTZ, JORDAN KULLMANN, JAMES MULLIS, DANIEL PARSONS, JOSHUA PUTT, JOHN SANNAR, ROBERT SAYLES, BEN SHADLE, BRENT STRINE, CHRISTINE VAN WOERKON, and SHERRIE WOHL, individually and on behalf of themselves and all others similarly situated, | Case No: 2:24-cv-02374-WB |
| Plaintiffs, | |
| v. | |
| HANNA HOLDINGS, INC., | |
| Defendant. | |

## STATEMENT OF INTEREST OF
## THE UNITED STATES OF AMERICA

ABIGAIL A. SLATER
*Assistant Attorney General*

MARK H. HAMER
DINA KALLAY
*Deputy Assistant Attorneys General*

DAVID B. LAWRENCE
*Policy Director*

ALICE A. WANG
*Counsel to the Assistant Attorney General*

DANIEL E. HAAR
NICKOLAI G. LEVIN
PETER M. BOZZO
*Attorneys*

*United States Department of Justice*
*Antitrust Division*
950 Pennsylvania Avenue, NW
Washington, DC  20530-0001
(202) 803-1196 (phone)
peter.bozzo@usdoj.gov

# TABLE OF CONTENTS

INTEREST OF THE UNITED STATES ....................................................................... 1

STATEMENT ............................................................................................................ 4

ARGUMENT ............................................................................................................. 9

I.  COMPETITION AMONG REAL-ESTATE BROKERS IS CRITICAL FOR
    PROTECTING AMERICAN HOMEBUYERS ..................................................... 10

II. THE COURT SHOULD CONSIDER THE MULTIPLE THEORIES OF
    CONCERTED ACTION POTENTIALLY APPLICABLE TO PLAINTIFFS'
    CLAIMS ........................................................................................................... 12

    A.  There Are Multiple Means of Establishing Concerted Action in Cases Involving
        Association Rules............................................................................................ 14

    B.  Multiple Theories of Concerted Action Are Potentially Applicable to Plaintiffs'
        Antitrust Claims ............................................................................................. 18

III. ASSOCIATION RULES ARE NOT AUTOMATICALLY EXEMPT FROM THE
     PER SE RULE AGAINST HORIZONTAL PRICE FIXING ................................ 21

CONCLUSION........................................................................................................ 24

# TABLE OF AUTHORITIES

Page(s)

CASES

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
  37 F.3d 996 (3d Cir. 1994) ................................................................................................. 13

*American Needle, Inc. v. NFL*,
  560 U.S. 183 (2010) ............................................................................. 2, 12, 13, 19, 21, 22

*American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*,
  456 U.S. 556 (1982) ............................................................................................................ 13

*American Tobacco Co. v. United States*,
  328 U.S. 781 (1946) ............................................................................................................ 18

*Arizona v. Maricopa County Medical Society*,
  457 U.S. 332 (1982) ...................................................................................................... 22, 23

*Associated Press v. United States*,
  326 U.S. 1 (1945) ........................................................................................................... 14, 15

*Board of Trade v. United States*,
  246 U.S. 231 (1918) ............................................................................................................ 14

*Burnett v. National Association of Realtors*,
  No. 4:19-cv-00332-SRB, 2022 WL 17741708 (W.D. Mo. Dec. 16, 2022) ............................ 12

*Business Electronics Corp. v. Sharp Electronics Corp.*,
  485 U.S. 717 (1988) ........................................................................................................ 7, 14

*Catalano, Inc. v. Target Sales, Inc.*,
  446 U.S. 643 (1980) (per curiam) ................................................................................... 23, 24

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984) ......................................................................................................... 2, 13

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
  610 F.3d 820 (3d Cir. 2010) ............................................................................................... 23

*Fashion Originators' Guild of America, Inc. v. FTC*,
  312 U.S. 457 (1941) ............................................................................................................ 22

*In re Flat Glass Antitrust Litigation*,
  385 F.3d 350 (3d Cir. 2004) ............................................................................................... 24

Page(s)

**C**ASES

*Gibson v. Cendyn Group, LLC,*
148 F.4th 1069 (9th Cir. 2025) .............................................................. 14

*Goldfarb v. Virginia State Bar,*
421 U.S. 773 (1975) .............................................................................. 14

*Illinois Brick Co. v. Illinois,*
431 U.S. 720 (1977) ................................................................................ 8

*In re Insurance Brokerage Antitrust Litigation,*
618 F.3d 300 (3d Cir. 2010) ............................................... 9, 12, 13, 15, 16

*Interstate Circuit v. United States,*
306 U.S. 208 (1939) .............................................................................. 17

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.,*
551 U.S. 877 (2007) .............................................................................. 21

*Moehrl v. National Association of Realtors,*
492 F. Supp. 3d 768 (N.D. Ill. 2020) ................................................... 12

*National Society of Professional Engineers v. United States,*
435 U.S. 679 (1978) .............................................................................. 10

*NCAA v. Alston,*
594 U.S. 69 (2021) ................................................................................ 14

*NCAA v. Board of Regents of University of Oklahoma,*
468 U.S. 85 (1984) .................................................................................. 7

*PLS.com, LLC v. National Association of Realtors,*
32 F.4th 824 (9th Cir. 2022),
*cert. denied,* 143 S. Ct. 567 (2023) .................................................. 18, 19

*Plymouth Dealers' Association of Northern California v. United States,*
279 F.2d 128 (9th Cir. 1960) ................................................................ 24

*Polk Bros., Inc. v. Forest City Enterprises, Inc.,*
776 F.2d 185 (7th Cir. 1985) .................................................................. 9

*Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.,*
364 U.S. 656 (1961) (per curiam) .................................................. 17, 19

Page(s)

**CASES**

*Relevent Sports, LLC v. United States Soccer Federation, Inc.*,
  61 F.4th 299 (2d Cir. 2023),
  *cert. denied*, 144 S. Ct. 1391 (2024) .......................................................... 7, 15, 16, 18, 19, 20

*Robertson v. Sea Pines Real Estate Cos.*,
  679 F.3d 278 (4th Cir. 2012) ................................................................................. 15

*Silver v. New York Stock Exchange*,
  373 U.S. 341 (1964) ............................................................................................... 14

*Sitzer v. National Association of Realtors*,
  420 F. Supp. 3d 903 (W.D. Mo. 2019) ................................................................... 12

*Standard Oil Co. of New Jersey v. United States*,
  221 U.S. 1 (1911) ................................................................................................... 21

*Standard Oil Co. v. FTC*,
  340 U.S. 231 (1951) ............................................................................................... 10

*Sullivan v. DB Investments, Inc.*,
  667 F.3d 273 (3d Cir. 2011) (en banc) ..................................................................... 8

*United States Soccer Federation, Inc. v. Relevent Sports, LLC*,
  144 S. Ct. 1391 (2024) ........................................................................................... 16

*United States v. American Linseed Oil Co.*,
  262 U.S. 371 (1923) ............................................................................................... 10

*United States v. Brown University*,
  5 F.3d 658 (3d Cir. 1993) ....................................................................................... 23

*United States v. Foley*,
  598 F.2d 1323 (4th Cir. 1979) ................................................................................ 12

*United States v. Masonite Corp.*,
  316 U.S. 265 (1942) ............................................................................................... 17

*United States v. National Association of Real Estate Boards*,
  339 U.S. 485 (1950) .......................................................... 11, 12, 15, 16, 17, 22

*United States v. Paramount Pictures, Inc.*,
  334 U.S. 131 (1948) ........................................................................................ 17, 18

Page(s)

CASES

*United States v. Realty Multi-List, Inc.*,
 629 F.2d 1351 (5th Cir. 1982) .................................................................. 12

*United States v. Sealy, Inc.*,
 388 U.S. 350 (1967) ......................................................................... 21, 22

*United States v. Socony-Vacuum Oil Co.*,
 310 U.S. 150 (1940) .............................................................................. 24

*United States v. Topco Associates, Inc.*,
 405 U.S. 596 (1972) .............................................................................. 22

*Winn-Dixie Stores, Inc. v. Eastern Mushroom Marketing Cooperative, Inc.*,
 89 F.4th 430 (3d Cir. 2023) ............................................................. 3, 22, 23

STATUTES

15 U.S.C. § 1 ............................................................................................. 6

15 U.S.C. § 3 ........................................................................................... 11

28 U.S.C. § 517 ......................................................................................... 1

MISCELLANEOUS

Rupkatha Banerjee & Andrew Paciorek, *Commissions and Omissions: Trends in Real Estate Broker Compensation*, Bd. of Governors of Fed. Reserve Sys. (May 12, 2025) ....................... 1

J. Scott Davis, *Evidence Suggests U.S. House Price/Rent Ratio, Real Home Prices to Decline*, Fed. Reserve Bank of Dallas (Feb. 5, 2025) ............................................. 1

Shane Meyers et al., *Consumer Expenditures in 2023*, U.S. Bureau of Labor Statistics (Dec. 2024) ................................................................................... 1

## INTEREST OF THE UNITED STATES

The United States submits this Statement of Interest under 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the Department of Justice to attend to the interests of the United States in any case pending in a federal or state court.

Americans devote about a third of their overall expenditures to housing and housing-related costs.[1]  For many Americans, the largest transaction of their lives will be the purchase or sale of their home.  When navigating these transactions, the vast majority of homebuyers and sellers use brokers, who, through at least 2024, usually received commissions totaling five to six percent of the sale price.[2]  The aggregate amount of these commissions is massive.  The U.S. housing market has about five million home sales (worth $1.5 trillion) annually, and broker commissions and related costs amounted to $170 billion in 2024—0.6% of total U.S. GDP.[3]  Because "U.S. house prices and rents are generally closely aligned,"[4] increased commissions and housing costs can signal higher rents for tenants as well.  This case rests on Plaintiffs' claim that

---

[1] Shane Meyers et al., *Consumer Expenditures in 2023*, U.S. Bureau of Labor Statistics (Dec. 2024), https://www.bls.gov/opub/reports/consumer-expenditures/2023/home.htm.

[2] *See* Statement of Interest of the United States at 3-4, *Nosalek v. MLS Prop. Info. Network, Inc.*, No. 1:20-cv-12244-PBS (D. Mass. Feb. 15, 2024), Doc. 290 ("*Nosalek* SOI"); Second Am. Compl. ¶¶ 66, 90, Doc. 104; *see also* Rupkatha Banerjee & Andrew Paciorek, *Commissions and Omissions: Trends in Real Estate Broker Compensation*, Bd. of Governors of Fed. Reserve Sys. (May 12, 2025) (stating that "the national average buyer's agent commission rate" was 2.7% and presenting data "suggesting that the industry norm of the 6 percent total commission paid to buyer and seller agents persists to some extent, at least under the usual assumption that the buyer and seller agents split commissions equally"), https://www.federalreserve.gov/econres/notes/feds-notes/commissions-and-omissions-trends-in-real-estate-broker-compensation-20250512.html#fig2.

[3] Banerjee & Paciorek, *supra* note 2.

[4] J. Scott Davis, *Evidence Suggests U.S. House Price/Rent Ratio, Real Home Prices to Decline*, Fed. Reserve Bank of Dallas (Feb. 25, 2025), https://www.dallasfed.org/research/economics/2025/0225.

real-estate brokers, through a constellation of anticompetitive agreements embodied in trade-association rules, inflated commissions and thus raised home prices for Americans.

The United States has a critical interest in promoting competition among real-estate brokers, which directly affects consumers' pocketbooks. Competition ensures low commissions and promotes high-quality brokerage services aimed at helping buyers find and afford their ideal home. But Defendant has raised arguments in its pending motion to dismiss that, if accepted, would make it unjustifiably harder for plaintiffs to challenge allegedly anticompetitive agreements embodied in trade-association rules. Contrary to these arguments, Congress broadly defined the concept of concerted action under Section 1 of the Sherman Act to encompass the many ways independent economic actors can be joined together. Whether in the form of trade-association rules or otherwise, the combination of distinct economic forces "'inherently is fraught with anticompetitive risk' insofar as it 'deprives the marketplace of independent centers of decisionmaking that competition assumes and demands.'" *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010) (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768-69 (1984)).

First, Defendant claims that the complaint fails to allege any agreements between Defendant and competing brokerages, but this argument fails to appreciate the wide range of ways that plaintiffs can demonstrate an agreement. Among other ways, plaintiffs can do so by showing that association members agreed to adhere to association rules governing their separate businesses, collectively promulgated such rules in the first place, or accepted an invitation embodied in the rules to participate in a common scheme. All of these collusive theories are potentially raised by the allegations in this case.

Second, Defendant erroneously claims that agreements between associations and their members are exempt from the per se rule's categorical condemnation of certain types of

2

restraints.  But the case on which Defendant principally relies—*Winn-Dixie Stores, Inc. v. Eastern Mushroom Marketing Cooperative, Inc.*, 89 F.4th 430 (3d Cir. 2023)—does not support this proposition.  *Winn-Dixie* does not even address the per se rule.  And the decision does not—and could not—overturn longstanding Supreme Court precedent applying the same analysis to agreements involving associations as to other types of agreements.  In either situation, if the challenged conduct falls into a category of restraint that is inherently anticompetitive, the per se rule applies.

While the United States takes no position on the ultimate disposition of the motion to dismiss, it submits this Statement to affirm the importance of competition among real-estate brokers and to correct Defendant's misstatements about the antitrust laws' application to trade-association rules.  The United States has investigated potentially anticompetitive rules, policies, and practices in the residential real-estate industry, including some addressed in Plaintiffs' complaint, and has challenged certain multiple listing services' rules.[5]  The United States also has filed numerous amicus briefs and statements of interest in cases involving challenges to rules governing the real-estate industry.[6]  And the United States has filed amicus briefs and statements

---

[5] *See* [Br. for the Resp'ts. in Opp'n](#) at 2, *Nat'l Ass'n of Realtors v. United States*, No. 24-417 (U.S. Dec. 10, 2024); [Final Br. of Appellants United States of America, et al.,](#) at 6, 9, *Nat'l Ass'n of Realtors v. United States*, No. 23-5065 (D.C. Cir. Aug. 18, 2023); *see also* Final Judgment, *United States v. Consol. Multiple Listing Serv., Inc.*, No. 3:08-cv-01786 (D.S.C. Aug. 17, 2009), Doc. 68; Final Judgment, *United States v. Multiple Listing Serv. of Hilton Head Island, Inc.*, No. 9:07-cv-3435 (D.S.C. May 28, 2008), Doc. 16.

[6] *See, e.g.*, [Br. for the United States of America as Amicus Curiae in Supp. of Neither Party](#), *Real Estate Exchange, Inc. v. Zillow Grp., Inc.*, No. 24-685 (9th Cir. June 20, 2024), Doc. 33.1 ("*REX* Amicus Br."); [Br. for the United States of America as Amicus Curiae in Supp. of Neither Party](#), *PLS.com, LLC v. Nat'l Ass'n of Realtors*, No. 21-55164 (9th Cir. June 2, 2021), Doc. 34; [Br. for the United States of America as Amicus Curiae in Supp. of Neither Party](#), *Top Agent Network, Inc. v. Nat'l Ass'n of Realtors*, No. 21-16494 (9th Cir. Mar. 13, 2023), Doc. 21;

of interest addressing the legal issues in play here, including the variety of means to establish an agreement and the per se rule's scope.[7]

## STATEMENT

Plaintiffs allege that real-estate brokerages and their trade association, the National Association of Realtors ("NAR"), entered into numerous anticompetitive agreements that raised housing prices.

1. NAR is allegedly "the largest trade association in America." Second Am. Compl. ("SAC") ¶ 62, Doc. 104. According to the complaint, NAR's members include approximately 1.4 million real-estate agents and 1,200 local realtor associations or boards. *Id.* ¶¶ 62, 72. NAR allegedly "establishes and enforces rules, policies, and practices" regarding the real-estate industry, and "[c]ompliance with NAR's rules is mandatory for NAR membership." *Id.* ¶¶ 63, 113. Plaintiffs state that local associations often adopt NAR's rules and policies "in their individual rules and regulations." *Id.* ¶ 59; *see id.* ¶¶ 16, 63, 105, 116, 130, 158, 164.

According to the complaint, many local associations also operate multiple listing services, or "database[s] of properties listed for sale in a particular geographic region." SAC ¶ 3. NAR requires that association-operated multiple listing services abide by NAR's rules and

---

*Nosalek* SOI; Statement of Interest on Behalf of the United States of America, *Moehrl v. Nat'l Ass'n of Realtors*, No. 1:19-cv-01610 (N.D. Ill. Oct. 11, 2019), Doc. 140.

[7] *See, e.g.*, REX Amicus Br. at 16-31; Br. for the United States as Amicus Curiae at 7-13, *U.S. Soccer Fed'n, Inc. v. Relevent Sports, LLC*, No. 23-120 (U.S. Mar. 14, 2024); Br. for the United States of America as *Amicus Curiae* in Supp. of Panel Rehearing at 6-12, *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*, No. 22-2289 (3d Cir. Nov. 20, 2023), Doc. 58; Br. for the United States as Amicus Curiae in Supp. of Pls.-Appellees, *Robertson v. Sea Pines Real Estate Cos.* at 14-32, Nos. 11-1538, 11-1539, 11-1540, 11-1541 (4th Cir. Aug. 29, 2011); Statement of Interest of the United States of America at 7-17, *In re: Granulated Sugar Antitrust Litig.*, No. 0:24-md-03110-JWB-DTS (D. Minn. June 24, 2025), Doc. 415; Mem. of Law in Supp. of the Statement of Interest of the United States at 5-23, *In re: RealPage, Rental Software Antitrust Litig. (No. II)*, No. 3:23-md-03071 (M.D. Tenn. Nov. 15, 2023), Doc. 628.

policies, and non-compliant services can "have their charter[s] revoked, lose NAR insurance, and have their officers removed." *Id.* ¶ 64.  Brokerages and real-estate agents that seek access to the services must also comply with NAR's rules and policies as a condition of access.  *Id.* ¶¶ 5, 176. And "[a]ccess . . . is critical for brokers to compete and to assist home buyers."  *Id.* ¶ 106. Indeed, the complaint alleges that "[t]he vast majority of homes in the United States are sold" through multiple listing services.  *Id.* ¶ 3.

Plaintiffs challenge the following series of NAR rules and policies related to compensation of homebuyers' brokers:

- From 1996 to at least 2023, NAR allegedly required sellers' brokers, when listing homes on multiple listing services, to include offers of compensation for the buyer's broker "to be paid from the sale proceeds."  SAC ¶¶ 117-22.

- "To force as many home listings as possible onto the [multiple listing services] . . . and to thus trigger" the buyer-broker compensation rule, NAR also allegedly required selling brokers to post properties to the services "[w]ithin one business day."  *Id.* ¶¶ 126-28.

- Until at least 2021, NAR purportedly "prohibited disclosing to prospective buyers the total commissions offered to" the buyer's broker.  *Id.* ¶ 154.

- NAR allegedly permitted buyers' brokers to filter the listings displayed on multiple listing services so that buyers could see only listings that offered specified compensation levels to the buyer's broker.  *Id.* ¶¶ 162-63.

- NAR allegedly prohibited buyers' brokers from making offers "conditional on the seller['s] reducing the buyer-[broker] commission."  *Id.* ¶ 166.

5

- Until 2022, NAR allegedly permitted real-estate agents to "represent their services as 'free' or without cost even if they expect[ed] to receive compensation from a source other than their client." *Id.* ¶ 160. The agent needed to ensure that "the potential . . . to obtain a benefit from a third party [was] clearly disclosed at the same time." *Id.*

The complaint claims that these rules had numerous anticompetitive effects, including increased buyer-broker commissions and thus increased home prices. SAC ¶ 187. Because selling brokers made compensation offers to buying brokers that were subject to minimal (if any) negotiation, buying brokers allegedly had little reason "to compete on things like price and quality of services." *Id.* ¶ 132. And, by filtering out homes with low commissions and concealing the amount of compensation, buyer brokers allegedly could "steer[] home buyers to residential properties that offered higher commissions." *Id.* ¶ 139; *see id.* ¶¶ 41, 156, 164.

2. Plaintiffs, who bought homes between 2018 and 2024, sued Hanna Holdings, Inc., a NAR member and purportedly the "largest privately-held real estate brokerage company in the United States." First Am. Compl. ("FAC") ¶¶ 20-43, 46, Doc. 40. Plaintiffs claimed that Hanna had violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and state antitrust laws by agreeing with NAR and competing brokerages "to set, raise, and maintain the level of broker commissions." FAC ¶ 166, Doc. 40; *see id.* ¶¶ 5, 9, 50, 178.

Hanna moved to dismiss, and this Court partially granted the motion without prejudice. Op. 40, Doc. 84; Op. 40, Doc. 93. The Court recognized that, to plead the antitrust claims, Plaintiffs needed to allege that "a 'contract, combination . . . or conspiracy'" (i.e., concerted action) existed and that the concerted action constituted "an unreasonable restraint on trade." Op. 10, Doc. 93 (citation omitted). The Court divided its analysis of the first element into two

parts.  First, it considered whether Plaintiffs had alleged a horizontal agreement—"an agreement among competitors on the way in which they will compete with one another," *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 99 (1984).  Op. 12-20, Doc. 93.  Then the Court considered whether Plaintiffs had alleged a vertical agreement—an "agreement between firms at different levels of distribution" on matters over which they do not compete, *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 & n.4 (1988).  Op. 20-21, Doc. 93.

This Court held that Plaintiffs had failed to allege a horizontal agreement between Hanna and competing brokers.  Op. 16-20, Doc. 93.  In reaching this conclusion, the Court distinguished between "two types of § 1 cases involving trade organization rules."  *Id.* at 15.  In one type, plaintiffs claim that "the policy or rule *is the agreement itself*," in which case "the plaintiff[s] 'need not allege any further agreement.'"  *Id.* (quoting *Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*, 61 F.4th 299, 308 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 1391 (2024)).  In the other type, plaintiffs allege that "a policy or rule is in service of a plan to restrain competition[,]" in which case the plaintiffs "must allege enough additional facts to show that agreement to such a plan exists."  *Id.* (quoting *Relevent*, 61 F.4th at 308).  This Court determined that Plaintiffs' horizontal-agreement claim rested on only the second type of allegation— specifically, that "the NAR rules work[ed] 'in service of a plan'" that was "separate from and antecedent to those rules."  *Id.* at 18 (quoting *Relevent*, 61 F.4th at 308).  And the Court held that Plaintiffs' allegations "d[id] not plausibly establish the existence of a prior and separate . . . agreement" among Hanna and competing brokerages.  *Id.* at 19.

Nonetheless, this Court held that Plaintiffs had pleaded a vertical agreement between Hanna and NAR, "entities 'at different levels' of the real estate market[.]"  Op. 20, Doc. 93.  The Court then applied the rule of reason, which involves "weigh[ing] all of the circumstances of a

case," to assess the vertical agreement's reasonableness. *Id.* at 22-23 (citation omitted). And the Court determined that Plaintiffs had plausibly alleged that the vertical agreement was unreasonable under this standard. *Id.* at 23-30.

Accordingly, with some exceptions not relevant here,[8] this Court permitted Plaintiffs' antitrust claims to proceed based on the vertical Hanna-NAR agreement. Op. 40, Doc. 93. The Court also allowed Plaintiffs to amend their complaint to allege a horizontal agreement among Hanna and competing brokerages. *Id.*

3. Plaintiffs amended their complaint, dropping their Section 1 claim but renewing their state-law antitrust claims. *See* SAC ¶¶ 219-26.[9] The amended complaint directly challenges multiple NAR rules, claiming that they constitute "agreement[s] among competitors." *Id.* ¶ 116. In particular, Plaintiffs assert that "NAR's rules, and their adoption and enforcement by [NAR-operated multiple listing services] . . . , reflected concerted action between horizontal competitors and constituted agreements among competing real estate brokers." *Id.*; *see id.* ¶¶ 124, 136, 219. And Plaintiffs claim that Hanna's "agree[ment] with its competitors to implement, enforce, and abide by the NAR Rules . . . constitutes an unreasonable restraint of

---

[8] The Court dismissed some state-law antitrust claims without prejudice due to Plaintiffs' failure to comply with state procedural requirements. Op. 31-32, Doc. 93. In a separate order, the Court also dismissed (without prejudice) Plaintiffs' request for injunctive relief under Section 1 on the ground that Plaintiffs lacked Article III standing to pursue this relief. Op. 13-15, Doc. 84.

[9] Plaintiffs continue to assert that the challenged agreements violate Section 1, *see* SAC ¶ 19, but no longer include any federal antitrust violations among their "Claims for Relief," *see id.* ¶¶ 218-34. Under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), indirect purchasers generally cannot seek treble damages under the Sherman Act. *Id.* at 728-29. Many states, however, have passed "*Illinois Brick* repealer" statutes that permit indirect purchasers to seek treble damages under state antitrust laws. *See Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 293, 298 & n.20 (3d Cir. 2011) (en banc).

trade." *Id.* ¶ 219.  Plaintiffs also continue to allege "a vertical conspiracy between [Hanna] and NAR." *Id.* ¶ 124.

Hanna has moved to dismiss.  Def.'s Mot. to Dismiss the Second Am. Compl. with Prejudice, Doc. 110 ("Mot.").  Hanna argues that Plaintiffs have still failed to plead a horizontal agreement among Hanna and competing brokers and urges the Court to revisit its conclusion that Plaintiffs alleged a vertical agreement.  *Id.* at 6-17.  Regarding the horizontal-agreement claim, Hanna asserts that "[a]llegations that members of a trade association chose to follow the association's guidelines . . . are insufficient to adequately allege an anticompetitive agreement" in the Third Circuit.  *Id.* at 6.  In addition, Hanna argues that any agreement is subject to the rule of reason rather than the per se rule.  *Id.* at 18-21.  The latter, Hanna asserts, does not apply as a matter of law "where the alleged restraint involves the use of a trade association[.]" *Id.* at 18.

## ARGUMENT

Because competition plays a critical role in securing benefits for American homebuyers, it is essential that the antitrust laws provide a remedy when real-estate brokers agree to stop competing with one another—whatever form that agreement takes.  And, because this case arises under state antitrust statutes that "are regularly interpreted in accordance with federal caselaw," Op. 10 n.4, Doc. 93, applying the correct legal principles has implications for homebuyers nationwide and potentially for consumers in other markets experiencing competition failure.[10]

---

[10] When courts interpret state antitrust laws "under the rubric of the Sherman Act," as this Court has determined is appropriate here, Op. 10 n.4, Doc. 93, the United States has an interest in ensuring that the court interprets federal law correctly.  In future cases brought under the federal antitrust laws, courts may rely on this court's discussion of those laws.  *E.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 345 (3d Cir. 2010) (relying on *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185 (7th Cir. 1985), when applying Section 1 of Sherman Act); *see Polk Bros.*, 776 F.2d at 188 (noting that case was brought under state antitrust law).  For that reason, the United States has filed multiple amicus briefs or statements of interest in cases raising only state-law antitrust claims.  *See* Br. for the United States of America and the States of Louisiana,

Hanna, however, has incorrectly articulated some of the principles established by the federal case law.

In particular, when plaintiffs challenge agreements embodied in association rules, the rules—just like any other form of concerted action—are subject to challenge under Section 1 and are unlawful if unreasonable.  Similarly, when the rules are inherently anticompetitive, they are per se illegal, just like other inherently anticompetitive agreements.  Hanna's attempts to heighten the legal standards applicable to trade-association rules find no support in the Sherman Act or the case law interpreting it.  And those attempts, if successful, would undermine the Congressional policy favoring competition and hurt the homebuyers whom this policy protects.

## I.    COMPETITION AMONG REAL-ESTATE BROKERS IS CRITICAL FOR PROTECTING AMERICAN HOMEBUYERS

"The heart of our national economic policy long has been faith in the value of competition." *Standard Oil Co. v. FTC*, 340 U.S. 231, 248 (1951).  The Sherman Act embodies this faith, "reflect[ing] a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services." *Nat'l Soc'y of Prof'l Engineers v. United States*, 435 U.S. 679, 695 (1978).  The statute thus promises "equality of opportunity" for American citizens, enabling them to participate in the economy on terms set by the market—not terms set by powerful economic actors joining forces at consumers' expense. *United States v. Am. Linseed Oil Co.*, 262 U.S. 371, 388 (1923).

---

Ohio, and Texas as Amici Curiae in Supp. of Appellant, *Stromberg v. Qualcomm Inc.*, No. 19-15159 (9th Cir. June 10, 2019); Br. of the United States of America as *Amicus Curiae* Supporting Pl.-Appellee, *Illinois v. Colony Display LLC*, No. 128767 (Ill. June 13, 2023); Br. of the United States of America as *Amicus Curiae* Supporting Pl.-Appellee, *Illinois v. Elite Staffing, Inc.*, No. 128763 (Ill. June 13, 2023); Statement of Interest of the United States, *Beck v. Pickert Med. Grp., P.C.*, No. CV21-02092 (Nev. 2d Jud. Dist. Feb. 25, 2022).

Plaintiffs allege that competition is lacking in the real-estate market to the detriment of American homebuyers.  In a competitive industry, the complaint explains, homebuyers "would negotiate buyer-agent commissions, and brokers would compete with each other by offering lower commission rates and/or higher quality services."  SAC ¶ 153.  When buyer-broker commissions are effectively set by the selling broker, however, buyer brokers have little incentive to offer lower rates, and homebuyers have no practical ability to negotiate such rates.  *See id.* ¶¶ 132-34.  The alleged result is that, despite today's "diminishing role of buyer-agents," broker commissions have remained "remarkably stable" at 5-6% for at least two decades (and likely far longer).  *Id.* ¶ 193; *see id.* ¶¶ 88-90.  Plaintiffs also claim that, because buyer brokers do not receive higher commissions for "match[ing] [homebuyers] with the optimal home," brokers end up directing buyers to listings that offer the highest commissions.  *Id.* ¶ 139.  Accordingly, commissions are allegedly "divorced from the quantity, quality, and value of the services" provided.  *Id.* ¶ 190.  Renters may feel some of the same harmful effects as homebuyers because, based on Plaintiffs' allegations, at least some of the challenged commission rules apply to tenants' brokers as well as to buyers' brokers.  *See id.* ¶ 166.

Courts and enforcers have long attempted to narrow the gap between the Sherman Act's objectives and the real-estate market's realities.  In *United States v. National Association of Real Estate Boards*, 339 U.S. 485 (1950), the Supreme Court agreed with the government that a local real-estate board had violated the Sherman Act by "adopt[ing] standard rates of commissions." *Id.* at 488-92.[11]  The Court confirmed that "[t]he competitive standards which the Act sought to preserve in the field of trade and commerce seem as relevant to the brokerage business as to

---

[11] The Court decided the case under Section 3 of the Sherman Act, *see* 339 U.S. at 487, which extends Section 1 to U.S. territories and the District of Columbia, *see* 15 U.S.C. § 3.

other branches of commercial activity." *Id.* at 492. Other courts, too, have upheld Section 1 claims challenging alleged price-fixing agreements in the real-estate industry, including the same agreements at issue here.[12] And in 2008, the government challenged NAR rules that restricted competition from brokers who used an innovative tool to deliver more efficient services to customers.[13] The government and NAR resolved this challenge through a consent decree that eliminated the rules at issue and thus remedied the alleged violations.[14] This case presents another opportunity for a court to assess purportedly anticompetitive agreements infecting the real-estate industry.

## II. THE COURT SHOULD CONSIDER THE MULTIPLE THEORIES OF CONCERTED ACTION POTENTIALLY APPLICABLE TO PLAINTIFFS' CLAIMS

The motion to dismiss fails to grapple with the full range of ways that plaintiffs can establish concerted action when challenging allegedly anticompetitive association rules. Multiple means of demonstrating concerted action are potentially relevant here.

The Supreme Court and the Third Circuit have identified two primary elements for claims under Section 1. *See Am. Needle, Inc. v. NFL*, 560 U.S. 183, 186 (2010); *In re Ins.*

---

[12] *See Burnett v. Nat'l Ass'n of Realtors*, No. 4:19-cv-00332-SRB, 2022 WL 17741708, at *9-10 (W.D. Mo. Dec. 16, 2022); *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 774-76, 781, 785-86 (N.D. Ill. 2020); *Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 910-11, 913-15 (W.D. Mo. 2019); *see also, e.g.*, *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1383, 1389 (5th Cir. 1982) (multiple listing service's membership criteria "on their face create[d] restraints on commerce"); *United States v. Foley*, 598 F.2d 1323, 1326 (4th Cir. 1979) (affirming criminal convictions for conspiracy to fix real-estate commissions).

[13] *See* Am. Complaint ¶¶ 30-42, *United States v. Nat'l Association of Realtors*, No. 05C-5140 (N.D. Ill. Oct. 4, 2005).

[14] *See* Final Judgment at 5-6, *United States v. Nat'l Ass'n of Realtors®*, No. 1:05-cv-05140 (N.D. Ill. Nov. 18, 2008), Doc. 248; Resp. of the United States to Public Comments on the Proposed Final Judgment at 37, *United States v. Nat'l Ass'n of Realtors*, No. 1:05-cv-05140 (N.D. Ill. Oct. 23, 2008), Doc. 242.

*Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010).  First, the plaintiff must show the existence of a "contract, combination, or conspiracy" (i.e., "concerted action").  *Am. Needle*, 560 U.S. at 186.  Second, the plaintiff must show that the concerted action "unreasonably restrains trade."  *Id.*  We address the first element in this section and the second element in the following section.

As the Supreme Court has made clear, "[t]he key" to the concerted-action inquiry is whether the challenged conduct "joins together separate decisionmakers"—that is, "separate economic actors pursuing separate economic interests."  *Am. Needle*, 560 U.S. at 195 (citation omitted).  Congress defined concerted action broadly because it "deprives the marketplace of . . . independent centers of decisionmaking" and thus "inherently is fraught with anticompetitive risk."  *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768-69 (1984).

This approach to concerted action is as applicable in cases involving association rules as in any other case under Section 1.  When industry members form associations that set standards governing the industry's operation, the association "can be rife with opportunities for anticompetitive activity."  *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 571 (1982).  As the Third Circuit explained in a case involving a trade association, "[t]he actions of a group of competitors taken in one name present the same potential evils as do the actions of a group of competitors who have not created a formal organization within which to operate."  *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1007 (3d Cir. 1994).  An unduly stringent application of the concerted-action requirement would contravene this principle by enabling anticompetitive activity to escape Section 1 scrutiny when conducted through an association.

### A. There Are Multiple Means of Establishing Concerted Action in Cases Involving Association Rules

Hanna misstates the concerted-action standards relevant to binding association rules.[15] Hanna improperly disregards or limits multiple ways of establishing concerted action that are potentially applicable to Plaintiffs' horizontal-agreement claim.[16]

First, for over a century, the Supreme Court has treated agreements to adhere to association rules as concerted action when the rules impose "duties and restrictions in the conduct of [members'] separate businesses." *Associated Press v. United States*, 326 U.S. 1, 8 (1945); *see, e.g.*, *NCAA v. Alston*, 594 U.S. 69, 77-79, 86 (2021) (NCAA rules); *Silver v. N.Y. Stock Exch.*, 373 U.S. 341, 347-48 (1964) (stock-exchange rules); *Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918) (commodities-exchange rule).  Hanna is thus incorrect to argue that, in the Third Circuit, plaintiffs cannot allege concerted action by pleading that association members "adopt[ed] and adher[ed] to an allegedly anticompetitive trade association policy," Mot. 11.

---

[15] Besides binding rules, other associational activities can also qualify as concerted action.  For example, non-binding rules regarding members' separate businesses may constitute concerted action if they are mandatory in practice or if they otherwise satisfy the concerted-action theories discussed in the text.  *E.g.*, *Goldfarb v. Va. State Bar*, 421 U.S. 773, 776-78, 781-82 (1975).

[16] In addition to arguing for dismissal of Plaintiffs' horizontal-agreement claim, Hanna relies on *Gibson v. Cendyn Group, LLC*, 148 F.4th 1069 (9th Cir. 2025), to argue that Plaintiffs failed to plead a vertical agreement between Hanna and NAR.  Mot. 16-17.  As explained above, however, this Court previously held that Plaintiffs had pleaded such an agreement under Supreme Court case law, and *Gibson* cannot have altered that case law.  *See* Op. 20-21, Doc. 93 (citing *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988)).  In any event, *Gibson* held that the plaintiffs had alleged "an 'agreement' within the meaning of Section 1."  148 F.4th at 1081.  While the court believed that this agreement was not vertical because it purportedly did not operate "up or down the supply chain in the relevant market," *id.*, Plaintiffs here allege that the agreement between Hanna and NAR did just that.  Specifically, Plaintiffs plead that NAR adopted rules that shaped "[t]he relevant service market," SAC ¶ 106—brokers' "provision of buyer-agent services," *id.* ¶ 112.

The U.S. Supreme Court has specifically applied this principle to real-estate association rules.  In *National Association of Real Estate Boards*, the Court addressed association members' "agree[ment] to abide by" a local real-estate association's code of ethics, which required the members to adopt "standard rates of commission."  339 U.S. at 488.  The Court held that "[a]n agreement[] shown . . . by adherence to a price schedule . . . is itself illegal under the Sherman Act."  *Id.* at 489.

Failing to acknowledge these Supreme Court precedents, Hanna claims that this theory of concerted action emerged only from the Second Circuit's recent decision in *Relevent Sports, LLC v. U.S. Soccer Federation, Inc.*, 61 F.4th 299 (2d Cir. 2023).  *See* Mot. 10-11.  Indeed, *Relevent* held that "[t]he promulgation of [an association] rule, in conjunction with the members' 'surrender[] . . . to the control of the association,' sufficiently demonstrates concerted action." 61 F.4th at 309 (citation omitted).  But this was not a new rule of law.  The Second Circuit recognized that "[i]t follow[ed] from . . . precedent," citing the Supreme Court's decision in *Associated Press*.  *Id.* at 307.  This Court, too, has stated that *Relevent* "distilled Supreme Court precedent" in determining how to analyze challenges to association rules.  Op. 15, Doc. 93.  And the Fourth Circuit has taken the same approach to association rules as the Second Circuit, *see Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 289 (4th Cir. 2012)—confirming that *Relevent* was not an outlier but applied principles that govern nationwide.

Hanna is mistaken to argue that *Relevent* conflicts with the Third Circuit's decision in *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300 (3d Cir. 2010).  *See* Mot. 10-11; *see also* Op. 16 n.6, Doc. 93 (declining to rule on this issue).  *Insurance Brokerage* involved an alleged conspiracy to conceal the commission arrangements that brokers had established with insurance companies.  618 F.3d at 313.  As circumstantial evidence of the conspiracy, the

plaintiffs alleged that the brokers were members of a trade association and had adopted policies at the association's "suggestion[]" to facilitate the concealment. *Id.* at 349. Unlike in *Relevent*, the plaintiffs were not challenging the association policies themselves as allegedly anticompetitive agreements but were challenging a broader conspiracy of which the policies were a part. *See id.* at 313, 349.

As *Relevent* recognized, this distinction makes a difference. Where "the plaintiff adequately alleges that the policy or rule <u>is</u> the agreement itself," as the *Relevent* plaintiff did, "then it need not allege any further agreement." 61 F.4th at 308. But where "the plaintiff alleges that a policy or rule is in service of a plan to restrain competition, then it must allege enough additional facts to show that agreement to such a plan exists." *Id.*; *see* Op. 15-16, Doc. 93 (discussing this distinction). The plaintiffs in *Insurance Brokerage* fell into the second category, and the Third Circuit held that they had failed to allege sufficient additional facts. *See* 618 F.3d at 349. *Relevent* and *Insurance Brokerage* thus reached different outcomes because the cases involved materially different allegations. Indeed, one of the defendants in *Relevent* petitioned for a writ of certiorari, arguing that the decision created a circuit split with *Insurance Brokerage* and other cases, but the Supreme Court denied the petition. 144 S. Ct. 1391 (2024); *see* Petition for a Writ of Certiorari at 16-17, *U.S. Soccer Fed'n, Inc. v. Relevent Sports, LLC*, No. 23-120 (U.S. Aug. 4, 2023).

Second, in addition to identifying an agreement to adhere to association rules governing members' separate businesses, Plaintiffs can establish concerted action among an association's members by showing that the members voted on (or otherwise acted collectively to promulgate) the association's rules. *National Association of Real Estate Boards* confirms the point. The Court explained that the plaintiffs could show an unlawful agreement not only by demonstrating

"adherence to a price schedule" but also "by proof of consensual action fixing the uniform or minimum price" through an association rule. 339 U.S. at 489. The Court made clear that these were alternative, but equally valid, methods of establishing concerted action. *Id.* (noting that "[a]n agreement[] shown [by] *either*" means would suffice (emphasis added)).

While these two theories may overlap in some cases, they may not in others. If an association's members vote to issue and enforce product standards in order to exclude a competitor, the collective issuance and enforcement qualify as concerted action among the members regardless of whether the members have also agreed to abide by the standards themselves. *See Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 658, 660 (1961) (per curiam).

Finally, there is at least one more way for plaintiffs to establish concerted action among association members when challenging association rules: by showing that the rule was an invitation to collective action accepted by the members. For example, in *Interstate Circuit v. United States*, 306 U.S. 208 (1939), a manager of movie-theater companies sent identical letters to eight film distributors. *Id.* at 215-16. Each letter identified all the distributors as addressees and asked them to impose restrictions on secondary runs of films. *Id.* at 215-17. The distributors largely complied. *Id.* at 218-19. The Supreme Court held that "[a]cceptance by competitors, without previous agreement, of an invitation to participate" in an anticompetitive plan was "sufficient to establish an unlawful conspiracy under the Sherman Act." *Id.* at 227; *see United States v. Masonite Corp.*, 316 U.S. 265, 269, 274-75 (1942). That is, the Court inferred concerted action among the distributors from the nature of the manager's invitation (the fact that it "contemplated and invited" concerted action) and from the distributors' conduct demonstrating acceptance of the invitation. 306 U.S. at 226-27; *see also United States v. Paramount Pictures,*

17

*Inc.*, 334 U.S. 131, 142 (1948) ("It is not necessary to find an express agreement in order to find a conspiracy. It is enough that a concert of action is contemplated and that the defendants conformed to the arrangement."); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946) (circumstances showing "a unity of purpose or a common design and understanding" among competitors suffice).

The Court of Appeals for the Ninth Circuit recently applied this principle in a case involving a NAR rule. *See PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 842-43 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 567 (2023). The plaintiff alleged that several multiple listing services had "call[ed] for collective action to address the threat" posed by potential competitors, successfully urged NAR to promulgate a rule addressing the threat, and encouraged other services to adopt the rule. *Id.* at 842. Relying on *Interstate Circuit*, the court held that the plaintiff had pleaded horizontal concerted action. *Id.* at 842-43; *see id.* at 838 n.7 (explaining that the case involved an alleged "horizontal restraint of trade"). Specifically, the defendants had allegedly "worked together to ensure that NAR required [the rule] so that every NAR-affiliated [multiple listing service] would be forced to adopt it too." *Id.* at 842-43.

## B. Multiple Theories of Concerted Action Are Potentially Applicable to Plaintiffs' Antitrust Claims

To determine whether the above (or any other) theories of concerted action apply to Plaintiffs' horizontal-agreement claim, the Court will need to parse the specific injuries alleged in that claim. As *Relevent* explained, "how the plaintiff frames a challenge affects how [the court] analyze[s] the adequacy of its pleadings." 61 F.4th at 308. In that case, the plaintiff alleged that soccer's governing body had adopted a policy that barred official league matches outside of the playing teams' home territory. *Id.* at 304. The plaintiff was a soccer promoter that sought to host such a match but, because of the policy, could not do so. *Id.* at 303-04. It was

"[t]he promulgation of the rule," combined with leagues' and teams' "agree[ment] to abide by the will of the association[]," that injured the plaintiff and thus constituted the concerted action that was the subject of the Section 1 challenge. *Id.* at 309 (citation omitted).

In other cases, the alleged injury differs, and the concerted-action analysis differs correspondingly. When association members vote to issue and enforce product standards against a potential competitor, it is the members' vote, not their agreement to adhere to the standards themselves, that potentially harms competition and forms the appropriate subject of any Section 1 challenge. *See Radiant Burners*, 364 U.S. at 658, 660 (addressing challenge to association's "adopt[ion] [of] a 'seal of approval'" and decision to deny seal to potential competitor). In *PLS.com*, on the other hand, it was the promulgation of the challenged rule, coupled with individual services' adoption of it, that purportedly "prevented [the plaintiff] from gaining a foothold in the market." 32 F.4th at 840, 842-43. Treating the NAR rule as an invitation to collective action—an invitation that multiple listing services accepted by adopting the rule themselves—thus mapped onto the plaintiff's correct theory of antitrust harm.

Each of these theories of concerted action is potentially relevant to Plaintiffs' horizontal-agreement claim.[17] First, Plaintiffs allege that they were "harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services." SAC ¶ 221. The complaint asserts that these injuries arose because competing brokerages, as a condition of joining NAR and participating in NAR-affiliated multiple listing services, "agree[d] to adhere to and enforce" the NAR rules regarding buyer-brokers'

---

[17] Whether the complaint alleges concerted action (the "join[ing] together [of] separate decisionmakers," *Am. Needle*, 560 U.S. at 195) is a distinct question from whether each association member is liable for that concerted action. Hanna's argument that the complaint lacks allegations about Hanna's "participation in the 'enforcement' of NAR guidelines," Mot. 15, goes to the latter question, not the former.

commission rates.  *Id.* ¶ 116.  If these allegations are plausible, Plaintiffs have alleged "[t]he promulgation of [association] rule[s], in conjunction with [competing brokers'] 'surrender[] . . . to the control of the association,'" *Relevent*, 61 F.4th at 309 (citation omitted). That would "sufficiently demonstrate[] concerted action" among competitors, *id.*; *see* Pls.' Opp'n to Def.'s Mot. to Dismiss Their Second Am. Compl. at 8, Doc. 111 (arguing that complaint pleads horizontal concerted action under *Relevent*).

Second, the complaint contains allegations focused specifically on the mechanisms used by NAR's members to adopt and promulgate the challenged rules.  Plaintiffs claim that Hanna and competing brokerages "supervis[ed], through their executives, NAR's operations[,] including NAR's adoption, maintenance, and enforcement" of the rule requiring sellers' brokers to offer commissions to buyers' brokers.  SAC ¶ 181.  Plaintiffs also note that Hanna executives "served on NAR's Board of Directors," which "agreed to enact and maintain each of the NAR Rules challenged" by Plaintiffs.  *Id.* ¶ 185.  If Plaintiffs are challenging the rules' very enactment, the collective adoption of those rules would establish horizontal concerted action.

Finally, the complaint alleges that local associations and multiple listing services often incorporated NAR's rules into their own regulations.  *See* SAC ¶ 63.  Plaintiffs state that, "in their individual rules and regulations," association-operated multiple listing services included the rule requiring sellers' brokers to make compensation offers to buyers' brokers.  *Id.* ¶ 59. Association-operated multiple listing services also "widely adopted" NAR's rules permitting buyers' brokers to filter listings based on compensation level.  *Id.* ¶ 164; *see also id.* ¶¶ 130, 158. These allegations suggest that NAR's issuance of rules may have amounted to an invitation to collective adoption of those rules—an invitation that local associations and multiple listing services subsequently accepted.  If the associations' and services' broad adoption of the rules

allegedly had anticompetitive effects, the invitation-and-acceptance theory of concerted action could apply to Plaintiffs' horizontal-agreement claim.[18]

### III. ASSOCIATION RULES ARE NOT AUTOMATICALLY EXEMPT FROM THE PER SE RULE AGAINST HORIZONTAL PRICE FIXING

In arguing for the rule of reason's application, Hanna makes overbroad and incorrect assertions about the per se's application to trade-association rules and to price-fixing agreements.

1. Certain types of horizontal agreements have an inherently anticompetitive "nature and character," *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 64-65 (1911), and are categorically condemned under the per se rule. Among those agreements are horizontal agreements to fix prices. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007); *see* Mot. 18 (acknowledging this point). Accordingly, if Plaintiffs have alleged horizontal concerted action in the form of NAR rules that fix the prices of brokers' services, Plaintiffs have alleged a per se violation.

2. Hanna claims, however, that the Third Circuit does not apply the per se rule "to allegations of price fixing where the alleged restraint involves the use of a trade association." Mot. 18. According to Hanna, "the interplay between the[] vertical and horizontal components" of trade-association restraints "muddies the theoretical economic conclusions that a court might draw, in turn negating [the court's] ability to label [the scheme] as 'obviously anticompetitive.'"

---

[18] Beyond the three theories discussed here, others could potentially apply in cases challenging NAR (or other association) rules. For example, when an association is "controlled by a group of competitors and serve[s], in essence, as a vehicle for ongoing concerted activity," the association is an "instrumentality" of the competitors, and its decisions about the competitors' separate businesses qualify as concerted action. *Am. Needle*, 560 U.S. at 191-92, 201 (citation omitted); *see United States v. Sealy, Inc.*, 388 U.S. 350, 352-54 (1967).

*Id.* at 18-19 (quoting *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*, 89 F.4th 430, 441 (3d Cir. 2023)).  Hanna is wrong on the law.

Antitrust law focuses on "substance, not form."  *Am. Needle*, 560 U.S. at 195 (citation omitted).  When parties enter into an inherently anticompetitive agreement, the agreement is per se unlawful whether it takes the form of an association rule or something else.  For that reason, the Supreme Court has repeatedly applied the per se rule in cases involving association rules, including real-estate association rules.

As explained above, *National Association of Real Estate Boards* held that, by requiring members to charge "standard rates of commission," a local real-estate board had committed per-se-unlawful price fixing.  339 U.S. at 488-89.  Similarly, in *Arizona v. Maricopa County Medical Society*, 457 U.S. 332 (1982), the Court held that a medical society's schedule of maximum prices was per-se-unlawful price fixing.  *Id.* at 339-41, 355-57.  In these and other cases applying the per se rule to association rules, the Court has never suggested that "restraint[s] involv[ing] the use of a trade association," Mot. 18, automatically escape per se treatment.  *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 601-03, 608 (1972); *United States v. Sealy, Inc.*, 388 U.S. 350, 352-54, 357-58 (1967); *Fashion Originators' Guild of Am., Inc. v. FTC*, 312 U.S. 457, 461-63, 467-68 (1941).

As with its concerted-action arguments, Hanna ignores this Supreme Court precedent, choosing instead to rely on Third Circuit case law.  *See* Mot. 18-19.  But, even then, Hanna misinterprets the Third Circuit's decisions.  *Winn-Dixie* involved "an agreement by [a cooperative's] members to encourage vertically oriented distributors—some of which were integrated with [cooperative] members and some of which were not—to charge retailers at least the [cooperative-established] minimum rate."  89 F.4th at 436.  The court held that the quick-

look rule, an abbreviated version of the rule of reason, did not apply because of the "unique" nature of the challenged arrangement. *Id.* at 440-42. The court specifically stated that it "ha[d] no occasion to address" the per se rule's application because the argument had been forfeited. *Id.* at 442 n.7. And the court's emphasis on the distinctive features of the defendants' scheme does nothing to suggest that all association rules are exempt from quick-look condemnation, let alone the per se rule. Nor could the court have made such a suggestion in light of the Supreme Court authority cited above.

The other cases cited by Hanna also fail to support its argument. In *United States v. Brown University*, 5 F.3d 658 (3d Cir. 1993), the Third Circuit recognized that, while the Supreme Court had declined to apply the per se rule to some association rules, the Court had applied the per se rule to others. *Id.* at 670-72 (citing, *e.g.*, *Maricopa County*, 457 U.S. 332). In *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820 (3d Cir. 2010), the Third Circuit stated that the per se rule did not apply to a tennis tour's arrangement because, for "sports leagues, 'horizontal restraints on competition are essential if the product is to be available at all.'" *Id.* at 831 (citation omitted). But in the real-estate industry, unlike in sports leagues, brokers can make their services available regardless of whether they enter into agreements with competitors.

3. In addition to erroneously arguing that association rules are categorically exempt from per se challenge, Hanna suggests that the specific rules at issue are not per se unlawful because they are not price-fixing agreements. *See* Mot. 12-13. Hanna points out that the rules do not "state that the buyer-broker's compensation is fixed at a specific amount." *Id.* at 13. But an agreement does not need to specify a precise price to qualify as per-se-illegal price fixing.

In *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980) (per curiam), the Supreme Court addressed an agreement among beer wholesalers to "sell to retailers only if payment were

made in advance or upon delivery." *Id.* at 644.  Although this "credit-fixing agreement" did not

set prices, the Court held that it "f[ell] squarely within the traditional *per se* rule against price

fixing." *Id.* at 645, 648.  Setting the formulas used to calculate prices is also price fixing because

the precise "machinery employed by a combination for price-fixing is immaterial."

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 192-93, 222-24 (1940).  And, even

where producers did not agree on the "transactional prices" at which they "actually sold their

product to customers," an agreement on "list prices" that served as the starting point for

transactional prices was price fixing.  *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 362-63

(3d Cir. 2004); *accord Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128, 129-

32 (9th Cir. 1960).  Under these cases, Hanna cannot escape the per se rule against horizontal

price fixing merely by pointing out that the challenged rules fail to state a specific price.

## CONCLUSION

The Court should not apply a heightened legal standard in evaluating whether Plaintiffs'

allegations regarding association rules adequately plead concerted action or per se antitrust

violations.

December 19, 2025                              Respectfully submitted,

                                              ABIGAIL A. SLATER
                                              *Assistant Attorney General*

                                              MARK H. HAMER
                                              DINA KALLAY
                                              *Deputy Assistant Attorneys General*

                                              DAVID B. LAWRENCE
                                              *Policy Director*

                                              ALICE A. WANG
                                              *Counsel to the Assistant Attorney General*

                                              DANIEL E. HAAR
                                              NICKOLAI G. LEVIN
                                              PETER M. BOZZO
                                              *Attorneys*

                                               */s/ Peter M. Bozzo*
                                              *United States Department of Justice*
                                              *Antitrust Division*
                                              950 Pennsylvania Avenue, NW
                                              Washington, DC  20530-0001
                                              (202) 803-1196 (phone)
                                              peter.bozzo@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on December 19, 2025, I electronically filed the foregoing brief by using the CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

*/s/ Peter M. Bozzo*

Peter M. Bozzo
