## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SCOTT DAVIS, *et al.*,** | **CIVIL ACTION** |
| **Plaintiffs,** | |
| | |
| **v.** | |
| | |
| **HANNA HOLDINGS, INC.,** | **NO.  24-2374** |
| **Defendant.** | |

## OPINION

Plaintiffs are twenty-six individuals who purchased homes throughout the United States with the assistance of a real estate broker.  They have sued Defendant Hanna Holdings, Inc. (Hanna"), a real estate brokerage firm, alleging that it participated in a conspiracy to adopt and enforce anticompetitive rules governing brokerage commissions in residential real estate transactions.  Plaintiffs allege that the conspiracy caused artificially inflated home prices and reduced competition in the market for residential brokerage services.

Plaintiffs' allegations have already been reviewed once.  Their Amended Complaint contained four counts,[1] which Hanna moved to dismiss on several grounds, including lack of standing, failure to state a claim, and failure to mediate.[2]  Hanna's efforts were partly successful, but Plaintiffs were given the opportunity to cure various deficiencies in their pleading by filing a Second Amended Complaint ("SAC").  The SAC contains some notable differences when compared to its predecessor.  For one thing, Plaintiffs have abandoned their federal antitrust

---

[1] Count I asserted a violation of the Sherman Act, 15 U.S.C. § 1, *et seq.*, seeking injunctive relief only.  Count II asserted violations of twenty-five states' respective antitrust statutes.  Count III asserted violations of twenty-three states' respective consumer protection statutes.  And Count IV raised an unjust enrichment claim, without specifying a particular jurisdiction.

[2] Given the complexity of the matter, each ground was addressed in separate decisions.  *Davis v. Hanna Holdings, Inc.*, 771 F. Supp.3d 552 (E.D. Pa. 2025) ("*Davis Standing Opinion*"); *Davis v. Hanna Holdings, Inc.*, 787 F. Supp.3d 42 (E.D. Pa. 2025) ("*Davis 12(b)(6) Opinion*"); *Davis v. Hanna Holdings, Inc.*, 2025 WL 4234309 (E.D. Pa. June 23, 2025).

claim and claim for unjust enrichment;[3] their claims are now brought only under state antitrust and state consumer protection statutes.[4]  Moreover, the SAC pursues a strategy not found in the prior complaint, which was the subject of the earlier motion to dismiss.  Specifically, the SAC maintains the NAR rules themselves are the horizontal agreement between Hanna and its coconspirators, a theory not set forth in the Amended Complaint.

Hanna moves to dismiss the SAC pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Its Motion will be granted in part and denied in part for the reasons that follow.[5]

---

[3] They dropped their consumer protection claims under Michigan and Rhode Island statutes.  *See* Mich. Comp. Laws Ann. § 445.901, *et seq.*; R.I. Gen Laws § 6-13.1-1, *et seq.*

[4] The antitrust statutes are: Ariz. Rev. Stat. §§ 44-1401, *et seq.*; Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*; Conn. Gen. Stat. §§ 35-24, *et seq.*; D.C. Code Ann. §§ 28-4501, *et seq.*; Haw. Rev. Stat. § 480-3, *et seq.*; 740 Ill. Comp. Stat. Ann. 10/7, *et seq.*; Iowa Code §§ 553.1, *et seq.*; Kan. Stat. Ann. §§ 50-101, *et seq.*; Me. Rev. Stat. Ann. tit. 10, § 1104(1), *et seq.*; Md. Com'l Law Code Ann. § 11-204, *et seq.*; Mich. Comp. Laws Ann. §§ 445.771, *et seq.*; Minn. Stat. Ann. § 325D.57, *et seq.*; Neb. Code Ann. §§ 59-801, *et seq.*; Nev. Rev. Stat. Ann. §§ 598A, *et seq.*; N.H. Rev. Stat. § 356:1, *et seq.*; N.M. Stat. Ann. § 57-1-1, *et seq.*; N.Y. Gen. Bus. L. §§ 340, *et seq.*; N.C. Gen. Stat. §§ 75-1, *et seq.*; N.D. Cent. Code § 51-08.1-01, *et seq.*; Or. Rev. Stat. §§ 646.705, *et seq.*; R.I. Gen. Laws §§ 6-36-4, *et seq.*; Utah Code 76-10-3101, *et seq.*; Vt. Stat. Ann. tit. 9, § 2453 *et seq.*; W. Va. Code § 47-18-1, *et seq.*; and, Wis. Stat. §§ 133.03, *et seq.*

The consumer protection statutes are: Ariz. Rev. Stat. §§ 44-1521, *et seq.*; Cal. Bus. and Prof. Code §§ 17200, *et seq.*; Colo. Rev. Stat §§ 6-1-105, *et seq.*; Conn. Gen. Stat. §§ 42-110A, *et seq.*; D.C. Code §§ 28-3901, *et seq.*; Fla. Stat. §§ 501.201, *et seq.*; Iowa Code §§ 714H.1, *et seq.*; Mass. Gen. Laws ch. 93A, § 9 *et seq.*; Mo. Stat. §§ 407.010, *et seq.*; Mont. Code Ann. § 30-14-101, *et seq.*; Neb. Rev. Stat. § 59-1601, *et seq.*; Nev. Rev. Stat. §§ 598.0903, *et seq.*; N.H. Rev. Stat. § 358:1, *et seq.*; N.J. Stat. Ann. § 56:8-1, *et seq.*; N.Y. Gen. Bus. Law § 349, *et seq.*; N.C. Gen. Stat. §§ 75-1.1, *et seq.*; Or. Rev. Stat. §§ 646.605, *et seq.*; 73 Pa. Stat. Ann. §§ 201-1 *et seq.*; S.C. Code Ann. § 39-5-140(a), *et seq.*; Va. Code §§ 59.1-196, *et seq.*; and, Wisc. Stat. § 100.18, *et seq.*

[5] The United States of America filed a statement of interest in this matter pursuant to 28 U.S.C. § 517, which permits the Attorney General to "sen[d]" "any officer of the Department of Justice . . .  to attend to the interests of the United States in a suit pending in a court of the United States."  28 U.S.C. § 517; *see also Statements of Interest*, Dep't of Just. Antitrust Div. (last visited Feb. 23, 2026), https://www.justice.gov/atr/statements-interest (publishing the statement of interest filed in this matter).  Hanna maintains that "[t]he filing was improper, as DOJ made no showing that the Attorney General 'sent' any 'Officer of the Department of Justice' 'to attend to the interests of the United States' in this case.  28 U.S.C. § 517.  The statement should thus be stricken or disregarded."

This contention borders on the frivolous.  To start, as a matter of statutory interpretation, § 517 contains nothing to suggest the filing was improper.  The provision's text does not require a DOJ officer to provide a particular "showing" of being sent by the Attorney General as a prerequisite to filing a statement of interest.  *See id.*  Hanna cites no authority to the contrary.  Nor does it provide its own gloss on what such a showing would entail.

Moreover, Hanna's rule would unnecessarily throw sand in in DOJ's gears by requiring the Attorney General's personal involvement in the day-to-day enforcement operations of the DOJ Antitrust Division.  But the Attorney

### I.   FACTUAL BACKGROUND[6]

#### A.  The Parties and Their Roles in the Market

In any particular geographical region, the *de facto* marketplace for home listings is a database of local property listings called a Multiple Listing Service ("MLS").  Owned and operated by a local realtor association, MLSs function as joint ventures among brokers competing in a specific area.  Brokers working for home sellers ("seller-brokers") list houses on MLSs, and brokers working for home buyers ("buyer-brokers") use them to find potential homes for their clients.  Most home sales in the United States involve the use of an MLS; access to an MLS is a virtual necessity for both sellers' and buyers' agents.  Indeed, because of industry-wide participation, MLSs provide the most comprehensive, accurate, and up-to-date information about local home listings.  A seller-broker without MLS access would be effectively unable to market a property, and a buyer-broker similarly without access would have difficulty locating properties for prospective buyers.

Defendant Hanna is the largest privately held real estate brokerage company in the United States, operating across thirteen states on the East Coast and in the Midwest.  Hanna and its employee-brokers are members of the National Association of Realtors ("NAR"), the nation's

---

General is expressly authorized to delegate "any function of the Attorney General" to "any other officer, employee, or agency of the Department of Justice."  28 U.S.C. § 510.  And pursuant to that authority, the Attorney General has "assigned" to the Assistant Attorney General of the Antitrust Division the "function[]" of "[g]eneral enforcement . . . of the Federal antitrust laws and other laws relating to the protection of competition and the prohibition of restraints of trade and monopolization, including . . . participation as amicus curiae in private antitrust litigation."  28 C.F.R. § 0.40(a).

Accordingly, by virtue of this delegation and the Assistant Attorney General's appointment, the DOJ Antitrust Division was properly "sent" to represent the federal government's interests in this private suit.  Here, as explained further below, that asserted interest is in ensuring the correct interpretation of federal antitrust law when it is used as a paradigm to evaluate state antitrust claims.

[6] The well-pleaded allegations in Plaintiffs' SAC are taken as true at this stage.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

largest trade association, which represents residential and commercial real estate brokers, salespeople, property managers, appraisers, counselors, and others engaged in the real estate industry. NAR has a federated structure, meaning its 1.4 million members simultaneously belong to one or more of NAR's roughly 1,200 local associations, 54 state and territorial associations, and the national association.

The overwhelming majority of MLSs nationwide, including some owned and operated by Hanna, are under the control of NAR. Through its Board of Directors and various committees, NAR promulgates rules, policies, and practices that its members and their affiliated MLSs must follow. Specifically, NAR MLSs must comply with NAR's Code of Ethics and the mandatory provisions in NAR's Handbook on Multiple Listing Policy ("Handbook"). Failure to do so can result in the loss of NAR-provided professional liability insurance and expulsion from the association. NAR's map of affiliated MLSs demonstrates its sweeping influence over the practices governing residential real estate transactions:



Figure 1 in the SAC

Most homes bought each year—nearly 90%, according to NAR figures from 2020—are bought with the assistance of a broker. Plaintiffs are no exception. They are twenty-six

individuals who bought homes with the help of a NAR-member broker who utilized a NAR-controlled MLS.[7]  They allege that Hanna and non-party coconspirators—NAR and other real estate brokerages that are members of NAR—devised, promulgated, and enforced several NAR rules intended to inflate buyer-agent commissions above competitive market rates and stymie competition among real estate brokers.  The net effect, Plaintiffs allege, was that homebuyers paid higher home prices and received poorer quality brokerage services than they would have in a competitive market.

### B.  The History and Mechanics of Broker Compensation

The mechanics of broker compensation have come under antitrust scrutiny at various times over the past century.  Legal challenges have pressured NAR to experiment with broker compensation methods.  In this case, Plaintiffs challenge a practice for setting buyer-broker commissions that can be directly traced to these problematic precursors.

In the first half of the twentieth century, NAR required its member-agents to adhere to commission schedules published by local associations.  That practice drew antitrust challenges, culminating in the Supreme Court's conclusion that it constituted unlawful price fixing under the Sherman Act.  *See United States v. Nat'l Ass'n. of Real Est. Bds.*, 339 U.S. 485, 488-89 (1950).  Thereafter, NAR shifted to "recommended" or "suggested" commission rates, but later also abandoned that system in the 1970s after objections and lawsuits by the U.S. Department of Justice.

In the years that followed, the industry transitioned to a "subagency" model: listing brokers made offers of compensation to buyer-brokers who agreed to work as their "subagents."  The peculiarity of that regime was that brokers, although working with buyers, owed a duty of

---

[7] Plaintiff James Mullis's claims are currently stayed pending resolution of appeals in related litigation.

loyalty to sellers only.  Over time, the practice also generated complaints and legal challenges as homebuyers came to understand that they lacked any real representation in transactions.

In the early 1990s, NAR abandoned the subagency rule, recognizing that it was no longer tenable given widespread discontent and technological advances that threatened to make buyer-brokers and MLSs obsolete.  With the subagency rule's demise and the emergence of brokers who worked exclusively for buyers' benefits, there was little reason for buyer-broker compensation to be set by other brokers.  Nevertheless, NAR adhered to a "culture of cooperation" among competing real estate agents.  It enacted certain buyer-broker commission mechanics that were the industry standard until August 2024.

Under the revised mechanics, a seller and his broker agreed at the outset of their relationship to an overall commission rate, usually expressed as a percentage of a home's sale price.  They did not agree to the buyer-broker's commission specifically.  Instead, using an MLS, the seller-broker listed the house and unilaterally made an offer of compensation to any buyer-broker who could successfully broker the sale.  Accordingly, the seller-broker determined how to split the total commission and therefore ultimately set the buyer-broker's compensation.

Suppose, for example, that Sam wanted to sell their house.  Sam contacted a seller-broker, who agreed to market the house in exchange for a 6% total commission fee.  Sam's broker then created a listing for Sam's house on the MLS and, as part of that listing, offered a fee of 3% to any buyer-broker who could find a buyer.  Several buyer-brokers showed Sam's house to their clients, and a few buyers made offers on the home.  Sam then accepted Blake's offer of $500,000.  Blake paid $500,000 into an escrow account.  From this account, $15,000 was transmitted to Blake's broker (3% of the sale price, pursuant to the unilateral offer made by Sam's broker); another $15,000 went to Sam's broker (the 6% total commission minus the 3%

offered to the buyer-broker); and the rest was sent to Sam.

### C.  The NAR Rules

Plaintiffs allege that Hanna, its competitor brokerages, and NAR conspired to artificially inflate commission rates for buyer-brokers, and suppress competition among them, by promulgating and enforcing certain rules governing the provision of buyer-broker services through NAR MLSs.  These rules, Plaintiffs contend, constitute impermissible agreements among competitors.

The first and most central of these rules, which Plaintiffs call the "Buyer-Agent Commission Rule," provides:

> In filing a property with [an MLS controlled by the NAR] the Participant makes a blanket unilateral offer of cooperation to the other MLS Participants, and shall therefore specify on each listing filed with the Service the compensation being offered by the listing broker to the other MLS Participants. . . . [M]ultiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships.

In lay terms, the Buyer-Agent Commission Rule required seller-brokers, when listing a house on an MLS, to offer the same fee to any buyer-broker who successfully found a buyer for the home, and forbade them from inviting buyer-brokers to negotiate the commission amount.

Furthermore, the "Clear Cooperation Policy" channeled listings onto MLSs.  It required NAR seller-brokers to submit a property to an MLS "[w]ithin one (1) business day of marketing a property to the public."  In other words, off-MLS listings were prohibited and, effectively, so too were alternative commission schemes.

The Handbook also included the "Commission Filter Rule," which allowed buyer-brokers using an MLS to sort and select "listings they choose to display based only on objective criteria

including . . . cooperative compensation offered by listing brokers." Certain NAR-controlled MLSs even allowed buyer-brokers to set up automated email blasts to their buyer clients which filtered out any homes that fell below a certain compensation amount or percentage.

Collectively, these rules facilitated a process dubbed "steering," whereby buyer-brokers deliberately avoided showing homes with buyer-broker commissions below the standard market rate. By refusing to show those homes, and therefore limiting their demand, buyer-brokers informally penalized seller-brokers who set the commission rate too far below the supracompetitive fee. Thus, to ensure clients' homes would be seen, seller-brokers consistently offered buyer-brokers the "going rate."

Plaintiffs also contend that Hanna and its coconspirators developed rules that concealed from potential buyers the information needed to detect and resist steering. Foremost was the "Free Service Rule," under which buyer-brokers were permitted to represent that their services were "free"—even though, as Plaintiffs allege, a buyer ends up paying for these services through inflated home prices. Meanwhile, the "Commission Concealment Rule" prohibited NAR-governed MLSs from disclosing to buyers the total commission for a given property. Because buyers believed their brokers were working for free, and did not know the commission rates involved in the transaction, they were highly unlikely to negotiate, or even attempt to negotiate, a lower buyer-broker commission.

But even if buyers had known the offered rate, Plaintiffs contend they were all but powerless to reduce it. This is because the "Commission Modification Rules" forbade buyer-brokers from "us[ing] the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation." To the extent buyer-brokers could negotiate their commission rates, NAR required such negotiations to take place *before* the buyer-broker showed the home in

question to a potential buyer, and the seller lost the ability to unilaterally modify the offer of compensation once a buyer placed an offer on the house, leaving a short window of time during which fees had the potential to be modified downward. NAR also prohibited buyer-agents from urging their clients to attempt fee negotiations directly with the seller, meaning that buyer-agents could not skirt the NAR's guardrails by encouraging the buyer to act in his own best interest.

### D. The Anticompetitive Effects

Plaintiffs contend that the NAR rules and policies described above caused the overuse and overcompensation of buyer-brokers. Specifically, the rules enabled Hanna and its coconspirators to maintain buyer-agent commissions at artificially high levels. In turn, those inflated commissions were "baked into the price of the house," meaning buyers paid more for their homes than they would have in a competitive market.

This occurred despite technological changes that lowered costs for brokerage services and rendered the buyer-broker's role less instrumental in the home-buying process. The digitalization of real estate databases and the ubiquity of instantaneous communication methods for transmitting offers have reduced the amount of time it takes for brokers to find houses for their client and make offers on their behalf. What is more, the rise of online public real estate marketplaces like Zillow has changed the *modus operandi* of home buying; buyers increasingly locate the homes they are interested in on their own and retain a broker only to coordinate a showing or to help put in an offer. Yet for decades, in areas with NAR MLSs, the total standard broker commission rate hovered steadily between 5% and 6%. In a competitive market, studies estimate the rate would fall to around 3%. Although a difference of just two or three percentage points, it represents tens of billions of dollars in overcharges paid every year by unaware homebuyers.

Buyers also received lower quality brokerage services, primarily because of steering.

When brokers decided which houses to show their clients based on potential payouts, those brokers discounted a buyer's desiderata—location, style, land features, *et cetera*. And since the same compensation fee was offered to all buyer-brokers regardless of skill, experience, or amount of time expended, buyer-brokers had no need to market themselves to compete along these axes. Making money as a buyer-broker was a pure numbers game, and buyers were deprived of the bespoke services they might have otherwise received under a buyer-negotiated compensation system. NAR's rules, specifically the Free Service and Commission Concealment Rules, ensured that buyers lacked the information needed to negotiate better rates or services. And buyers lacked any real ability to search for a home beyond the conspiracy's reach.

## II.    LEGAL STANDARD

To survive a motion to dismiss brought pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare" recitations of the elements of a claim supported only by "conclusory statements" will not suffice. *Id.* at 683. Rather, a plaintiff must allege some facts to raise the allegation above the level of mere speculation. *Great W. Mining & Min. Co. v. Fox Rothschild, LLP*, 615 F.3d 159, 176 (3d Cir. 2010) (citing *Twombly*, 550 U.S. at 555). Furthermore, a court may grant a motion to dismiss under Rule 12(b)(6) if there is a dispositive issue of law. *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

When analyzing a motion to dismiss, a complaint must be construed "in the light most favorable to the plaintiff," with the question being "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler*, 578 F.3d at 210 (citation omitted).

Legal conclusions are disregarded, well-pleaded facts are taken as true, and a determination is made as to whether those facts state a "plausible claim for relief." *Id.* at 210-11.

## III.    DISCUSSION

### A.  Certain Issues Previously Decided Will Not Be Reconsidered

Hanna's Motion in many respects seeks a do-over on issues that the Court has already considered and rejected in its opinions deciding the previous motions to dismiss. Specifically, Hanna's Motion reprises arguments that Plaintiffs lack Article III standing for certain state law claims, fail to allege a vertical agreement, and fail to allege an unreasonable restraint of trade in violation of state antitrust laws. Plaintiffs respond that Hanna's bid to relitigate the many issues it has already lost is improper.

While interlocutory orders may be revised before final judgment, Fed. R. Civ. P. 54(b), that discretion is guided by the law-of-the-case doctrine, which "directs courts to refrain from re-deciding issues that were resolved earlier in the litigation," *Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997). As the Supreme Court has explained: "A court has the power to revisit prior decisions of its own . . . , although as a rule courts should be loathe to do so in the absence of extraordinary circumstances . . . ." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988). Extraordinary circumstances warranting reconsideration include: (1) the availability of "new evidence"; (2) a supervening change in the law; and, (3) the need to correct a clear error or prevent "manifest injustice." *Pub. Int.*, 123 F.3d at 116-17 (citations omitted). Even when a new complaint has been filed, revisiting decided issues absent such extraordinary circumstances contravenes principles of finality and judicial economy. *Id.* at 116. So, courts routinely apply the law-of-the-case doctrine to their conclusions in a prior motion to dismiss. *See, e.g.*, *Gundell v. Sleepy's Inc.*, 2019 WL 6040004, at *2 (D.N.J. Nov. 14, 2019); *Prod. Source Int'l, LLC v. Foremost Signature*

11

*Ins. Co.*, 234 F. Supp.3d 619, 624 (D.N.J. 2017); *Dorley v. S. Fayette Twp. Sch. Dist.*, 2016 WL 3102227, at \*8-9 (W.D. Pa. June 1, 2016); *Volynsky v. Clinton*, 2012 WL 2362398, at \*4 (E.D. Pa. June 21, 2012).

Here, the holdings on the matters enumerated above do not merit reconsideration because extraordinary circumstances are absent: the allegations (*i.e.*, the "evidence") bearing on these holdings are materially the same (if not completely unchanged) between the operative pleadings, Hanna identifies no change in controlling law, and adherence to these conclusions would not result in manifest injustice.  Hanna, a "disappointed litigant," *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 169 (3d Cir. 1982), offers no reason for the Court to revisit its earlier determinations.  They will therefore remain the law of the case.

### B.  Plaintiffs Have Statutory Antitrust Standing

Although the Court previously held that Plaintiffs have statutory standing to bring their state law antitrust claims, Hanna renews its challenge on that front, arguing that legal developments and the SAC's revised allegations undermine that conclusion.

Antitrust standing is a "threshold requirement in any antitrust case."  *Phila. Taxi Ass'n v. Uber Techs., Inc.*, 886 F.3d 332, 343 (3d Cir. 2018).  Like proximate cause, antitrust standing is grounded in a recognition that federal antitrust remedies "cannot encompass every conceivable harm that can be traced to alleged wrongdoing."  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 536 (1983) ("*AGC*").  In certain circumstances, "a particular injury is too far removed from an alleged violation to warrant [an antitrust] remedy."  *Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958, 964 (3d Cir. 1983).  Accordingly, antitrust standing—a purely prudential limitation—asks a deceptively simple question: is this plaintiff "'a proper party to bring a private antitrust action'"?  *Phila. Taxi*, 886 F.3d at 343 (quoting *AGC*, 459 U.S. at 535 n.31).  The answer resists a "black-letter rule," *AGC*,

459 U.S. at 536, and instead requires a court to weigh and balance five factors:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing;

> (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress;

> (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims;

> (4) the existence of more direct victims of the alleged antitrust violations; and

> (5) the potential for duplicative recovery or complex apportionment of damages.

*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165-66 (3d Cir. 1993).

Collectively, these are referred to as the "*AGC* factors." *See, e.g.*, *id.* at 1166.

In the first round of motions to dismiss, the parties wrangled with whether and how to apply the federally crafted *AGC* factors to Plaintiffs' state antitrust claims. "As a legal matter, the parties . . . agree[d] that federal courts hearing state antitrust claims must look to state law antitrust principles to determine whether a plaintiff has antitrust standing." *Davis Standing Opinion*, 771 F. Supp.3d at 575 (citing *D.R. Ward Constr. Co. v. Rohm & Haas Co.*, 470 F. Supp.2d 485, 494 (E.D. Pa. 2006)). Plaintiffs have sued under the antitrust laws of twenty-five jurisdictions, so determining the precise analysis required by each "would [have been] no small task." *Id.* Hanna contended that "almost all" states' high courts would apply *AGC*.[8] Plaintiffs

---

[8] One state, Minnesota, has explicitly rejected *AGC*. *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 629 (Minn. 2007). Others, like California and Connecticut, have adopted *AGC* or a test like it. *See Vinci v. Waste Mgmt., Inc.*, 43 Cal. Rptr.2d 337 (Ct. App. 1995) (applying *AGC*); *Tremont Pub. Advisors, LLC v. Conn. Res. Recovery Auth.*, 217 A.3d 953, 966 (Conn. 2019) (applying an *AGC*-like test that requires a plaintiff to show "it has suffered an antitrust injury and that it is an efficient enforcer of the antitrust act"). Still others have federal harmonization provisions that require or allow their state antitrust laws to be interpreted in accordance with federal antitrust law. *Compare, e.g.*, Ariz. Rev. Stat. Ann. § 44-1412 ("[I]n construing this article, the courts *may* use as a guide interpretations given by

retorted that they would instead apply some different, less-restrictive test—specifically, one reflecting that the state laws under which Plaintiffs sue, unlike federal law, permit indirect purchasers to recover damages in antitrust actions.[9]  *Id.* at 575-76.  That Herculean labor of a state-by-state analysis was, however, avoided in that even "assuming *arguendo* that *AGC*— concededly the most restrictive test on offer—would be applied under the law of all twenty-five of these states," Plaintiffs had established antitrust standing under that test, even when giving all *AGC* factors their "full weight."  *Id.* at 577, 579 n.19; *see also, e.g.*, *D.R. Ward*, 470 F. Supp.2d at 502 (applying *AGC* for the sake of argument and finding that indirect purchasers satisfied it); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp.3d 665, 697 (E.D. Pa. 2014) (same).

In light of that approach, the parties again battle about antitrust standing using *AGC*'s framework and progeny.  As Plaintiffs put it, "if [they] satisfy *AGC*, [they] have standing to bring their antitrust claims in each of the states for which they bring claims."  Thus, an analysis of the *AGC* factors follows.

### i.    *Factor 1: Causal Connection and Intent*

The first *AGC* factor concerns two things: first, "the causal connection between the antitrust violation and the harm to the plaintiff," and second, "the intent by the defendant to cause that harm, with neither . . . alone conferring standing."  *Lower Lake Erie*, 998 F.2d at 1165.

---

the federal courts to comparable federal antitrust statutes." (emphasis added)); *with, e.g.*, Haw. Rev. Stat. § 480-3 ("This chapter *shall* be construed in accordance with judicial interpretations of similar federal antitrust statutes." (emphasis added)).

[9] Indirect purchasers are individuals who purchased goods or services not *directly* from the alleged antitrust violator, but rather *indirectly* from a middleman, wholesaler, or other intermediary.  *See Ill. Brick Co. v. Illinois*, 431 U.S. 720, 726 (1977).  The distinction matters because *Illinois Brick* announced a bright-line prohibition against recovery of damages under § 4 of the Clayton Act when indirect purchasers claim overcharges were passed on to them.  *Id.* at 746.  Here, there is no dispute that "Plaintiffs are indirect purchasers of buyer-broker services, as it is home *sellers*, not home *buyers*, who directly pay the buyer-broker's commission."  *Davis Standing Opinion*, 771 F. Supp.3d at 574-75.

The Court previously found the following allegations sufficient to plead causation and intent: Hanna and its coconspirators "intentionally and wrongfully" conspired to adopt the NAR rules to stifle competition in the market for brokerage services; the rules resulted in inflated buyer-broker commissions; and, the inflated commissions then increased home prices, ultimately paid by homebuyers. *Davis Standing Opinion*, 771 F. Supp.3d at 577-78. The SAC repeats these allegations. As another court considering the same alleged conspiracy has remarked, "it is easy to understand how [the NAR rules in question] could plausibly result in inflated commission rates." *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp.3d 768, 784 (N.D. Ill. 2020); *see also Batton v. Nat'l Ass'n of Realtors*, 2024 WL 689989, at *8 (N.D. Ill. Feb. 20, 2024) ("[I]t is not difficult to trace the path of the overcharge. Indeed, the Court finds Plaintiffs' theory of injury relatively simple."). Hanna, however, argues that the SAC contains allegations defeating the causal link between Hanna's conspiracy and Plaintiffs' harms.

To begin, Hanna contends that new allegations in the SAC now blame "cooperative commissions" for supracompetitive home prices. But that is not what the SAC says. Throughout this litigation, Plaintiffs have attributed their harms to the NAR rules. In fact, the first paragraph of the SAC plainly alleges that "[Hanna] and its coconspirators unlawfully agreed to anti-competitive rules that encouraged overuse of buyer agents, increased their cost to homebuyers, and reduced the quality of their services. The net result of [Hanna's] conspiracy was that buyers overpaid for their homes."

By contrast, the SAC contains precisely one reference to "cooperative commissions," in a section explaining how the challenged NAR rules can be traced to a "dual tradition of competition and cooperation" in the residential real estate industry that has historically raised antitrust concerns. The term "cooperative commissions" appears to refer to nothing more than

the long-standing industry practice of seller-brokers setting buyer-brokers' commissions.  Hanna

and its coconspirators carried forward that custom when they adopted the Buyer-Agent

Commission Rule, which, in tandem with the threat of steering and general industry norms,

created a substantial disincentive for seller-brokers to deviate from an inflated "going rate."  In

sum, Plaintiffs still allege that the NAR rules resulted in inflated home prices.  Hanna's

cherrypicking of the allegations does not make that otherwise, particularly given the ironclad

requirement that on a motion to dismiss Plaintiffs' allegations are to be construed in the light

most favorable to them.  *See Fowler*, 578 F.3d at 210 (citation omitted).

Hanna next argues that the causal link is too speculative because countless factors affect

home prices.  It contends there is an inherent tension between the SAC's acknowledgement that

there are "widespread fluctuations in housing prices" despite broker commissions remaining at

"remarkably stable and inflated levels for the past two decades."  Hanna further argues: "If

broker commission levels were the only principal force pressing on home prices, then such

fluctuations would not occur.  The Court can and should acknowledge there are complex market

forces at play in the real estate market."  It is so acknowledged.  But the argument carries little

weight at this juncture of the litigation because Plaintiffs have never alleged that brokerage

commissions are the only force impacting prices.  Like any product on the market, home prices

are determined by multiple inputs.  If one of those inputs is supracompetitively priced because of

an illegal conspiracy, then the good's overall cost can go up and down yet always be higher than

it would be but for the conspiracy.  What matters for purposes of this factor is not whether other

considerations contributed to the costs of home prices, but rather whether Plaintiffs' alleged

overpayment is "directly traceable to [Hanna's] anti-competitive behavior."  *Lower Lake Erie*,

998 F.2d at 1167.  As set forth in the SAC, it is.  There are no "missing links in the causation

chain here." *Id.* at 1168. And in fact, the causal path here is far clearer than other chains that have satisfied the first *AGC* factor. *See, e.g., Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 439 (3d Cir. 2000) (holding there was a causal connection between tobacco companies' conspiracy to conceal and limit information about the risks of tobacco and state hospitals' increased costs for treating nonpaying, tobacco-consuming patients).

Accordingly, given Hanna's alleged intent and the causal link between its conspiracy and Plaintiffs' injuries, the first factor weighs in Plaintiffs' favor.

### ii.   *Factor 2: Nature of Injury in Relation to Purpose of Antitrust Statutes*

The second factor considers whether Plaintiffs' injuries are "of the type for which the antitrust laws were intended to provide redress." *Lower Lake Erie*, 998 F.2d at 1165; *see also Phila. Taxi*, 886 F.3d at 338 ("Competition is at the heart of the antitrust laws; it is only anticompetitive conduct, or 'a competition-reducing aspect or effect of the defendant's behavior,' that antitrust laws seek to curtail." (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990))). Hanna does not dispute the Court's earlier determination that Plaintiffs' injuries sound in antitrust. *Davis Standing Opinion*, 771 F. Supp.3d at 579. Indeed, Plaintiffs, as customers of buyer-broker services, allege that the conspiracy deprived them of the benefits of robust competition among buyer-brokers. *See AGC*, 459 U.S. at 538 ("[T]he Sherman Act was enacted to assure customers the benefits of price competition, and our prior cases have emphasized the central interest in protecting the economic freedom of participants in the relevant market."). Accordingly, the second *AGC* factor weighs in Plaintiffs' favor as well.

### iii.   *Factor 3: Directness of the Injury*

The third *AGC* factor considers "the directness of the injury." *Lower Lake Erie*, 998 F.2d at 1165. It has substantial overlap with the first factor regarding the causal connection. *See id.*

at 1168 ("The direct nature of the injury absorbs the question of causal connection.").  In its

prior opinion, the Court observed:

> Although, as the parties agree, Plaintiffs are not the direct *purchasers* of the overpriced
> buyer-broker services, they are the direct *recipient* of those services, and they separately
> allege that the prices of homes—which they *do* directly purchase—are artificially inflated
> to cover the increased cost of those services.  In this regard, Plaintiffs allegations suggest
> that they "have suffered the greatest, if not the most direct, injury of alleged antitrust
> conspiracy," *D.R. Ward*, 470 F. Supp.2d at 503, since they received worse services and
> paid higher prices than they otherwise would, while sellers came out even after passing
> on the supracompetitive fees.

*Davis Standing Opinion*, 771 F. Supp.3d at 578.  Accordingly, the factor weighed in Plaintiffs'

favor.  *Id.* at 579.

Hanna notes that the SAC now describes that the NAR rules are enacted through a multi-

step governance process within NAR: the rules are first agreed upon by a relevant subcommittee

and then approved by NAR's Board of Directors and Executive Committee.  In Hanna's view,

the "revised allegations now make clear that there are far too many links in Plaintiffs' theory of

harm."

But this is an exaggeration of the changes made in the newest version of the complaint.

These supposed additional links are in fact one single step previously alleged: the conspiracy's

enactment of the rules.  That basic conduct—rather than all the picayune, preceding acts that set

the conspiracy in motion—marks the starting point for an evaluation of the "links in the chain of

causation."  *Steamfitters Loc. Union No. 420 Welfare Fund v. Philip Morris*, 171 F.3d 912, 930

(3d Cir. 1999); *see id.* ("These alleged links include the following: (1) the tobacco companies

engaged in a conspiracy to suppress information and withhold products from the market . . . .").

Thus, consistent with the analysis above regarding the first *AGC* factor, there are at most four

causal steps under Plaintiffs' theory: (1) Hanna participated in a conspiracy to adopt and

implement restrictive rules regarding brokerage commissions; (2) seller-brokers set buyer-broker

commissions through a noncompetitive process; (3) home sellers incorporated those inflated commissions into the home price; and, (4) homebuyers purchased properties at an inflated price. *See id.* (reasoning that five "links in the chain of causation" weighed against standing). Considering the fewer links connecting Hanna's conspiratorial conduct and Plaintiffs' injury, as well as Plaintiffs' argument that they were "directly impacted" because they "bore the brunt" of the inflated buyer-brokerage commissions, *Lower Lake Erie*, 998 F.2d at 1168, the third *AGC* factor weighs slightly in Plaintiffs' favor.

### iv.    Factor 4: Existence of More Direct Victims

The fourth *AGC* factor asks whether there exist "more direct victims of the alleged antitrust violations" than Plaintiffs. *Lower Lake Erie*, 998 F.2d at 1165-66. It remains undisputed that a home seller, as the party "who pays the total premium for the overinflated brokerage costs out of the funds they receive from the sale of the home," are the most "direct" victims of the alleged conspiracy. *Davis Standing Opinion*, 771 F. Supp.3d at 580. Hanna previously argued that, because home sellers are "seeking the same relief as Plaintiffs in other litigation, Plaintiffs should be barred from seeking damages here." *Id.* The Court disagreed. "[T]he mere presence of a more directly-injured market participant, even if they are also litigating a similar case, [did] not automatically command pre-discovery dismissal." *Id.* at 580. Instead, the fourth factor simply weighed against finding that Plaintiffs have antitrust standing. *Id.* at 581. That conclusion was consistent with the Third Circuit's interpretation of *AGC* as requiring a "'case-by-case . . . balancing test.'" *Id.* at 580 (quoting *Lower Lake Erie*, 998 F.2d at 1166). And, in fact, *Lower Lake Erie* explicitly rejected the proposition that "indirect purchaser status is the death knell of plaintiffs' claim." 998 F.2d at 1168.

Now, Hanna reports that it has received final approval of a settlement in a case brought by home sellers based on the same alleged conspiracy as this matter, and it argues that the

settlement precludes the claims made here. *Gibson v. Nat'l Ass'n of Realtors*, 4:23-cv-00788-SRB, Dkt. 866 (W.D. Mo. Feb. 5, 2026) ("Settlement Order"). The settlement "is nationwide and releases claims arising from sales of homes listed on NAR and non-REALTOR® MLSs, including all claims on behalf of Class Members, as sellers, buyers, or otherwise, arising from the same factual predicate." Settlement Order ¶ 14. Although the *Gibson* Court found that "a complete release – including indirect purchaser buyer claims – was part of the consideration necessary to obtain" the settlement, Settlement Order ¶ 77 (internal quotation marks and citation omitted), that finding is at odds with the claims in that litigation, which concerned only sellers. And further, the settlement is not referred to in the SAC, so it cannot be considered in the Motion to Dismiss.[10]

Because Plaintiffs are indirect purchasers, the fourth *AGC* factor weighs against them.

### v. Factor 5: Duplicative Recovery or Complex Apportionment of Damages

The fifth *AGC* factor concerns "the potential for duplicative recovery or complex apportionment of damages." *Lower Lake Erie*, 998 F.2d at 1165-66. As before, this factor still "weigh[s] against a finding of antitrust standing for Plaintiffs' state law damages claims" but not "with fulsome force." *Davis Standing Opinion*, 771 F. Supp.3d at 581. "[D]uplicative recovery may indeed be a concern here," but "the damages potentially recoverable by Plaintiffs would not be truly 'duplicative' of whatever damages home sellers may recover, as sellers and buyers would recover different amounts depending on how much of the alleged overcharge they can

---

[10] In its prior decision, the Court acknowledged the existence of the *Gibson* litigation and others like it but still found antitrust standing. *See Davis Standing Opinion*, 771 F. Supp.3d at 580-81 & 580 n.20. Thus, Hanna's point that standing should be denied based on this factor alone fails to grapple with this Court's and Third Circuit's interpretation of *AGC* as demanding a balancing test. *See id.* at 580-81; *Merican Inc.*, 713 F.2d at 965 ("The [Supreme] Court's case-by-case approach reflects the fact that [the antitrust] standing analysis is essentially a balancing test comprised of many constant and variable factors and that there is no talismanic test capable of resolving all . . . standing problems." (internal quotation marks and citation omitted)).

demonstrate they have paid." *Id.*[11] The fifth factor therefore weighs slightly against finding antitrust standing.

### vi.    *Conclusion on Antitrust Standing*

The Court previously held that, "assuming for the sake of argument that *AGC* applies to all of Plaintiffs' state law antitrust claims, the considerations of that balancing test net in favor of a finding that Plaintiffs have antitrust standing." *Id.*  As the foregoing analysis indicates, that conclusion is undisturbed by Plaintiffs' revised allegations.  Defendants' Motion to Dismiss Plaintiffs' state antitrust claims for lack of antitrust standing will therefore be denied.

### C.  Plaintiffs Plausibly Allege Antitrust Violations

Hanna next challenges whether Plaintiffs adequately state a claim for a violation of twenty-five states' antitrust laws.   Consistent with the Court's prior approach, to which no party has objected, these claims "will be interpreted together under the rubric of the Sherman Act." *Davis 12(b)(6) Opinion*, 787 F. Supp.3d at 55 n.4.

"'[C]oncerted activity inherently is fraught with anticompetitive risk' insofar as it 'deprives the marketplace of independent centers of decisionmaking that competition assumes and demands.'" *Am. Needle Inc. v. NFL*, 560 U.S. 183, 190 (2010) (alteration omitted) (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768-69 (1984)).  Accordingly, § 1 of the Sherman Act prohibits any "contract, combination . . ., or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1.  A § 1 claim has two discrete components.  "First, the plaintiff must show that the defendant was a party to a 'contract, combination . . . or conspiracy.'" *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 218-19 (3d Cir. 2008).  Second,

---

[11] While it carries no weight here, the Court observes that Plaintiffs relay that they have submitted an expert report in related litigation.  According to Plaintiffs, the report sets forth "a comprehensive, precise methodology for calculating damages for each individual buyer by isolating the effect of supracompetitive buyer-broker commissions from other facts impacting home prices."

"the plaintiff must show that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade." *Id.* Hanna argues that Plaintiffs' claims clear neither of these hurdles.

### *i.    Plaintiffs Plausibly Plead a Horizontal Agreement*

#### a.  Legal Framework

The existence of a conspiratorial agreement is one of the two pillars of a § 1 violation. *See id.* Although the text of § 1 refers to the trio of "contract, combination . . . or conspiracy," 15 U.S.C. § 1, courts have interpreted that text to refer to "a single concept about common action"—in other words, an agreement—without which no § 1 claim may proceed. *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980); s*ee also Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946) (interpreting § 1 to prohibit two or more actors engaging in "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement"). An agreement among competitors is referred to as a horizontal restraint. *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988).

At the pleading stage, a complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. Courts and parties alike must be particularly sensitive to how a plaintiff pleads an agreement, as the framing of "a challenge affects how [courts] analyze the adequacy of [a plaintiff's] pleadings." *Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*, 61 F.4th 299, 308 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 1391 (2024). This Circuit permits plaintiffs to plead an agreement using circumstantial evidence, direct evidence, or some combination of the two. *See, e.g.*, *In re Ins. Brokerage Antitrust Litg.*, 618 F.3d 300, 323-24 (3d Cir. 2010); *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99-100 (3d Cir. 2010); *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011); *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 333 (3d Cir. 2018); *see also Twombly*, 550 U.S. at

564 (noting that plaintiffs "rest[ed] their § 1 claim on descriptions of parallel conduct and not on

any independent allegation of actual agreement").

When allegations of an agreement rest on coconspirators' "parallel conduct, i.e.,

circumstantial evidence," a court must determine if the complaint permits an inference "'of a

preceding agreement.'" *Ins. Brokerage*, 618 F.3d at 322, 324 n.23 (quoting *Twombly*, 550 U.S.

at 557). This is because parallel conduct may well be a rational, competitive response by firms

with similar economic interests and market perceptions. *See id.* at 321. So, to provide a measure

of protection against the application of the antitrust laws to "the very conduct [they] are designed

to protect," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986), the

complaint must allege enough additional facts, referred to as "plus factors," to enable a plausible

inference that the parallel conduct is the result of an illicit agreement, *Ins. Brokerage*, 618 F.3d at

321-22. "It bears noting that . . . plus factors need be pled only when a plaintiff's claims of

conspiracy rest on parallel conduct." *Id.* at 323.

A plaintiff may also plead "[a]llegations of direct evidence of an agreement." *Id.*

Paradigmatic examples of direct evidence are "a document or conversation explicitly manifesting

the existence of the agreement in question." *Id.* at 324 n.23. Direct evidence "obviates the need"

to plead "plus factors" because it requires no inferences to be made. *Id.* Put differently, direct

evidence "removes any ambiguities that might otherwise exist with respect to whether the

parallel conduct in question is the result of independent or concerted action." *Id.* Accordingly,

"[a]llegations of direct evidence of an agreement, if sufficiently detailed, are independently

adequate" to satisfy § 1's agreement requirement at the pleading stage. *Id.* at 323-24 (citing

*Twombly*, 550 U.S. at 564); *accord W. Penn*, 627 F.3d at 99 ("If a complaint includes non-

conclusory allegations of direct evidence of an agreement, a court need go no further on the

23

question whether an agreement has been adequately pled." (citing *Ins. Brokerage*, 618 F.3d at 323)).

In this case, Hanna argues that Plaintiffs fail to plead a horizontal agreement using either direct or circumstantial evidence. Plaintiffs say their allegations satisfy both frameworks, but only their allegations of direct evidence need be addressed.

b.  Plaintiffs Plausibly Allege Direct Evidence of an Agreement

Plaintiffs submit that the NAR rules themselves are direct evidence of an agreement between Hanna, its competitor brokerages, and NAR. To do so, they rely heavily on the Second Circuit's decision in *Relevent Sports, LLC v. United States Soccer Federation*. In that case, the defendant United States Soccer Federation ("USSF") followed a policy issued by FIFA, the international governing association for soccer. *Relevent Sports*, 61 F.4th at 304. The policy prohibited FIFA's national associations and their member leagues from hosting any official-season games outside of their respective home territories. *Id.* For example, La Liga—a member league based in Spain—was forbidden, under the policy, from hosting a regular-season match between two La Liga teams in the United States. *Id.* Leagues and teams who did not comply ran the risk of FIFA penalties. *Id.* The plaintiff, a U.S.-based soccer promoter, alleged that the rule constituted a "horizontal division of geographic markets agreement" in violation of § 1 of the Sherman Act. *Id.* at 308. Upon motion by USSF, the district court had dismissed the § 1 claim for failure to plead an agreement, holding that "[i]n order for an organizational decision or policy to constitute concerted action and, therefore, to serve as direct evidence of an unlawful agreement," a plaintiff "must plausibly allege an antecedent agreement among horizontal competitors to agree to vote a particular way to adopt such a policy." *Relevent Sports, LLC v. Fédération Internationale de Football Ass'n*, 551 F. Supp.3d 120, 131-32 (S.D.N.Y. 2021) (internal quotation marks, internal brackets, and citation omitted).

24

On appeal, the Second Circuit reversed the district court's decision, concluding that the plaintiff had adequately pleaded an agreement. *Relevent Sports*, 61 F.4th at 308-09. The Second Circuit began by observing that its caselaw (like the Third Circuit's) permits plaintiffs to plead an agreement using either direct or circumstantial evidence. *Id.* at 308. The plaintiff had attacked the association policy "directly as anticompetitive," so the implicit question on appeal was whether, as a matter of law, "the adoption of a binding association rule designed to prevent competition" constitutes "direct evidence of concerted action." *Id.* at 307. The court held that it does. *Id.* It reasoned that "[c]ompetitors do not avoid antitrust liability by hiding behind or acting through third-party intermediaries." *Id.* at 306-07. And while caveating that "not every decision by an association violates federal antitrust laws," the court found the FIFA policy problematic because association members had "'surrender[ed] . . . to the control of [FIFA]'" and then acceded to a rule "impos[ing] 'duties and restrictions in the conduct of the members' separate businesses.'" *Id.* at 307 (quoting *Associated Press v. United States*, 326 U.S. 1, 8, 19 (1945)). These allegations were direct evidence of an agreement and, therefore, "provide[d] 'enough factual matter (taken as true) to suggest that an agreement was made.'" *Id.* at 308 (quoting *Twombly*, 550 U.S. at 556).

The Second Circuit's decision finds support in numerous Supreme Court cases addressing association rules. In each, the Court treated binding association policies as illicit agreements under the Sherman Act. *See, e.g.*, *Anderson v. Shipowners' Ass'n of Pac. Coast*, 272 U.S. 359, 361-62 (1926) (condemning under § 1 of the Sherman Act a merchant association's regulations, finding they were "a combination to control the employment, upon such vessels, of all seamen upon the Pacific Coast"); *Associated Press*, 326 U.S. at 9, 11 n.6, 19 (holding that a press association's bylaws illegally suppressed competition because they were "agreements

25

between the [association's] members" and had the "joint effect" of restraining "the disposition of news in interstate commerce"); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 776, 781-83 (1975) (condemning a fee schedule implemented by a "purely voluntary association of attorneys" as "a classic illustration of price fixing"); *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 99 (1984) ("By participating in an association which prevents member institutions from competing against each other on the basis of price or kind of television rights that can be offered to broadcasters, the NCAA member institutions have created a horizontal restraint—an agreement among competitors on the way in which they will compete with one another.").

Particularly notable is *National Society of Professional Engineers v. United States*, 435 U.S. 679 (1978), in which the Court analyzed a professional association's ethical rule prohibiting association members from price-based bidding on engineering projects. *Id.* at 682-84; *see id.* at 684 n.5 (noting that association enforced the ethical canon by "actively pursu[ing] a course of policing adherence to the competitive bid ban through direct and indirect communication with members and prospective clients"). In doing so, the Court referred to the ethical rule as "[e]vidence" of the association's members' "agreement" to suppress competition in the market for engineering services. *Id.* at 682-83.

These cases make clear that "association rules having a competitive impact" are "within the reach of § 1 of the Sherman Act." 14E Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1477 (5th ed. 2025). *Relevent Sports*'s holding naturally follows. When a trade, professional, or sports association promulgates a compulsory rule that restrains competition among its members, it effectively announces to all that the members have embraced "a single concept about common action." *Edward J. Sweeney & Sons,* 637 F.2d at 111. Therefore, to satisfy § 1's requirement of an agreement at the pleading stage, plaintiffs may plead the

association rule as direct evidence of the members' concerted action.

Other circuits are aligned with the Second Circuit's view on pleading a challenge to an association rule. The Fourth Circuit, for example, in a case alleging a conspiracy among real estate brokerages, concluded that the agreement requirement was satisfied by allegations detailing MLS-membership rules that excluded innovative, low-priced real estate brokerages. *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 283, 288-90 (4th Cir. 2012). The court reasoned that there was no "uncertainty . . . about the terms of the agreement" given that the defendants had allegedly "conspired in the form of the MLS rules" that were "both plainly documented and readily available." *Id.* at 289-90. Similarly, the D.C. Circuit held the agreement requirement was satisfied where plaintiffs alleged that retail banks had "used . . . bankcard associations to adopt and enforce a supracompetitive pricing regime" concerning ATM access fees. *See Osborn v. Visa Inc.*, 797 F.3d 1057, 1067 (D.C. Cir. 2015). Specifically, the plaintiffs alleged that the banks had "appointed representatives to the bankcard associations' Boards of Directors, which in turn established the anticompetitive access fee rules, with the cooperation and assent of the member banks." *Id.* That was enough to plead a horizontal agreement between the bankcard associations' members. *Id.*

Unlike Plaintiffs' prior pleading, which had alleged that the NAR rules "work[ed] 'in service of a plan to restrain competition' separate from and antecedent to those rules,"[12] *Davis 12(b)(6) Opinion*, 787 F. Supp.3d at 60 (quoting *Relevent Sports*, 61 F.4th at 308), the SAC rests on a different theory. Plaintiffs now assert that the "NAR rules constitute an agreement among

---

[12] The Amended Complaint had contained "a few stray statements" suggesting that the NAR rules themselves were the anticompetitive agreements. *Twombly*, 550 U.S. at 564. But those allegations were not brought to the Court's attention. And regardless, reading the Amended Complaint as a whole, it "explicitly contemplate[d] the existence of agreements antecedent to the challenged NAR rules." *Davis 12(b)(6) Opinion*, 787 F. Supp.3d at 59.

competitors."[13]  Adoption and enforcement of these rules was compulsory for Hanna and its coconspirators.  Indeed, their NAR membership and benefits were conditioned on complying with the challenged rules.  NAR policed compliance by periodically reviewing MLS governing documents.  In turn, Hanna had a policy explicitly requiring its agents "to comply with any real estate transaction standards adopted by NAR."  *See Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1180 n.30 ("[T]he key factor in the analysis [is] the existence of a rule, with an enforcement mechanism, binding on all members.").

Moreover, the rules "impose[d] 'duties and restrictions'" on brokerages with respect to a fundamental dimension of their "'separate businesses'": compensation.  *Relevent Sports*, 61 F.4th at 307 (quoting *Associated Press*, 326 U.S. at 8).  Specifically, the Clear Cooperation Policy funneled homes onto NAR-controlled MLSs by requiring listing agents to submit a property to an MLS within one business day of publicly marketing it.  Then, once the property was listed, the Buyer-Agent Commission Rule required agents to offer the same compensation to every buyer-broker regardless of their experience, services, or financial arrangement with the buyer.  And the Commission Modification Rules made it unethical for a buyer-broker to use his client's offer on a property as an opportunity to renegotiate the buyer-agent commission, even if he was willing to accept a lower fee.  *Relevent Sports*, although not binding, is persuasive.  And under its reasoning, Plaintiffs meet their burden of alleging a horizontal agreement: "[T]he

---

[13] More particularly, Plaintiffs aver that "[t]he NAR Buyer-Agent Commission Rule is an anticompetitive agreement in itself and constitutes both a vertical conspiracy between [Hanna] and NAR and a horizontal conspiracy among [Hanna], NAR, and [Hanna's] coconspirator brokerages."  Nevertheless, Hanna reads two allegations to still suggest that the NAR rules are not the challenged agreement: (1) "[Hanna] and its conspirators further enforced the conspiracy by reviewing and reissuing NAR's rules"; and, (2) "[Hanna] and its coconspirators instituted and abided by a series of rules ensuring commission concealment from buyers, each of which became effective and remained effective through *agreements* between [Hanna] and its coconspirators."  (emphasis added).  Viewing those allegations in context and in a light most favorable to Plaintiffs, the first merely describes Hanna's anticompetitive conduct, while the second seems to characterize each NAR rule as a separate agreement.  Such allegations do not contradict Plaintiffs' characterization of the NAR rules as the relevant agreement.

adoption of the [NAR rules], combined with the member [brokerages'] prior agreement, by

joining [NAR], to adhere to its policies, constitutes an agreement on the part of all . . . to adhere

to the announced restriction[s] on competition." *Id.*[14]

Hanna's arguments to the contrary are not persuasive. To begin, Hanna argues that

*Relevent Sports* is inconsistent with the Third Circuit's decision in *In re Insurance Brokerage*.

Hanna, however, reads *Insurance Brokerage* for the rule it wants, not for what the decision says.

In that case, the plaintiffs alleged that defendant insurance brokers each individually established

vertically anticompetitive business relationships with preferred insurance agencies, and then

proceeded to agree horizontally with one another to conceal the existence and details of those

relationships. *Ins. Brokerage*, 618 F.3d at 313. Crucially, the plaintiffs' allegations of the

horizontal agreement rested exclusively on circumstantial evidence. *See id.* (noting plaintiffs'

evidence consisted of allegations describing "similar" conduct among the brokers). To that end,

as a "plus factor[]" tending to suggest an antecedent agreement, the plaintiffs alleged that the

brokers had adopted a trade association position statement "advising brokers on how to respond

to questions regarding" their separate vertical arrangements. *Id.* at 349 (internal quotation mark

omitted).

The Third Circuit acknowledged that the brokers' common adoption of the policy

indicated that the brokers "had an opportunity to conspire." *Id.* But that opportunity did not

"plausibly imply that each broker acted other than independently when it decided to incorporate

---

[14] Plaintiffs' allegations are also sufficient under *Osborn*, which articulates a slightly stricter pleading requirement insofar as it requires competitors to "use[]" the trade association to restrain competition. *Osborn*, 797 F.3d at 1067. The SAC alleges that Hanna executives served on the various NAR governing bodies responsible for promulgating the NAR rules. And those executives "further enforced the conspiracy by reviewing and reissuing NAR's rules at yearly NAR meetings." Thus, by pleading that Hanna had an active role in promulgating and renewing the challenged rules, Plaintiffs plausibly allege that Hanna and its coconspirators "used" NAR as an artifice to arrange an anticompetitive horizontal restraint.

the [association's] proposed approach as the best means of protecting its lucrative arrangements from hostile scrutiny." *Id.* And even if the brokers had "collaborated in crafting" the position statement, that collaboration would not plausibly imply that doing so "was itself the product of an agreement—not, at least, in the face of the complaint's many allegations showing that each defendant had ample independent motive to conceal" its vertical arrangements. *Id.* at 349-50. Accordingly, the court held that plaintiffs failed to allege a horizontal agreement between the brokers. *Id.* at 351.

Hanna posits that *Insurance Brokerage* stands for a broad proposition: as a matter of law, allegations that trade association members "chose to follow" the association's "guidelines" are insufficient to allege an anticompetitive agreement. But that reading ignores the fact the *Insurance Brokerage* plaintiffs proceeded under a circumstantial evidence theory, and they alleged that the brokers' common adoption of the trade association's "proposed approach" was a "plus factor" tending to indicate there was a separate agreement. *Id.* at 349. The Third Circuit rejected that particular argument. By contrast, *Relevent Sports* addressed the parameters for treating a binding association rule as direct evidence of a conspiratorial agreement. The cases therefore addressed materially different association policies under distinct pleading strategies— one requiring a "plausible inference of conspiracy" and another requiring no inferences whatsoever. *Id.* at 324 n.23, 325 n.25. Accordingly, there is no tension between *Insurance Brokerage* and *Relevent Sports*.[15] And in this case, Plaintiffs have followed the lead of the *Relevent Sports* plaintiffs, arguing that the NAR rules are direct evidence of an agreement *because they are the agreement*. Moreover, Plaintiffs allege that the NAR rules were not merely

---

[15] For the same reason, there is also no conflict between *Twombly* and *Relevent Sports*. *See Twombly*, 550 U.S. at 564-65 & 567 n.12 (noting that the plaintiffs alleged a § 1 conspiracy based on parallel conduct, and holding that a defendant's mere membership in a trade association is insufficient to support an inference of a conspiracy).

"suggestions," *id.*, but rather restraints that Hanna had to adopt and enforce on pain of losing NAR membership and benefits.[16]

Next, Hanna argues that Plaintiffs' allegations fail even under the terms of *Relevent Sports*. It notes that, there, the antitrust violation—a horizontal market division agreement—was clear on the face of the policy, which provided that "official league matches must be played within the territory of the respective member association." *Relevent Sports*, 61 F.4th at 304; *see also United States v. Topco Assocs.*, 405 U.S. 596, 608-609 (1972) (holding that horizontal territorial restraints are "per se violative of the Sherman Act"). But in this case, Hanna contends, the NAR rules are not "synonymous" with the alleged antitrust violation because "there are numerous steps between the conduct governed by the NAR guidelines and Plaintiffs' theory of an antitrust conspiracy to inflate broker fees." Put differently, Hanna's agreement "to adopt the rule was [not] definitionally agreeing to the antitrust violation." From this, Hanna extrapolates that the NAR rules are not direct evidence of an agreement.

The argument falls short. For one thing, the Second Circuit did not limit its holding in the manner that Hanna suggests it did. Rather, the court's rule was simple: "[T]he adoption of a binding association rule designed to prevent competition is direct evidence of concerted action.

---

[16] As alluded to above, Hanna suggests that it "chose to follow" the NAR rules. If by "chose" Hanna means to suggest that the challenged NAR rules were optional, then such a contention would run headlong into Plaintiffs' allegations, which must be taken as true at this stage.

Elsewhere in its briefing, Hanna asserts that its "home MLS" does not follow the NAR rules. It points to the allegations in *Moratis v. W. Penn Multi-List, Inc.*, 2024 WL 4436425 (W.D. Pa. Oct. 7, 2024), for this proposition, and argues that Plaintiffs' framing of the rules as "mandatory" is "implausible." As an initial matter, Hanna mischaracterizes the allegations in *Moratis*, which concerned a non-NAR MLS that imposed a buyer-broker compensation rule substantively similar to NAR's Buyer-Agent Commission Rule. *See Moratis*, 2024 WL 4436425, at *1. But even if that were not the case, it would still be fundamentally improper for Hanna to use allegations in a different judicial decision to contradict the well-pleaded allegations in Plaintiffs' SAC. *See Erickson v. Padus*, 551 U.S. 93-94 (2007) ("[A] judge must accept as true all of the factual allegations contained in the complaint." (citing *Twombly*, 550 U.S. at 555-56)); *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999) (explaining that, "on a motion to dismiss, [a court] may take judicial notice of another court's opinion," but "not for the truth of the facts recited therein" (citation omitted)).

No further proof is necessary." *Relevent Sports*, 61 F.4th at 307.  If the Second Circuit required

an agreement to be "synonymous" with a claimed antitrust violation, it would have said so.

Moreover, Hanna's argument strays too far from the threshold question in a § 1 claim:

Was there an agreement?  The question goes to "very essence of a section 1 claim" by preserving

the Sherman Act's distinction between liability for concerted action and liability for

monopolization.  *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999-1000 (3d Cir.

1994).  Hanna proposes that the answer should turn on the claimed antitrust violation.  But the

metes and bounds of an antitrust violation are normally determined at the second step of a § 1

analysis, which takes the existence of an agreement as a given and asks whether it unreasonably

restrains trade.  *See, e.g.*, *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2019) (noting the parties'

agreement that the defendant imposed a vertical restraint on its merchant customers, and then

proceeding to a rule-of-reason analysis).  Hanna's synonymity principle conflates § 1's distinct

analytical steps.

The other problem with Hanna's principle is that it would lead to illogical results in cases

challenging association rules with subtle or uncertain anticompetitive effects.  Hanna contends

that an association rule is direct evidence of an agreement only where the antitrust violation is

apparent on the face of the rule.  As *Relevent Sports* illustrates, however, a violation will be

apparent on a rule's face only in a narrow category of antitrust suits, where the rule imposes a

restraint clearly warranting *per se* condemnation.  So, how would plaintiffs plead an agreement

when contesting an association rule that is not "definitionally" an antitrust violation and would

require a cautious assessment under the rule of reason?  Hanna's principle would force them to

take the difficult route of pleading circumstantial evidence only, *i.e.*, parallel conduct and plus

factors that permit an inference of a conspiracy.  In other words, the plaintiffs could not point to

the figurative smoking gun in the case: the compulsory association policy that lays bare an agreement among competitors. Pleading an agreement should not be so onerous.

In short, plaintiffs may plead adherence to a binding association rule as direct evidence of a defendant's concerted action. And because Plaintiffs have done so here, they plausibly allege a horizontal agreement.[17]

### ii.    *Plaintiffs Plausibly Allege an Unreasonable Restraint of Trade*

In addition to pleading an agreement, a § 1 plaintiff must also plausibly allege that such an agreement unreasonably restrained trade. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) ("[T]he Court has repeated time and again that § 1 'outlaws only unreasonable restraints.'" (internal brackets omitted) (quoting *State Oil v. Khan*, 522 U.S. 3, 10 (1997))). Courts utilize one of three tests to assess an agreement's reasonableness: the rule of reason, the intermediate "quick look" analysis, and the *per se* approach. *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*, 89 F.4th 430, 438-39 (3d Cir. 2023). The rule of reason is "the accepted standard for testing whether a practice restrains trade" unreasonably, *Leegin*, 551 U.S. at 885, and it is presumed to apply in all § 1 cases, *Winn-Dixie*, 89 F.4th at 438 (citing *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)). That presumption does not hold, however, where the challenged conduct "is manifestly anticompetitive" such that it may be deemed illegal *per se*, *Continental T.V. v. GTE Sylvania*, 433 U.S. 36, 49-50 (1977), or in cases "where *per se* condemnation is inappropriate" but a "quick look" reveals "the anticompetitive character of an

---

[17] Plaintiffs also plausibly allege a hub-and-spoke conspiracy, with NAR serving as the "hub" and Hanna and its competitor brokerages comprising the "spokes." This is because Plaintiffs plausibly allege that Hanna and its competitor brokerages each had a vertical relationship with NAR, *see Davis 12(b)(6)*, 787 F. Supp.3d at 61, and now sufficiently allege a horizontal agreement among the brokerage firms that constitutes a "the rim of the wheel." *Kotteakos v. United States*, 328 U.S. 750, 755 (1946); *see also Ins. Brokerage*, 618 F.3d at 327 (observing that the hub-and-spoke model "has 'a long history in antitrust jurisprudence'" (quoting *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 601 F.3d 237, 255 (3d Cir. 2010))).

inherently suspect restraint." *United States v. Brown Univ.*, 5 F.3d 658, 669 (3d Cir. 1993)

(internal quotations omitted).  A court looks to the nature of the alleged restraint to determine the

appropriate test.  *See Leegin*, 551 U.S. at 885-87; *Winn-Dixie*, 89 F.4th at 438-42.

Here, the parties vigorously dispute which mode of analysis should apply to the

horizontal agreement between Hanna and its competitor brokerages.  Plaintiffs argue that the

NAR rules constitute a horizontal price-fixing conspiracy, which can be summarily condemned

under the *per se* approach.  *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980)

(per curiam) ("It has long been settled that an agreement to fix prices is unlawful *per se*.").

Hanna, on the other hand, argues for application of the rule of reason.  Among other things, it

notes that the NAR rules do not set buyer-broker fees at a particular level, and it asserts the *per*

*se* rule does not apply to price-fixing restraints imposed by a trade association.  In its statement

of interest, the DOJ Antitrust Division takes Plaintiffs' side on this issue.  It persuasively argues

that association rules are not automatically exempt from the *per se* rule against horizontal price

fixing.  *See, e.g.*, *Nat'l Ass'n of Real Est. Bds.*, 339 U.S. at 488-89 (holding that a local real

estate board committed *per se* unlawful price fixing by requiring members to charge "standard

rates of commission"); *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 356-57 (1982)

(applying the *per se* approach to a medical society's schedule of maximum prices, characterizing

it as "an agreement among hundreds of competing doctors concerning the price at which each

will offer his own services to a substantial number of consumers").

At this juncture, it is unnecessary to decide definitively which mode of analysis applies

here.  Rather, "[f]or purposes of a motion to dismiss, evaluating whether Plaintiffs' factual

allegations could plausibly satisfy a rule-of-reason standard is sufficient."  *Sitzer v. Nat'l Ass'n of*

*Realtors*, 420 F. Supp.3d 903, 913 n.3 (W.D. Mo. 2019); *accord Swarthmore Radiation*

*Oncology, Inc. v. Lapes*, 812 F. Supp. 517, 520 (E.D. Pa. 1992) (explaining that a court need not

determine "whether to apply a per se standard or a 'rule of reason'" before discovery (citing

*Fuentes v. S. Hills Cardiology*, 946 F.2d 196, 202 (3d Cir. 1991))); *Fuentes v. Royal Dutch Shell*

*PLC*, 2019 WL 7584654, at *1 (E.D. Pa. Nov. 25, 2019) (collecting cases).

Hanna does not argue that each instantiation of the conspiracy requires a distinct analysis;

to the contrary, all parties treat the vertical, horizontal, and hub-and-spoke conspiracies as

implicating the same rule-of-reason analysis of the same relevant market—here, the market for

buyer-agent services in the geographic areas where NAR MLSs operate.  And to that end, the

Court has already concluded that Plaintiffs met their "'burden . . . of showing that the [vertical]

agreement produced adverse, anti-competitive effects within the relevant product and geographic

markets.'"  *Davis 12(b)(6) Opinion*, 787 F. Supp.3d at 62 (quoting *Brown Univ.*, 5 F.3d at 668).

The same holds true for the horizontal and hub-and-spoke conspiracies.[18]  Accordingly,

Plaintiffs' state antitrust claims will proceed.

### D.  Plaintiffs Plausibly Allege Violations of State Consumer Protection Statutes

In addition to their state antitrust claims, Plaintiffs also bring claims under the consumer

---

[18] In the instant Motion, Hanna maintains that Plaintiffs have not met their burden for the following reasons: (1) Plaintiffs fail to sufficiently allege a geographic market; and, (2) Plaintiffs have failed to allege anticompetitive effects.  The first argument takes issues with the Court's prior analysis but fails to articulate an "extraordinary reason" to reconsider it.  *Pub. Int.*, 123 F.3d at 116-17.  It is therefore an improper attempt to relitigate a decided issue.

The second argument is also procedurally improper.  In its prior 12(b)(6) dismissal motion, Hanna did not argue that Plaintiffs had failed to allege anticompetitive effects, although such a defense could have been raised.  Instead, Hanna chose to argue that Plaintiffs failed to adequately allege a relevant market.  Accordingly, Hanna may not attack the plausibility of the SAC's allegations of anticompetitive effects for the first time in this successive 12(b)(6) motion.  *See Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 319-20 (3d Cir. 2015) (explaining that a party contravenes Rule 12(g)(2)'s "consolidation rule" by raising new arguments in a successive 12(b)(6) motion that could have been raised in an earlier one); *see also* 5C Wright & Miller's Federal Practice & Procedure § 1384 (3d ed. 2025) ("Subdivision (g) contemplates the presentation of an omnibus pre-answer motion in which the defendant advances every available Rule 12 defense and objection he may have that is assertable by motion.  The defendant cannot . . . interpos[e] these defenses and objections in piecemeal fashion but must present them simultaneously.").

protection laws of twenty-one jurisdictions.[19]  Hanna's Motion raises two arguments with respect to these claims: (1) the Arizona, Massachusetts, and Washington, D.C. claims should be dismissed for failure to allege a requisite "business relationship"; and, (2) the Florida and Iowa claims should be dismissed because those states' consumer protection statutes exempt licensed real estate brokerage services.  With respect to the former, the Court has already held that, to the extent these jurisdictions even require a "business relationship," a proposition which Plaintiffs dispute, their allegations satisfy such a requirement.  *Davis Standing Opinion*, 771 F. Supp.3d at 581-82.  Consistent with the discussion above, Hanna fails to provide an "extraordinary circumstance" to warrant revisiting that conclusion.  *Pub. Int.*, 123 F.3d at 116-17.

That leaves only the claims under Florida's and Iowa's laws to be discussed.  Both states' consumer protection statutes contain exemptions for real estate brokerages that are licensed or registered under the respective laws of those states.  Fla. Stat. § 501.212(6); Iowa Code § 714H.4(1)(a)(4).  The revised allegations in the SAC affirmatively plead that Hanna "is not a licensed broker" in Florida or Iowa "and is therefore not exempt from liability arising from conduct involving real estate transactions."  That contention sufficiently pleads that Hanna is not statutorily exempt from liability in those two states.  Hanna does not contend otherwise.[20] Therefore, Plaintiffs' consumer protection claims may proceed.

---

[19] The SAC initially asserted claims under the consumer protection laws of Colorado, New York, Oregon, Pennsylvania, Virginia, and Wisconsin.  In their briefing, Plaintiffs withdraw these claims, so they will be dismissed with prejudice.

[20] Hanna's only argument is that it has no presence in Florida or Iowa, which is a factual assertion that goes beyond the scope of the pleadings.  Accordingly, it does not defeat the SAC's allegations.  *See In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.")

An appropriate order follows.

**BY THE COURT:**

**S/ WENDY BEETLESTONE**

**_____**

**WENDY BEETLESTONE, C.J.**