**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| SCOTT DAVIS, NIALL ADAMS, MYA BATTON, THEODORE BISBICOS, AARON BOLTON, JASON BOOMSMA, THOMAS BRAUN, SABRINA CLARK, RYAN EISNER, STEVEN EWALD, JOHN GARRETT, BRENNON GROVES, DARIN HENDRY, ANNA JAMES, DO YEON IRENE KIM, JAMES LUTZ, JORDAN KULLMANN, JAMES MULLIS, DANIEL PARSONS, JOSHUA PUTT, JOHN SANNAR, ROBERT SAYLES, BEN SHADLE, BRENT STRINE, CHRISTINE VAN WOERKON, AND SHERRIE WOHL, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br>v.<br><br>HANNA HOLDINGS, INC.,<br><br>      Defendant. | Case No. 2:24-cv-2374-WB<br><br>Hon. Wendy Beetlestone |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

BACKGROUND ................................................................................................................. 4

   A.   Reverse Auctions Are Inherently Unfair and Dangerous……………………………..…..5

   B.   *Batton*: The Beginning of Plaintiffs' Counsel's Five-Year Push to Compensate Injured Homebuyers………………………………………………………………………6

   C.   Plaintiffs' Counsel Simultaneously Champions Homebuyer Claims in this Court and Other Fora..............………………………………………………..……………8

   D.   The Copycat *Tuccori* Action…………………………………………………………9

   E.   The Anywhere Reverse Auction Settlement…………………………………………..10

   F.   Batton Plaintiffs' Efforts to Prevent and Mitigate The Reverse Auction Harm…………10

   G.   Hanna's Participation in the Reverse Auction……………………………..............11

ARGUMENT ................................................................................................................ 13

   I.   Legal Standard……………………………………………………………………...13

   II.   Plaintiffs are Highly Likely to Succeed on the Merits……………………………..13

   III.   Plaintiffs Will Suffer Irreparable Harm Absent an Injunction…………………….…..14

   IV.   The Balance of Harms Favors the Relief Plaintiffs Seek……………………………..18

   V.   In the alternative, Plaintiffs Request That the Court Order Discovery Regarding Hanna's Settlement in *Tuccori*…………………………………………………….19

CONCLUSION............................................................................................................... 19

## TABLE OF AUTHORITIES

Cases

*Acosta v. Trans Union, LLC*,
  243 F.R.D. 377 (C.D. Cal. 2007) ................................................................. 11

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) .................................................................................. 12

*Blair v. Equifax Check Servs., Inc.*,
  181 F.3d 832 (7th Cir. 1999) ...................................................................... 13

*China Agritech, Inc. v. Resh*,
  584 U.S. 732 (2018) .................................................................................. 18

*Degen v. United States*,
  517 U.S. 820, (1996) ................................................................................. 19

*EF Operating Corp. v. Am. Bldgs.*,
  993 F.2d 1046 (3d Cir. 1993) ................................................................. 3,15

*Fid. Fed. Sav. & Loan Ass'n v. Felicetti*,
  148 F.R.D. 532 (E.D. Pa. 1993) ................................................................. 19

*In re Bank of Am. Wage & Hour Emp. Litig.*,
  740 F. Supp. 2d 1207 (D. Kan. 2010) ............................................. 14, 16, 17

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir. 2001) ........................................................................ 5

*In re Cendant Corp. Litig.*,
  264 F.3d 286 (3d Cir. 2001) ...................................................................... 17

*In re Checking Account Overdraft Litig.*,
  859 F. Supp. 2d 1313 (S.D. Fla. 2012.) ..................................................... 14

*In re Cmty. Bank of N. Virginia*,
  418 F.3d 277 (3d Cir. 2005) ..................................................................... 2, 5

iii

*In re Managed Care Litig.*,
236 F. Supp. 2d 1336 (S.D. Fla. 2002)........................................................................ 14,17,18, 19

*In re Remicade Antitrust Litig.*,
No. 17-CV-04326, 2022 WL 3042766 (E.D. Pa. Aug. 2, 2022)................................................. 16

*Mars Steel Corp. v. Con'l Ill. Nat'l Bank and Trust Co.,*
834 F.2d 677 (7th Cir.1987)........................................................................................ 2

*Neuberger & Scott v. Shapiro*,
196 F.R.D. 286 (E.D. Pa. 2000) ................................................................................. 19

*O'Connell v. David*,
35 B.R. 146 (E.D. Pa. 1983)........................................................................................ 15

*Pacitti v. Macy's*,
193 F.3d 766 (3d Cir.1999)......................................................................................... 19

*Reilly v. City of Harrisburg*,
858 F.3d 173 (3d Cir. 2017)........................................................................................ 13

*Reynolds v. Beneficial Nat'l Bank,*
288 F.3d 277 (7th Cir. 2002)............................................................................ 2, 5, 16, 18

*Rodriguez v. W. Publ'g Corp.*,
563 F.3d 948 (9th Cir. 2009)....................................................................................... 16

*Scott v. Univ. of Delaware*,
601 F.2d 76 (3d Cir. 1979).......................................................................................... 15

*Siemens USA Holdings Inc v. Geisenberger*,
17 F.4th 393 (3d Cir. 2021)......................................................................................... 14

*Standard Fire Ins. Co. v. Knowles*,
568 U.S. 588 (2013) .................................................................................................. 13

*Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship*,
874 F.3d 692 (11th Cir. 2017)...................................................................................... 14

*Veterans Guardian VA Claim Consulting LLC v. Platkin*,
   133 F.4th 213 (3d Cir. 2025)................................................................................... 13

*Weinberger v. Great N. Nekoosa Corp.*,
   925 F.2d 518 (1st Cir.1991) ................................................................................. 2, 5

Rules
Fed. R. Civ. P. 23(b) .................................................................................................. 10
Fed. R. Civ. P. 24 ...................................................................................................... 14
Fed. R. Civ P. 23 .................................................................................................. 10, 13
Fed.R.Civ.P. 26(b)(1)................................................................................................. 19
Rule 23(g) of the Federal Rules of Civil Procedure ................................................. 8, 16
Rule 26(b) of the Federal Rules of Civil Procedure .................................................... 19

v

Plaintiffs' counsel has zealously pursued antitrust claims on behalf of homebuyers for the past five years, beginning with the *Batton*[1] litigation in the Northern District of Illinois. When Plaintiffs added Hanna[2] as a defendant in *Batton*, Hanna asserted that it had no contacts in Illinois and was not subject to personal jurisdiction there. Plaintiffs accordingly refiled their claims against Hanna in this Court and have spent the past two years extensively briefing and arguing two rounds of motions to dismiss. The case drew the attention of the Department of Justice, which submitted a statement of interest in support of Plaintiffs' argument that they had plausibly alleged a horizontal conspiracy among the National Association of Realtors, Hanna, and Hanna's co-conspirator brokerages. ECF No. 115. In its March 9, 2026 order on Hanna's latest motion to dismiss, this Court agreed with the Department of Justice, sustained the vast majority of Plaintiffs' claims, and observed that Hanna made contentions that "border[ed] on the frivolous" and sought "a do-over on issues that the Court already considered and rejected." *See* ECF No. 123 at 2 n.5, 11. Hanna now faces a barrage of costly discovery, which will be followed by a class certification motion supported by the world-class experts Plaintiffs have already deployed in *Batton.*

Hanna scrambled for the exit. Just last night, it announced that it found a separate set of plaintiffs' lawyers who had filed a copycat case in Illinois against other, smaller brokerages ("*Tuccori*")[3] and were all too happy to sell Hanna a release of Plaintiffs' claims here to help it end-run this Court's jurisdiction in exchange for fees for themselves. ECF No. 129-1 at 1. Hanna

---

[1] "*Batton*" refers to *Batton et al. v. Nat'l Assoc. of REALTORS®* ("*NAR*") *et al.*, No. 21-cv-00430 (N.D. Ill. Jan. 25, 2021) ("Batton I"). "*Batton II*" refers to *Batton, et al v. Compass, Inc., et al.*, 23-cv-15618 (N.D. Ill.).

[2] "Hanna" refers to Defendant Hanna Holdings, Inc.

[3] On March 20, 2026, Plaintiffs' counsel filed suit in Illinois state court on behalf of a class of Illinois residents who are members of the Anywhere and Hanna settlement classes against *Tuccori* counsel for breach of their fiduciary duty to class members. The undersigned provided Hanna's counsel with a copy of the complaint the same day.

bought itself a release of Plaintiffs' claims from plaintiffs who not only *did* not sue Hanna in their case, but *could* not, given Hanna's lack of personal jurisdiction in Illinois. While Hanna has not disclosed the specific amount of its settlement, the *Tuccori* plaintiffs had no leverage over Hanna whatsoever, and there can be no doubt that Hanna paid a bargain-basement price. The losers of this unsavory deal are the injured homebuyer class members whose claims have been sold out from under their feet for a fraction of their true value.

The Third Circuit has "commented extensively on the collusive dangers inherent in a settlement-only class action" such as *Tuccori*, which is filed not for the purpose of prosecuting claims, but only as a vehicle for settlements. *See In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 318 (3d Cir. 2005) (citing cases and legal scholarship). These dangers include "a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." *Id.* at 308 (citing *Weinberger v. Great N. Nekoosa Corp.,* 925 F.2d 518, 524 (1st Cir.1991) and *Mars Steel Corp. v. Con'l Ill. Nat'l Bank and Trust Co.,* 834 F.2d 677, 680–81 (7th Cir.1987)). The Seventh Circuit, similarly concerned about the harm to class members arising from such self-interested settlements, has condemned what it calls a "reverse auction": "the practice whereby the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant." *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 282–83 (7th Cir. 2002). That is exactly what happened here. Hanna went to the most "ineffectual class lawyers" possible—those with no ability to litigate against it at all—to extract a settlement designed to preclude Plaintiffs from further pursuing their valuable claims here. This Court should immediately enjoin Hanna from proceeding any further with this reverse auction settlement. Absent such an injunction, Plaintiffs and class members will suffer multiple irreparable harms.

2

*First*, continuation of the *Tuccori*-Hanna settlement will incentivize other defendants to join the race to the bottom. As this Court already knows, this action is one of four actions Plaintiffs' counsel have been prosecuting across the country against various real estate brokerages, all challenging the same conspiracy to fix buyer-broker commissions through restraints of trade on the multiple listing services that controlled homebuyers' access to homes for sale. Anywhere Real Estate, Inc. ("Anywhere"), a defendant in the original *Batton* litigation in the Northern District of Illinois, kicked off the *Tuccori* reverse auction on February 23, 2026, when it announced a $9.6 million settlement in *Tuccori* that expressly released Plaintiffs' claims against it in *Batton*. That settlement is inadequate on its face, considering that just weeks before, Anywhere's co-defendant Keller Williams entered a $20 million settlement in *Batton.* Keller Williams' $20 million settlement (by a defendant with a much smaller market share than Anywhere's) was meant to be an icebreaker settlement, setting a benchmark from which other settlement values would go *up*. Plaintiffs' counsel immediately sought to intervene in *Tuccori* and to preliminarily enjoin the Anywhere settlement before the *Batton* court. Both motions were denied, and Plaintiffs' counsel have now appealed the denial of their motion to intervene in *Tuccori* to the Seventh Circuit. It is crystal clear that Hanna's actions here were inspired by Anywhere's success in pushing forward with its cut-rate settlement. Absent an injunction, at least pending resolution of Plaintiffs' counsel's Seventh Circuit appeal, other defendants are certain to follow Anywhere's and Hanna's lead, causing Plaintiffs immediate and irreparable harm as the value of their claims plummets.

*Second,* Plaintiffs and the class are being deprived of their crucial due process right to adequate representation. *See EF Operating Corp. v. Am. Bldgs.*, 993 F.2d 1046 (3d Cir. 1993) ("Adequate representation, in addition to being required by Rule 23, is constitutionally mandated if absent class members are to be bound by the judgment."). The only counsel representing them

3

in the *Tuccori* settlement with Hanna are the *Tuccori* plaintiffs' counsel, who will surely seek to be officially appointed as class counsel when they move for preliminary approval. But the *Tuccori* plaintiffs' counsel have done absolutely no work to prosecute the class's claims against Hanna, have no basis to evaluate the strengths and weaknesses of those claims, and have no ability to bring such claims themselves or even threaten to do so. The *Tuccori* plaintiffs' counsel cannot and do not adequately protect the class's interests. Furthermore, when notice of the Hanna settlement issues, class members will almost certainly be confused by the overlapping litigations and sets of counsel and be unable to assess whether it is in their best interest to opt out of, object to, or participate in the settlement. Enjoining Hanna from proceeding with the settlement is the only way to safeguard the class from the ongoing, irreparable harm of inadequate representation by *Tuccori* plaintiffs' counsel.

Accordingly, Plaintiffs respectfully move this Court to enjoin Hanna from proceeding with its settlement in *Tuccori* in any way, pending resolution of the *Batton* Plaintiffs' appeal to the Seventh Circuit from the *Tuccori* court's denial of *Batton* Plaintiffs' motion to intervene. In the alternative, Plaintiffs respectfully request that the Court order discovery regarding Hanna's settlement in *Tuccori*, including the amount of the settlement, communications between Hanna's counsel and *Tuccori* plaintiffs' counsel, and information shared with (or withheld from) the mediator who facilitated the settlement.

## BACKGROUND

Given the complications of the multiple ongoing actions in different jurisdictions, a detailed background is necessary here. Plaintiffs first present the law and policy regarding the dangers of reverse auctions, and then detail the facts about how a real-life reverse auction took place here and is causing direct, detrimental, and irreparable harm to Plaintiffs and the class.

### A.    Reverse Auctions Are Inherently Unfair and Dangerous

Settlements that result from reverse auctions are highly unfair because they severely undervalue class members' claims. Instead of sellers lowering prices (like a normal reverse auction) which benefits consumers, in the class action context, rival firms compete by offering the cheapest settlement to a defendant, thereby causing injury to the very consumers to whom lawyers owe fiduciary duties of care, loyalty, good faith, and the duty to remain conflict-free. The Third Circuit has warned that such settlements favor fees for counsel over fair results for class members. *See In re Cmty. Bank of N. Va.*, 418 F.3d at 308 (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991)); *see also Reynolds*, 288 F.3d at 279 ("[L]awyers for the class [] may, in derogation of their professional and fiduciary obligations, place their pecuniary self-interest ahead of that of the class," and accept a quick settlement for less than their clients' claims are truly worth.). Those dynamics create incentives for counsel to accept a settlement that advances counsel's own interests at the expense of class members. *See In re Cmty. Bank of N. Va.*, 418 F.3d at 307–08; *In re Cendant Corp. Litig.*, 264 F.3d 201, 254–55 (3d Cir. 2001) (noting that fee and settlement incentives often diverge from maximizing the class's net recovery). If a settlement generated by reverse auction is permitted to proceed, its inadequacy cannot be undone because "the first team to settle with the defendants in effect precludes the others (who may have originated the action and litigated it with sufficient skill and zeal that the defendants were eager to settle with someone else))." John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 COLUM. L. REV. 1343, 1370 (1995).

Reverse auctions not only award counsel with "fees disproportionate to the effort they actually invested in the case", they impose substantial costs on society, litigants and class members: "lost opportunities for deterrence (if class counsel settled too quickly and too cheaply)

5

[and] wasted resources (if defendants settled simply to get rid of the lawsuit at an attractive price, rather than because the case was meritorious)." S. Rep. 109–14, at 32, U.S. Code Cong. & Admin. News 2005, pp. 3, 3. For defendants wishing to limit their liability by obtaining a first-to-settle discount, reverse auctions make it impossible for them to have any faith that they will not be undermined by later-settling defendants seeking a cheaper release from competing plaintiffs' counsel. And all of this is to say nothing of the ethical questions implicated in a defendant's choice to negotiate the release of litigants' claims against the defendant without including the counsel prosecuting those claims in the negotiations.

### B. *Batton*: The Beginning of Plaintiffs' Counsel's Five-Year Push to Compensate Injured Homebuyers

In 2021, Plaintiffs' counsel filed *Batton*, the first case on behalf of homebuyers alleging that a conspiracy among NAR and several large brokerages inflated real estate commissions, and, in turn, home prices. *Batton*, ECF No. 1.[4] After the *Batton* court initially held that homebuyers are indirect purchasers (*Batton*, ECF No. 81), *Batton* plaintiffs added new plaintiffs, developed additional facts, and researched the laws of more than 30 states to replead their complaint as indirect purchasers bringing claims under state antitrust and consumer protection laws. *Id.*, ECF No. 84. *Batton* plaintiffs went on to defeat the defendants' second and third motions to dismiss. *Id.*, ECF No. 185. Thereafter, they propounded discovery requests, obtained and analyzed hundreds of thousands of documents and 40 gigabytes of nationwide real estate data, and spent millions on world-class experts who opined that the NAR rules caused inflated home prices on a class-wide basis and provided a model for measuring those damages.

---

[4] *Batton* counsel's additional investigation also led to the filing of *Batton II* in the Northern District of Illinois, which added Compass Inc., eXp World Holdings, Inc., Redfin Corporation, Weichert Realtors, United Real Estate Group, Howard Hanna Real Estate Services, and Douglass Elliman Inc.

*Batton* counsel has also fought for its class members impacted by earlier, related litigation on behalf of home-sellers damaged by the same conspiracy *Batton* challenges.[5] The home-sellers' cases were successfully litigated to verdict by different class counsel against certain defendants in *Batton,* resulting in post-verdict settlements. Within days of the final fairness approval hearing of the first round of the home-seller settlements, and weeks after class notice had been completed, the home-sellers took the position for the first time that the release they had negotiated with the settling defendants was meant to release not only the home-selling claims that had been litigated all along, but also any home-*buying* claims held by home-seller class members, including those prosecuted in *Batton*. *See Burnett*, ECF No. 1469; *see also Batton*, ECF No. 152. *Batton* counsel immediately objected on the grounds that the seller settlements released their claims without additional compensation, let alone adequate notice and representation for the unique claims held by homebuyers, evidenced by numerous facts, including: (1) the seller cases did not allege any harm to homebuyers; (2) defendants' counsel stated their seller settlements would not impact the homebuying cases; (3) the initial class notice did not mention *Batton* or homebuyer claims; and (4) the claim form did not request any information relating to homebuying transactions. *Burnett*, ECF No. 1447 at 8-11. The district court overruled the objection in granting final approval of the settlements (*id.*, ECF No. 1487) and the *Batton* plaintiffs appealed to the Eighth Circuit. *See Rhonda Burnett et al. v. James Mullis*, No. 24-2143 (8th Cir. Oct. 9, 2024). That appeal has been fully briefed and argued and awaits decision.

In September 2025, the *Batton* plaintiffs moved for class certification. *Id.* ECF Nos. 236, 243. Following filing of Plaintiffs' opening class certification brief and expert reports, Defendant

---

[5] *Burnett et al. v. Nat'l Ass'n of REALTORS®, et al.*, No. 4:19-cv-00332 (W.D. Mo.) ("*Burnett*") and *Moehrl, et al. v. Nat'l Ass'n of REALTORS®, et al.*, No. 1:19-cv-01610 (N.D. Ill.) ("*Moehrl*").

Anywhere moved to stay, arguing that the *Batton* Plaintiffs' class certification motion should await resolution of their Eighth Circuit appeal. The district court granted the stay over the objection of the *Batton* Plaintiffs. ECF No. 257.

On February 2, 2026, following more than six months of adversarial and arms' length negotiations, and with the assistance of renowned mediator Gregory P. Lindstrom, the *Batton* plaintiffs announced they had reached a $20 million icebreaker settlement with Keller Williams. *Batton*, ECF No. 262. This settlement was preliminarily approved on February 12, 2026. *Id.*, ECF No. 269. In approving the settlement, the court appointed *Batton* counsel as Class Counsel. *Id.* ¶ 7 (appointing *Batton* counsel, finding "the requirements of Rule 23(g) of the Federal Rules of Civil Procedure [] fully satisfied by this appointment.").

### C. Plaintiffs' Counsel Simultaneously Champions Homebuyer Claims in this Court and Other Fora

In 2024, the *Batton* court found that it lacked personal jurisdiction over defendant HomeServices of America, Inc. *Batton* plaintiffs thereafter dismissed their claims against HomeServices and Douglas Elliman and refiled in the Southern District of Florida. *See Lutz et al. v. HomeServices of America, Inc. et al.*, No. 24-cv-10040 (S.D. Fla.) ("*Lutz*"). Plaintiffs in *Lutz* have briefed three rounds of motions to dismiss (awaiting decision on the most recent) and are engaging in voluminous discovery.

Following the *Batton* court's dismissal of HomeServices, Hanna advised Plaintiffs' counsel that, like HomeServices, it had no contacts in the state of Illinois and was not subject to personal jurisdiction there. Plaintiffs accordingly refiled their claims against Hanna in this Court on June 3, 2024, and amended the complaint on September 16, 2024. ECF No. 40.

This Court is already familiar with the efforts Plaintiffs' counsel have undertaken here (which are also detailed in their motion to be appointed interim co-lead counsel, *see* ECF No. 121).

Hanna moved to dismiss Plaintiffs' amended complaints on four separate grounds, leading to extensive briefing and two oral arguments. Notably, in February 2025, while those motions to dismiss were pending, Hanna and Plaintiffs tried and failed to resolve Plaintiffs' claims via mediation.

Following this Court's rulings over the period from March through June 2025 on Hanna's motions to dismiss, Plaintiffs filed their Second Amended Complaint on October 1, 2025, which Hanna moved to dismiss a month later. This Court's March 9, 2026 ruling on that second motion to dismiss upheld the vast majority of Plaintiffs' claims. Of particular note, it held that Plaintiffs had plausibly alleged a horizontal agreement between NAR, Hanna, and Hanna's co-conspirator brokerages. *See* ECF No. 123 at 22-33. Following the March 9, 2026 motion to dismiss order, Hanna asked Plaintiffs to stipulate to an extension of time for Hanna to answer. Plaintiffs agreed—having no idea that Hanna never intended to answer at all, but needed the time to cut a quick deal with *Tuccori* plaintiffs' counsel.

### D. The Copycat *Tuccori* Action

In December 2023, almost three years into *Batton* and *Batton II* in which Plaintiffs' counsel originally named Hanna, Plaintiff Tuccori filed his "copycat" action in state court against a single defendant not named in *Batton*, alleging the same conspiracy and the same theory of harm to the same homebuyer class. Thereafter, several other cases were filed and related to *Tuccori*, all naming regional brokerages with small market share compared to the defendants named in *Batton*. Three months later—before any motion to dismiss decision or discovery—*Tuccori* was stayed to allow the parties to engage in mediation. Six months after that, the parties announced their first set of settlements for a total of $3,202,000. ECF No. 58. As part of its motion for preliminary approval of those settlements, *Tuccori* plaintiffs outlined an "opt-in" procedure pursuant to which any

9

brokerage could opt-in to the settlement and either mediate, or pay 25% of what that brokerage paid in resolving the homesellers' *Burnett* litigation. *Id.* This opt-in procedure is an extremely unusual feature in Fed. R. Civ. P. 23(b) "opt-out" class actions such as *Tuccori*. Indeed, to counsel's knowledge, the only other example of such a procedure is in *Burnett* itself. But the *Burnett* opt-in mechanism was intended as a "monitoring and enforcement mechanism" to ensure industry practice changes were widely implemented, and to quiet homeseller litigation brought by the same *Burnett* counsel that had originated the homeseller claims and tried them to verdict, not to encourage reverse auctions by counsel who arrive on the scene years later that result in inferior settlements that harm class members. *Burnett*, ECF No. 1458 at 14.

### E. The Anywhere Reverse Auction Settlement

On February 23, 2026, the *Tuccori* plaintiffs moved for preliminary approval of a settlement with Anywhere (alongside several other small brokerages) that expressly released the claims in *Batton*. ECF No. 98. The motion disclosed for the first time to *Batton* plaintiffs and the *Batton* court that *Tuccori* plaintiffs and Anywhere were separately negotiating a release of the *Batton* claims. The $9.6 million settlement amount that resulted from this negotiation is less than half of Keller Williams' $20 million icebreaker settlement, despite Anywhere's much larger market share. Anywhere, just like Hanna here, had previously mediated with Plaintiffs, and thus had a clear idea of the price the *Tuccori* plaintiffs needed to beat. And just as with Hanna here, the *Tuccori* plaintiffs had no litigation leverage to wield over Anywhere to drive the price back up.

### F. Batton Plaintiffs' Efforts to Prevent and Mitigate The Reverse Auction Harm

To prevent the impending harm to the overlapping proposed classes in these cases, the *Batton* plaintiffs immediately moved to: (1) intervene in *Tuccori* to object to the motion to amend the complaint to add Anywhere as a defendant; (2) reassign *Tuccori* under the Local Rules to Judge

Hunt in earlier filed *Batton*; (3) preliminarily enjoin Anywhere from proceeding with settlement approval in *Tuccori*; and (4) be appointed interim class counsel for the homebuyer class. ECF No. 100; *Batton*, ECF Nos. 271, 273, 292. Plaintiffs' counsel similarly moved for appointment as interim class counsel in this action (*see* ECF No. 121), and in *Lutz.*

The *Tuccori* court held a hearing on March 4, 2026, and thereafter denied the motion to intervene, granted preliminary approval of the Anywhere settlement, and granted Plaintiffs' motion to amend their complaint to add Anywhere as a defendant in *Tuccori*. ECF Nos. 117-119. The *Batton* court held a hearing on March 5, 2026, and denied the motion for preliminary injunction and motion to transfer. *Batton*, ECF No. 294. On March 12, 2026, Plaintiffs' counsel appealed to the Seventh Circuit from the denial of their motion to intervene in *Tuccori* (*Tuccori* ECF Nos. 126-27), and on March 19, 2026, moved to stay *Tuccori* pending the outcome of that appeal. *Tuccori*, ECF No.131.

### G. Hanna's Participation in the Reverse Auction

Last night, Hanna advised this Court and Plaintiffs for the first time that it has entered into a settlement in *Tuccori* purporting to extinguish Plaintiffs' claims here. ECF Nos. 128 at 1-2; 129-1 at 1. Without disclosing the actual amount of the settlement, Hanna nonetheless argues that it is fair and reasonable because the settlement negotiations were overseen by mediator Judge Holderman. ECF No. 128 at 10. But the mere presence of a mediator does not make a settlement presumptively fair, procedurally or substantively. *See*, *e.g.*, *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 399-400 (C.D. Cal. 2007) (rejecting settlement negotiated with assistance of mediator due to procedural unfairness where, *inter alia*, settlement provided inadequate relief to a select group of class members and plaintiffs' counsel conducted insufficient and deficient discovery). Notwithstanding Judge Holderman's skill and good faith as a mediator, the settlement here was

11

inherently tainted by the structure under which it arose. John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 COLUM. L. REV. 1343, 1372 (1995) ("No explicit agreement among [defendants and plaintiffs' counsel] is needed; all that is necessary is that each team of plaintiffs' attorneys sees that it can be divested of any participation in the action unless it reaches a settlement with the defendants first.").

The *Tuccori* Plaintiffs had no credible leverage to bring Hanna to the settlement table other than by offering it a means to settle homebuyer claims at a substantial discount to the liability Hanna faces here as a result of years of hard-fought litigation. The *Tuccori* plaintiffs had not sued Hanna, and any threat to sue Hanna in *Tuccori* for duplicative claims being litigated here carried no weight, especially in light of Hanna's personal jurisdiction defense in Illinois and the JPML proceedings that would necessarily follow a defendant litigating the same claim in two different jurisdictions. In other words, no matter how hard *Tuccori* plaintiffs' counsel may have pressed during mediation, they were hamstrung from the start because they had no means to hold the very substantial costs of continued litigation over Hanna's head. That leverage only exists in this Court. This is exactly why the Supreme Court has rejected the use of "[c]lass counsel confined to settlement negotiations" who "could not use the threat of litigation to press for a better offer." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621 (1997). It is no wonder that Hanna—after first trying and failing to settle with Plaintiffs—later sought to negotiate with the *Tuccori* plaintiffs who were disarmed from the start, a classic reverse auction process. However competent *Tuccori* counsel may be, they have been rendered ineffectual negotiators and advocates by the highly objectionable practices surrounding the proposed Hanna settlement.

Further, in order to proceed with the settlement, the *Tuccori* plaintiffs will need to file an amended complaint naming Hanna as a defendant, just as they did with Anywhere. *Tuccori*, ECF

No. 123. This duplicative litigation is another hallmark of the reverse auction process. *See Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 839 (7th Cir. 1999) (defendants facing overlapping class actions are incentivized to tr[y] to use [the later-filed suit] as a way to thwart parallel [class] actions where the class had more vigorous champions.").

## ARGUMENT

### I.   Legal Standard

To obtain a preliminary injunction, a movant must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). The first two factors are gateway requirements. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). Once the movant shows both a likelihood of success on the merits and that it is more likely than not to suffer irreparable harm if the injunction is denied, the court "considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.*

### II.    Plaintiffs are Highly Likely to Succeed on the Merits

"Likelihood of success on the merits means only a 'reasonable probability' of success[.]" *Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F.4th 213, 218 (3d Cir. 2025). Plaintiffs have much more than a reasonable probability of success in their appeal to the Seventh Circuit from the *Tuccori* court's denial of their motion to intervene.

The *Tuccori* court reasoned that the interests of the intervenors (the *Batton* class) are not impaired or impeded absent intervention because they can challenge the adequacy and fairness of Anywhere's settlement by objection to or opting out of the settlement under Fed. R. Civ P. 23. *Tuccori*, ECF No. 118 at 1–2. This ruling was error. The Supreme Court has recognized that

13

"[m]embers of a class have a right to intervene if their interests are not adequately represented by existing parties." *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 594 (2013) (quoting 5 Alba Conte & Herbert Newberg, Newberg on Class Actions § 16:7, at 154 (4th ed. 2002)). The advisory committee notes to Rule 24 similarly state that a class member "should, as a general rule, be entitled to intervene in the action," unless the current parties adequately represent him. *Id.*; Fed. R. Civ. P. 24 advisory committee's note to the 1966 amendment. This law is squarely contrary to the *Tuccori* court's finding that the possibility of objecting to or opting out under Rule 23 was enough protection for *Batton* plaintiffs' interests. If Rule 23 alone were the answer, "class members could *never* intervene in a class action because they would always have recourse to Rule 23 procedural protections and would therefore always fail to satisfy the third prong." *Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship*, 874 F.3d 692, 696 (11th Cir. 2017) (emphasis added). Instead of relying on Rule 23, the *Tuccori* court was required to assess whether the *Batton* plaintiffs were in fact adequately represented by the *Tuccori* parties. It did not do so, and this alone is sufficient basis to reverse.  Indeed, courts have repeatedly enjoined unfair and inadequate class-action settlements regardless of any ability to object against final approval or to opt out. *See, e.g.*, *In re Bank of Am. Wage & Hour Emp. Litig.*, 740 F. Supp. 2d 1207, 1218 (D. Kan. 2010); *In re Managed Care Litig.*, 236 F. Supp. 2d 1336, 1344 (S.D. Fla. 2002).; *In re Checking Account Overdraft Litig.*, 859 F. Supp. 2d 1313, 1322–24 (S.D. Fla. 2012.). And had the *Tuccori* court conducted the required analysis regarding the adequacy of *Tuccori* counsel's representation, it would have been compelled to find that they were *not* adequately represented, triggering a right to intervene. Plaintiffs' Seventh Circuit appeal is on strong footing.

### III.    Plaintiffs Will Suffer Irreparable Harm Absent an Injunction

Irreparable harm is "potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Siemens USA Holdings Inc v. Geisenberger*, 17 F.4th 393, 407–08 (3d

14

Cir. 2021) (internal citations and quotations omitted).  Plaintiffs here face a number of irreparable harms.

First, absent an injunction, Plaintiffs are at imminent risk of being deprived of their essential due process rights under Fed. R. Civ P 23. Adequate representation is a crucial due process requirement in class action litigation and settlement. *See, e.g., Scott v. Univ. of Delaware*, 601 F.2d 76, 84–85 (3d Cir. 1979), *abrogated on other grounds by EF Operating Corp. v. Am. Bldgs.*, 993 F.2d 1046 (3d Cir. 1993) ("Adequate representation, in addition to being required by Rule 23, is constitutionally mandated if absent class members are to be bound by the judgment"); *O'Connell v. David*, 35 B.R. 146, 148 (E.D. Pa. 1983), *aff'd*, 740 F.2d 958 (3d Cir. 1984), *and aff'd sub nom. Appeal of O'Connell*, 740 F.2d 958 (3d Cir. 1984) ("Unless there has been fair and adequate representation, a judgment will not be binding against unnamed members of the class for lack of due process of law."). "Adequate representation requires that the class representatives or their attorneys will competently and vigorously protect the interests of all class members." *Id.*

Here, by virtue of negotiating the settlement with Hanna, *Tuccori* counsel purport to represent homebuyers in their claims against Hanna. They will undoubtedly move to be officially appointed as class counsel for purposes of their Hanna settlement when they move for preliminary approval of the settlement, which Hanna represents is likely to occur in short order. ECF No. 129 at 2. But *Tuccori* plaintiffs' counsel have no case on file against Hanna (and cannot credibly threaten to add them, given the lack of personal jurisdiction over Hanna in Illinois), did not invest any time or resources in prosecuting claims against Hanna (or indeed against any defendants), and had no information with which to evaluate the value of homebuyers' claims against Hanna. They thus had no litigation leverage to use against Hanna. Supreme Court precedent precludes the appointment of counsel who are confined to settlement and cannot threaten litigation. *Amchem*,

15

521 U.S. at 621. Such disarmed counsel is well positioned to sell a low-cost release to the defendant in exchange for fees despite doing little or no work—exactly what happened here. John C. Coffee, Jr., Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation, 100 COLUM. L. REV. 370, 392 (2000). This representation is not adequate. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009) (the standard of adequacy for class counsel "does not permit even the appearance of divided loyalties of counsel."). Moreover, counsel that does not invest time or resources in a case is "almost certainly inadequate" under Rule 23. *Reynolds*, 288 F.3d at 284 (finding representation inadequate where "lawyers' efforts between the filing of the complaint and the settlement negotiations were singularly feeble"); *In re Remicade Antitrust Litig.*, No. 17-CV-04326, 2022 WL 3042766, at *7 (E.D. Pa. Aug. 2, 2022) ("The Third Circuit has indicated that courts should consider the non-exhaustive list of factors in Rule 23(g) for appointing counsel in determining the adequacy of representation. … include[ing] counsel's work in the instant class action.").

Second, putative class members here who are also members of the Hanna settlement class, if it is certified, are at imminent risk of becoming confused by the overlapping litigations and potentially permanently forfeiting their valuable claims against Hanna as a result. Specifically, notice of the Hanna settlement will likely issue "before the opportunity even arises to opt-out of the settlement or raise an objection." *Bank of Am.*, 740 F. Supp. 2d at 1218. This notice is likely "to be confusing to most lay people on the issue of the extent to which" the cases overlap. *Id.* Consequently, settlement class members are likely to struggle to understand who represents them as to which claims against which defendants, which claims are still being litigated in which jurisdiction by which counsel, and where to even begin to assess whether it is in their best interest to opt-out or participate in the settlement. These class members include the Plaintiffs before this

16

Court whom the Court has a duty to protect. *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d 286, 296 (3d Cir. 2001) ("The fiduciary duty to the class exists because the very nature of the class action device prevents many who have claims from directly participating in the litigation process."); 2 Herbert Newberg & Alba Conte, Newberg on Class Actions § 1.46, at 11–105 to 11–106 (3d ed. 1992) ("The court must be assured that the settlement secures an adequate advantage for the class in return for the surrender of litigation rights against the defendants.").

Third, Plaintiffs face the irreparable harm of a woefully inadequate settlement with Hanna, as well as with the *Lutz* and remaining *Batton* defendants going forward. Since Anywhere successfully obtained a settlement through its reverse auction tactics, the remaining defendants in all four non-*Tuccori* cases are now empowered to likewise threaten to opt-in to *Tuccori* if Plaintiffs insist on their higher, fairer benchmark. As a result, Plaintiffs are forced into a Hobson's choice: settle at the reduced, inadequate benchmark amounts established by the *Tuccori* Anywhere settlement, or risk having their claims released by *Tuccori* for potentially even less. As one court explained, "[o]ther Defendants will doubtless argue that the . . . settlement, regardless of its inadequacies, sets the standard for settlement . . . [and] will have the practical effect of limiting and hindering settlement of the encompassing issues before this Court . . . ." *Managed Care Litig.*, 236 F. Supp. 2d at 1344 (S.D. Fla. 2002).

This is precisely what has happened here and what will continue to occur. After the Anywhere settlement, Hanna "follow[ed] suit." *Id.* Other defendants in the other related cases have, like Hanna, opposed Plaintiffs' motions to be appointed lead counsel and, in some cases, backed out of settlement discussions. Plaintiffs have every reason to believe this race to the bottom will continue.

There is no adequate remedy at law for these well-recognized types of harms. *Reynolds*,

17

288 F.3d at 282, 284 (finding inadequate Rule 23 representation in reverse-auction context); *Bank of Am.*, 740 F. Supp. 2d at 1218 ("plaintiffs have shown irreparable harm by virtue of the fact that the Lopez settlement will establish a lower baseline for future settlement negotiations in this case"); *Managed Care Litig.*, 236 F. Supp. 2d at 1344–45 (enjoining settlement in related litigation, finding that permitting settlement to proceed would "clearly cause irreparable harm to all Plaintiffs and class members" where future "settlements reached [might] be woefully inadequate" and "nothing would stop every other Defendant from following suit"). Plaintiffs will undoubtedly suffer irreparable harm in the absence of an injunction.

## IV.    The Balance of Harms Favors the Relief Plaintiffs Seek

As set forth above, if Hanna is permitted to participate in the *Tuccori* settlement and it is preliminarily approved, Plaintiffs will suffer irreparable harm. *See* pp. 15-19, *infra*. As to any alleged inequities that would inure to Hanna if the Court enjoins Hanna from proceeding with its *Tuccori* settlement, these inequities are of Hanna's own making. Hanna chose to settle with *Tuccori* counsel without informing this Court or involving Plaintiffs' counsel in the discussions, even after observing the flurry of motion practice that ensued following the announcement of the Anywhere settlement. *See*, pp. 11–12, *supra*. Hanna cannot now claim prejudice because it must deal with the fallout of its own actions.

Granting this motion is also in the public interest. Permitting Hanna to opt in to the *Tuccori* settlement under these circumstances sets a dangerous precedent that encourages forum and judge shopping in class action litigation. It also encourages a perverse race to the bottom where class members are victim to whichever law firm from a different case decides to settle their claims at a lower cost. *China Agritech, Inc. v. Resh*, 584 U.S. 732, 754 (2018) (Sotomayor, J., concurring) (reverse auctions are pure "gamesmanship" that are "not in class members' interest, nor in the interest of justice[.]"). And by depriving the class of adequate counsel best able to represent it,

18

Hanna's *Tuccori* settlement also compromises the public trust in the judiciary. *Managed Care Litig.*, 236 F. Supp. 2d at 1344. ("It is of the greatest public interest to ensure public trust in the judiciary. This trust comes from rendering *just* proceedings.").

### V.    In the Alternative, Plaintiffs Request That the Court Order Discovery Regarding Hanna's Settlement in *Tuccori*

If the Court determines it needs additional evidence before issuing a preliminary injunction, Plaintiffs request in the alternative that the Court order discovery regarding the settlement, including the amount of the settlement, communications between Hanna's counsel and *Tuccori* plaintiffs' counsel, communications between Hanna and defendants in Plaintiffs' other cases about *Tuccori*, and information shared with (or withheld from) the mediator who facilitated the settlement.

The "District Court has its usual authority to manage discovery in a civil suit[.]" *Degen v. United States*, 517 U.S. 820, 826, (1996). Moreover, "Rule 26(b) of the Federal Rules of Civil Procedure is widely recognized as a discovery rule which is liberal in scope and interpretation[.]" The Federal Rules of Civil Procedure also "allow broad and liberal discovery[.]" *Pacitti v. Macy's*, 193 F.3d 766, 777 (3d Cir.1999); Fed.R.Civ.P. 26(b)(1); *Neuberger & Scott v. Shapiro*, 196 F.R.D. 286, 287 (E.D. Pa. 2000). Given that this discovery is unquestionably relevant to the disposition of Plaintiffs' motion for preliminary injunction, it is well within the Court's power to permit discovery into whether a reverse auction occurred in the *Tuccori* settlement. *Fid. Fed. Sav. & Loan Ass'n v. Felicetti*, 148 F.R.D. 532, 534 (E.D. Pa. 1993) (granting request for discovery where requesting party demonstrated documents were relevant).

### CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court enjoin Defendant from proceeding with its settlement in *Tuccori* in any way pending resolution of the *Batton* plaintiffs'

appeal to the Seventh Circuit from the *Tuccori* court's denial of *Batton* Plaintiffs' motion to intervene.

Dated: March 20, 2026

Respectfully submitted,

 /s/ *Vincent Briganti*

Vincent Briganti (pro hac vice)
Margaret MacLean (pro hac vice)
Noelle Forde (pro hac vice)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
(914) 997-0500
vbriganti@lowey.com
mmaclean@lowey.com
nforde@lowey.com

Gerald Lawrence (PA ID #69079)
Anthony Christina (PA ID #322528)
**LOWEY DANNENBERG, P.C.**
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
(215) 399-4770
glawrence@lowey.com
achristina@lowey.com

Randall P. Ewing, Jr. (pro hac vice)
George A. Zelcs (pro hac vice)
Ryan Z. Cortazar (pro hac vice)
**KOREIN TILLERY, LLC**
205 N. Michigan Avenue, Suite 1950
Chicago, IL 60601
(312) 641-9750
rewing@koreintillery.com
gzelcs@koreintillery.com
rcortazar@koreintillery.com

Steven M. Berezney (pro hac vice)
**KOREIN TILLERY, LLC**
505 N. 7th Street, Suite 3600
St. Louis, MO 63101
(314) 241-4844
sberezney@koreintillery.com

20

Case 2:24-cv-02374-WB    Document 132-1    Filed 03/20/26    Page 26 of 27

*Attorneys for Plaintiffs and
the Proposed Class*

Case 2:24-cv-02374-WB    Document 132-1    Filed 03/20/26    Page 26 of 27

21

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2026, a true and correct copy of the foregoing was served upon counsel of record by electronic filing.

/s/ *Anthony Christina*
Anthony Christina