**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SCOTT DAVIS, NIALL ADAMS, MYA BATTON, THEODORE BISBICOS, AARON BOLTON, JASON BOOMSMA, THOMAS BRAUN, SABRINA CLARK, RYAN EISNER, STEVEN EWALD, JOHN GARRETT, BRENNON GROVES, DARIN HENDRY, ANNA JAMES, DO YEON IRENE KIM, JAMES LUTZ, JORDAN KULLMANN, JAMES MULLIS, DANIEL PARSONS, JOSHUA PUTT, JOHN SANNAR, ROBERT SAYLES, BEN SHADLE, BRENT STRINE, CHRISTINE VAN WOERKON, and SHERRIE WOHL, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.: 2:24-cv-02374-WB<br><br>**Hon. Wendy Beetlestone** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| HANNA HOLDINGS, INC., | ) ) | |
| Defendant. | ) | |

**DEFENDANT HANNA HOLDINGS, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**

Defendant Hanna Holdings, Inc. answers Plaintiffs' Second Amended Class Action Complaint ("Complaint"). Unless expressly stated otherwise, Hanna Holdings denies each and every allegation contained in the Complaint. Hanna Holdings states that the headings, sub-headings, and footnotes throughout the Complaint do not constitute well-pled allegations of fact and therefore require no response. To the extent that an answer is deemed necessary, Hanna Holdings denies the allegations in the headings, sub-headings, and footnotes in the Complaint, except as otherwise stated. Hanna Holdings reserves the right to seek to amend and/or supplement its Answer as may be necessary.

1

**ANSWERS TO SPECIFIC ALLEGATIONS**

## I.    INTRODUCTION

1.    This case challenges Defendant's unlawful agreements with the National Association of Realtors ("NAR") and other coconspirator brokerages with whom Defendant ostensibly competes to reduce competition amongst real estate agents assisting homebuyers. Defendant and its coconspirators unlawfully agreed to anti-competitive rules that encouraged overuse of buyer agents, increased their cost to homebuyers, and reduced the quality of their services. The net result of Defendant's conspiracy was that buyers overpaid for their homes.

**ANSWER:** Paragraph 1 consists of Plaintiffs' characterizations of their purported claims, to which no answer is necessary. To the extent that an answer is deemed necessary, Hanna Holdings denies the allegations in Paragraph 1 that relate to Hanna Holdings. As to the allegations that relate to other entities, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1 and, on that basis, denies the allegations.

2.    NAR is a trade association of real estate professionals with over 1.4 million members. Each of those members competes with the others in the business of helping buyers find homes to purchase. NAR also oversees local realtor associations throughout the country (e.g., Greater Philadelphia Association of Realtors). Each local realtor association is itself composed of local real estate agents who ostensibly compete with one another.

**ANSWER:** Hanna Holdings admits that NAR is a trade association. Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegation that NAR is a trade association with "over 1.4 million members" and, on that basis, denies the allegation. The remainder of the allegations in Paragraph 2 are not susceptible to being answered because of their ambiguity or vagueness, and Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations and, on that basis, denies the allegations.

3.    Brokers use Multiple Listing Services ("MLSs") to share information about homes for sale. An MLS is a database of properties listed for sale in a particular geographic region. The vast majority of homes in the United States are sold on an MLS. The home seller's

broker (the "seller-broker") lists her client's home on the MLS, and the home buyer's broker (the "buyer-agent") uses the MLS to locate homes for her clients. In order to effectively market properties to buyers, seller-brokers must list their clients' properties on an MLS. The vast majority of MLSs are owned and operated by one or more local realtor associations governed by NAR.

**ANSWER:** Hanna Holdings admits that an MLS is a database that includes properties listed for sale in a particular geographic region. Hanna Holdings also admits that brokers can use MLSs to share information about homes for sale, that a seller-broker can list her client's home on an MLS, and that a home buyer's broker can use an MLS to locate homes for her clients. Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 3 and, on that basis, denies the allegations.

4.      NAR issues mandatory policies through its Board of Directors and various committees, such as the Multiple Listing Policy Committee, the Professional Standards Committee, and the MLS Technology and Emerging Issues Advisory Board. NAR's Board of Directors, and each relevant committee, is composed of real estate agents who compete with one another for business.

**ANSWER:** Hanna Holdings denies the allegations in the first sentence of Paragraph 4. Hanna Holdings admits that NAR's Board of Directors and committees have members who are real estate agents. Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 4 and, on that basis, denies the allegations.

5.      In turn, the local realtor associations and the competitor brokerages who ran them agreed to restrict access to and use of their own particular MLS to only NAR members, or, at bare minimum, those following NAR's Code of Ethics and MLS Rules.

**ANSWER:** Hanna Holdings denies the allegations in the first sentence of Paragraph 5 to the extent that they relate to Hanna Holdings and, to the extent that the allegations relate to other entities, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations and, on that basis, denies them.

6.      For most of the 20th Century up through the 1970s, MLSs published commission

schedules for all competitors to abide by, and NAR's Code of Ethics required agents to comply with the commission schedules.

**ANSWER:** Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6 and, on that basis, denies the allegations.

7.    Faced with antitrust challenges to their commission schedules, NAR and the competitor brokerages who comprise NAR, agreed in the 1970s to include offers of compensation to other agents who procured a buyer to purchase the property, but only to agents who were working as "subagents" of the seller with no duty of loyalty to the buyer. There was no mechanism in the NAR or MLS Rules to permit offers of compensation to real estate agents who wanted to owe their duty of loyalty to the buyer instead.

**ANSWER:** Hanna Holdings denies the allegations in the first sentence of Paragraph 7 to the extent that they relate to Hanna Holdings, and, to the extent that the allegations relate to other entities, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations and, on that basis, denies them. Hanna Holdings denies the allegations in the second sentence of Paragraph 7.

8.    At this same time and prior to the advent of the internet in the mid-1990s, MLSs maintained their listings primarily in hard copies that could only be accessed by other MLS members.

**ANSWER:** Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8 and, on that basis, denies the allegations.

9.    By 1992, NAR and its membership of competitor brokers recognized that they were facing two existential threats: (1) following governmental investigation and other legal challenges, "subagency" was no longer a tenable model for guaranteeing compensation to agents that procured a buyer or for encouraging the use of buyer agents; and (2) technological advances, including the internet, opened the possibility for consumers to search databases of homes for sale and thereby bypass MLSs and buyer-brokers altogether. As NAR's President said to its members at the time in a since memorialized speech, "the lions were coming over the hill."

**ANSWER:** Hanna Holdings denies the allegations in the first sentence of Paragraph 9 to the extent that they relate to Hanna Holdings, and, to the extent that the allegations relate to other entities, Hanna Holdings does not have knowledge or information sufficient to form a belief as to

the truth of the allegations and, on that basis, denies them.  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 9, and, on that basis, denies them.

10.    To counteract these competitive threats, Defendant, its competitor brokerages, and NAR agreed to a series of anticompetitive restraints that would encourage overuse of buyer-brokers, restrict homebuyers' ability to view offered commissions, heavily restrict if not outright eliminate the ability for either sellers or buyers to negotiate the cost of buyer-brokers, remove incentives for buyer-brokers to compete based on price or quality, and permit real estate agents to misrepresent the cost of their services to homebuyers.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 10 as they relate to Hanna Holdings.  To the extent that the allegations in Paragraph 10 relates to NAR and "competitor brokerages," Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations and, on that basis, denies the allegations.

11.    These anticompetitive rules, policies, and practices include:

a.    requiring every seller-broker, when listing a property on an MLS, to make a "blanket unilateral offer[] of compensation" to any buyer-agent who may find a buyer for the home;

b.    requiring the offer of compensation to the buyer-agent to be a blanket offer—i.e., the exact same compensation terms must be simultaneously offered to every buyer-agent without regard to their experience, the services they are providing to the buyer, or the financial arrangement they have made with the buyer;

c.    prohibiting disclosure of the total commission—the commission due to the seller-broker and the portion of the commission earmarked for the buyer-agent—for any listing on a NAR MLS;

d.    permitting buyer-agents to misrepresent to buyers that a buyer-agent's services are free, when in fact the buyer-agent is receiving a portion of the total commission that comes from the buyer's pocket;

e.    enabling buyer-agents to filter MLS listings based on the offered commissions and to exclude lower-commission homes from consideration by prospective home buyers; and

f.    severely restricting brokers' ability to modify the buyer-agent commission after the buyer-agent conveys a purchase offer.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 11.

12.    To become effective, the unlawful restraints were first agreed upon by the relevant subcommittees, composed of real estate agents who would otherwise compete for the business of representing homebuyers, and then approved by NAR's Board of Directors

and Executive Committee, also composed of real estate agents who would otherwise compete for the business of representing homebuyers.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 12.

13.    To be effective, all coconspirators had to abide by the rules and impose them throughout each NAR-affiliated MLS, which constituted an overwhelming majority of MLSs in the country.  Absent an agreement to make the rules mandatory and for all major real estate brokers to abide by the rules, it would have been in each coconspirator's economic self-interest to obtain market share by competing on price and quality of service for homebuying services and listings available for sale.

**ANSWER:**  The allegations in Paragraph 13 consist of Plaintiffs' characterizations of their purported claims, to which no answer is necessary.  To the extent that an answer is deemed necessary, Hanna Holdings denies the allegations in Paragraph 13 to the extent they relate to Hanna Holdings.  As to the allegations that relate to other entities, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13 and, on that basis, denies the allegations.

14.    Because Defendant and its coconspirators are among the leading real estate firms in the United States, their participation in the conspiracy was essential to its success.  Each plays an active role in NAR and has required franchisees, brokerages, and individual realtors to join in and implement NAR's anticompetitive agreements as a condition to receiving the benefits of their brand, brokerage infrastructure, and other support. Defendant and its coconspirators used their control of the MLSs and their own governing policies to ensure adherence to NAR rules.  Absent an agreement among its coconspirators, it would not have been in Defendant's economic self-interest to refrain from competing for homebuyers based on price.

**ANSWER:**  Hanna Holdings denies the allegations in the first and second sentences of Paragraph 14 as they relate to Hanna Holdings.  As to the allegations in the first and second sentences of Paragraph 14 that relate to other entities, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations and, on that basis, denies the allegations.  The remaining allegations in Paragraph 14 consist of Plaintiffs' characterizations of their purported claims, to which no answer is necessary.  To the extent an answer is deemed necessary, Hanna Holdings denies the remaining allegations in Paragraph 14.

15.     Defendant and its coconspirators further enforced the conspiracy by reviewing and reissuing NAR's rules at yearly NAR meetings and serving on the boards and committees that enforce compliance with NAR's rules.  And their agents did so on a daily basis via the hundreds of real estate transactions that took place every day.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 15 to the extent that they relate to Hanna Holdings.  As to the allegations that relate to other entities, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 and, on that basis, denies the allegations.

16.     On November 19, 2020, the Department of Justice ("DOJ") filed an antitrust complaint in the District of Columbia against NAR alleging that NAR's rules, policies, and practices "governing, among other things, the publication and marketing of real estate, real estate broker commissions, as well as real estate broker access to lockboxes" where keys required to gain access to a property are stored were "widely adopted by NAR's members resulting in a lessening of competition among real estate brokers to the detriment of American home buyers."[1]  Simultaneously with the complaint, the DOJ announced a proposed settlement with NAR pursuant to which NAR committed to modifying its rules to provide greater transparency to home buyers.  Assistant Attorney General Makan Delrahim explained that the settlement "prevents traditional brokers from impeding competition—including by internet-based methods of home buying and selling—by providing greater transparency to consumers about broker fees.  This will increase price competition among brokers and lead to better quality of services for American home buyers and sellers."

**ANSWER:**  Hanna Holdings admits that on November 19, 2020, DOJ filed a complaint against the National Association of Realtors.  To the extent that the first sentence of Paragraph 16 purports to quote from a publicly available court filing, Hanna Holdings respectfully refers the Court to that public court filing, which speaks for itself, for a complete and accurate statement of its contents.  Hanna Holdings admits that, simultaneous with the filing of the November 19, 2020 complaint, DOJ announced a proposed settlement with NAR.  Hanna Holdings otherwise does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 and, on that basis, denies the allegations.

17.     On July 1, 2021, however, the DOJ sought to withdraw its consent to the proposed

---

[1] Complaint, *United States v. Nat'l Ass'n of Realtors®*, No. 1:20-cv-3356 (D.D.C. July 1, 2021), ECF No. 1 at 1.

settlement with NAR.[2]  The DOJ wanted to ensure it would be able to conduct a "broader investigation of NAR's rules and conduct to proceed without restriction."[3]  The DOJ further explained "we cannot be bound by a settlement that prevents our ability to protect competition in a market that profoundly affects Americans' financial well-being."[4]

**ANSWER:**  To the extent that the first sentence of Paragraph 17 purports to characterize or summarize a public court filing, Hanna Holdings respectfully refers the Court to that public court filing, which speaks for itself, for a complete and accurate statement of its contents.  To the extent that the second and third sentences of Paragraph 17 purport to quote from a publicly available website, Hanna Holdings respectfully refers the Court to that public website, which speaks for itself, for a complete and accurate statement of its contents.  Hanna Holdings otherwise does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17 and, on that basis, denies the allegations.

18.    The conspiracy has substantially reduced competition in the market for buyer-agent services to the detriment of American home buyers.  Specifically, the conspiracy causes overuse of buyer-agents and compensation at artificially high levels, which in turn causes home buyers to pay higher prices.  The conspiracy also enabled brokers to "steer" home buyers away from lower commission homes.  As a result, home buyers have been harmed in at least the following ways:

a.    the conspiracy has inflated the cost of buyer-agent services by inflating buyer-agent commissions;

b.    inflated buyer-agent commissions in turn have inflated home prices; and

c.    the conspiracy has reduced the quality of services provided by buyer-agents by, for example, facilitating the steering of home buyers by their brokers towards higher-commission homes and away from lower-commission homes, even though such homes may otherwise match buyers' criteria.

**ANSWER:**  The allegations in Paragraph 18 consist of Plaintiffs' characterizations of their purported claims, to which no answer is necessary.  To the extent that an answer is deemed necessary, Hanna Holdings denies the allegations in Paragraph 18.

---

[2] *Id.*, Notice of Withdrawal of Consent, ECF. No. 14.

[3] Press Release, *Justice Department Withdraws from Settlement with the National Association of Realtors*, Dep't of Justice (Jul. 1, 2021), https://www.justice.gov/opa/pr/justice-department-withdraws-settlement-national-association-realtors.

[4] *Id.*

19.     The agreements individually and collectively among Defendant and its coconspirators, unreasonably restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26; state antitrust laws; consumer protection laws; and common law.  Plaintiffs, on behalf of themselves and the Class, sue Defendant for these violations and seek treble damages and the costs of this lawsuit, including reasonable attorneys' fees.

**ANSWER:**  Hanna Holdings admits that Plaintiffs have brought suit against Hanna Holdings seeking treble damages, injunctive relief, and attorneys' fees.  Hanna Holdings otherwise denies the allegations in Paragraph 19 as they relate to Hanna Holdings.  As to the allegations in Paragraph 19 that relate to other entities, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations and, on that basis, denies the allegations.

20.     Plaintiffs and Class Members are home buyers who purchased their homes on MLSs affiliated with and governed by NAR.  Plaintiffs bring this action against Defendant for agreeing, combining, and conspiring to enact impose, implement, and enforce anticompetitive restraints that reduced competition in the markets for buyer-agent services in violation of federal antitrust law and state antitrust statutes, consumer protection laws, and common law.  Defendant's unlawful, anticompetitive conduct caused America's home buyers to pay inflated commissions for broker services misrepresented as free, to pay inflated prices for the homes they purchase, and to receive reduced quality broker services.

**ANSWER:**  Hanna Holdings admits that Plaintiffs have brought this suit on behalf of a putative class of home buyers.  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegation that Plaintiffs are home buyers who purchased their homes on MLSs affiliated with and governed by NAR and, on that basis, denies the allegation. The remaining allegations in Paragraph 20 consist of Plaintiffs' characterizations of their purported claims, to which no answer is necessary.  To the extent that an answer is deemed necessary, Hanna Holdings denies the allegations in Paragraph 20.

## II.     JURISDICTION AND VENUE

21.     The Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1337.  This case arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and Sections 4

and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

**ANSWER:**  The allegations in Paragraph 21 are legal conclusions not subject to admission or denial.  To the extent that an answer is deemed necessary, Hanna Holdings denies the allegations in Paragraph 21.

22.     This Court also has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the Class contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of each class is a citizen of a State different from Defendant.

**ANSWER:**  The allegations in Paragraph 22 are legal conclusions not subject to admission or denial.  To the extent that an answer is deemed necessary, Hanna Holdings does not presently contest that this Court has subject matter jurisdiction over Plaintiffs' claims, but if it learns of facts suggesting otherwise, it retains the right to argue the absence of subject matter jurisdiction.

23.     This Court has personal jurisdiction over Defendant.  Defendant has: (1) transacted business in the United States, including in this District; (2) transacted with members of the Class throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District; and (4) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

**ANSWER:**  The allegations in Paragraph 23 are legal conclusions not subject to admission or denial.  To the extent that an answer is deemed necessary, Hanna Holdings does not presently contest that this Court has personal jurisdiction over Hanna Holdings, but if it learns of facts suggesting otherwise, it retains the right to argue the absence of personal jurisdiction.  Hanna Holdings admits that it has transacted business in the United States and in this District.  Hanna Holdings otherwise denies the allegations in Paragraph 23.

24.     Venue is proper in this District under 28 U.S.C. §1391(b), (c), and (d).  Defendant transacted business, was found, had agents, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

**ANSWER:**  The allegations in Paragraph 24 are legal conclusions not subject to admission or

10

denial.  To the extent that an answer is deemed necessary, Hanna Holdings admits that it transacted business in this District.  Hanna Holdings denies the remaining allegations in Paragraph 24.

## III.   TRADE AND COMMERCE

25.   NAR's anticompetitive rules apply to and have been implemented and enforced by Defendant and its coconspirators nationwide.  These rules govern the conduct of local NAR associations, local brokers, and local realtors across the United States.  Defendant's conduct alleged herein has, among other harms, inflated buyer-agent commissions nationwide, including in the areas in which the NAR MLSs operate.  Coconspirator NAR, through its members and other coconspirators, and Defendant, through its franchisees, brokers, and other coconspirators, are engaged in interstate commerce and activities affecting interstate commerce.

**ANSWER:**  Paragraph 25 consists of legal conclusions to which no answer is necessary.  To the extent that an answer is deemed necessary, Hanna Holdings denies the allegations in Paragraph 25 that relate to Hanna Holdings.  As to the allegations that relate to NAR and other entities, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25 and, on that basis, denies the allegations.

## IV.   THE PARTIES

### A.   Plaintiffs

26.   Plaintiff Scott Davis is a resident of North Carolina.  In 2022, Mr. Davis purchased a home in Greensboro, North Carolina using a buyer-agent broker from Allen Tate Real Estate, LLC, a subsidiary of Defendant Hanna Holdings, Inc.  The home Mr. Davis purchased was listed on the Triad Multiple Listing Service.  Upon information and belief, the Triad MLS is owned and/or run by the Greensboro Regional REALTORS® Association, a NAR member that must adhere to NAR's guidelines and policies.  Davis offered to mediate his claims with Defendant.

**ANSWER:**  Hanna Holdings admits that, in 2022, Scott Davis purchased a home in Greensboro, North Carolina using a buyer-agent broker from Allen Tate Real Estate, LLC.  Hanna Holdings admits that Allen Tate Real Estate LLC is a subsidiary of Hanna Holdings, Inc.  Hanna Holdings admits that the home Mr. Davis purchased in 2022 was listed on Triad Multiple Listing Service.

Hanna Holdings denies the allegation that Mr. Davis "offered to mediate his claims" with Hanna Holdings. Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 26 and, on that basis, denies the allegations.

27. Plaintiff Niall Adams is a resident of Maine. In May 2024, Mr. Adams purchased a home in Freeport, Maine using a buyer-agent associated with coconspirator Keller Williams. The property Mr. Adams purchased was listed on the MLS Maine Listings, which upon information and belief is owned and operated by the Maine Association of REALTORS®, a member of NAR, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27 and, on that basis, denies the allegations.

28. Plaintiff Mya Batton is a resident of Tennessee. In 2020, Ms. Batton purchased a home in Mount Juliet, Tennessee using a buyer-agent. The property was listed on the MLS RealTracs, which upon information and belief is a member of NAR, or owned and operated by members of NAR, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28 and, on that basis, denies the allegations.

29. Plaintiff Theodore Bisbicos is a resident of Massachusetts. In 2021, Mr. Bisbicos purchased a home in Chelsea, Massachusetts using a buyer-agent. The home Mr. Bisbicos purchased was listed on the MLS Property Info Network ("MLSPIN"). Upon information and belief, the MLSPIN is run entirely by NAR members who must adhere to NAR's guidelines and policies.

**ANSWER:** Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29 and, on that basis, denies the allegations.

30. Plaintiff Aaron Bolton is a resident of Florida. In 2021, Mr. Bolton purchased a home in Parrish, Florida using a buyer-agent. The property was listed on the MLS Stellar MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30 and, on that basis, denies the allegations.

31. Plaintiff Jason Boomsma is a resident of Wisconsin. In March 2022, Mr. Boomsma purchased a home in Mount Horeb, Wisconsin using a buyer-agent affiliated with

coconspirator HomeServices of America, Inc.  The property was listed on the MLS Wisconsin Real Estate Exchange, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 31 and, on that basis, denies the allegations.

32.    Plaintiff Thomas Braun is a resident of North Carolina.  In September 2022, Mr. Braun purchased a home in Hendersonville, North Carolina using a buyer-agent.  The property was listed on the MLS MLS GRiD, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 32 and, on that basis, denies the allegations.

33.    Plaintiff Sabrina Clark is a resident of Iowa.  In 2021, Ms. Clark purchased a home in West Des Moines, Iowa using a buyer-agent associated with coconspirator Anywhere. The property was listed on MLS Des Moines Area Association of Realtors, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 33 and, on that basis, denies the allegations.

34.    Plaintiff Steven Ewald is a resent of Illinois.  In October 2022, Mr. Ewald purchased a home in Evanston, Illinois using a buyer-agent.  The property was listed on the MLS Midwest Real Estate Data, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 34 and, on that basis, denies the allegations.

35.    Plaintiff Ryan Eisner is a resident of Illinois.  In May 2021, he purchased a home in Chicago, Illinois using a buyer-agent.  The property was listed on the listed on the MLS Midwest Real Estate Data, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 35 and, on that basis, denies the allegations.

36.     Plaintiff John Garrett is a resident of West Virginia.  In May 2023, Mr. Garrett purchased a home in Lewisburg, West Virginia using a buyer-agent.  The property was listed on the MLS Greenbriar Valley MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 36 and, on that basis, denies the allegations.

37.     Plaintiff Brennon Groves is a resident of Maryland.  In October 2022, Mr. Groves purchased a home in Waldorf, Maryland using a buyer-agent.  The property was listed on the MLS Bright MLS, which upon information and belief is a member of the NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 37 and, on that basis, denies the allegations.

38.     Plaintiff Darin Hendry is a resident of Missouri.  In February 2022, Mr. Hendry purchased a home in St. Peters, Missouri using a buyer-agent.  The property was listed on the MLS Maris MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 38 and, on that basis, denies the allegations.

39.     Plaintiff Anna James is a resident of North Carolina.  In 2022, Ms. James purchased a home in Greensboro, North Carolina using a buyer-agent.  Also in 2022, Ms. James purchased a home in High Point, North Carolina using a buyer-agent.  Both properties were listed on the MLS Triad MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:**  Hanna Holdings admits that Triad MLS is a member of NAR.  Hanna Holdings

otherwise does not have knowledge or information sufficient to form a belief as to the truth of

the allegations in Paragraph 39 and, on that basis, denies the allegations.

40.     Plaintiff Do Yeon Irene Kim is a resident of Florida.  In 2018, Ms. Kim purchased a home in Orlando, Florida using a buyer-agent.  The property was listed on the MLS Stellar

14

MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 and, on that basis, denies the allegations.

41. Plaintiff James Lutz is a resident of Colorado.  In 2021, Mr. Lutz purchased a home in Key Colony, Florida using a buyer-agent.  The property was listed on the MLS FLK MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41 and, on that basis, denies the allegations.

42. Plaintiff Jordan Kullmann is a resident of Minnesota. In September 2022, Mr. Kullmann purchased a home in Plymouth, Minnesota using a buyer-agent.  The property was listed on the MLS Northstar MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 and, on that basis, denies the allegations.

43. Plaintiff James Mullis is a resident of Nevada.  In 2020, Mr. Mullis purchased a home in Henderson, Nevada using a buyer-agent.  The property was listed on the MLS GLVAR, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43 and, on that basis, denies the allegations.

44. Plaintiff Daniel Parsons is a resident of New Mexico.  In 2021, Mr. Parsons purchased a home in Rio Rancho, New Mexico using a buyer-agent.  The property was listed on the MLS SWMLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44 and, on that basis, denies the allegations.

45. Plaintiff Joshua Putt is a resident of Arizona.  In September 2020, Mr. Putt purchased a home in Maricopa, Arizona using a buyer-agent.  The property was listed on the MLS

ARMLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45 and, on that basis, denies the allegations.

46.    Plaintiff John Sannar is a resident of Virginia.  In June 2020, Mr. Sannar purchased a home in Alexandria, Virginia using a buyer-agent.  The property was listed on the MLS Bright MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46 and, on that basis, denies the allegations.

47.    Plaintiff Robert Sayles is a resident of South Carolina.  In May 2019, Mr. Sayles purchased a home in Mount Pleasant, South Carolina using a buyer-agent.  The property was listed on the MLS Broker Reciprocity, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47 and, on that basis, denies the allegations.

48.    Plaintiff Benjamin Shadle is a resident of Washington D.C.  In March 2021, Mr. Shadle purchased a home in Washington D.C. using a buyer-agent.  The property was listed on the MLS Bright MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48 and, on that basis, denies the allegations.

49.    Plaintiff Brent Strine is a resident of Oregon.  In May 2019, Mr. Strine purchased a home in Oregon City, Oregon using a buyer-agent.  The property was listed on the MLS Oregon Data Share, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:**  No response is required because Plaintiff Brent Strine has voluntarily dismissed his claims against Hanna Holdings.  *See* Dkt. 134.  To the extent an answer is deemed necessary,

16

Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49 and, on that basis, denies the allegations.

50.    Plaintiff Christine Van Woerkon is a resident of Connecticut. In 2023, Ms. Van Woerkon purchased a home in Sterling, Connecticut using a buyer-agent. The property was listed on the MLS Smart MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50 and, on that basis, denies the allegations.

51.    Plaintiff Sherrie Wohl is a resident of New York. In March 2023, Ms. Wohl purchased a home in Roslyn, New York using a buyer-agent. The property was listed on the MLS One Key Realty, which upon information and belief is a member of NAR, or owned and operated by NAR members, and imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51 and, on that basis, denies the allegations.

## B.    Defendant

52.    Defendant Hanna Holdings, Inc.[5] is a privately-held real estate brokerage company and a member of NAR. Defendant is incorporated in Delaware with its principal place of business in Pennsylvania. In 2022, Defendant was ranked first as the largest privately-held real estate brokerage company in the United States, and ahead of other companies such as Redfin and United Real Estate Group. In 2022 alone, Defendant was engaged in over 113,000 transactions with a sales volume in excess of $36.6 billion. According to Defendant, it is a "powerhouse brand that stretches across the East Coast and into the Midwest" with "15,000" agents across a "13-state footprint."[6]

**ANSWER:**  Hanna Holdings admits that it is privately held and that it has its principal place of business in Pennsylvania. Hanna Holdings denies that it is a brokerage company, that it is incorporated in Delaware, that it was ever engaged in real estate transactions (including in 2022),

---

[5] This is the holding company for the Hanna Family of Companies. At times, Defendant is also referred to as "Howard Hanna Real Estate Services" or "Howard Hanna," names under which various companies affiliated with Defendant do business.

[6] Lindsay Kovach, *Hanna Holdings Inc. Recognized as One of Only Five Major Brokerages to Grow Sales in 2022*, Howard Hanna Real Estate Services Press Release (Apr. 11, 2023), https://blog.howardhanna.com/press/hanna-holdings-inc-recognized-as-one-of-only-five-major-brokerages-to-grow-sales-in-2022/.

that it is a member of NAR, and that it has real estate agents.  The remaining allegations in

Paragraph 52 purport to quote from a publicly available website, and Hanna Holdings

respectfully refers the Court to that public website, which speaks for itself, for a complete and

accurate statement of its contents.

53.     Defendant transacts business in Pennsylvania, including in this District, by providing relocation and other moving services to over 250 companies and organizations, many of which have relocated employees to or from Pennsylvania.

**ANSWER:**  Hanna Holdings admits that it transacts business in Pennsylvania and in this

District.  Hanna Holdings otherwise denies the allegations in Paragraph 53.

54.     In addition, Defendant advertises its "Referral Network" and actively solicits "referral" business under which real estate agents gain "the ability to place local, national, and global referrals" for their business partners' "real estate needs."[7]

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 54.

55.     Defendant's employees have held leadership positions within NAR (including on NAR's RES Advisory Board, Professional Standards Committee, and Membership Policy and Board Jurisdiction Committee), and on several MLSs, whereby they agree with other competitor brokerages to impose the NAR Rules.

**ANSWER:**  The allegation in Paragraph 55 that "Defendant's employees have held leadership

positions within NAR…and on several MLSs" is not susceptible to being answered because of

its ambiguity or vagueness.  To the extent it can discern the allegation, Hanna Holdings admits

that at certain points in time, some representatives of Hanna Holdings have held positions within

NAR and on certain MLSs.  Hanna Holdings otherwise denies the allegations in Paragraph 55.

56.     Several subsidiaries owned and controlled by Defendant, such as Tucker Referrals, Inc. and Allen Tate Real Estate, LLC, tout similar referral programs and include sample calculations for how commission fees will be shared with referral partners.[8]  Under such programs, Defendant has sent and received fees in dealings with real estate agents located in Pennsylvania and in this District.

---

[7] *See* "Realty One Referral Network, Howard Hanna Real Estate Services, https://www.howardhanna.com/realty-one-referral-network (last visited Oct. 1, 2025).
[8] *See*, *e.g.*, "FAQ for Tucker Referrals Inc.", Tucker Realtors, https://www.talktotucker.com/referrals/faq (last visited Oct. 1, 2025).

**ANSWER:**  Hanna Holdings admits that Tucker Referrals, Inc. and Allen Tate Real Estate, LLC are subsidiaries of Hanna Holdings, Inc. Hanna Holdings further admits that Tucker Referrals, Inc. and Allen Tate Real Estate, LLC permit agents to refer potential customers to agents and brokers and shares commissions with referral partners.  Hanna Holdings otherwise denies the allegations in Paragraph 56.

### C.    Coconspirators

57.    Defendant's coconspirators include four of the largest real estate brokers in the country: Anywhere Real Estate Inc. (f/k/a Realogy Holdings Corp.); RE/MAX Holdings, Inc.; Keller Williams Realty, Inc.; and HomeServices of America, Inc.  The coconspirators further include: Compass, Inc. ("Compass"); ExP World Holdings, Inc.; Redfin Corporation; Weichert Realtors; United Real Estate Group; and Douglas Elliman Inc. Plaintiffs' counsel has brought suit against these coconspirators, as well as NAR, in related litigations.

**ANSWER:**  Hanna Holdings admits that Plaintiffs' counsel has brought suit against NAR and the real estate brokers listed in Paragraph 57.  Hanna Holdings otherwise denies the allegations in Paragraph 57.

58.    Multiple local realtor associations not named as defendants participated as coconspirators in the violations alleged herein and performed acts in furtherance thereof.  Specifically, each of the local realtor associations that own and operate the NAR MLSs agreed to, complied with, and implemented the "Buyer-Agent Commission Rule," which required a seller-broker to specify the blanket, unilateral commission to be paid to the buyer-agent upon sale in terms of a definite dollar amount or percentage of the sale price.

**ANSWER:**  Hanna Holdings denies that local realtor associations participated as "coconspirators" of Hanna Holdings.  Hanna Holdings otherwise does not have knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 58 and, on that basis, denies the allegations.  Hanna Holdings does not have knowledge or information sufficient to form a belief as to what "each of the local realtor associations that own and operate the NAR MLSs agreed to, complied with, and implemented" and, on that basis, denies the allegations in the second sentence of Paragraph 58.  Hanna

19

Holdings otherwise denies the allegations in Paragraph 58.

59.     The NAR MLSs, among others, have participated as coconspirators in the violations alleged herein and performed acts in furtherance thereof, including by adopting the Buyer-Agent Commission Rule in their individual rules and regulations.

**ANSWER:**  Hanna Holdings denies that NAR MLSs participated as "coconspirators" of Hanna

Holdings.  Hanna Holdings does not have knowledge or information sufficient to form a belief as

to the truth of the remaining allegations in Paragraph 59 and, on that basis, denies the allegations.

60.     Franchisees and brokers of Defendant also participated as coconspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. Specifically, each complied with and implemented the Buyer-Agent Commission Rule and its predecessor, in the geographic areas where the NAR MLSs operate.  In addition, other brokers in these areas have participated as coconspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.  These other brokers complied with and implemented the Buyer-Agent Commission Rule in these geographic areas.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 60 that relate to Hanna

Holdings and its franchisees and brokers.  As to the allegations that relate to other entities, Hanna

Holdings does not have knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 60 and, on that basis, denies the allegations.

61.     Defendant is jointly and severally liable for the acts of its coconspirators, whether named or not named as defendants in this Complaint.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 61.

## V.      BACKGROUND ON NAR AND THE REAL ESTATE INDUSTRY

### A.      NAR and Affiliated MLSs

62.     NAR is the largest trade association in America, composed of REALTORS® (real estate agents registered with NAR), including residential and commercial brokers, salespeople, property managers, appraisers, counselors, and others engaged in the real estate industry across the United States.  Members belong to one or more of NAR's approximately 1,200 local associations or boards and/or 54 state and territory associations.  NAR's local associations and affiliated MLSs govern the conduct of NAR's 1.4 million member REALTORS®.

**ANSWER:**  Hanna Holdings admits that NAR is a trade association, and that real estate agents,

brokers, salespeople, property managers, appraisers, counselors, and others engaged in the real

estate industry in the United States are members of NAR.  Hanna Holdings otherwise does not

have knowledge or information sufficient to form a belief as to the truth of the allegations in

Paragraph 62 and, on that basis, denies the allegations.

63.    Among other activities, NAR establishes and enforces rules, policies, and practices that are adopted by NAR's local associations and their affiliated MLSs and, in turn, must be complied with by REALTORS®.  Examples include a Code of Ethics and a Handbook on Multiple Listing Policy (the "Handbook").[9]  The Handbook "is intended to guide member associations of REALTORS® in the operation of multiple listing services consistent with the policies established by the National Association's Board of Directors."[10]  NAR requires local REALTOR® associations to follow and enforce the Handbook.[11]

**ANSWER:**  To the extent that Paragraph 63 purports to characterize, summarize, or quote a

publicly available NAR publication, Hanna Holdings respectfully refers the Court to that

publication, which speaks for itself, for a complete and accurate statement of its contents.  Hanna

Holdings admits that NAR has published model rules for local realtor associations and MLSs.

Hanna Holdings does not have knowledge or information sufficient to form a belief as to the

truth of the remaining allegations in Paragraph 63 and, on that basis, denies the allegations.

64.    NAR rules are enforced by local MLS associations, typically in conjunction with the association of REALTORS®.  Local MLSs with an NAR charter that do not follow NAR rules and policies could have their charter revoked, lose NAR insurance, and have their officers removed.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 64 and, on that basis, denies the allegations.

65.    Membership in NAR provides real estate professionals with a number of benefits, including liability insurance, access to MLSs, training, and more.

---

[9] *See* Governing Documents, NAR, *available at* https://www.nar.realtor/about-nar/governing-documents (last visited Oct. 1, 2025).
[10] *See* NAR, 2025 *Handbook: Multiple Listings Policy* at iii (Jan. 23, 2025), https://www.nar.realtor/sites/default/files/2025-01/PDF-HMLP-2025-Handbook-on-Multiple-Listing-Policy-2025-01-23.pdf.
[11] *See id.* at iii, 8, 35–39.

21

**ANSWER:**  Hanna Holdings admits that membership in NAR may provide real estate professionals insurance and training.  Hanna Holdings denies the remaining allegations in Paragraph 65.

66.     Home sellers and buyers are typically represented by brokers, including those registered with NAR.  According to NAR, in 2020, 89% of sellers sold their home with assistance from a seller-broker, and 88% of buyers purchased their home with assistance from a buyer-agent.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 66 and, on that basis, denies the allegations.

67.     State licensing laws regulate who can represent sellers and buyers in the real estate market.  Two categories of entities may be licensed under state law: (1) the real estate broker (also known as a "brokerage firm"); and (2) the individual real estate licensee or agent.  Real estate brokers are legally responsible for the activities of their licensed agents.

**ANSWER:**  Hanna Holdings admits that state licensing laws, where they exist, may regulate who can represent sellers and buyers in the real estate market.  Hanna Holdings further admits that licenses exist for real estate brokers and individual real estate licensees or agents.  The allegation that real estate brokers are legally responsible for the activities of their licensed agents is a legal conclusion not subject to admission or denial.  To the extent that an answer is deemed necessary, Hanna Holdings admits that real estate brokers are legally responsible for some of the activities of their licensed agents.  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegation that "[t]wo categories of entities may be licensed" and, on that basis, denies the allegation.  The last sentence of Paragraph 67 is not susceptible to being answered because of its ambiguity or vagueness, and Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations and, on that basis, denies the allegations.

68.     Licensed brokers are the only entities permitted by state law to be paid to represent buyers or sellers in a real estate transaction.  For that reason, all contracts for real estate services

22

must be with brokers, not agents, and all payments are made to brokers, not agents. Brokerage firms pay their individual agents. For ease of reference, this Complaint generally refers to brokers and agents interchangeably.

**ANSWER:** Hanna Holdings admits that licensed brokers are permitted by law to be paid to represent buyers or sellers in a real estate transaction. Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations that licensed brokers are "the only entities permitted by state law to be paid to represent buyers or sellers in a real estate transaction" and that "contracts for real estate services must be with brokers, not agents" and, on that basis, denies the allegations. Hanna Holdings otherwise denies the allegations in Paragraph 68.

69. Brokers typically share and find information about houses for sale on an MLS. An MLS is a database of properties listed for sale in a defined region that is accessible to real estate brokers and their individual realtors so long as they comply with the rules of the MLS. MLSs function as joint ventures between real estate brokers to publish and share information about property listings in specified geographic areas.

**ANSWER:** Hanna Holdings does not have knowledge or information sufficient to form a belief as to the "typical" actions or inactions of brokers and, on that basis, denies the allegations in the first sentence of Paragraph 69. Hanna Holdings admits that an MLS is a database of properties listed for sale in a defined region. Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 69 and, on that basis, denies the allegations.

70. MLSs also act as the main sources of listings for online websites, such as Zillow, through which many prospective home buyers find homes. However, the local MLS provides the most up-to-date, accurate, and comprehensive compilation of the area's home listings.

**ANSWER:** Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 70 and, on that basis, denies the allegations.

71. Due to near industry-wide participation and control over important data, brokers offering MLSs possess and exercise power in the markets for the provision of real estate brokerage services to home buyers and sellers throughout the country. If a seller-broker does not list a

23

client's property on an MLS, many buyer-agents will not show that property to prospective buyers.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 71.

72.    NAR controls a substantial number of the MLSs in the United States.  The NAR MLSs are owned and operated by local realtor associations that are members of, and governed by, NAR.  NAR's map of affiliated MLSs reflects NAR's wide reach.

**Figure 1**[12]



**ANSWER:**  The allegations in Paragraph 72 are not susceptible to being answered because of their ambiguity or vagueness.  To the extent it can discern the allegations, Hanna Holdings denies the allegations in Paragraph 72.

### B.    Broker Compensation

73.    The standard practice in the residential real estate industry is to compensate brokers and agents with commissions that are calculated as a percentage of a home's sale price.  Commissions are paid when the home sells.

---

[12] *MLS Map of the National Association of REALTORS®*, NAR, https://www.nar.realtor/mls-map-of-the-national-association-of-realtors (last visited Oct. 1, 2025).

**ANSWER:**  Hanna Holdings denies that there is a "standard practice" in the residential real estate industry for how brokers and agents are compensated.  Hanna Holdings admits that some commissions are paid when a home sells.  Hanna Holdings otherwise denies the allegations in Paragraph 73.

74.  The seller-broker's compensation is specified in a listing agreement, a contract between the seller and the seller-broker that details the terms of the seller-broker services, such as requiring that property be listed on an MLS.  The listing agreement specifies the total commission that a home seller will pay to the seller-broker, often with a portion of that amount earmarked to be paid to the buyer-agent in the event the buyer has a broker.

**ANSWER:**  Hanna Holdings admits that some listing agreements specify the seller-broker's commission.  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations relating to the information stated or specified in every listing agreement and, on that basis, denies the remaining allegations in Paragraph 74.

75.  The buyer-agent is typically compensated with a portion of the total commission paid to the seller-broker, which the buyer-agent receives if her client purchases the seller's home. When a buyer retains a broker, the buyer enters into a contract with that broker, which typically discloses that the buyer-agent will be compensated out of the total commission.

**ANSWER:**  Hanna Holdings admits that some buyer-agents are compensated with a portion of the total commission paid to the seller-broker.  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the disclosures included in contracts between a buyer and their broker to which it is not a party and, on that basis, denies the allegation in Paragraph 75 that the contract "typically discloses that the buyer-agent will be compensated out of the total commission."

76.  The following example illustrates how this process typically worked before August 17, 2024:

- A homeowner enters into a contract with a seller-broker, in which the seller agrees to pay the seller-broker six percent in total commissions in exchange for marketing and facilitating the sale of the home.
- The seller-broker then makes a blanket, unilateral offer of a three percent commission to every buyer-agent when it lists the home on the MLS.

- A buyer-agent shows the property to a buyer client, who buys the home for $500,000.
- The buyer pays the $500,000 purchase price into an escrow account. The escrow company then simultaneously transmits the seller-broker's commission (three percent of the sales price or $15,000) to the seller-broker, the buyer-agent commission (three percent of the sales price or $15,000) to the buyer-agent, and the net amount to the seller.

**ANSWER:** Hanna Holdings denies the allegations in Paragraph 76.

77.    Buyer-agent fees are paid out of the funds from the purchase price of the house—a price the home buyer pays. Even when there is a split commission between the seller and buyer agents, the money paid to the buyer's broker ultimately comes from the buyer and his/her mortgage company. In the words of a real estate brokerage affiliated with Defendant, "The commission would then normally be paid out of the proceeds of the sale."[13] To be sure, "buyers paid compensation to their buyer's agent, but they almost never had to come 'out of pocket.'" Instead, they essentially got to finance that commission over 30 years through their mortgage."[14]

**ANSWER:** To the extent that Paragraph 77 purports to quote from a publicly available website, Hanna Holdings respectfully refers the Court to that public website, which speaks for itself, for a complete and accurate statement of its contents. Hanna Holdings otherwise denies the allegations in Paragraph 77.

78.    But buyer agents, including agents from Defendant, nevertheless often told home buyers that the buyer agent's services are free to the buyer because the fee will be paid by the seller. For instance, Rand Realty, a New York-based Howard Hanna brokerage, published an article on their website explaining "the advantages of working with a buyer's agent."[15] Among those "advantages" was: "your buyer agent usually comes free!"[16] Indeed, according to Howard Hanna | Rand Realty, "[i]t's really one of the best deals in the industry: you get all the services of a buyer agent to represent your own interest, help you find the right home to buy, and facilitate the entire purchasing process, and you don't even have to pay for it."[17]

**ANSWER:** To the extent that Paragraph 78 purports to quote from a publicly available website,

---

[13] James Troia, *Understanding the New Compensation Structure in Real Estate Transactions: An Explainer for Our Clients*, Howard Hanna | Rand Realty (Aug. 15, 2024), https://randrealty.com/2024/08/15/understanding-the-new-compensation-structure-in-real-estate-transactions-an-explainer-for-our-clients.
[14] *Id.*
[15] *The Advantages of Working with a Buyer's Agent*, Howard Hanna | Rand Realty (May 11, 2017), https://randrealty.com/2017/05/11/working-with-a-buyer-agent.
[16] *Id.*
[17] *Id.*

26

Hanna Holdings respectfully refers the Court to that public website, which speaks for itself, for a complete and accurate statement of its contents.  Hanna Holdings otherwise does not have knowledge or information sufficient to form a belief as to the truth of the allegations and, on that basis, denies the allegations.

79.     Cindy Jones, a Howard Hanna agent based in New York, writes on her "About Me" page on Defendant's website that "if you are buying a home, there is no cost to having me represent you as a buyer's agent."[18]  And The May Team, an Ohio-based Defendant-affiliated brokerage, writes on its website that "[a] real estate commission is a fee typically paid by the seller for the services of both the listing agent (also known as the seller's agent) and the agent that represented him (known as the buyer's agent)."[19]

**ANSWER:**  Hanna Holdings admits that The May Team is based in Ohio and that Cindy Jones is a Howard Hanna agent based in New York.  To the extent that Paragraph 79 purports to quote publicly available websites, Hanna Holdings respectfully refers the Court to those public websites, which speak for themselves, for a complete and accurate statement of their contents.  Hanna Holdings otherwise denies the allegations in Paragraph 79.

80.     Buyers therefore did not necessarily realize that the broker commission is added to the purchase price of the home such that buyers are sharing the cost of the commission with the seller.  In fact, home buyers paid a high price for these so-called "free" services in the form of supracompetitive purchase prices and buyer-agent commission rates as well as reduced quality of buyer-agent services.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief as to what all buyers realized and, on that basis, denies the allegations in the first sentence of Paragraph 80.  Hanna Holdings otherwise denies the allegations in Paragraph 80.

81.     Defendant later came to realize that its prior conduct was problematic.  In explaining the "problems" with the system described above, a real estate brokerage affiliated with Hanna explained that the Buyer-Broker Commission Rule meant that "sellers didn't have a choice.  They had to offer something.  Conversely, buyers had limited choices as well, because they never had a direct opportunity to negotiate the commission for their buyer's

---

[18] Cindy Jones, *Buying and Selling Real Estate Has Never Been Easier*, Howard Hanna Real Estate Services, https://www.howardhanna.com/Agent/Content/10107640/about_me (last visited Oct. 1, 2025).

[19] Understanding Real Estate Commissions, Howard Hanna | The May Team (Aug. 30, 2018), https://www.themayteamsold.com/blog/2020/10/14/understanding-real-estate-commissions.

agent."[20]  Moreover, buyers "misunderstood that all those services were free, since they didn't have to pay 'out-of-pocket' for them.  But they still paid for those services."[21]

**ANSWER:**  To the extent that Paragraph 81 purports to quote from a publicly available website, Hanna Holdings respectfully refers the Court to that public website, which speaks for itself, for a complete and accurate statement of its contents.  Hanna Holdings otherwise denies the allegations in Paragraph 81.

82.    But buyers misunderstood this because Defendant and its coconspirators created the misunderstanding in the first place by misrepresenting the facts regarding who paid the buyer agent commission.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 82.

83.    This was obscured further by NAR's Code of Ethics, which permitted and encouraged buyer-agents to tell their clients that their services were free.  From January 1997 to January 2022, the NAR Code of Ethics said that "REALTORS® may represent their services as 'free' or without cost even if they expect to receive compensation from a source other than their client, provided that the potential for the REALTOR® to obtain a benefit by a third-party is clearly disclosed at the same time."

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 83.

84.    Because buyer agents were widely misleading their buyer clients throughout most of the relevant period, the former NAR Standard of Practice 12-2 was repealed and the NAR Code of Ethics as of January 2022 says, "REALTORS® must not represent that their brokerage services to a client or customer are free or available at no cost to their clients, unless the REALTOR® will receive no financial compensation from any source for those services."

**ANSWER:**  Hanna Holdings admits that, as of January 2022, NAR Standard of Practice 12-2 was repealed and that the NAR Code of Ethics stated: "REALTORS® must not represent that their brokerage services to a client or customer are free or available at no cost to their clients, unless the REALTOR® will receive no financial compensation from any source for those services."  Hanna Holdings otherwise denies the allegations in Paragraph 84.

---

[20] James Troia, *Understanding the New Compensation Structure in Real Estate Transactions: An Explainer for Our Clients*, Howard Hanna | Rand Realty (Aug. 15, 2024), https://randrealty.com/2024/08/15/understanding-the-new-compensation-structure-in-real-estate-transactions-an-explainer-for-our-clients.
[21] *Id.*

C.     The Real Estate Industry Has Fixed or Artificially Inflated Broker Compensation for Over a Century

85.     NAR's Code of Ethics in 1914 encouraged REALTORS® to maintain local industry commission rates.[22]

**ANSWER:**  To the extent that Paragraph 85 purports to characterize or summarize a public

website, Hanna Holdings respectfully refers the Court to that public website, which speaks for

itself, for a complete and accurate statement of its contents.  Hanna Holdings does not have

knowledge or information sufficient to form a belief as to the truth of the allegations in

Paragraph 85 and, on that basis, denies the allegations.

86.     NAR's Code of Ethics in 1924 encouraged REALTORS® to set commission rates according to those suggested by local REALTOR® associations.[23]

**ANSWER:**  To the extent that Paragraph 86 purports to characterize or summarize a public

website, Hanna Holdings respectfully refers the Court to that public website, which speaks for

itself, for a complete and accurate statement of its contents.  Hanna Holdings does not have

knowledge or information sufficient to form a belief as to the truth of the allegations in

Paragraph 86 and, on that basis, denies the allegations.

87.     In 1950, the Supreme Court found a local REALTOR® board violated the Sherman Act by setting nonmandatory standard commissions based on a schedule of fees.  *See United States v. Nat'l Assoc. Real Estate Boards*, 339 U.S. 485 (1950).

**ANSWER:**  To the extent that Paragraph 87 purports to characterize or summarize a public court

filing, Hanna Holdings respectfully refers the Court to that public court filing, which speaks for

itself, for a complete and accurate statement of its contents.  Hanna Holdings otherwise does not

---

[22] *See* Nat'l Assoc. of Real Estate Exchanges, *Ethics of the Real Estate Profession* art. 9 (1914), https://www.nar.realtor/sites/default/files/documents/COE1914.pdf ("If the commission which it is usual to charge in the locality in which the broker is operating, is a fair one to the owner and broker alike, each broker owes it to himself, to his other clients as well as to his fellow brokers, to maintain the rate.").

[23] *See* Nat'l Assoc. of Real Estate Bds., *Code of Ethics* art. 9 (June 6, 1924), https://www.nar.realtor/about-nar/history/1924-code-of-ethics ("The schedules of fees established by the various real estate boards are believed to represent fair compensation for services rendered in their communities and should be observed by every Realtor.").

have knowledge or information sufficient to form a belief as to the truth of the allegations in

Paragraph 87 and, on that basis, denies the allegations.

88.    By the 1950s, a 5% "commission rate was quite uniform across the U.S.," and began to increase to 6% in 1958 throughout the country.[24]

**ANSWER:**  To the extent that Paragraph 88 purports to characterize or summarize a publicly

available FTC report, Hanna Holdings respectfully refers the Court to that report, which speaks

for itself, for a complete and accurate statement of its contents.  Hanna Holdings does not have

knowledge or information sufficient to form a belief as to the truth of the allegations in

Paragraph 88 and, on that basis, denies the allegations.

89.    Soon after the Supreme Court's decision in *Nat'l Assoc. Real Estate Boards*, local REALTOR® boards and MLSs began "recommending" or "suggesting" commission rates, including efforts by REALTORS® in California and Maryland to set commissions at 6% or above.[25]  NAR ultimately abolished use of recommended fees in 1971 after objections and lawsuits by the U.S. Department of Justice.[26]

**ANSWER:**  To the extent that Paragraph 89 purports to characterize or summarize a publicly

available report published by the U.S. Government Accountability Office, Hanna Holdings

respectfully refers the Court to that report, which speaks for itself, for a complete and accurate

statement of its contents.  Hanna Holdings otherwise does not have knowledge or information

sufficient to form a belief as to the truth of the allegations in Paragraph 89 and, on that basis,

denies the allegations.

90.    Since the 1980s, real estate agents have generally been charging 5–6% commission for one

---

[24] *See* FTC, *The Residential Real Estate Brokerage Industry* 196 (Dec. 1983),
https://www.ftc.gov/system/files/ftc_gov/pdf/The-Residential-Real-Estate-Brokerage-Report--Butters-Report.pdf.
[25] *See id.* at 197–99; U.S. Gov't Accountability Off., Real Estate Brokerage: Factors That May Affect Price
Competition, at 12–13 (GAO-05-947) (Aug. 2005) https://www.gao.gov/assets/gao-05-947.pdf.
[26] *Id.*

residential transaction.[27]

**ANSWER:** Hanna Holdings denies the allegations in Paragraph 90.

### D. The Culture of Cooperation

91. NAR created a culture of cooperation among competing real estate agents, including the payment of cooperative commissions, that would disappear if NAR died.

**ANSWER:** Hanna Holdings denies the allegations in Paragraph 91 to the extent that the

allegations relate to Hanna Holdings. To the extent that the allegations relate to other entities,

Hanna Holdings does not have knowledge or information sufficient to form a belief as to the

truth of the allegations and, on that basis, denies the allegations.

92. According to NAR, broker cooperation sets the United States real estate industry apart from the rest of the world.

**ANSWER:** Hanna Holdings does not have knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 92 and, on that basis, denies the allegations.

93. According to NAR publications in 2014 and 2016, the dual tradition of competition and cooperation in the real estate profession presents frequent opportunities for antitrust misconduct.[28]

**ANSWER:** To the extent that Paragraph 93 purports to characterize or summarize NAR

publications, Hanna Holdings respectfully refers the Court to those publications, which speak for

themselves, for a complete and accurate statement of their contents. Hanna Holdings otherwise

---

[27] *See id.* at 9 ("Although comprehensive data on brokerage fees are lacking, past analyses and anecdotal information from industry analysts and participants indicate that, historically, commission rates have remained relatively uniform across markets and over time. Various studies using data from the late 1970s through the mid-1980s found evidence that the majority of listings in many communities clustered around the same rate, exactly 6 percent or 7 percent.… Many of the industry analysts and participants we interviewed said that commissions still cluster around a common rate within most markets, and they generally cited rates of 5 percent to 6 percent as typical now.").

[28] *See* NAR, *Antitrust Compliance Guide for REALTORS®* 5–6 (2014), https://www.gmar.com/data/resources_files/126-1093%20Anti-Trust.pdf (noting the dual tradition of competition and cooperation "presents opportunities for antitrust suspicion and occasionally misconduct almost on a daily basis"); NAR, *Real Estate Brokerage Essentials* app. 2, at 2 (2016), https://www.sacrealtor.org/documents/pro_standards/2018_training/Appendix%202%20Antitrust%20and%20the%20 Real%20Estate%20Brokerage%20Firm.pdf (stating, "This dual tradition of competition and cooperation, which exists in few other professions, presents frequent opportunities for antitrust misconduct. . . .").

does not have knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 93 and, on that basis, denies the allegations.

94.    The U.S. Department of Justice and the Federal Trade Commission have noted: "Under the MLS system, listing brokers rely on cooperating brokers to procure a buyer in the majority of transactions."[29]

**ANSWER:**  To the extent that Paragraph 94 purports to quote from a public report from the U.S.

Department of Justice and the Federal Trade Commission, Hanna Holdings respectfully refers

the Court to that report, which speaks for itself, for a complete and accurate statement of its

contents.  Hanna Holdings does not have knowledge or information sufficient to form a belief as

to how all listing brokers procure a buyer in "the majority" of transactions and, on that basis,

denies the allegation.

95.    The U.S. Department of Justice and the Federal Trade Commission have further noted: "The cooperation between brokers characterizing many real estate transactions clearly provides incentives for adhering to the 'going rate' commission.  A brokerage firm that solicits listings by offering lower commissions may find itself disadvantaged since agents from other firms may prefer to concentrate their efforts where higher commissions are available."[30]

**ANSWER:**  To the extent that Paragraph 95 purports to quote from a public report from the U.S.

Department of Justice and the Federal Trade Commission, Hanna Holdings respectfully refers

the Court to that report, which speaks for itself, for a complete and accurate statement of its

contents.  The allegations in Paragraph 95 are otherwise not susceptible to being answered

because of their ambiguity or vagueness, and Hanna Holdings does not have knowledge or

information sufficient to form a belief as to the truth of the allegations and, on that basis, denies

the allegations.

96.    The United States Government Accountability Office concluded in 2005 that: "One

---

[29] *See* U.S. Dep't of Justice and FTC, *Competition in the Real Estate Brokerage Industry* 67 (Apr. 2007), https://www.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf.
[30] *Id.*

potential cause of the industry's apparent lack of price variation is the use of multiple listing services (MLS), which facilitates cooperation among brokers in a way that can benefit consumers but may also discourage participating brokers from deviating from conventional commission rates.  For instance, an MLS listing gives brokers information on the commission that will be paid to the broker who brings the buyer to that property.  This practice potentially creates a disincentive for home sellers or their brokers to offer less than the prevailing rate, since buyers' brokers may show high-commission properties first."[31]

**ANSWER:**  To the extent that Paragraph 96 purports to quote from a public report from the

United States Government Accountability Office, Hanna Holdings respectfully refers the Court

to that report, which speaks for itself, for a complete and accurate statement of its contents.

Hanna Holdings admits that, in 2005, an MLS listing could give brokers information on the

commission that will be paid to a buyer-broker.  The allegations in Paragraph 96 are otherwise

not susceptible to being answered because of their ambiguity or vagueness, and Hanna Holdings

does not have knowledge or information sufficient to form a belief as to the truth of the

allegations and, on that basis, denies the allegations.

97.     The United States Government Accountability Office concluded in 2005 that: "When choosing among comparable homes for sale, brokers have a greater incentive—all else being equal—to first show prospective buyers homes that offer other brokers the prevailing commission rate than homes that offer a lower rate.  Therefore, even without formal policies to maintain uniform rates, individual brokers' reliance on the cooperation of other brokers to bring buyers to listed properties may help maintain a standard commission rate within a local area, at least for buyers' brokers."[32]

**ANSWER:**  To the extent that Paragraph 97 purports to quote from a public report from the

United States Government Accountability Office, Hanna Holdings respectfully refers the Court

to that report, which speaks for itself, for a complete and accurate statement of its contents.  The

allegations in Paragraph 97 are otherwise not susceptible to being answered because of their

ambiguity or vagueness, and Hanna Holdings does not have knowledge or information sufficient

---

[31] *See* U.S. Gov't Accountability Off., *Real Estate Brokerage: Factors That May Affect Price Competition, supra* note 25, at "What GAO Found".
[32] *Id.* at 3.

to form a belief as to the truth of the allegations and, on that basis, denies the allegations.

98.    In 2017, NAR and many competing real estate brokerages (including Realogy, Howard Hanna Real Estate, and HomeServices of America) participated in a study called "MLS 2020 Agenda: Redesigning a New MLS Industry," designed "to determine the most significant and important issues that the MLS industry should focus on over the next few years."[33]

**ANSWER:**  Hanna Holdings admits that it provided information for a report titled "MLS 2020 Agenda: Redesigning a New MLS Industry."  Hanna Holdings does not have knowledge or information sufficient to form a belief as to whether Realogy or HomeServices of America participated in "MLS 2020 Agenda: Redesigning a New MLS Industry."  The remainder of Paragraph 98 purports to quote from a publicly available document, and Hanna Holdings respectfully refers the Court to that document, which speaks for itself, for a complete and accurate statement of its contents.  Hanna Holdings denies the remainder of the allegations in Paragraph 98.

99.    As part of the MLS 2020 Agenda, Art Carter (CEO of California Regional Multiple Listing Service, Inc.) stated, "The only solution for the real estate business—organized real estate, the brokerage community and MLSs—is to all get on the same page and move in the same direction."[34]

**ANSWER:**  To the extent that Paragraph 99 purports to quote from a publicly available document, Hanna Holdings respectfully refers the Court to that document, which speaks for itself, for a complete and accurate statement of its contents.  The allegations in Paragraph 99 are otherwise not susceptible to being answered because of their ambiguity or vagueness, and Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations and, on that basis, denies the allegations.

100.    Howard Hanna Real Estate's "proposed solution" in the MLS 2020 Agenda noted that "[t]he data provided by the MLS today isn't truly reflective of the market since it's only

---

[33] *See* MLS Round Table, *MLS 2020 Agenda* i, https://www.mlsroundtable.com/wp-content/uploads/2021/01/MLS2020-Agenda.pdf.
[34] *Id.* at 13.

the properties sold in the MLS causing agents to not be equipped with full data to do a CMA.  In the outside world, however, consumers are getting access to all kinds of additional data and often more comprehensive data."[35]

**ANSWER:**  To the extent that Paragraph 100 purports to quote from a publicly available document, Hanna Holdings respectfully refers the Court to that document, which speaks for itself, for a complete and accurate statement of its contents.  The allegations in Paragraph 100 are otherwise not susceptible to being answered because of their ambiguity or vagueness, and Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations and, on that basis, denies the allegations.

### E.      Subagency

101.    Under NAR model rules for MLSs in place before 1996, listing brokers would offer to share commissions with buyer's brokers to serve as the listing broker's subagent, meaning that buyer's brokers owed a fiduciary duty only to the seller.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 101 and, on that basis, denies the allegations.

102.    As one academic noted:

For most of the last century, the legal relationships between brokers and their clients were simple: Listing brokers represented sellers, and agents who worked with buyers did so as "subagents" of the listing broker.  All of the agents involved in a transaction owed their allegiance to the seller, and buyers were unrepresented.…

The concept of subagency helped the National Association of Realtors, and its state and local Realtor associations, establish the multiple listing service as the dominant method of marketing properties, limiting the legal liability of their members, and shielding Realtor associations and MLSs from antitrust claims.[36]

**ANSWER:**  The allegations in the first and second sentences of Paragraph 102 are not susceptible to being answered because of their ambiguity or vagueness, and Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the

---

[35] *Id.* at 17.
[36] *See* MLS Round Table, *MLS 2020 Agenda* i, https://www.mlsroundtable.com/wp-content/uploads/2021/01/MLS2020-Agenda.pdf.

allegations and, on that basis, denies them.  Hanna Holdings denies the allegations in the third

sentence of Paragraph 102.

103.    Home buyers eventually started to learn that they lacked any representation in house transactions.  In response to confusion and complaints, 44 states passed mandatory disclosure laws requiring home buyers to be adequately informed about subagency.  This caused NAR to analyze the subagency issue beginning in July 1991.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 103 and, on that basis, denies the allegations.

104.    "Subagency had worked so well, and for so long, that the brokerage industry's first response to the new threat was to defend the practice.  The legal liability associated with subagency represented a threat to mandatory cooperation between brokers and the MLS itself.  For years, MLSs had successfully argued that they could require members to be Realtors, because only brokers who had pledged to follow the Realtor code of ethics could be entrusted with automatic offers of compensation as subagents of the listing broker."[37]

**ANSWER:**  The allegations in Paragraph 104 are not susceptible to being answered because of

their ambiguity or vagueness, and Hanna Holdings does not have knowledge or information

sufficient to form a belief as to the truth of the allegations and, on that basis, denies the

allegations.

105.    In July 1992, NAR and its members abandoned the subagency rule and instead adopted the unilateral offer of cooperation and compensation in its place, requiring the listing agent to make an offer of compensation to the buyer's agent.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 105 and, on that basis, denies the allegations.

**VI.    DEFENDANT AND ITS COCONSPIRATORS POSSESS MARKET POWER IN THE MARKET FOR THE PROVISION OF BUYER-AGENT SERVICES**

106.    The relevant service market for the claims asserted herein is the market for buyer-agent services.  The relevant geographic markets for the claims asserted herein are the geographic areas in which NAR MLSs operate.  This market comprises the bundle of services provided to home buyers by residential real estate brokers with access to the

[37] *See* Matt Carter, "From Subagency to Non-Agency: A History," *Inman* (Feb. 17, 2012), https://www.inman.com/2012/02/17/from-subagency-non-agency-a-history.

36

NAR MLSs. Defendant's and its coconspirators' control of the NAR MLSs gave them the ability to impose the Buyer-Agent Commission Rule and other anticompetitive NAR rules on class members and other market participants. Access to NAR MLSs is critical for brokers to compete and to assist home buyers where those MLSs operate.

**ANSWER:** Hanna Holdings denies the allegations in Paragraph 106 that relate to Hanna Holdings. As to the allegations that relate to other entities, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 106 and, on that basis, denies the allegations. Hanna Holdings denies the remaining allegations in Paragraph 106.

107.    Upon information and belief, NAR and Defendant, through their coconspirator franchisees and other conspiring brokers where the NAR MLSs operate, collectively provide the majority of the residential real estate broker services in these areas.

**ANSWER:** Hanna Holdings denies the allegations in Paragraph 107 that relate to Hanna Holdings. As to the allegations that relate to other entities, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 107 and, on that basis, denies the allegations.

108.    Defendant and its coconspirators collectively have market power in each relevant market through their control of the local MLS and their dominant share of the local market.

**ANSWER:** Hanna Holdings denies the allegations in Paragraph 108 that relate to Hanna Holdings. As to the allegations that relate to other entities, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 108 and, on that basis, denies the allegations.

109.    Any buyer-agents in the areas in which the NAR MLSs operate who wished to compete outside of the conspiracy would face insurmountable barriers. Defendant's control of the NAR MLSs through itself and its coconspirators means that non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring brokers, or alternatively, attempt to compete without access to a listing service. A seller-broker who represented a seller without using a listing service would lose access to the large majority of potential buyers, and a buyer-agent who represented a buyer without using a listing service would lose access to the large majority of sellers. Brokers cannot compete effectively without access to a listing service. Having access to an MLS is a

37

virtual necessity for a real estate agent's job, for both seller's agents and buyer's agents.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 109 that relate to Hanna Holdings.  As to the allegations that relate to other entities, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 109 and, on that basis, denies the allegations.  Hanna Holdings denies the remaining allegations in Paragraph 109.

110.   For an alternative listing service to compete effectively with one of the NAR MLSs, the alternative would require listings as comprehensive as the NAR MLS.  Brokers and their individual realtors who were profiting from inflated buyer-agent commissions had minimal incentives to participate in an alternative listing service that would generate lower buyer-agent commissions and lower total commissions.  Further, many buyers would be very reluctant to retain a buyer-agent operating on an alternative listing service that required them to pay the buyer-agent commission when other buyer-agents operating on the NAR MLSs represented that they were entirely compensated by home sellers. Accordingly, seller-brokers on an alternative listing service would struggle to attract buyer-agents and their buyer clients.  And buyer-agents would be reluctant to use a listing service with limited properties.  Accordingly, a listing service attempting to compete with any of the NAR MLSs would likely fail to attract enough property listings to operate profitably and act as a competitive constraint on the incumbent MLSs.  The absence of listing services that effectively compete with the NAR MLSs (or other MLSs) reflects substantial barriers to entry.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 110.

111.   NAR also advises MLSs that non-compete agreements are a "critical component" of any agreement between MLSs and third-party websites, such as Zillow, that may wish to access the MLSs data.  NAR's checklist of "critical components" states that any non-compete should include provisions that the third-party website "must agree they will not compete with the brokerage firms or MLS by either becoming a licensed brokerage firm or by providing offers of cooperation and compensation."  Further, NAR advises that the non-compete agreement should require the third-party website to agree not to "use the data in a manner that is similar to a Multiple Listing Service."  Thus, NAR, in furtherance of the conspiracy, has advised MLSs to take affirmative steps to prevent third-party websites from becoming competitors.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 111 and, on that basis, denies the allegations.

38

## VII.   THE ANTICOMPETITIVE AGREEMENTS

112.   NAR's Handbook, Code of Ethics, and Standards of Practice, among other policies, impose rules, policies, and practices on all NAR members, including NAR MLSs.  Certain of these rules, practices, and policies significantly restrain competition for the provision of buyer-agent services and harm home buyers across the United States.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 112.

113.   Compliance with NAR's rules is mandatory for NAR membership.  NAR's Code of Ethics states that "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 113.

114.   Additionally, NAR's Handbook on Multiple Listing Policy provides that "Association and Association-owned MLSs must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program."

**ANSWER:**  Hanna Holdings admits that the quoted language in Paragraph 114 appears in the NAR Handbook on Multiple Listing Policy.  Hanna Holdings otherwise denies the allegations in Paragraph 114.

115.   NAR's rules and policies included until recently: (i) the Buyer-Agent Commission Rule; (ii) a prohibition on disclosing to buyers the total commissions paid to brokers upon the sale of a house ("Concealment Rule"); (iii) rules permitting and encouraging buyer-agents to represent to home buyers that their services are free ("Free-Service Rule"); (iv) rules allowing and making it easy for buyer-agents to filter MLS listings to only those with high commissions ("Filter Rules"); and (v) rules restricting sellers and seller-brokers' ability to modify the commissions offered to buyer-agents after an offer to purchase the listed home has been made ("Commission Modification Rules.").

**ANSWER:**  The allegations in Paragraph 115 are not susceptible to being answered because of their ambiguity or vagueness.  To the extent that it can discern the allegations, Hanna Holdings denies the allegations in Paragraph 115.

116.   These NAR Rules constitute an agreement among competitors: NAR members can participate in the MLS, and gain the benefits provided by NAR and the NAR MLS, as long as they agree to adhere to and enforce the anticompetitive restraints set forth in NAR's

39

rules, practices, and policies.  Thus, NAR's rules, and their adoption and enforcement by NAR MLSs that are in turn operated by a consortium of competing brokers, reflected concerted action between horizontal competitors and constituted agreements among competing real estate brokers that reduced price competition among brokers, encouraged overuse of buyer-brokers, and led to higher prices and lower quality service for American home buyers.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 116.

### A.    The Buyer-Agent Commission Rule

117.    Per NAR's mandatory rules, in place since at least the 1990s under the unilateral offer of cooperation and compensation principle in the real estate industry for all houses listed on the MLS, there was a requirement that the seller's agent makes a unilateral offer of compensation or offers commission or compensation to the buyer's agent to be paid from the sale proceeds expressed either as a percentage of the gross selling price or a definite dollar amount.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 117.

118.    In 1996, the Handbook set forth the Buyer-Agent Commission Rule as follows: "In filing a property with the Multiple Listing Service of a Board of Realtors® the Participant makes a blanket unilateral offer of cooperation to the other MLS Participants, and shall therefore specify on each listing filed with the Service the compensation being offered by the listing broker to the other MLS Participants."

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 118 and, on that basis, denies the allegations.

119.    In 1996, the Handbook further stated that "multiple listing services shall not publish listings that do not include an offer of compensation *expressed as a percentage of the gross selling price or as a definite dollar amount*, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 119 and, on that basis, denies the allegations.

120.    From November 2004 to at least 2023, NAR rules stated: "In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants."

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief

40

as to the truth of the allegations in Paragraph 120 and, on that basis, denies the allegations.

121.    From November 1996 to at least 2023, NAR rules stated: "Multiple listing services shall not publish listings that do not include an offer of compensation *expressed as a percentage of the gross selling price or as a definite dollar amount*, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."  This practice is virtually universally adopted.

**ANSWER:**  Hanna Holdings admits that the language quoted in the first sentence of Paragraph

121 appeared in prior versions of NAR's Handbook on Multiple Listing Policy.  Hanna Holdings

otherwise denies the allegations in the first sentence of Paragraph 121.  Hanna Holdings denies

the allegations in the second sentence of Paragraph 121.

122.    The NAR Code of Ethics said in part: "In cooperative transactions, REALTORS® shall compensate cooperating REALTORS® (principal brokers) …."[38]

**ANSWER:**  The allegations in Paragraph 122 purport to quote from a publicly available NAR

publication.  Hanna Holdings refers the Court to that publication, which speaks for itself, for a

complete and accurate statement of its contents.  The allegations in Paragraph 122 are otherwise

not susceptible to being answered because of their ambiguity or vagueness, and Hanna Holdings

denies the allegations on that basis.

123.    Article 3 of the NAR Code of Ethics said that REALTORS® shall cooperate with other brokers, except when cooperation is not in their client's interest.  NAR has said that Rule 8.0 is consistent with Article 3 of the NAR Code of Ethics—by joining the MLS in which participants agree to be bound by MLS rules, the MLS participant has already concluded that cooperation with other MLS participants is in the client's interest.

**ANSWER:**  The allegation in the first sentence of Paragraph 123 is not susceptible to being

answered because of its ambiguity or vagueness.  Hanna Holdings does not have knowledge or

information sufficient to form a belief as to the truth of the allegations in the second sentence of

---

[38] *See* NAR, *Code of Ethics and Standards of Practice of NAR* sect. 16-15 (2023), https://www.maar.org/clientuploads/about/documents/nar-code-of-ethics.pdf; NAR, *Code of Ethics and Standards of Practice of NAR* sect. 16-15 (2022), https://www.pmc-pa.com/wp-content/uploads/2022/01/NAR-2022CodeofEthics.pdf; NAR, *Code of Ethics and Standards of Practice of NAR* sect. 16-15 (2014), https://www.nar.realtor/sites/default/files/documents/COE2014.pdf.

Paragraph 123 and, on that basis, denies the allegations.

124.    The NAR Buyer-Agent Commission Rule is an anticompetitive agreement in itself and constitutes both a vertical conspiracy between Defendant and NAR and a horizontal conspiracy among Defendant, NAR, and Defendant's coconspirator brokerages.  But that is just latest anticompetitive agreement.

**ANSWER:**  The allegations in Paragraph 124 are legal conclusions not subject to admission or denial.  To the extent that an answer is deemed necessary, Hanna Holdings denies the allegations in Paragraph 124.

125.    A horizontal agreement between Defendant and other coconspirator real estate brokerages also existed prior to NAR's codification of the Buyer-Agent Commission Rule.  As noted above, real estate agents first agreed among themselves to set and abide by mandatory commission schedules; when that proved untenable, NAR's membership of competing brokers required unilateral offer of cooperation and compensation to subagents working with homebuyers even though they owed fiduciary duties to the selling agent.  When that eventually proved untenable, NAR's membership of competing brokers proposed, enacted, abided by, and enforced the Buyer-Agent Commission Rule to codify the overuse of buyer's agents by ensuring that funds would be earmarked for buyer brokers from every transaction regardless of whether a buyer wanted a broker or could negotiate a lower rate.

**ANSWER:**  The allegation in the first sentence of Paragraph 125 is a legal conclusion not subject to admission or denial.  To the extent an answer is deemed necessary, Hanna Holdings denies the allegations in the first sentence of Paragraph 125.  Hanna Holdings denies the allegations in the second and third sentences of Paragraph 125 as they relate to Hanna Holdings.  As to the allegations that relate to other entities, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in the second and third sentences of Paragraph 125 and, on that basis, denies the allegations.

### 1.    The Clear Cooperation Policy was Enacted to Bolster the Buyer-Agent Commission Rule.

126.    To force as many home listings as possible onto the MLS in the face of competitive threats from companies like Zillow and to thus trigger the Buyer-Agent Commission Rule, NAR—with help from the coconspirators—passed the Clear Cooperation Policy in November 2019.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 126 as they relate to Hanna

Holdings.  As to the allegations that relate to other entities, Hanna Holdings does not have

knowledge or information sufficient to form a belief as to the truth of the allegations in

Paragraph 126 and, on that basis, denies the allegations.

127.    NAR Rule 8.0 (a/k/a the "Clear Cooperation Policy" or "Off-MLS listing rule") says, "Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants."[39]

**ANSWER:**  The allegations in Paragraph 127 purport to quote from a publicly available NAR

publication.  Hanna Holdings refers the Court to that publication, which speaks for itself, for a

complete and accurate statement of its contents.  Hanna Holdings otherwise denies the

allegations in Paragraph 127.

128.    The NAR Handbook also addresses NAR Rule 8.0, stating "Within one business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with the other participants."

**ANSWER:**  Hanna Holdings admits that the quoted language in Paragraph 128 appears in the

NAR Handbook on Multiple Listing Policy.  Hanna Holdings otherwise denies the allegations in

Paragraph 128.

129.    Because all Defendant agents and brokers belong to an MLS, they are required to list their properties within one business day of marketing the property.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 129.

130.    Local MLSs sometimes have their own NAR Rule 8.0 mirroring the NAR's similar rule that real estate agents are obligated to follow.

**ANSWER:**  The allegations in Paragraph 130 are not susceptible to being answered because of

their ambiguity or vagueness.  To the extent that it can discern the allegations, Hanna Holdings

---

[39] *See* NAR, *2022 Handbook: Multiple Listing Policy* 32 (Mar. 10, 2022), https://web.archive.org/web/20220530111628/https://cdn.nar.realtor/sites/default/files/documents/mls-handbook-2022-03-10.pdf ("Clear Cooperation (Policy Statement 8.0)").

does not have knowledge or information sufficient to form a belief as to the truth of the

allegations and, on those bases, denies the allegations.

### 2.    The Buyer-Agent Commission Rule Harmed Home Buyers.

131.    Without the unilateral offer of compensation, home prices would likely go down.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 131.

132.    As a result of the Buyer-Agent Commission Rule and its predecessor, seller-brokers have been required to make "blanket unilateral unconditional offers of compensation to their adversarial buyer-agents."  These blanket offers relieve buyer-agents of the need to compete on things like price and quality of services.  Thus, the Buyer-Agent Commission Rule reduced competition in the market for buyer-agent services and harms home buyers in a number of ways.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 132.

133.    First, through the Buyer-Agent Commission Rule and its predecessor, Defendant and its coconspirators acted to sustain high commission rates for broker services.  This commission rate was then baked into the price of the house, artificially raising home prices.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 133.

134.    The Consumer Federation of America has explained, "[t]ypically, on either a 5% or 6% commission, 3% will be offered to brokers with buyer clients, and that commission split is disclosed to brokers on real estate firm and multiple listing service databases."  The listing of the 3% split "then acts as a powerful force to discourage lower splits of 2% or even 1% because listing brokers, and their sellers, fear that properties carrying these lower splits will not be shown.  As a result, 'a listing broker lists a split below' the standard industry level 'at their, and their clients', peril because of the risk that traditional brokers working with buyers will avoid this property. . . . This informal discrimination against price competitors is the most important factor that allows dominant brokers to maintain high and uniform prices."  As coconspirator Keller Williams acknowledged in its instructions to seller-brokers regarding what to tell home sellers: "[y]ou're putting yourself at a disadvantage competitively when you reduce your commission."

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief

as to whether the language quoted in the last sentence of Paragraph 134 is properly attributed to

Keller Williams and, on that basis, denies the allegations in the last sentence of Paragraph 134.

Hanna Holdings also does not have knowledge or information sufficient to form a belief as to

whether the remainder of the language quoted in Paragraph 134 is properly attributed to the Consumer Federation of America and, on that basis, denies the allegations. Hanna Holdings otherwise denies the allegations in Paragraph 134.

135.    Additionally, because NAR and its members agreed amongst themselves to require blanket, unilateral, unconditional commissions, brokers did not need to compete with respect to the quality of services in order to obtain higher commissions. For example, novice brokers who had just received their licenses can charge the same prices as highly skilled, long-practicing brokers. Similarly, to the extent a broker commission is calculated as a "percentage of the gross selling price," a buyer-agent who facilitates the purchase of an $800,000 home will receive potentially two times as much as a buyer-agent who facilitates the purchase of a $400,000 home, regardless of whether the higher compensation is commensurate with the amount and type of services provided.

**ANSWER:**  Hanna Holdings denies the allegations in the first sentence of Paragraph 135 to the extent that they relate to Hanna Holdings. As to the allegations that relate to other entities, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 135, and on that basis, denies the allegations. Hanna Holdings otherwise denies the allegations in Paragraph 135.

136.    This Rule was an unlawful agreement among Defendant, NAR, and Defendant's coconspirators to encourage the overuse and overcompensation of buyer-brokers. Absent this agreement among competitors, Defendant and its coconspirators would have been economically self-motivated to compete based on price and services with the actual consumer of their service—homebuyers.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 136.

137.    Indeed, the Consumer Federation has called brokers "a price-setting cartel." As the Federation explained, "[i]n a rational pricing system, home sellers and buyers would each pay for real estate brokerage services they receive." But, "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform [] commissions would quickly disappear."

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief as to whether the language quoted in the first sentence of Paragraph 137 is properly attributed to the Consumer Federation of America and, on that basis, denies that allegation. Hanna Holdings admits that the Consumer Federation of America stated that "in a rational pricing system, home

45

sellers and buyers would each pay for real estate brokerage services they receive" and that "if sellers and buyers each separately negotiated compensation with their brokers, uniform [] commissions would quickly disappear," but Hanna Holdings denies the accuracy of both statements. Hanna Holdings otherwise denies the allegations in Paragraph 137.

138. In March 2012, a broker/owner from REALPRO Associates who was a member of the NAR Professional Standards Committee notified NAR that the unilateral offer of compensation was the ultimate form of a trade restraint and violated the Sherman Act, stating: "The Sherman Antitrust Law is very clear about price fixing. We all understand that we cannot set fees, other than our own, and that there can be no standardization, express or implied, regarding fees of any nature. My contention is that the traditional method of compensation of a Seller and a Broker 'setting' compensation to be paid to a cooperating agent's company/firm is the ultimate form of restraint of trade, and indeed, represents price fixing in a free market."

**ANSWER:** Hanna Holdings does not have knowledge or information sufficient to form a belief as to whether the language quoted in Paragraph 138 is properly attributed to a "broker/owner from REALPRO Associates who was a member of the NAR Professional Standards Committee" or as to whether this individual "notified NAR that the unilateral offer of compensation was the ultimate form of a trade restrained and violated the Sherman Act" and, on that basis denies the allegations. Hanna Holdings otherwise denies the allegations in Paragraph 138.

139. Second, while doing so is contrary to the fiduciary duties they owe to buyers, buyer-agents often "steer[ed] home buyers to residential properties that offered higher commissions. Steering of home buyers to high commission homes reinforced high commission rates. It also reduced the quality of buyer-agent services by incentivizing buyer-agents to limit the homes they showed prospective buyers to those that offered high commissions. Home buyers were therefore both more likely to pay a higher price for their (since the buyer-agent commission is baked into the sale price), and less likely to be matched with the optimal home—the exact task the buyer-agent is paid to do.

**ANSWER:** Hanna Holdings denies the allegations in Paragraph 139.

140. Fear of having buyers steered away from a property was also a strong deterrent to sellers who would otherwise offer lower buyer-agent commissions, which further contributed to higher prices for buyer-agent services.

**ANSWER:** Hanna Holdings denies the allegations in Paragraph 140.

141.    The prevalence of such steering has been widely reported in government reports, economic research, and the trade press.

**ANSWER:**  The allegations in Paragraph 141 are not susceptible to being answered because of their ambiguity or vagueness.  To the extent it can discern the allegations, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations and, on those bases, denies the allegations.

142.    Defendant and its coconspirators enabled steering by agreeing amongst themselves to impose rules mandating that blanket commission offers be made available to every buyer-agent using the MLS.  NAR's requirement that offers of compensation be expressed in specific dollar or percentage terms enabled buyer-agents to easily compare the financial compensation offered to them by home sellers and steer their clients to higher commission homes.

**ANSWER:**  Hanna Holdings denies the allegations in the first sentence of Paragraph 142 to the extent that they relate to Hanna Holdings.  As to the allegations that relate to other entities, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 142 and, on that basis, denies the allegations.  Hanna Holdings otherwise denies the allegations in Paragraph 142.

143.    Thus, the Rule and its predecessor was designed to create tremendous pressure on sellers to offer the high, standard commission and to act as a powerful deterrent to anyone who may attempt to offer a discounted commission.  As one commentator explained: "[e]ssentially, the MLS listing acts as a tool which competing brokers can use to help enforce a near uniform commission rate and drive out discounters."

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 143.

144.    Defendant's franchisees, agents, and other coconspirators have also utilized software technology to help facilitate steering based on MLS commission data and to impede buyers from learning about properties that offer discount buyer-agent commissions.  For example, NAR's affiliate, the Greater Las Vegas Association of REALTORS ("GLVAR") uses for its MLS a software program called Matrix, which was designed and sold by CoreLogic.  CoreLogic provides software and data services to most, if not all, of the NAR MLSs.  Matrix allows brokers to provide tailored electronic listings to their buyer clients.  Matrix automatically generates and regularly sends emails to buyer clients that describe properties for sale that match their search criteria.  When brokers set up the Matrix program for their buyer clients, one of the fields in the software allows the brokers to filter listings according to the value of the buyer-agent commission being offered.  In

47

other words, brokers could program the software to only send property listings to buyers that promise buyer-agent commissions above a specified value.

**ANSWER:**  Hanna Holdings denies the allegations in the first sentence of Paragraph 144 that relate to Hanna Holdings.  As to the allegations in the first sentence of Paragraph 144 that relate to other entities, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations and, on that basis, denies the allegations.  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 144 and, on that basis, denies the allegations.

145.    GLVAR elected to adopt a version of the Matrix software that permitted brokers to exclude properties offering discount buyer-agent commissions from Matrix-generated emails to buyer clients.  A number of franchisees and broker agents, including coconspirator Compass, in at least the area covered by Greater Las Vegas trained their realtors to insert 2.5 percent or higher as the minimum permissible buyer-agent commission when using the Matrix system to send property listings to buyer clients.  As a consequence, unbeknownst to them, buyer clients of those realtors often did not receive Matrix-generated emails that include properties offering a buyer-agent commission of less than 2.5 percent, even if that property perfectly matches the buyers' search criteria.  Compass is not the only one.  In fact, Defendant and its coconspirators implemented a policy requiring a minimum buyer-agent commission of 2.7 percent.[40]

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in the first three sentences of Paragraph 145 and, on that basis, denies the allegations.  Hanna Holdings denies the allegation in the last sentence of Paragraph 145 to the extent it relates to Hanna Holdings.  To the extent the allegation in the last sentence of Paragraph 145 relates to other entities, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 145 and, on that basis, denies the allegations.

146.    As part of the DOJ's investigation into NAR and anticompetitive practices in the real estate industry, the DOJ served a Civil Investigative Demand ("CID") on CoreLogic directing it to produce "all documents relating to any MLS member's search of, or ability

---

[40] *Burnett et al. v. National Association of Realtors et al.,* No. 19-cv-00332-SRB (W.D. Mo. Oct. 12, 2023), ECF No. 1220, Exhibit 1.

to search, MLS listings on any of the Company's multiple listing platforms, based on (i) the amount of compensation offered by listing brokers to buyer-agents; or (ii) the type of compensation, such as a flat fee, offered by listing brokers to buyer-agents."

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 146 and, on that basis, denies the allegations.

147.    By encouraging and facilitating steering, and adhering to the "standard real estate commission," the Buyer-Agent Commission Rule and its predecessor deterred downward departures from the standard commission, encouraged overuse of buyer-brokers, and enabled brokers to avoid doing business with, or otherwise retaliate against, buyer-agents who try to compete by offering significant discounts.  Absent an agreement among the competing brokerages to implement, maintain, and enforce these rules, it would have been in Defendant's self-interest to compete based on price and services.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 147.

148.    There is no pro-competitive justification for the Buyer-Agent Commission Rule.  Until the early 1990s, all brokers were seller-brokers or subagents of seller-brokers.  Under this "almost universal sub agency system . . . brokers, even those working solely with buyers, were legally obligated to represent the interests of sellers."  Because "nearly all brokers involved in transactions represented the seller either as the seller's agent or as the subagent of the listing [*i.e.*, seller's] broker," the seller's broker was paid by the seller and would then compensate the subagent working with the buyer.

**ANSWER:**  Hanna Holdings denies the allegation in the first sentence of Paragraph 148.  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 148 and, on that basis, denies the allegations.

149.    With the emergence of brokers who were no longer sub-agents of the seller's broker but were instead working for the buyer, there was no justification for requiring buyer-agents' commissions to be paid as a portion of the total commission.  One industry participant acknowledged, "[w]ith the demise of subagency, there is little reason to keep interbroker compensation.    It does not make sense for listing brokers to pay buyers' brokers for the services the latter provides to buyers."  As another commentator has written: the practice of "sellers' brokers specifying the fees that buyers' brokers charge to the latter's own clients, should be recognized" as "at least an attempt to fix market prices. . . . There is no longer any reason to permit listing brokers [*i.e.*, seller-brokers] to set the default prices that these competing buyers' brokers charge to serve their own customers.    The elimination of interbroker compensation would diminish the ability of traditional brokers to frustrate vigorous price competition, and thus likely lead to a dramatic fall in broker revenues."

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief

as to the truth of the allegations in the first three sentences of Paragraph 149 and, on that basis

denies the allegations.  Hanna Holdings denies the remainder of the allegations in Paragraph 149.

150.    Moreover, other segments of the real estate market both foreign and domestic prove that the Buyer-Agent Commission Rule and its predecessor were unnecessary.  There is no unilateral offer of cooperation and compensation in commercial real estate.

**ANSWER:**  The allegations in Paragraph 150 are not susceptible to being answered because of

their ambiguity or vagueness.  To the extent it can discern the allegations, Hanna Holdings does

not have knowledge or information sufficient to form a belief as to the truth of the allegations

and, on those bases, denies the allegations.

151.    The internet has made buyer's agents less relevant.  For the past 20 years, information on houses for sale is routinely posted on the internet, often with multiple photographs or virtual tours; "thus, the Internet has allowed buyers to perform much of the search and evaluation process independently, before contacting a broker."[41]

**ANSWER:**  The allegation that "[f]or the past 20 years, information on houses for sale is

routinely posted on the internet, often with multiple photographs or virtual tours" is not

susceptible to being answered because of its ambiguity or vagueness, and Hanna Holdings does

not have knowledge or information sufficient to form a belief as to the truth of the allegations

about what information is "routinely" or "often" posted on the internet and, on that basis, denies

the allegation.  Hanna Holdings denies the remainder of the allegations in Paragraph 151.

152.    The real estate industry was thus well aware that home buyers operated under a fundamental misunderstanding about buyer's agents and devised ways to keep up that ruse simply to line the industry's pockets at the buyers' expense.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 152.

153.    The reason for the Buyer-Agent Commission Rule and its predecessor was clear: to maintain overuse of buyer-agents at the expense of home buyers.  In the absence of the Rule, buyers rather than sellers would negotiate buyer-agent commissions, and brokers would compete with each other by offering lower commission rates and/or higher quality

---

[41] *See* NAR, *2022 Handbook: Multiple Listing Policy* 32 (Mar. 10, 2022), https://web.archive.org/web/20220530111628/https://cdn.nar.realtor/sites/default/files/documents/mls-handbook-2022-03-10.pdf ("Clear Cooperation (Policy Statement 8.0)").

services.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 153.

### B.        The Commission Concealment Rule

154.    The anticompetitive effects of NAR's Buyer-Agent Commission Rule were magnified by additional rules agreed upon and enforced by Defendant and its coconspirators.  NAR's Commission Concealment Rule prohibited disclosing to prospective buyers the total commissions offered to buyer-agents.  So, while buyer-agents could see the commission they would earn if their client purchased a property, Defendant and its coconspirators agreed through at least 2021 that MLSs had to conceal this fee from the home buyers who would actually pay the commission through the home purchase price.

**ANSWER:**  Hanna Holdings denies the allegations Paragraph 154.

155.    Defendant and its coconspirators instituted and abided by a series of rules ensuring commission concealment from buyers, each of which became effective and remained effective through agreements between Defendant and its coconspirators.  These rules were laid out in several places in NAR's Handbook, including Policy Statement 7.23, which stated "the multiple listing service shall not publish the total negotiated commission on a listing which has been submitted to the MLS by a participant.  The multiple listing service shall not disclose in any way the total commission negotiated between the seller and the listing broker."

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 155.

156.    Simultaneously, the NAR rules agreed to by Defendant and its coconspirators mandate price information sharing among brokers through its MLS rules.  This type of one-way information exchange agreement eliminated the need for buyer-agents to compete on price by offering rebates or accepting lower commissions.  It also encouraged and enabled brokers to set persistently high commission offers, leading to higher prices for buyer-agent services.  Additionally, since buyers could not see commission offers, they could not detect or resist steering.  As explained above, steering results in higher prices and reduces the quality of buyer-agent services for home buyers.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 156.

157.    Defendant and its coconspirators implemented the Commission Concealment Rule in each MLS they operated, which are themselves controlled by the coconspirators.  Absent an agreement, it would have been in each MLS's economic self-interest, and also in each broker's individual self-interest, to compete for homebuyers by displaying to them the charges for buyer-broker services and by removing the ability for brokers to steer unwitting homebuyers away from properties that otherwise met their qualifications.

**ANSWER:**  Hanna Holdings denies the allegations in the first sentence of Paragraph 157 to the

51

extent they relate to Hanna Holdings.  As to the allegations that relate to other entities, Hanna

Holdings does not have knowledge or information sufficient to form a belief as to the truth of the

allegations in the first sentence of Paragraph 157 and, on that basis, denies the allegations.

Hanna Holdings otherwise denies the allegations in Paragraph 157.

### C.    NAR's Free-Service Rule

158.    As discussed earlier in ¶¶ 73-80, *supra*, NAR's Free-Service Rule, which was widely adopted by NAR MLSs, encouraged buyer-agents to mislead buyers into thinking that the buyer-agent's services are free when they were not.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 158.

159.    The Free-Service rule was passed by the Board of Directors after approval by the Professional Standards Committee, which required Defendant and its coconspirators to agree to enact the rule and to abide it.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 159.

160.    Until January 2022, NAR Ethics Standard 12-2 stated "REALTORS® may represent their services as 'free' or without cost even if they expect to receive compensation from a source other than their client provided that the potential for the REALTOR to obtain a benefit from a third party is clearly disclosed at the same time."  Because buyer-agents governed by NAR were technically paid through the seller-broker, those buyer-agents could always tell their buyer clients that their services were free.  As a result, buyers would think they were paying nothing for buyer-agent services.

**ANSWER:**   Hanna Holdings denies the allegations in Paragraph 160.

161.    The Free-Service Rule restrained competition because it made it unlikely for a buyer to (1) attempt to negotiate a lower buyer-agent commission and/or (2) search for or find attractive buyer-agent rebate offers or other discounts.  In these ways, NAR's Free-Service Rule led to higher prices for services provided by buyer-agents.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 161.

### D.    NAR's Commission Filter Rules

162.    NAR's Commission Filter Rules allowed buyer-agents to filter MLS listings that were shown to buyers based on the level of buyer-agent commissions offered.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 162.

163.    For example, according to former Policy Statement 7.58 of NAR's Handbook

"Participants may select the IDX listings they choose to display based only on objective criteria including . . . cooperative compensation offered by listing brokers."

**ANSWER:**  Hanna Holdings admits that a previous version of NAR's Handbook on Multiple Listing Policy stated: "Participants may select the IDX listings they choose to display based only on objective criteria including … cooperative compensation offered by listing brokers."  Hanna Holdings otherwise denies the allegations in Paragraph 163.

164.    These Filter Rules, which were widely adopted by NAR MLSs, facilitate steering by helping buyer-agents selectively conceal from potential home buyers any property listings offering lower buyer-agent commissions.  This reduced the quality of buyer-agent services and raises prices for buyer-agent services for home buyers.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 164.

### E.    Commission Modification Rules

165.    Even if a home buyer were to obtain enough information to negotiate a lower buyer-agent commission, NAR's ethics rules expressly prohibit buyer-agents from attempting to reduce buyer-agent commissions offered on MLSs through the submission of purchase offers.  These restrictions appear through NAR's Code of Ethics and Standard of Practice, which require agreement among competing real estate agents on the Board of Directors and Professional Standards Committee.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 165.

166.    NAR's Standard of Practice 16-16, in place since January 2004, stated: "REALTORS®, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation."  In other words, it was an unequivocal violation of NAR's ethics rules for a buyer-agent to present an offer to a seller that is conditional on the seller reducing the buyer-agent commission.  Absent an agreement, it would have been in each Defendant and coconspirator's self-interest to negotiate on the buyer's behalf over the buyer-agent commission when directed or to accept a reduced commission to close more home transactions.

**ANSWER:**  Hanna Holdings admits that NAR's Standard of Practice 16-16 previously stated: "REALTORS®, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation

to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation." Hanna Holdings otherwise denies the allegations in Paragraph 166.

167. In each of the NAR MLSs, Defendant or its coconspirators who were otherwise competitors agreed amongst themselves to enforce the rules by requiring participants to adhere to NAR's Code of Ethics. Absent an agreement, it would have been in the MLSs' best interest to permit negotiation over buyer-broker commissions in order to make the MLS a more desirable place for sellers to list a home and for buyers to find a home.

**ANSWER:** Hanna Holdings denies the allegations in the first sentence of Paragraph 167 that relate to Hanna Holdings. As to the allegations that relate to other entities, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 167 and, on that basis, denies the allegations. Hanna Holdings otherwise denies the allegations in Paragraph 167.

168. To the extent buyer-agents did seek to modify buyer-agent commissions, NAR illogically instructed buyer-agents to attempt those modifications before even showing the property to any potential buyers. Per NAR's interpretation of its Code of Ethics, a buyer's broker may only ethically try to reduce the offered compensation from the seller *before* the buyer broker shows the house to the client.[42]

**ANSWER:** Hanna Holdings denies the allegations in the first sentence of Paragraph 168. To the extent that the second sentence of Paragraph 168 purports to characterize or summarize a publicly available NAR publication, Hanna Holdings respectfully refers the Court to that publication, which speaks for itself, for a complete and accurate statement of its contents. Hanna Holdings otherwise denies the allegations in Paragraph 168.

169. By requiring buyer-agents willing to reduce buyer-agent commissions to request those reductions prior to even showing the property to a potential buyer, NAR foreclosed virtually all negotiation over the buyer-agent commission. To comply, a buyer-agent

---

[42] *See* NAR, *Interpretations of the Code of Ethics of NAR* sect.16-15, at 92 (Jan. 2022), https://www.nar.realtor/sites/default/files/documents/coe-2022-case-interpretations-2022-03-28.pdf ("The Hearing Panel's decision noted that Realtor® B was indeed entitled to negotiate with Realtor® A concerning cooperating broker compensation but that such negotiation should be completed prior to the showing of the property by Realtor® B. The decision indicated that Realtor® B was entitled to show property listed by Realtor® A on the terms offered by the listing broker in the MLS.").

effectively needed to contact a seller-broker on his own to negotiate a reduction to his own commission before his client has even seen the potential home.

**ANSWER:** Hanna Holdings denies the allegations in Paragraph 169.

170.    Since January 2014, NAR's rules also restrained negotiation of the buyer-agent commission by providing that after the seller has received purchase offers, the seller-broker was prohibited from attempting to unilaterally modify the buyer-agent commission that was offered on the MLS.  NAR Standard of Practice 3-2 stated: "Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property.  After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction."

**ANSWER:** Hanna Holdings denies the allegations in Paragraph 170.

171.    Consistent with NAR's rule, the New Jersey MLS Rules and Regulations, for example, stated that a listing broker may only offer a buyer-agent compensation that differs from the compensation indicated on the listing if the seller-broker "informs the other broker in writing in advance of submitting an offer to purchase."  As another example, MLSListings Inc., one of the largest MLSs in Northern California, stated the following on its website to help explain the governing NAR rules:

> **Can I change my offer of compensation that I had offered to the cooperating agent in the MLS after the agent produces an offer signed by the buyer?**
>
> No.  In no event shall the listing broker revoke or modify the offer of compensation later than the time the cooperating broker produces a prospective buyer who has signed an offer to purchase the property for which the compensation has been offered through the MLS (9.8).

**ANSWER:** Hanna Holdings does not have knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 171 and, on that basis, denies the allegations.

172.    NAR imposed yet another restraint on negotiation by making it unethical for a buyer-agent to urge the buyer to negotiate directly with the seller to reduce commissions.  Since the vast majority of home buyers have limited or no familiarity with this market and believed that the buyer-agent's services to them were "free," this restriction further restrained negotiations regarding buyer-agent commissions.

**ANSWER:** Hanna Holdings denies the allegations in Paragraph 172.

## VIII.    NAR REQUIRED LOCAL ASSOCIATIONS TO PARTICIPATE IN THE CONSPIRACY

173.    Defendant and its coconspirators agreed that all NAR members, including state and local

realtor associations, as well as non-member brokers and agents operating in areas with NAR MLSs, had to comply with the above anti-competitive rules, and with other rules contained in NAR's rules, practices and policies, including the NAR Handbook and the NAR Code of Ethics.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 173 that relate to Hanna Holdings.  As to the allegations that relate to other entities, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 173 and, on that basis, denies the allegations.

174.    NAR required NAR members that own an MLS to comply with the mandatory provisions in NAR's Handbook on Multiple Listing Policy and with NAR's Code of Ethics.  The Handbook stated that an agreement by an association for the establishment of an MLS must include "roles and responsibilities of each association for enforcement of the Code of Ethics and the intent of the multiple listing service(s) to operate in compliance with the multiple listing policies of the National Association."

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 174.

175.    NAR threatened its individual and association members with expulsion if they fail to comply with the Code of Ethics.  NAR's Code of Ethics stated that "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 175.  Hanna Holdings denies the allegations in the second sentence of Paragraph 175.

176.    A local realtor association owns each of the NAR MLSs, and those realtor associations were required by NAR to ensure that their MLS and the MLS's participants adhered to the mandatory provisions in NAR's Handbook on Multiple Listing Policy.  Because access to the NAR MLSs and other MLSs is commercially necessary, brokers and agents had to comply with the mandatory provisions in NAR's Handbook.  Without access to a local MLS, including the NAR MLSs, a broker or agent would be unable to list properties for sale in the centralized database or receive offers of compensation for finding a buyer for a listed property.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 176 and, on that basis, denies

56

the allegations.  Hanna Holdings denies the remaining allegations in Paragraph 176.

177.    The role of a local realtor association is particularly important for home buyers as the local MLS provides the most up-to-date, accurate, and comprehensive compilation of the area's home listings.  Listing brokers use the MLS to market sellers' properties to other broker and agent participants in the MLS and, through those brokers and agents, to potential home buyers.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 177 and, on that basis, denies the allegations.  Hanna Holdings admits that listing brokers can use an MLS to market sellers' properties to other broker and agent participants in the MLS and potential home buyers.

178.    Further, one of the many benefits NAR provides to its realtor associations and the MLSs owned by those associations is professional liability insurance.  To be eligible for this insurance, realtor associations and their MLSs must comply with the mandatory provisions in the Handbook on Multiple Listing Policy.  NAR threatens to withhold these insurance benefits from realtor associations and MLSs that do not comply with NAR's mandatory provisions.  NAR's Handbook states that "[t]hose associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation."

**ANSWER:**  Hanna Holdings denies that the quoted language in Paragraph 178 appears in the NAR Handbook on Multiple Listing Policy.  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 178 and, on that basis, denies the allegations.

179.    NAR reviews the governing documents of its local realtor associations to ensure compliance with its rules.  NAR also requires its local realtor associations to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 179 and, on that basis, denies the allegations.

57

IX.    **DEFENDANT AND ITS COCONSPIRATORS PARTICIPATE IN, FACILITATE, AND IMPLEMENT THE CONSPIRACY**

180.    As alleged above, NAR requires its members that own an MLS to comply with the mandatory provisions in NAR's Handbook on Multiple Listing Policy and with NAR's Code of Ethics.  Defendant, for instance, has required its agents to comply with "any real estate transaction standards adopted by" NAR.[43]  NAR and its affiliated associations and MLSs enforce the Handbook's rules, policies, and practices as well as the rules, policies, and practices codified in NAR's Code of Ethics.

**ANSWER:**  Hanna Holdings denies the allegation in the second sentence of Paragraph 180.

Hanna Holdings does not have knowledge or information sufficient to form a belief as to the

truth of the remaining allegations in Paragraph 180 and, on that basis, denies the allegations.

181.    Defendant and its coconspirators orchestrated and participated in the conspiracy alleged herein by at least: (1) adopting, imposing, and maintaining the NAR Rules; (2) requiring their franchisees (and the agents employed by those franchisees) to comply with NAR rules including the Buyer-Agent Commission Rule; (3) supervising, through their executives, NAR's operations including NAR's adoption, maintenance, and enforcement of rules like the Buyer-Agent Commission Rule; and (4) agreeing with each other to restrain competition on individual MLSs they control.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 181 that relate to Hanna

Holdings.  As to the allegations that relate to other entities, Hanna Holdings does not have

knowledge or information sufficient to form a belief as to the truth of the allegations in

Paragraph 181 and, on that basis, denies the allegations.

182.    Defendant's rules and policies require its franchises and agents to (1) comply with NAR's Code of Ethics; (2) join and comply with the rules of the local realtor association; and (3) participate in and comply with the rules of the local MLS, which include the mandatory provisions of NAR's Handbook on Multiple Listing Policy.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 182.

183.    Executives of Defendant have also actively participated in the management and operation of NAR, whose board of directors promulgated the rules in NAR's Handbook and Code of Ethics, including the Buyer-Agent Commission Rule, and in NAR's Professional Standards Committee.

---

[43] Howard Hanna Franchise Disclosure Document § 10.11.

**ANSWER:**  The allegations in Paragraph 183 are not susceptible to being answered because of their ambiguity or vagueness.  To the extent it can discern the allegations, Hanna Holdings admits that, at certain points in time, some members of Hanna Holdings have participated in the management or operation of NAR.  Hanna Holdings otherwise does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 183.

184.    Senior executives of Defendant have served on NAR's governing board of directors.  For example, Kristine Burdick, President of Broker Operations, and Donna Kreps, President of Real Estate Service, have served as NAR Large Board Representatives.

**ANSWER:**  Hanna Holdings admits that Kristine Burdick served on NAR's Board of Directors.  Hanna Holdings otherwise denies the allegations in Paragraph 184.

185.    Further, executives of Defendant, including Gary Scott, Pat Riley, Marsha Rand, and Dennis Cestra, Sr., have served on NAR's Board of Directors.  Both NAR's Handbook and its Code of Ethics (and thus the Mandatory Offer of Compensation Rule) were drafted, developed, and promulgated by NAR's board of directors or NAR's Professional Standards Committee.  The Board of Directors (a group composed of individuals who are otherwise competitors) agreed to enact and maintain each of the NAR Rules challenged herein.

**ANSWER:**  Hanna Holdings admits that Gary Scott has served on NAR's Board of Directors.  Hanna Holdings denies that Pat Riley, Marsha Rand, or Dennis Cestra, Sr. have served on NAR's Board of Directors.  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 185.  Hanna Holdings denies the remainder of the allegations in Paragraph 185.

186.    Executives of Defendant, including Howard W. Hanna and Helen Hanna Casey, have also participated in the NAR Multiple Listing Issues Committee, which is responsible for reviewing and reissuing the NAR Handbook.

**ANSWER:**  Hanna Holdings denies that Howard W. Hanna and Helen Hanna Casey participated in NAR's Multiple Listing Issues Committee.  Hanna Holdings otherwise does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 186.

## X.    EFFECTS OF THE CONSPIRACY

187.    The conspiracy has had the following anticompetitive effects, among others, in each area in which a NAR MLS operates, and nationwide:

- Home buyers have paid, through the purchase price of their homes, inflated buyer-agent commissions and inflated total commissions;
- Inflated total commissions were incorporated into the home purchase price, thereby causing buyers to pay higher prices for homes;
- The retention of a buyer-agent has been severed from the setting of the broker's commission; the home buyer retains the buyer-agent, while the home seller sets the buyer-agent's compensation;
- Price competition among brokers to be retained by home buyers has been restrained;
- Competition among home buyers has been restrained by their inability to compete for the purchase of a home by lowering the buyer-agent commission;
- The quality of buyer-agent services has been reduced, as buyer-agents are incentivized to steer their clients to higher commission homes;
- The quality of buyer-agent services has also been reduced through barriers that prevent buyer-agents from presenting and receiving purchase proposals that reduce the buyer-agent commission, thus making the proposals more attractive to and more likely to be accepted by sellers; and
- Defendant and its coconspirators have increased their profits substantially by receiving inflated buyer-agent commissions and inflated total commissions.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 187.

188.    There is no pro-competitive benefit to the conspiracy.  Defendant and its coconspirators successfully inflated buyer-agent commissions despite the diminishing role of buyer-agents through these agreements to encourage their overuse and dictate the manner in which they are paid.  According to data from NAR, many home buyers no longer locate prospective homes with the assistance of a broker, but rather independently through online services.  Buyer-agents increasingly have been retained after their client has already found the home the client wishes to buy.  "One would have expected that an information and communication-based industry like real estate brokerage, would enjoy tremendous cost efficiencies from the development of the Internet, Databases, and other communication technologies.  Yet it appears that traditional brokers generally have not passed on their cost savings to consumers in the form of lower fees."

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 188.

189.    Defendant's and its coconspirators' success in preventing the disintermediation of buyer agents despite the advent of new technologies stands in stark contrast to other industries.  "[I]n almost every other consumer industry—booksellers, retailers, home appliances, insurance, banking, stock brokers—the introduction of Internet and discount sellers has been a phenomenal financial benefit to customers.    Economists call this process of squeezing out transaction costs 'disintermediation.' If any industry is ripe for this, it is the

$70 billion-a-year real estate brokerage market."[44]  Despite technological advances that have lessened the role of brokers and widespread fluctuations in housing prices, buyer-brokers have not been disintermediated in any sense.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 189.

190.    Moreover, there is a disconnect between buyer-agent costs and buyer-agent commissions. Competition normally pushes firms to adopt fee structures that approximate their costs, but this trend is absent real estate brokerage fees.  For example, buyer-agent costs are similar regardless of the price of the home.  As the Wall Street Journal has explained, "many, if not most, of the services that Realtors provide don't vary with the sales price, so the percentage fee should fall as home price rises."[45]  Instead, broker commissions remain divorced from the quantity, quality, and value of the services.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 190.

191.    Even if there were any plausible pro-competitive effects, they would be substantially outweighed by the conspiracy's anticompetitive effects.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 191.

192.    There is substantial economic evidence that the conspiracy has resulted in buyer-agent commissions and total commissions that are inflated well above a competitive level nationwide.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 192.

193.    The conspiracy has maintained broker commission levels at remarkably stable and inflated levels for the past two decades, despite the advent of the internet and the diminishing role of buyer-agents.  Between 2000 and 2017, the average commission nationally has been stable at a supracompetitive rate of between 5 and 5.4 percent regardless of changing market conditions.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 193.

194.    Moreover, because housing prices have increased substantially in recent years (at a rate significantly exceeding inflation), and commissions are charged on a percentage of a home's sale price, the actual dollar commissions have become even higher.  "For example, between 2001 and 2017, the average price of new homes in current dollars sold rose from $213,200 to $384,900, according to U.S. Census Bureau Statistics."  As the Consumer Federation of America has observed, "[b]ecause the industry functions as a cartel, it is able to overcharge consumers tens of billions of dollars a year.

---

[44] *The Realtor Racket*, WSJ (Aug. 12, 2005), *available at* https://www.wsj.com/articles/SB112381069428011613?gaa_at=eafs&gaa_n=ASWzDAjKVfbaW9R17aKdsTKGtKZ1 JIJv3_yJ4wVVgMuNunD0WnvlgVK7DB2xe05jch4%3D&gaa_ts=68dd59f7&gaa_sig=Y0aihU6Dw24rdW4yQvIzsW 45O7WpHdHm7vVwoO24X7bmpMMozpqS1nNwp9JcNy29f65ak7Xz0YD_OUGLSB-j9A%3D%3D.
[45] *Id.*

. . . Consumers are increasingly wondering why they are often charged more to sell a home than to purchase a new car."[46]

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 194.

195.    The standard total broker commissions (*i.e.*, the aggregate commission paid to the seller-broker and buyer-agent) in areas where the NAR MLSs operate is between five and six percent, substantially higher than in countries with competitive markets for residential real estate brokerage services.  In a 2002 study titled "International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry," economists Natalya Delcoure and Norm Miller concluded: "Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand. . . . In the UK, the [total] commission rates average less than 2% . . . In New Zealand and South Africa, [total] commission rates average 3.14%.  In Singapore, the [total] commission rates also tend to run around 3%."[47]  They also found variation within countries; in the United Kingdom, for example, Delcoure and Miller found that "1%-2% is typical; in very competitive areas 0.5-0.75%; in low priced areas [for homes] as high as 3.5%."[48]  Ultimately, the economists concluded that, "[b]ased on global data … [total] US residential brokerage fees should equal something closer to 3.0%."[49]

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in the first four sentences of Paragraph 195 and, on that basis, denies the allegations.  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegation in the fifth sentence that "economists concluded" that total US residential brokerage fees should equal something closer to 3.0%; Hanna Holdings denies the accuracy of that statement and otherwise denies the remaining allegations in Paragraph 195.

196.    The adverse economic impact of the conspiracy's restraints on price competition has been severe.  The Consumer Federation of America indicated that "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform 5-6% commissions would

---

[46] Glen Justice, *Lobbying to Sell Your House*, N.Y. TIMES (Jan. 12, 2006), https://www.nytimes.com/2006/01/12/business/lobbying-to-sell-your-house.html.
[47] Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 INTL. REAL ESTATE REV. 12, 14 (2002).
[48] *Id.* at 17.
[49] *Id.* at 29.

quickly disappear."[50]

**ANSWER:**  Hanna Holdings denies the allegations in the first sentence of Paragraph 196.

Hanna Holdings admits that the Consumer Federation of America stated that "if sellers and

buyers each separately negotiated compensation with their brokers, uniform 5-6% commissions

would quickly disappear," but it denies the accuracy of that statement.

197.  Brian Larson, an attorney who has represented many MLSs, has observed that "[w]ith the demise of subagency, there is little reason to keep interbroker compensation."[51] According to Larson, "[g]etting rid of interbroker compensation", *i.e.*, payments from seller-brokers to buyer-agents, would improve the market in several areas, including:

- "Buyer broker fees can be commensurate with the skill and experience of the broker and with the buyer's needs."
- "The market benefits from price competition for buyer-broker services."
- "The dangers of price fixing, and the claims by industry watchdogs that it exists now, will largely be addressed.  Brokers will really be unable to tell what their competitors are charging for services, and there will be no incentive for commissions to be 'standard.'"[52]

**ANSWER:**  Hanna Holdings admits that Brian Larson made the statements alleged in Paragraph

197, but it denies the accuracy of those statements and otherwise denies the allegations in

Paragraph 197.

198.  Because of the scope and magnitude of the overcharges at issue here, the economic cost to the Plaintiff class and other consumers has been enormous.  Experts have suggested that the amount of "annual broker fees consumers might save if there was effective price competition is as much as $30 billion or more annually."[53]

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 198.

199.  Economists Chang-Tai Hsieh and Enrico Moretti have suggested that more than half of

---

[50] Stephen Brobeck & Patrick Woodall, *How the Real Estate Cartel Harms Consumers and How Consumers Can Protect Themselves*, Consumer Fed. of Am., at 4 (June 2006), https://consumerfed.org/wp-content/uploads/2006/06/6-19-06-Real-Estate-Cartel_Report.pdf.

[51] Brian Larson, *The End of MLS as We Know It (Redux) – Part I*, Larson Skinner (Dec. 15, 2010), https://larsonskinner.com/2010/12/15/the-end-of-mls-as-we-know-it-redux-part-i/.

[52] Brian Larson, *The End of MLS as We Know It (Redux) – Part II*, Larson Skinner (Dec. 20, 2010), https://larsonskinner.com/2010/12/20/the-end-of-mls-as-we-know-it-redux-part-ii/.

[53] Mark S. Nadel, *A Critical Assessment of the Traditional Residential Real Estate Broker Commission Rate Structure (Abridged)*, 5 CORNELL REAL ESTATE REV. 26, 26 n.1 (2007).

current commissions might be eliminated by competition.[54]  And as noted above, Natalya Delcoure and Norm Miller found that U.S. broker fees should equal something closer to three percent.[55]

**ANSWER:**  To the extent Paragraph 199 purports to characterize or summarize publicly available documents, Hanna Holdings respectfully refers the Court to those documents, which speak for themselves, for a complete and accurate statement of their contents.  Hanna Holdings otherwise denies the allegations in Paragraph 199.

## XI.    CONTINUOUS ACCRUAL

200.    During the years preceding the filing of this complaint, Defendant, NAR, and their coconspirators repeatedly engaged in anticompetitive conduct, including implementing and enforcing the Buyer-Agent Commission Rule and other anticompetitive NAR rules nationwide.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 200 that relate to Hanna Holdings.  As to the allegations that relate to the other Defendants, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 200 and, on that basis, denies the allegations.

201.    As a result of their conspiracy, Defendant and its coconspirators repeatedly charged and received inflated buyer-agent commissions and total commissions that were paid by Plaintiffs and the Class in connection with the purchase of residential real estate listed on one of the NAR MLSs.  Each payment of these inflated commissions by Plaintiffs and Class Members during the class period injured them and gave rise to a new cause of action.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 201 that relate to Hanna Holdings.  As to the allegations that relate to the other Defendants, Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 201 and, on that basis, denies the allegations.

---

[54] *See* Chang-Tai Hsieh & Enrico Moretti, *Can Free Entry be Inefficient? Fixed Commissions and Social Waste in the Real Estate Industry*, 111 J. POL. ECON. 1076, 1116 (2003).

[55] Delcoure & Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, *supra* n.47, at 29.

## XII.    STATUTE OF LIMITATIONS

202.    The running of the statute of limitations begins when the Plaintiff discovers the existence of a cause of action.

**ANSWER:** Paragraph 202 consists of a legal conclusion to which no answer is necessary. To the extent that an answer is deemed necessary, Hanna Holdings denies the allegation in Paragraph 202.

203.    Plaintiffs and the Class had no knowledge of this unlawful conspiracy and could not have discovered it by the exercise of due diligence until, at the earliest, November 19, 2020, the date the DOJ announced the settlement of its antitrust claims against NAR.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 203.

204.    Moreover, it was reasonable for Plaintiffs and Class Members not to suspect that Defendant and its coconspirators were engaging in any unlawful anticompetitive behavior.  Plaintiffs and Class Members are unsuspecting home buyers who do not have in-depth knowledge or information about the real estate industry and are not well-versed with NAR's framework.  Additionally, as alleged herein, NAR's policies, rules and practices specifically prohibit the disclosure of total broker commissions to home buyers and encourage buyer-agents to represent to their clients that they are receiving the brokers' services for free.  As a result, the average home buyer does not appreciate that buyer-agent services cost them anything, let alone that parties are actively conspiring together to maintain supracompetitive broker commissions.

**ANSWER:**  The first sentence of Paragraph 204 consists of legal conclusions to which no answer is necessary.  To the extent that an answer is deemed necessary, Hanna Holdings denies the allegations in the first sentence of Paragraph 204.  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 204 and, on that basis, denies the allegations.  Hanna Holdings denies the remaining allegations in Paragraph 204.

205.    For these reasons, the statutes of limitation applicable to Plaintiffs' and Class Members' claims have been tolled with respect to the claims asserted herein.

**ANSWER:**  Paragraph 205 consists of legal conclusions, to which no answer is necessary.  To the extent that an answer is deemed necessary, Hanna Holdings denies the allegations in

65

Paragraph 205.

206.     Additionally, or alternatively, application of the doctrine of fraudulent concealment tolled the statutes of limitation on Plaintiffs' and the Class Members' claims until at least November 19, 2020.

**ANSWER:**  Paragraph 206 consists of legal conclusions to which no answer is necessary.  To

the extent that an answer is deemed necessary, Hanna Holdings denies the allegations in

Paragraph 206.

207.     Defendant and its coconspirators actively concealed their conspiracy by, for example, prohibiting the disclosure of total commissions to home buyers and encouraging brokers to represent to home buyers that their services are free of charge.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 207 to the extent that they

relate to Hanna Holdings.  To the extent the allegations relate to other entities, Hanna Holdings

does not have knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 207 and, on that basis, denies the allegations.

208.     Moreover, Defendant's and its coconspirators anticompetitive conduct was inherently self-concealing because NAR tightly controls its regulated MLSs, agents, and brokers, and a reasonable buyer under the circumstances would not have had reason to suspect that they were being subjected to anticompetitive conduct.  The conduct prohibiting NAR MLSs from disclosing to prospective buyers the amount of commission that the buyer-agent will earn if the buyer purchases a home listed on the MLS is inherently self-concealing, as is the conduct allowing buyer-agents to misrepresent to buyers that a buyer-agent's services are free.  Likewise, conduct by Defendant and its coconspirators to filter MLS listings based on the level of buyer-agent commissions and to exclude homes with lower commissions is inherently self-concealing.

**ANSWER:**  The allegations in Paragraph 208 are not susceptible to being answered because of

their ambiguity or vagueness and, on that basis, Hanna Holdings denies the allegations.  To the

extent it can discern the allegations, Hanna Holdings otherwise denies the allegations in

Paragraph 208 to the extent that they relate to Hanna Holdings.  To the extent the allegations

relate to other entities, Hanna Holdings does not have knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 208 and, on that basis, denies the

allegations.

## XIII.  CLASS ACTION ALLEGATIONS

209.  Plaintiffs bring this action on behalf of themselves and as a class action under Federal Rules of Civil Procedure 23(a) and (b)(3) seeking damages pursuant to antitrust, unfair competition, consumer protection, and unjust enrichment laws, on behalf of the following class (the "Class"):

All persons who, since December 1, 1996 through August 1, 2024, purchased in the Indirect Purchaser States[56] residential real estate that was listed on a NAR MLS.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 209.

210.  Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 210.

211.  **Ascertainability**: Membership of the Class is defined based on objective criteria, and individual members will be identifiable from Defendant's and public records.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 211.

212.  **Numerosity**: The exact number of members of the Class is unknown and unavailable to Plaintiffs at this time, but individual joinder in this case is impracticable.  The Class likely consist of at least thousands of individuals, and the members can be identified through Defendant's and public records.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 212.

213.  **Predominant Common Questions:** The Class' claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members.  Common questions for the Class include, but are not limited to, the following:

a.      Whether Defendant conspired as alleged herein;
b.      Whether the conspiracy was implemented in the areas in which the NAR MLSs operate;

---

[56] The "Indirect Purchaser States" are the states listed in the First and Second claims for relief.

c.     Whether the conspiracy harmed competition as alleged herein;

d.     Whether home buyers were harmed as a result of Defendant's anticompetitive conduct as alleged herein;

e.     Whether buyer-agent commissions were inflated as a result of the conspiracy;

f.     Whether the quality of buyer-agent services was diminished as a result of the conspiracy;

g.     Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits; and

h.     The appropriate class-wide measures of damages.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 213.

214.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the proposed Class.  Defendant's conduct that gave rise to Plaintiffs' claims is the same for all members of the Class.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 214.

215.    **Adequate Representation**: Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class.  Plaintiffs have retained counsel competent and experienced in complex litigation and class actions, including antitrust violations.  Plaintiffs have no interest that is antagonistic to those of the Class.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so.  Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Class.

**ANSWER**:  Hanna Holdings denies the allegations in Paragraph 215.

216.    **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable.  This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 216.

217.    Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 217.

## XIV.  CLAIMS FOR RELIEF

### CLAIM I

### Violation of State Antitrust Statutes

218.  Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

**ANSWER:**  Hanna Holdings restates and incorporates here its responses to Paragraphs 1

through 217.

219.  Beginning at least in the 1990s, Defendant entered into a contract, combination, or conspiracy with respect to broker services provided in each of the Indirect Purchaser States by agreeing with its competitors to implement, enforce, and abide by the NAR Rules.  Defendant's conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in each of the Indirect Purchaser States.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 219.

220.  Defendant's acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 220.

221.  As a result of Defendant's unlawful conduct, Plaintiffs and other Indirect Purchasers in the Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in each of the Indirect Purchaser States.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 221.

222.  By engaging in the aforementioned conduct, Defendant intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

   a)   Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to home purchases in Arizona by Class Members and/or home purchases by Arizona residents;

   b)   Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to home purchases in California by Class Members and/or home purchases by California residents;

   c)   Conn. Gen. Stat. §§ 35-24, *et seq.*, with respect to home purchases in Connecticut by Class Members and/or home purchases by Connecticut residents;

   d)   D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to home purchases in District of Columbia by Class Members and/or home purchases by District of Columbia residents;

   e)   Haw. Rev. Stat. § 480-3, *et seq.*, with respect to purchases in Hawaii by Class

Members and/or purchases by Hawaii residents;

f)  740 Ill. Comp. Stat. Ann. 10/7 *et seq.*, with respect to purchases in Illinois by Class Members and/or purchases by Illinois residents;

g)  Iowa Code §§ 553.1, *et seq.*, with respect to home purchases in Iowa by Class Members and/or home purchases by Iowa residents;

h)  Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to home purchases in Kansas by Class Members and/or home purchases by Kansas residents;

i)  Me. Rev. Stat. Ann. tit. 10, § 1104(1), *et seq.*, with respect to home purchases in Maine by Class Members and/or home purchases by Maine residents;

j)  Md. Com'l Law Code Ann. § 11-204, *et seq.*, with respect to purchases in Maryland by Class Members and/or purchases by Maryland residents;

k)  Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, with respect to home purchases in Michigan by Class Members and/or home purchases by Michigan residents;

l)  Minn. Stat. Ann. § 325D.57, *et seq.*, with respect to home purchases in Minnesota by Class Members and/or home purchases by Minnesota residents;

m)  Neb. Code Ann. §§ 59-801, *et seq.*, with respect to home purchases in Nebraska by Class Members and/or home purchases by Nebraska residents;

n)  Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to home purchases in Nevada by Class Members and/or home purchases by Nevada residents;

o)  N.H. Rev. Stat. § 356:1, *et seq.*, with respect to home purchases in New Hampshire by Class Members and/or home purchases by New Hampshire residents after January 1, 2008;

p)  N.M. Stat. Ann. § 57-1-1, *et seq.*, with respect to home purchases in New Mexico by Class Members and/or home purchases by New Mexico residents;

q)  N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to home purchases in New York by Class Members and/or home purchases by New York residents;

r)  N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to home purchases in North Carolina by Class Members and/or home purchases by North Carolina residents;

s)  N.D. Cent. Code § 51-08.1-01, *et seq.*, with respect to home purchases in North Dakota by Class Members and/or home purchases by North Dakota residents;

t)  Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to home purchases in Oregon by Class Members and/or home purchases by Oregon residents;

u)  R.I. Gen. Laws §§ 6-36-4, *et seq.*, with respect to home purchases in Rhode Island by Class Members and/or purchases by Rhode Island residents after July 15, 2013;

v)  Utah Code 76-10-3101, *et seq.*, with respect to home purchases in Utah by Class Members and/or home purchases by Utah residents;

w)  Vt. Stat. Ann. tit. 9, § 2453 et *seq.*, with respect to home purchases in Vermont by Class Members and/or home purchases by Vermont residents;

x)  W. Va. Code § 47-18-1, *et seq.*, with respect to home purchases in West Virginia by Class Members and/or home purchases by West Virginia residents; and

y)  Wis. Stat. §§ 133.03, *et seq.*, with respect to home purchases in Wisconsin by Class Members and/or home purchases by Wisconsin residents.

**ANSWER:** Hanna Holdings denies the allegations in Paragraph 222.

70

223.    Plaintiffs provided notice to the state Attorneys General under the Notice Statutes[57] of Arizona, Hawaii, Illinois, Nevada, New York, Oregon, Rhode Island, and Utah ("Notice States") in connection with their Complaint and Amended Complaint.

**ANSWER:**  Hanna Holdings does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 223 and, on that basis, denies the allegations.

224.    In connection with their Second Amended Complaint, Plaintiffs sent a demand letter to Defendant's counsel on July 1, 2025 under Mass. Gen. Laws ch. 93A § 9(3).  Plaintiffs will send post-filing notice to the Notice States' Attorneys General pursuant to the Notice Statutes.

**ANSWER:**  Hanna Holdings admits that Plaintiffs sent a letter to Defendants' counsel on July 1, 2025.  Hanna Holdings otherwise denies the allegations in Paragraph 224.

225.    Plaintiffs and the Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendant's anticompetitive conduct.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 225.

226.    Defendant and its coconspirators are jointly and severally liable for all damages suffered by Plaintiffs and the Damages Class Members.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 226.

## CLAIM II

### Violation of State Consumer Protection Statutes

227.    Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

**ANSWER:**  Hanna Holdings restates and incorporates here its responses to Paragraphs 1 through 226.

228.    Beginning at least in the 1990s, Defendant engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices by agreeing with its competitors to enact, enforce, and abide by the NAR Rules in the states pleaded below.

---

[57] "Notice Statutes" refers to Ariz. Rev. Stat. § 44-1415, Haw. Rev. Stat. § 480-13.3, Ill. 815 I.L.C.S. §  505/10a(d), Nev. Rev. Stat. § 598A.210(3), N.Y. Gen. Bus. § 340(5), Or. Rev. Stat. § 646.780(5)(b), R.I. Gen. Laws Ann. § 6-36-21, and Utah Code § 76-10-3109(9).

71

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 228.

229.  As a direct and proximate result of Defendant's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiffs and the Damages Class Members have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in each of the Indirect Purchaser States.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 229.

230.  By engaging in the foregoing conduct, Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of the following state unfair and deceptive trade practices and consumer protection statutes:

a)  Ariz. Rev. Stat. §§ 44-1521, *et seq.*, with respect to home purchases in Arizona by Class Members and/or purchases by Arizona residents;

b)  Cal. Bus. and Prof. Code §§ 17200, *et seq.*, with respect to home purchases in California by Class Members and/or purchases by California residents;

c)  Colo. Rev. Stat §§ 6-1-105, *et seq.*, with respect to purchases in Colorado by Class Members and/or purchases by Colorado residents;

d)  Conn. Gen. Stat. §§ 42-110A, *et seq.*, with respect to purchases in Connecticut by Class Members and/or purchases by Connecticut residents;

e)  D.C. Code §§ 28-3901, *et seq.*; with respect to purchases in the District of Columbia by Class Members and/or purchases by District of Columbia residents;

f)  Fla. Stat. §§ 501.201, *et seq.*, with respect to home purchases in Florida by Class Members and/or purchases by Florida residents;

g)  Iowa Code §§ 714H.1, *et seq.*; with respect to purchases in Iowa by Class Members and/or purchases by Iowa residents;

h)  Mass. Gen. Laws ch. 93A, § 9 *et seq.*, with respect to home purchases in Massachusetts by Class Members and/or purchases by Massachusetts residents;

i)  Mo. Stat. §§ 407.010, *et seq.*, with respect to home purchases in Missouri by Class Members and/or purchases by Missouri residents;

j)  Mont. Code Ann. § 30-14-101, *et seq.*, with respect to home purchases in Montana by Class Members and/or purchases by Montana residents;

k)  Neb. Rev. Stat. § 59-1601, *et seq.*, with respect to home purchases in Nebraska by Class Members and/or purchases by Nebraska residents;

l)  Nev. Rev. Stat. §§ 598.0903, *et seq.*, with respect to home purchases in Nevada by Class Members and/or purchases by Nevada residents;

m)  N.H. Rev. Stat. § 358:1, *et seq.*, with respect to home purchases in New Hampshire by Class Members and/or home purchases by New Hampshire residents;

n)  N.J. Stat. Ann. § 56:8-1, *et seq.*, with respect to home purchases in New Jersey by Class Members and/or home purchases by New Jersey residents;

o)  N.Y. Gen. Bus. Law § 349, *et seq.*, with respect to home purchases in New York by Class Members and/or purchases by New York residents;

p)  N.C. Gen. Stat. §§ 75-1.1, *et seq.*, with respect to home purchases in North Carolina by Class Members and/or purchases by North Carolina residents;

q)   Or. Rev. Stat. §§ 646.605, *et seq.*, with respect to homes purchases in Oregon by Class Members and/or purchases by Oregon residents;

r)   73 Pa. Stat. Ann. §§ 201-1 *et seq.*, with respect to homes purchases in Pennsylvania by Class Members and/or purchases by Pennsylvania residents;

s)   S.C. Code Ann. § 39-5-140(a), *et seq.*, with respect to home purchases in South Carolina by Class Members and/or purchases by South Carolina residents;

t)   Va. Code §§ 59.1-196, *et seq.*, with respect to home purchases in Virginia by Class Members and/or purchases by Virginia residents; and

u)   Wisc. Stat. § 100.18, *et seq.*, with respect to homes purchases in Wisconsin by Class Members and/or purchases by Wisconsin residents.

**ANSWER:**  To the extent Paragraph 230 asserts claims under the laws of Colorado, New York, Oregon, Pennsylvania, Virginia, and Wisconsin, no response is required because the Court has dismissed with prejudice Plaintiffs' claims under the consumer protection acts of these states. *See* Dkt. 124.  To the extent an answer is deemed necessary, Hanna Holdings denies the allegations asserting claims under the laws of Colorado, New York, Oregon, Pennsylvania, Virginia, and Wisconsin.  Hanna Holdings denies the remaining allegations in Paragraph 230.

231.   Plaintiffs provided a demand letter to Defendant's counsel under Mass. Gen. Laws ch. 93A § 9(3) in connection with their Complaint and Amended Complaint.  In connection with their Second Amended Complaint, Plaintiffs sent a demand letter to Defendant's counsel on July 1, 2025 under Mass. Gen. Laws ch. 93A § 9(3).

**ANSWER:**  Hanna Holdings admits that Plaintiffs sent a letter to Defendants' counsel on July 1, 2025.  Hanna Holdings otherwise denies the allegations in Paragraph 224.

232.   Plaintiffs and members of the Class have been injured in their business and property by reason of Defendant's anticompetitive, unfair, unconscionable, and/or deceptive conduct.  Their injury consists of paying higher prices for buyer-agent services than they would have paid in the absence of these violations.  This injury is of the type that the state consumer protection statutes were designed to prevent and directly results from Defendant's unlawful conduct.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 232.

73

233.   Upon information and belief, Defendant is not a licensed broker in Florida,[58] Iowa,[59] or Virginia,[60] among other states, and is therefore not exempt from liability arising from conduct involving real estate transactions.

**ANSWER:**  To the extent that Paragraph 233 purports to characterize or summarize public websites, Hanna Holdings respectfully refers the Court to those public websites, which speak for themselves, for a complete and accurate statement of their contents.  The allegation that Defendant is "not exempt from liability arising from conduct involving real estate transactions" constitutes a legal conclusion to which no answer is necessary.  To the extent that an answer is deemed necessary, Hanna Holdings admits that it is not a licensed broker in Iowa or Florida and denies the allegation that it is not exempt from liability arising from conduct involving real estate transactions.  Hanna Holdings otherwise denies the allegations in Paragraph 233.

234.   On behalf of themselves and the Class, Plaintiffs seek all appropriate relief provided for under the foregoing statutes.

**ANSWER:**  Hanna Holdings denies the allegations in Paragraph 234.

## XV.   REQUESTED RELIEF

Plaintiffs request relief as follows:

A.     That the Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

---

[58] *See* Fla. Dep't of Bus. & Prof. Reg., *Licensee Search*, https://www.myfloridalicense.com/wl11.asp?mode=2&search=Name&SID=&brd=&typ= (last visited Oct. 1, 2025) (returning no results related to Hanna Holdings, Inc.); Howard Hanna Real Estate Services, *Home Page*, https://www.howardhanna.com/ (last visited Oct. 1, 2025) (listing homes for sale in CT, IN, KY, MD, MI, NJ, NY, NC, PA, OH, SC, VA, and WV).
[59] *See* Iowa Prof. Licensing, *Search License*, https://ia-plb.my.site.com/LicenseSearchPage (last visited Oct. 1, 2025) (returning no results for Hanna Holdings, Inc.).
[60] *See* Va. Dep't of Prof. & Occupational Licensing, License Lookup, https://www.dpor.virginia.gov/LicenseLookup (last visited Oct. 1, 2025) (returning no results for Hanna Holdings, Inc.).

B.      That the Court enter an order declaring that Defendant's actions, as set forth in this Complaint, violate the state antitrust and unfair competition and consumer protection laws as set forth herein;

C.      That the Court award Plaintiffs and the other members of the Damages Class damages and/or restitution in an amount to be determined at trial;

D.      That the Court award Plaintiffs pre- and post-judgment interest;

E.      That the Court award Plaintiffs their costs of suit, including reasonable attorney's fees and expenses; and

F.      That the Court award such other relief as the Court may deem just and proper.

**ANSWER:**  Hanna Holdings states that no response is required to Plaintiffs' prayer for relief.  To the extent an answer is deemed necessary, Hanna Holdings denies that Plaintiffs or the putative class are entitled to the relief sought in the Complaint, or to any relief at all.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

**ANSWER:**  The jury demand consists of Plaintiffs' characterizations of their purported claims, to which no answer is necessary.

### AFFIRMATIVE DEFENSES

Without assuming any burden of proof that it would not otherwise bear, Hanna Holdings reasserts, without limitation, all defenses raised in its Motions to Dismiss and other filings, whether or not separately re-pleaded herein.  Hanna Holdings also asserts the following affirmative and other defenses.  In listing the defenses below, Hanna Holdings does not knowingly or intentionally waive any defenses, including arguments about which issues fall within the Plaintiffs' burden of proof.  Hanna Holdings also reserves the right to rely on any

75

affirmative or other defense or claim that may subsequently come to light and expressly reserves the right to amend its Answer to assert such additional defenses or claims.

### FIRST DEFENSE

Plaintiffs challenge the NAR guideline that MLS listings make blanket unilateral offers of compensation to be paid to the buyer-agent upon sale, but many states explicitly authorize this arrangement by enshrining into law a seller's right to pay commissions to buyer-brokers and authorizing the seller's broker to disburse part of the broker's compensation to buyer-brokers. Thus, the challenged conduct is clearly authorized by the laws of numerous states, and the challenged conduct is actively supervised by those states.

### SECOND DEFENSE

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of waiver, including (but not limited to) because they expressly agreed with their buyer-brokers and agents that the brokers and agents could accept any and all compensation offered to them by the seller and/or listing broker.

### THIRD DEFENSE

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrines of estoppel, including (but not limited to) because they expressly agreed with their buyer-brokers and agents that the brokers and agents could accept any and all compensation offered to them by the seller and/or listing broker.

### FOURTH DEFENSE

The National Association of Realtors is a necessary party to this suit because the Court cannot accord complete relief among existing Defendants in NAR's absence or fairly adjudge Hanna Holdings' liability, and because NAR has an interest in this action such that disposing of

76

the action in its absence would impede its ability to protect that interest and leave Hanna Holdings at substantial risk of incurring multiple or inconsistent obligations.

## FIFTH DEFENSE

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because Plaintiffs failed to mitigate any damages they may have suffered.

## SIXTH DEFENSE

Without admitting the existence of any contract, combination or conspiracy in restraint of trade, and expressly denying the same, Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, to the extent they seek recovery for damages that are duplicative of damages sought or recovered by plaintiffs in other actions for the same alleged injury. *See Associated Gen. Contractors v. Carpenters*, 459 U.S. 519, 543–44 (1983) (holding that to recover damages, a plaintiff must show that they can "avoid[] either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other").

## SEVENTH DEFENSE

Plaintiffs are enjoined from bringing their claims, which are otherwise released by the settlement agreement in *Burnett, et al. v. The National Association of Realtors, et al.*, 4:19-cv-00332-SRB and *Moehrl, et al. v. The National Association of Realtors, et al.*, 1:19-cv-01610-ARW. The settlement agreement released "any and all manner of claims, regardless of the cause of action, arising from or relating to conduct that was alleged or could have been alleged in those actions against any released parties" and, therefore, enjoined them from prosecuting in any forum the released claims against the released parties. As in *Burnett* and *Moehrl*, Plaintiffs allege the NAR guideline that MLS listings make a blanket unilateral offer of compensation to be paid to the buyer-broker upon the sale of a home artificially inflated buyer-broker

77

commissions.  Plaintiffs' claims are thus "released claims" that fall within the scope of the settlement agreement and the settlement with NAR necessarily resolved those claims for the alleged conspiracy as a whole.  Plaintiffs cannot assert them again in this suit.

### EIGHTH DEFENSE

Plaintiffs are enjoined from bringing their claims, which are otherwise released by the settlement agreement that Hanna Holdings reached in *Gibson, et al. v. The National Association of Realtors, et al.*, No. 4:23-cv-00788-SRB (W.D. Mo.) and/or the pending settlement Hanna Holdings reached in *Tuccori v. At World Properties*, LLC, No. 1:24-cv-00150 (N.D. Ill.).

### NINTH DEFENSE

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part by the applicable statute(s) of limitations or repose.

### TENTH DEFENSE

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the applicable limitations period set out in contracts and/or agreements executed by Plaintiffs and/or putative class members.

### ELEVENTH DEFENSE

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of accord and satisfaction to the extent that Plaintiffs have released, settled, entered into an accord and satisfaction, or otherwise compromised their claims.

### TWELFTH DEFENSE

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, to the extent that they have agreed to arbitration or chosen a different forum for the resolution of their claims.

## THIRTEENTH DEFENSE

Without admitting the existence of any contract, combination or conspiracy in restraint of trade, and expressly denying the same, Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by Hanna Holdings' right to set off any amounts paid to Plaintiffs by any alleged coconspirator other than Hanna Holdings that has settled, or does settle, Plaintiffs' claims against it.

## FOURTEENTH DEFENSE

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of laches.

## FIFTEENTH DEFENSE

The Complaint should be dismissed or stayed to the extent that Plaintiffs have agreed to prohibit class actions and/or jury trials or have agreed to resolve claims brought here in an exclusive venue other than this Court.

## SIXTEENTH DEFENSE

Plaintiffs' claims and the claims of any putative class members should be dismissed because the damages sought are too speculative and uncertain and cannot be practically ascertained or allocated.

## SEVENTEENTH DEFENSE

The Complaint, in whole or in part, fails to state a claim upon which relief can be granted.

## EIGHTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrines of *res judicata* and/or collateral estoppel.

79

## NINETEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because recovery or relief would unjustly enrich Plaintiffs.

## TWENTIETH DEFENSE

Plaintiffs' claims should be dismissed to the extent that they are barred, in whole or in part, because any claimed injury or damage has been offset by benefits Plaintiffs received with respect to the challenged conduct.

Dated: March 30, 2026

Respectfully submitted,

s/ *David Z. Gringer*

David Z. Gringer*
Emily Barnet*
WILMER CUTLER PICKERING
 HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
david.gringer@wilmerhale.com
emily.barnet@wilmerhale.com

Seth P. Waxman*
Claire M. Bergeron*
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
seth.waxman@wilmerhale.com
claire.bergeron@wilmerhale.com

*Attorneys for Hanna Holdings, Inc.*

*Admitted *pro hac vice*

John R. Brumberg
Pa. I.D. No. 311352
William Pietragallo II
Pa. I.D. No. 16413
PIETRAGALLO GORDON ALFANO
 BOSICK & RASPANTI, LLP
One Oxford Centre, 38th Fl.
Pittsburgh, PA 15219
(412) 263-1836
JRB@Pietragallo.com
WP@Pietragallo.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 30, 2026, I caused the foregoing to be served via electronic mail on all counsel of record.

/s/ *David Z. Gringer*
David Z. Gringer